## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO.

**LATOYLA YASHEEN COOPER-LEVY,**
**PHILLIP SYLVERIN, SHERMAN RIVERS,**
**JOSEPH SIMMONS,**

      **PLAINTIFFS,**

**v.**

**CITY OF MIAMI,**

      **DEFENDANT.**

_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

### Preliminary Statement

1.     For two decades, the City of Miami ("City") was under the Pottinger consent decree, which regulated how the City interacted with its homeless residents. The consent decree was in response to what the City admitted in court was its "practice of criminalizing homelessness and the systematic disposal of homeless persons' property." The City of Miami's Motion for Termination, Or, Alternatively, Modification of the Pottinger Consent Decree ("Motion"), *Pottinger v. City of Miami*, No. 1:88-cv-2406-FAM (S.D. Fla.), Docket Entry ("DE") 566:10. In particular, the consent decree prohibited the City from unlawfully taking personal property belonging to homeless individuals. In 2019, the federal court terminated the consent decree, holding that "the City substantially complied with the Consent Decree's property provisions" by storing and protecting personal property. *Pottinger v. City of Miami*, 359 F. Supp. 3d 1177, 1199 (S.D. Fla. 2019), *aff'd sub nom. Peery v. City of Miami*, 977 F.3d 1061 (11th Cir. 2020). Now,

1

despite its assurances to the court that judicial oversight was no longer needed because the City's "policy of harassment has been replaced with one of compassion," Motion, DE 566:25, the City is routinely seizing and destroying the personal property of its homeless residents.

2.      Plaintiffs Latoyla Yasheen Cooper-Levy, Phillip Sylverin, Sherman Rivers, and Joseph Simmons bring this action to challenge the City of Miami's practice of seizing and destroying the personal property of homeless individuals.

3.      The City conducts sweeps without sufficient notice and in a manner that prevents Plaintiffs from securing their personal property to avoid destruction. These sweeps are still occurring today.

4.      When conducting the sweeps, the City often gives homeless individuals only a few minutes to move their belongings. If the person cannot move their personal property, the City removes and destroys it. If the individual is not present during the sweep, the City removes and destroys the personal property without giving them any means to secure or retrieve their personal possessions.

5.      The City's actions deprived Plaintiffs of personal property critical to their survival, such as government-issued identification documents, medication, and clothing, as well as irreplaceable personal possessions.

6.      The intentional taking and destruction of Plaintiffs' personal property violates Plaintiffs' constitutional right to be free from unreasonable seizure and their right to due process.

7.      Plaintiffs seek injunctive relief enjoining the City from taking and destroying homeless individuals' personal property in violation of the United States Constitution. Plaintiffs also seek a declaratory judgment that the City's policies and practices are unlawful under the Constitution.

8.      Plaintiffs further seek damages resulting from the City's intentional destruction of their personal property.

## Jurisdiction and Venue

9.      This action arises under the Fourth and Fourteenth Amendments to the United States Constitution. The Court has original jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) & (4). Plaintiffs' claims for declaratory relief and injunctive relief are authorized under 28 U.S.C §§ 2201-02 and 42 U.S.C. § 1983. At all times relevant to this action, Defendant and its officers, employees, and agents acted under color of state law.

10.     Venue is proper in the Southern District of Florida, Miami Division, pursuant to 28 U.S.C. § 1391(b). All the acts and omissions identified in this complaint occurred in the City of Miami, Miami-Dade County, Florida, which falls within the Miami Division of the Southern District of Florida.

## Parties

11.     Plaintiff Latoyla Yasheen Cooper-Levy is a resident of Miami and homeless at all relevant times.

12.     Plaintiff Phillip Sylverin is a resident of Miami and homeless at all relevant times.

13.     Plaintiff Joseph Simmons is a resident of Miami and homeless at all relevant times.

14.     Plaintiff Sherman Rivers is a resident of Miami and homeless at all relevant times.

15.     Defendant City of Miami is a municipality, duly organized and existing under the laws of the State of Florida, with the capacity to sue and be sued.

### Factual Allegations

### Background

16.     Most of the unsheltered individuals in Miami-Dade County live in the City of Miami. The Point-In-Time census conducted by the Miami-Dade County Homeless Trust in January 2021 found 892 unsheltered individuals, and 555 of them lived in the City of Miami.

17.     The *Pottinger* consent decree required the City to "respect the personal property of all homeless people," including not only "any personal property known to belong to a homeless person," but also "any personal property … readily recognizable as property of a homeless person (i.e., bedding, clothing, or other belongings organized or packaged together in a way indicating it had not been abandoned)." It also required all City departments to "follow their own internal procedures for taking custody of personal property." *Pottinger*, 359 F. Supp. 3d at 1188.

18.     Shortly before the district court terminated the *Pottinger* consent decree in February 2019, the City adopted an Administrative Policy regarding the Treatment of Homeless Persons' Property (APM-1-19). (Exhibit A.)

19.     APM-1-19 applies to all City employees, including outreach workers and public sanitation workers, as well as police officers except in case of conflict with Police Departmental Order 11, Chapter 10. (Exhibit A, at 1.)

20.     Police Departmental Order 11, Chapter 10 ("PDO 11, Ch. 10") instructs officers to "respect the personal property of homeless persons" and further states that "in no event shall any law enforcement officer destroy any personal property known to a homeless person, or readily recognizable as property of a homeless person. (Exhibit B, at 4.)

21.     Once the district court terminated the *Pottinger* consent decree in February 2019, the City was no longer under court enforcement of the consent decree or under court oversight as to how it treats the homeless.

22.     Beginning in early 2021, the City began an aggressive plan to clear homeless encampments within the City of Miami.

23.     The City drafted a "Street Clean Up and Encampment Resource Plan" which proposed to close homeless encampments by conducting ongoing sweeps. (Exhibit C.)

24.     In April 2021, the City Commission enacted a resolution directing the City Manager to facilitate bi-weekly cleanings of homeless encampments.

25.     In September 2021, the City Commission enacted a resolution directing the City Manager to facilitate the cleanings of homeless encampments at least three times a week.

26.     Homeless individuals living on the street often own personal property, including tents, clothing, shoes, personal hygiene products, medication, government-issued identification, and other important documents.

27.     When conducting sweeps, City staff, including those from the Homeless Outreach Team, the Police Department, and Solid Waste, arrive at the encampments along with dump trucks.

28.     The City staff instruct homeless individuals who are present to move their personal property within a few minutes.

29.     Some homeless individuals are not present when the City arrives because they are working, showering, visiting social service agencies, or tending to other matters. These individuals are not given an opportunity to move their personal property.

30.     After giving the homeless individuals a few minutes to move their personal property, the City then removes all personal property remaining at the encampment.

31.     The City often uses a crane to pick up the personal property, places it in the back of a dump truck, and then disposes of the personal property.

**The City's Practice and Custom**

32.     The City's practice and custom of how it treats the personal property of homeless individuals differs from the written policy outlined in APM-1-19 and PDO 11, Ch. 10.

33.      The City provides inadequate notice of the sweeps. The City's inadequacies include: posting notices identifying the date of the proposed sweep, but conducting the sweep on a different day than the one identified on the notice; posting notices that do not include the time of the sweep; posting notices with less than 24 hours' notice; posting notices that do not identify any date of the sweep; and conducting sweeps without any written notice.

34.     It is the City's practice and custom to provide insufficient notice to homeless residents when it conducts sweeps.

35.     The City's practice and custom is to seize and destroy personal property belonging to homeless individuals.

36.     The City does not sort the personal property or attempt to secure personal items such as identification, medicines and eyeglasses, and other small items of importance identified by the homeless person or readily identifiable as vital or significant personal property.

37.     The City does not determine whether unattended items are readily recognizable as personal property of a homeless person.

38.     The City does not determine whether the personal property is contaminated or poses a health or safety hazard.

39.    The City does not have a warrant when it conducts the sweeps. APM-1-19 requires City staff to complete an Inventory Storage Form for any personal property it seizes and attempt to notify the property's owner.

40.    Between January 1, 2021, and April 2022, City of Miami staff only completed two Inventory / Storage Invoices.

41.    Between January 1, 2021, and April 2022, the City of Miami only made one attempt to notify a homeless person that the City had stored personal property and that the owner could pick up the personal property.

42.    The City's practice and custom is to seize and destroy the personal property belonging to homeless individuals, rather than to inventory and store the personal property and provide an opportunity for the owner to recover the personal property.

43.    The City's practice and custom of seizing and destroying personal property erroneously deprives homeless individuals of their personal property.

44.    The City's officials, employees, and agents acted under color of law when they seized and destroyed the personal property belonging to homeless individuals.

## **Destruction of Plaintiffs' Property**

*Latoyla Cooper-Levy*

45.    In May 2021, Latoyla Yasheen Cooper-Levy ("Cooper-Levy") had been living at the homeless encampment located at Northwest 17 Street and 7th Avenue for approximately three years.

46.    One day in May 2021, Cooper-Levy left the encampment to attend orientation for a job to which she had recently been hired.

47.     Cooper-Levy did not abandon her property. Her property was readily recognizable as personal property of a homeless person and was inside her tent, organized in a way indicating it had not been abandoned.

48.     While she was gone, the City conducted a sweep of the encampment.

49.     Cooper-Levy did not receive any notice the City would conduct a sweep on that date and at that time.

50.     When Cooper-Levy returned to the encampment, she found the City had removed her personal property and the personal property of other homeless individuals.

51.     Cooper-Levy's personal property, which was not abandoned, was not contaminated, and did not pose a health hazard or safety issue.

52.     The City destroyed her U.S. passport, birth certificate, Social Security card, identification, telephone, clothing, work uniform, shoes, a sleeping tent, and an urn containing her mother's ashes.

53.     Because the City took her uniform and she was unable to purchase a new uniform, Cooper-Levy lost her job.

54.     After returning to the encampment, Cooper-Levy found a notice from the City under a brick which contained information about how to retrieve stored property.

55.     However, when Cooper-Levy went to the location indicated on the notice, City staff told her they did not have any of her belongings.

56.     The City made no attempt to save items that belonged to her, made no attempt to determine if her property was contaminated or contained dangerous items, and made no offer to store her property. Instead, the City irrevocably seized and destroyed her property.

57.     Cooper-Levy is currently homeless and is fearful that the City will seize and destroy her personal property without notice again.

58.     Cooper-Levy suffered damages from the City's actions, including the loss of her destroyed personal property and garden-variety emotional distress.

*Phillip Sylverin*

59.     In August 2021, Phillip Sylverin ("Sylverin") had been living in an encampment on NW 11th Street near or under the I-95 bridge for approximately 3 years.

60.     Mr. Syvlerin has been homeless for about 4 years.

61.     On or about August 2, 2021, at approximately 9:00 am the City arrived at the encampment and instructed Sylverin to take everything he could carry or it would be thrown out.

62.     Sylverin did not receive any notice the City would conduct a sweep on that date and at that time. He did not know about the sweep until City employees arrived and the City employees only gave him a few minutes to move his property.

63.     Sylverin uses a wheelchair for mobility and he was unable to move most of his personal property within the limited time given by the City.

64.     City employees used a crane to place his personal property into a dump truck including his tent, identification documents, furniture, and family photos. His pet cat was inside the tent when the City placed it in the dump truck and was presumably killed.

65.     Sylverin was unable to carry away or salvage any of his belongings. The only personal property he had left was what he was wearing and his wheelchair.

66.     Sylverin's personal property, which was not abandoned, was not contaminated, nor did it pose a health hazard or safety issue.

67.     The City made no attempt to save items that belonged to him, made no attempt to determine if his property was contaminated or contained dangerous items, and made no offer to store his property. Instead, the City irrevocably seized and destroyed his personal property.

68.     Sylverin is currently homeless and is fearful that the City will seize and destroy his personal property without notice again.

69.     Sylverin suffered damages from the City's actions, including the loss of his destroyed personal property and garden-variety emotional distress.

*Sherman Rivers*

70.     In August 2021, Sherman Rivers ("Rivers") resided in the encampment located under the bridge on NW 11th Street between NW 5th Avenue and NW 3rd Avenue.

71.     Rivers has been homeless for about 30 years.

72.     On or about August 2, 2021, at approximately 9:00 am, the City arrived at the encampment, but Rivers was at work when the City arrived.

73.     Rivers did not abandon his property. His property was readily recognizable as property of a homeless person, and it was organized in a way indicating it had not been abandoned. Most of his personal property was inside his tent.

74.     Rivers did not receive any notice the City would conduct a sweep on that date and at that time.

75.     When Rivers returned to the encampment, he found the City had removed his personal property.

76.     City employees used a crane to place his personal property into a dump truck including his tent, birth certificate, identification, public benefits cards, prescription medications, new clothing, shoes, a bike, toiletries, and $60 in change.

77.     Rivers' personal property, which was not abandoned, was not contaminated, and it did not pose a health hazard or safety issue.

78.     The City made no attempt to save items that belonged to him, made no attempt to determine if his personal property was contaminated or contained dangerous items, and made no offer to store his personal property. Instead, the City irrevocably seized and destroyed his property.

79.     On at least four other occasions, the City has seized and destroyed his personal property while he was at work.

80.     Rivers is currently homeless, and he is fearful that the City will continue to seize and destroy his belongings without notice.

81.     Rivers suffered damages from the City's actions, including the loss of destroyed personal property and garden-variety emotional distress.

*Joseph Simmons*

82.     In August 2021, Joseph Simmons ("Simmons") resided in the encampment located under the bridge on NW 11th Street between NW 5th Avenue and NW 3rd Avenue. He has been homeless for about 3 years.

83.     During a sweep that occurred on or about August 2, 2021, at approximately 9:00 a.m., the City arrived at the encampment and instructed Simmons to take everything he could carry, or it would be thrown out.

84.     City employees threw Simmons' personal belongings into a dump truck, including his tent, clothes, furniture, medication, glasses, dentures, identification documents, coin and stamp collections, and jewelry. Most of his personal property was inside his tent.

85.     Simmons did not receive any notice the City would conduct a sweep on that date and at that time. He did not know about the sweep until City employees arrived and was only given a few minutes to move his property.

86.     Simmons did not have sufficient time to protect his property, and he was unable to salvage any of his belongings. The only personal property he had left was the clothes he was wearing.

87.     Simmons' property, which was not abandoned, was not contaminated and did not pose a health hazard or safety risk.

88.     The City made no attempt to save items that belonged to him, made no attempt to determine if his property was contaminated or contained dangerous items, and made no offer to store his property. Instead, the City irrevocably seized and destroyed his property.

89.     On approximately 19 other occasions, the City has seized and destroyed his personal property.

90.     Simmons is currently homeless and is fearful that the City will seize and destroy his belongings without notice again.

91.     Simmons suffered damages from the City's actions, including the loss of his destroyed personal property and garden-variety emotional distress.

**First Claim for Relief**
Denial of Constitutional Right against Unreasonable Seizure
United States Constitution, Fourth and Fourteenth Amendments

92.     Plaintiffs incorporate and reallege by reference paragraphs 16-91.

93.     Plaintiffs have a right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

94.     Plaintiffs had a clearly established possessory interest in their personal property, and that interest is reasonable and legitimate.

95.     By seizing and destroying Plaintiffs' property, Defendant meaningfully interfered with Plaintiffs' possessory interests and seized Plaintiffs' property in violation of the Fourth and Fourteenth Amendments.

96.     Defendant acted under color of law in destroying Plaintiffs' property.

97.     Defendant's above-described practices and conduct violate Plaintiffs' right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

98.     Defendant has a persistent and widespread practice and custom of seizing and destroying the property of homeless individuals.

99.     Plaintiffs have suffered and continue to suffer irreparable harm for which there is no adequate remedy and law, and they have been directly damaged because of the City's conduct.

**Second Claim for Relief**
Denial of Constitutional Right to Due Process of Law
United States Constitution, Fourteenth Amendment

100.    Plaintiffs incorporate and reallege by reference paragraphs 16-91.

101.    Plaintiffs have a constitutionally protected interest in their personal property.

102.    Defendant seized and destroyed Plaintiffs' personal property with no notice, or with constitutionally inadequate notice.

103.    Defendant has a persistent and widespread practice and custom of seizing and destroying the personal property of homeless individuals without adequate notice.

104.    Defendant seized Plaintiffs' personal property without providing a meaningful opportunity for Plaintiffs to challenge the deprivation of property.

105.    Defendant has a persistent and widespread practice and custom of seizing the personal property of homeless individuals without providing a meaningful opportunity to challenge the deprivation.

106.    Defendant irrevocably deprived Plaintiffs of their personal property by destroying it without constitutionally adequate due process.

107.    Defendant has a persistent and widespread practice and custom of destroying the personal property of homeless individuals without adequate due process.

108.    Plaintiffs have suffered and continue to suffer irreparable harm for which there is no adequate remedy and law and they have been directly damaged by the City's conduct.

109.    Defendant acted under color of law in destroying Plaintiffs' property. Defendant's above-described custom, practices, and conduct violate Plaintiffs' right to due process of law under the Fourteenth Amendment to the United States Constitution.

## **Jury Demand**

Plaintiffs demand a jury trial on all issues so triable.

## **Prayer for Relief**

WHEREFORE, Plaintiffs seek relief from this Court as follows:

A.  Injunctive relief enjoining Defendant from repeating the unlawful policies, practices, and conduct, specifically that Defendant be enjoined from any future confiscation and destruction of Plaintiffs' property absent a lawful justification accompanied by proper notice, a reasonable opportunity to be heard, and other due-process protections;

B.  Declaratory judgment that Defendant's policies, practices and conduct violated Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution;

C.  Damages in an amount according to proof;

14

D. Attorneys' fees and costs as provided by law; and

E. Such other and further relief as the Court may deem just and proper.

Respectfully submitted,


_____/s/_ Jeffrey M. Hearne_____
Jeffrey M. Hearne, Fla. Bar No. 512060
jhearne@legalservicesmiami.org
Jocelyn Armand, Fla. Bar No.44264
jarmand@legalservicesmiami.org
LEGAL SERVICES OF GREATER MIAMI, INC.
4343 W Flagler Street, Suite 100
Miami, FL 33134
Tel. / Fax : (305) 438-2403

Stephen Schnably**
Professor of Law
schnably@law.miami.edu
University of Miami School of Law
1311 Miller Drive, Law Lib. G472
Coral Gable, FL 33146
Tel: (305) 284-4817
Cooperating Attorney, Greater Miami Chapter, ACLU of Florida
** Pro Hac Vice application pending

Jodi Siegel, Fla. Bar No. 511617
Jodi.siegel@southernlegal.org
Chelsea Dunn, Fla. Bar No. 1013541
Chelsea.dunn@southernlegal.org
SOUTHERN LEGAL COUNSEL, INC.
1229 NW 12th Avenue
Gainesville, FL 32601
Tel: (352) 271-8890
Fax: (352) 271-8347

Benjamin Waxman, Fla. Bar No. 403237
bwaxman@royblack.com
Benjiwaxman@gmail.com
BLACK SREBNICK P.A.
201 S. Biscayne Blvd., Suite 1300
Miami, FL 33131
Tel:    305-371-6421
Fax:    305-358-2006
Cooperating Attorney, Greater Miami Chapter, ACLU of Florida

Daniel Tilley, Fla. Bar No. 102882
dtilley@aclufl.org
ACLU FOUNDATION OF FLORIDA
4343 West Flagler St., Suite 400,
Miami, FL 33134
Tel: (786) 363-2714

| POLICY NUMBER:<br><br>**APM- 1- 19**<br><br>DATE:<br>1/14/2019<br><br>ISSUED BY:<br><br>*Emilio T. Gonzalez*<br>City Manager/Designee<br><br>SIGNATURE | **CITY OF MIAMI**<br><br><br><br>**ADMINISTRATIVE POLICY** | REVISIONS |  |
|---|---|---|---|
|  |  | REVISED SECTION<br>Created | DATE OF REVISION<br>01/14/2019 |

---

**SUBJECT:**     **TREATMENT OF HOMELESS PERSONS' PROPERTY**

---

**Purpose**

The purpose of this policy is to establish a standard practice for the handling, temporary storage, and disposition of property belonging to homeless persons.

**Scope**

This Administrative Policy shall apply to all City employees, whether probationary, classified, unclassified, executive, temporary, or part-time, except employees of the Miami Police Department shall be bound by and follow the procedures set forth in Departmental Order 11 Chapter 10, or any existing Departmental Order addressing the treatment of homeless persons' property, to the extent there is any conflict between this Administrative Policy and any Departmental Order.

**Definitions**

A. "Contaminated or Dangerous Items" are those items that present a hazard to the health and safety of City Personnel or the public. These items include, but are not limited to, hazardous materials, flammable materials (e.g., propane tanks), fabric contaminated with human or animal waste, fabric contaminated with flammable substances (e.g., oil or petroleum products), wet fabric (mold hazard), etc.

B. "Homeless Person" shall mean a person who lacks a fixed, regular, and adequate night-time residence and has a primary night-time residency that is: (a) supervised publicly or privately operated shelter designed to provide temporary living accommodations; (b) an institution that provides a temporary residence for individuals intended to be institutionalized; or (c) a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings. The term "homeless person" does not include any person imprisoned or otherwise detained pursuant to an Act of

**EXHIBIT A**

City of Miami                                      APM 1-19: Treatment of Homeless Persons' Property

Congress or a state law.  42 U.S.C. §11301, et seq. (1994).

C. "Homeless Person's Property" or "Homeless Property" shall mean personal property known to belong to a homeless person, or readily recognizable as property of a homeless person (i.e., bedding or clothing and other belongings organized or packaged together in a way indicating it has not been abandoned).

---

**Procedures**   I.   **General procedures:**
   1. City Personnel will attempt to secure personal items such as identification, medicines and eyeglasses and other small items of importance identified by the Homeless Person or readily identifiable as intimate personal property.
   2. Notwithstanding anything herein:
       a. Homeless Property that is contaminated or otherwise poses a health or safety concern to City Personnel or to members of the public may be disposed of.
       b. The City is not responsible for taking custody of mattresses, upholstered furniture, or other bulky items on public property, and may dispose of those items.
       c. Nothing herein prevents the disposal of items reasonably belied to be refuse.
       d. The City may prohibit the presence of unattended property in specified areas where the presence of such unattended property poses a threat or risk to the public health of safety.

   II.  **Tagged/Labeled Homeless Persons' Property:**
   1. In order to aid the City in its ability to readily identify and handle the property of homeless persons, the City requires that all homeless individuals who wish to identify their personal property place a tag or label with their name and contact information (telephone and/or email) on the outside of any such property, such that City employees can easily identify the property as belonging to a specific individual and will have a means of contacting that individual with regard to any actions taken as to that property.
   2. Whenever a City employee encounters unattended but tagged/labeled homeless persons' property, the following procedure shall be employed:
       a. Any personal items such as identification, medicines and eyeglasses and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel, and a copy of that

City of Miami                                                    APM 1-19: Treatment of Homeless Persons' Property

form will be provided to the Homeless Person by e-mail (if provided/available).

b. Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

c. Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding, photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel, and a copy of that form will be provided to the Homeless Person by e-mail (if provided/available).

d. Whenever possible, City personnel will photograph the homeless property prior to taking action.

e. Following any such action described above, the City will attempt to contact the homeless individual identified on that tag/label to inform them of the disposition of their unattended property, and to notify them of any stored property and the method through which the homeless person can claim that property. Three (3) attempts at contact will be made. The City shall document any such attempts.

III. **When a Homeless Person accepts voluntary placement in shelter:**

1. When a Homeless Person accepts placement in a shelter, City personnel will request the Homeless Person to secure the personal items that they wish to take to shelter with them. These items should include, at a minimum, any identification, medication, eyeglasses, and electronics in the homeless person's possession.

2. City personnel will request that the Homeless Person identify any of their remaining Homeless Property that they are willing to voluntarily discard. When a homeless person voluntarily agrees to discard property, they will be asked to sign a Waiver for Voluntary Disposal of Property Form.

3. Any remaining Homeless Property that cannot be taken to the shelter, which is not contaminated or does not otherwise pose a health hazard or obvious safety issue, will be documented, secured, and stored by City personnel. The Homeless Person will be required to sign an Inventory Storage Form, and a copy of that form will be provided to the Homeless Person. Any such stored property will be held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed.

4. Whenever possible, City personnel will photograph the homeless property prior to taking action.

IV.    **During a Cleanup operation:**
1.    All Cleanup operations will be coordinated by the Department of Human Services.
2.    City personnel will place notices of Cleanup operation, at least seven (7) days prior to the cleaning date. The notice will inform individuals of the date of cleaning and will provide the phone number and address of the Veterans Affairs/Homeless Assistance Program Division in the Department of Human Services, where any collected Homeless Property can be retrieved.
3.    Whenever possible, City personnel will photograph the Homeless Property prior to the Cleanup operation.
4.    Cleanup operation when the Homeless Person is present:
    a.  City Personnel will inform the Homeless Person that the Cleanup is about to commence and request that they relocate themselves with their Homeless Property. These items should include, at a minimum, any identification, medication, eyeglasses, and electronics in the homeless person's possession.
    b.  City personnel will request that the Homeless Person identify any of their remaining Homeless Property that they are willing to voluntarily discard. When a homeless person voluntarily agrees to discard property, they will be asked to sign a Waiver for Voluntary Disposal of Property Form.
    c.  Any remaining Homeless Property that cannot be left on the site, which is not contaminated or does not otherwise pose a health hazard or obvious safety issue, shall be documented, secured, and stored by City personnel. The Homeless Person will be required to sign an Inventory Storage Form, and a copy of that form will be provided to the Homeless Person. Any such property will be held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed.
5.    Cleanup operation when the Homeless Person is not present:
    a.  Any personal items such as identification, medicines and eyeglasses and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.
    b.  Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.
    c.  Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding,

photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.

d. If the property was tagged/labeled, the City will attempt to contact the individual identified as the property owner in the manner set forth in section II, above. If the property was not tagged/ labeled, the City will post a notice at the location of the property disposition, notifying the potential owner of the property that their property was either discarded or stored, and informing the reader of how to contact the City to discuss that property.

V.    **Procedures for unattended and unidentified (untagged/unlabeled) Homeless Property:**

1. The Department of Human Service shall be contacted prior to City personnel taking action with respect to Homeless Property.

2. Any personal items such as identification, medicines and eyeglasses and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.

3. Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

4. Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding, photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days. An Inventory Storage Form will be completed by City personnel.

VI.   **Storage Procedures**

1. The City homeless property storage site will be accessible by public transit or other means accessible to persons with low income.

2. When Homeless Property is collected by City personnel it should be labeled with the date of its removal and location from which it was removed to assist with its being reclaimed by its owners. Bags may be used to keep items collected from the same sites together.



**City of Miami**
**Street Clean Up & Encampment Resource Plan**
2021

EXHIBIT C

**Mission and Vision**

*To develop safe procedures so that communities in all five (5) districts are free of homeless encampments and debris while assisting those struggling with homeless by offering an easy transition to shelter and eventually more permanent housing.*

## Encampments and Homeless Clean Ups

**POPULATION – All Individuals and Families living on the street**

The 2021 census counted 555 homeless individuals living on the street in the City of Miami, a 15% decrease from the 2020 count at 654.

The population of homeless persons in downtown Miami and in the City overall fluctuates throughout the year based on various factors. What remains a constant challenge, however, is the debris, trash and solid waste left behind by homeless persons who live on the streets and other public areas of the City not intended for human habitation.  This includes human waste. The presence of human waste leads to an unsanitary environment and may also provide an environment for the spread of communicable diseases for both the homeless and surrounding residents and businesses.

The City of Miami currently provides homeless individuals assistance with placement into appropriate housing and/or shelter. The program provides outreach, assessment, placement, information, referral and transportation services to homeless individuals and families.  The program also employs and trains formerly homeless men and women through the Downtown Development Authority (DDA) and a service provide and expect to hire 6-10 individuals to be involved in the clean-ups.  All clean-up efforts will include the continuation of the outreach and resources provisions mentioned.

**PROJECT OVERVIEW**

To address these concerns, the City coordinates (and continue to coordinate) clean-ups in collaboration with other City Departments. The expanded and enhanced clean-ups include participation from:

- City of Miami of Human Services Clean Up Coordinator (FTE)
- City of Miami Homeless Outreach (FTE)
- City of Miami Neighborhood Service Centers (FTE)
- City of Miami Department of Solid Waste (FTE)
- City of Miami Police
- City of Miami Code Compliance (FTE)
- City of Miami Department of Innovation and Technology (as needed)
- City of Miami Communications (as needed)
- City of Miami Commissioners Offices (as needed)
- The Homeless Trust & Providers (Camillus House, Chapman House, Lotus House, Citrus Health -as needed)
- Miami-Dade Florida Department of Health (as needed)
- City of Miami Downtown Development Authority (as needed)

2

**PROTOCOL**

The City of Miami has identified homeless hot spots in the City of Miami. Each hot spot will consist of two clean ups per week.  During the clean ups overseen by the City's new Clean Up Coordinator, Homeless Outreach (Green Shirts) will offer shelter and resources to all individuals at each hot spot. Miami Police will address public access and enforcement. Department of Solid Waste will assist with street clean up and bulk pick up.  The Department of Human Services will also deploy the Neighborhood Service Center teams to assist residents and business owners. The clean-ups will be conducted in accordance with the requirements of APM 1-19. The Department of Human Services will maintain a list of homeless encampment hot spots. (See Appendix A)

**Resources and Specialized Teams include the following:**

**Department of Human Services**

- 1 Clean Up Coordinator
- 4 Homeless Outreach (Green Shirts)
- 1 Neighborhood Service Center Administrator (or equivalent from Commissioner's Office)

**Department of Solid Waste**

- 6 Staff (Waste Collectors)
- 3 Service Center Pick-up Trucks
- Sanitation Truck + Operator
- HAWK (combination crane and dump truck) + Operator
- Street Sweeper + Operator
- Water Truck + Operator
- 6 Sanitizers + Equipment

**Police & Code Compliance**

- 2 Officers (Neighborhood Resource Officers)
- 1 Code Compliance Officer

**PLAN**

Schedule: Clean ups will be conducted 2 times per week by location or as frequently as needed.  The required signage to alert the hot spot area will be posted seven (7) days prior to the clean-up. DHS Clean Up Coordinator is tasked with the responsibility of coordinating all clean ups related to homelessness in the City of Miami and documenting the posting of the notices. This employee is responsible for scheduling and coordinating all partners, teams and resources (internal and external).  This individual will attend all clean ups and supervise. Green Shirts will visit the site daily over the course of the seven (7) day posting and provide assistance.  We are recommending hiring two case managers (Licensed Clinical Social Workers, preferred). The sequencing of sites is prioritized by the negative impact they represent to the greatest number of residents and businesses in the area.  Teams will be deployed based

on need. It is recommended that a given area is completely cleared of encampments before the next area is addressed. All clean-up sites requiring heavy machinery will be conducted on Wednesdays, with follow up visits within the following week. The sites listed below are the first set of clean ups of major encampments (please see Appendix B).

|   | Site | Date |
|---|------|------|
| 1 | Overtown (NW 17 Street) | Wednesday, Feb 10, 2021 |
| 2 | Overtown (NW 13 Street & NW 11 Street) | Wednesday, Feb 17, 2021 |
| 3 | Area around Miami Rescue Mission Building | Wednesday, Feb 24, 2021 |
| 4 | Approach bridge between Downtown and Flagler | Wednesday, March 3, 2021 |

On the assigned day, significant number of beds through various shelter options will be made available. Outreach workers will arrive at the site in the morning and announce the start of the cleanup. Individuals will be interviewed by outreach workers, and basic information will be requested and documented.  All individuals will be given a choice to be transported to shelter, process for relocation to another city (if they have relatives or friends who would accept them) or simply told they can no longer occupy the public-right-of-way or private property.  Contaminated items will be discarded by the waste collectors.

Once the individuals have cleared the area and contaminated items are discarded, the area will be swept and properly disinfected for general and public use standards.   These areas will be monitored by the cleanup coordinator, outreach workers and police officers to ensure these sites are not repopulated.

Homeless Trust Continuum of Care (CoC)

The Homeless Trust will work to direct existing resources for homeless individuals and serve as an enhancement to clean-ups and large group feedings. These are in locations where City of Miami Green Shirts are deployed regularly. These services targeted to unsheltered persons experiencing homelessness include:

- Homeless Engagement and Outreach
  - Information regarding housing programs and opportunities offered through the CoC
  - Outreach staff for Homeless Management Information System input, administration of Vulnerability Assessments and Homeless Verifications
  - Information on area services for showers, mail, meals
  - Identification Assistance
  - Information on services targeting homeless sub-population (domestic violence, youth, veterans)
  - Distribution of Homeless Helpline cards
- Health Services
  - Providing educational and prevention materials:
    - COVID-19 social distancing recommendations, prevention, signs and symptoms
    - Hepatitis A
    - West Nile Virus
    - Needle Exchange

- ▪ Information on area community health centers
  - o Participation of partners including Camillus Health Concern, IDEA Exchange, Florida Department of Health in Miami-Dade providing:
    - ▪ Distribution of disease prevention supplies as available (face coverings, wipes, hand sanitizer)
    - ▪ COVID-19 Screening and Testing
    - ▪ Hepatitis A Vaccination
    - ▪ HIV Testing
    - ▪ Mobile Health
- • Mental Health and Substance Services
  - o Information on area community mental/behavioral health centers, suicide prevention, etc., mental health and substance abuse counseling
  - o On site mental health and substance abuse counseling
- • Legal Services

Homeless Trust Community Education

The Homeless Trust offers web-based orientations and educational opportunities for community groups and individuals:

- • The CoC Homeless System of Care
  - o History, Structure and Accomplishments to Date
  - o Miami-Dade CoC Housing Strategies to End Homelessness
  - o Housing First Approach
  - o Prevention
  - o Diversion
  - o Outreach and Specialized Outreach
  - o Emergency Shelter
  - o Landlord Recruitment and Retention through the RentConnect Program
  - o Rapid Re-Housing
  - o Permanent Supportive Housing
- • Nutritional Needs of Houseless Persons and Healthy Meal Planning for Street Feedings
- • Trauma-Informed Care and Harm Reduction

Law Enforcement: Miami Police will be present at all clean ups.  Law enforcement will patrol areas after clean ups are completed. Miami Police and DHS will coordinate the attendance of Homeless staff at police roll calls to update police officers on the homeless services currently available. Police can recommend clients to the overnight bed.  Clients in overnight beds will have priority to extended beds.

Sanitation: Six (6) staff designated to key areas (Overtown, Downtown and Little Havana).  Staff will be equipped with chemical resistant safety suits and equipment to sanitize streets.  They will oversee removing of human waste, as well as eliminating odor from the streets and sidewalks through sanitation efforts.

Cameras: Solid Waste will work with DHS and provide ten (10) cameras.  Solid Waste, Miami Police and DHS will coordinate the monitoring of camera footage for illegal dumping and related Solid Waste

violations.  The purpose of the cameras is to (1) deter and detect illegal dumping around homeless encampments, (2) to identify unpermitted feeders in accordance with Large Group Feeding Ordinance, and (3) to detect drug use and drug sales in and around encampments. The cost involved with this setup includes installation and monitoring service. This cost is included in the overall clean-up budget. Locations include (please see Appendix B):

**DOWNTOWN**
- SW 2nd Street from the Warf to North Miami Avenue
- Parking lot on Miami River Drive near MRC and around FPL building
- SW 1 Street Parking lot West of Macy's
- Flagler Street and NW 1 Street West Bound

**OVERTOWN**
- NW 10/11 Streets between 4 and 6 Avenue
- NW12 Street between 1 Avenue and 2 Avenue
- NW 17 Street between NW 4 and 6 Avenue
- NW 13/14 Streets between 1 and 2 Avenue.

**LITTLE HAVANA**
- SW 5th and SW 6th Street (Jose Marti Park area)
- Location TBD

Placements: Homeless Outreach "Green Shirts" will continue offering shelter and resources to homeless individuals and families.  If clients refuse, they are required to move from the clean-up location.

Partner Engagement: Continue to further engage FDOT and Miami Dade County regarding all appropriately properties in the City of Miami regarding homeless individuals and encampments around clean ups. Engage City of Miami Department of Public Works and Resilience to identify locations where foliage, trees, art, and more may be added to improve the areas.

Property: As per Executive Order, we will follow City Manager's APM regarding personal property.

Shopping Carts: Police will enforce Florida State Statute 506.509 , which states that "Any person who is in possession of a shopping cart... with a registered name or mark shall be presumed to be in possession of stolen property and is guilty of a misdemeanor of the first degree."

Signage: Signs will be posted throughout the City that provide notice of the Large Group Feeding Ordinance, as well as signs that relate to ADA compliance and the blocking of sidewalks within the City of Miami. The Large Group Feeding permit allows the City to manage large group feedings in our public spaces with advance notice through printed signage (installed by Public Works), ensuring a safe and sanitary environment for our citizens. Signage is in accordance with City Code 54.9 and Miami21 10.1.3 SIGNS EXEMPTED FROM PERMIT REQUIREMENTS. Police and Code will be deployed together to the following areas where group feedings are common to conduct enforcement:

**DOWNTOWN**
- SW 2nd St between second Ave and North River Drive
- SW 2nd Street and 3rd Ave
- SW 1st Street along 1st Ave to Miami Ave

6

- S Miami Ave and 2nd Street, next to FedEx
- Bayfront Park
- North Miami Ave and 5th Street
- NE 6th Street and Miami Ave, around Christ Fellowship
- Flagler Street under I-95
- South and West of the MDC Government Center

**OVERTOWN**:
- NW 13th St and 1 Ct
- NW 14th St and 1st Ct
- NW 10th Ave and 4th St
- NW 10th Ave and 5th St
- NW 17th St and east of 7th Ave

**ALLAPATTAH**
- NW 17th St west of NW 7th Ave (Mother Teresa)
- NW 7 Ave under I-395
- Little Havana sites:
- SW 6th St and 3rd – 4th Ave

City of Miami Code Compliance, Miami Police and an accompanying Homeless outreach staff (Green Shirt) will inspect identified areas in residential and commercial downtown and will issue violations to property owners as needed if litter is left on property due to large group feedings.

A violation of the Large Group Feeding Ordinance shall be enforced jointly by Miami Police and Code Compliance against the individual or organization by the issuance of a civil code enforcement fine in the amount of $250.00 for a first occurrence and a civil fine in the amount of $500.00 for each subsequent occurrence in accordance with Chapter 2, Article X of the City Code. Repeat violations in anyone (1) calendar year may also subject the repeat violator to being precluded from receiving Large Group Feeding permits for a period of up to twelve (12) months. These procedures are to be determined.

**DUTIES**

**City of Miami - Homeless Outreach**
- The division of Homeless Outreach will post notices in the areas of the cleanup at least seven (7) days in advance and reserve beds to offer homeless individuals who may be impacted.
- Green Shirts will visit the site daily over the course of the seven (7) day posting and provide assistance.  Homeless Outreach personnel are dispatched daily, no fewer than 2 green shirts. We would like at least two green shirts deployed to homeless encampment clean-up sites on a permanent basis, split shifts (8am-6pm and 12pm-9pm). Homeless Outreach will invite agencies to participate (drug and alcohol partners, mental health partners).
- Homeless Outreach will provide guidance and instruction to assist with clean-up activities with Solid Waste and Neighborhood Service Centers.
- Homeless Outreach will properly handle, temporary store and/or dispose of property belonging to homeless persons in accordance with Administrative Policy - Treatment of Homeless Property dated 1/14/2019.
- Homeless Outreach's task force around mental health/substance abuse will work with providers. Task force will continue weekly meetings to discuss cases and patrol every morning.

**City of Miami Code Compliance**
- City of Miami Code Compliance will inspect identified areas in residential and commercial properties throughout the City of Miami.
- City of Miami Code Compliance will issue violations to property owners as needed.

**City of Miami – Solid Waste**
- The Solid Waste Department will provide an initial clean up per location using heavy equipment.
- Department of Solid Waste will also pressure wash. The Department will also work at night due to traffic safety concerns.
- The Department will consider additional cleanup events on Saturdays. This is with the goal of monitoring if the area remains clean as needed.
- The goal for the department is to address public health and sanitary concerns including but not limited to fecal matter, issues relating to the homelessness population, and litter.
- City of Miami Sanitation Code Enforcement Inspectors will educate local property owners to use environmentally safe chemicals that can be recommended to property owners for the maintenance of adjoining Public Right of Way (PROW) areas.

**City of Miami – Police Department**
- Police will accompany the clean-up detail.
- Police will patrol areas post clean up. When debris of encampments are beginning to form, Police will contact Homeless Outreach and Clean Up Coordinator to deploy appropriate teams.
- Police will take law enforcement action when appropriate.
- Police will address individuals found in a state of crisis through the Baker Act or Marchman Act when appropriate.

**City of Miami Neighborhood Service Centers**
- Neighborhood Service Centers will work with scheduling clean ups and be present at clean ups.
- All Centers with Pick-up Trucks and Waste Collectors will be deployed during clean-ups all over the City where homeless clean ups are scheduled.

**City of Miami Office of Communications**
- Communications will assist in public relations efforts through a joint Communication Plan.

**City of Miami Department of Innovation and Technology**
- The Department of Innovation and Technology will explore using 311 as a reporting mechanism for residents and business owners to report any concerns.
- The Department will also explore using 311 for homeless individuals who are seeking shelter.
- The Department, with DHS, will explore contractual services for a call center to assist our homeless population.

8

**PROPOSED BUDGET**

**Twelve (12) month Budget**

| Department | Description | Amount |
|---|---|---|
| Homeless Outreach | Two (2) Case Managers Salaries (Licensed Clinical Social Worker)<br><br>Assists in providing counseling services to mental health and substance abuse affected parties to decrease undesirable influences and outcomes. Assists in altering attitudes and behaviors of clients and makes recommendations for effective remedies. Works with assessment, placement, and case management staff along with clients and external resources to assist in developing Individual Service Strategies as appropriate. | **$99,800.00**<br>(Salaries) |
| Homeless Outreach & Solid Waste | 10 cameras<br><br>Installation, Surveillance & Software | **$5,826.00**<br>(Surveillance & Software $4,326.00<br>Installation $1,500.00) |
| Solid Waste | Six (6) Designated Sanitizing Staff and all PPE and equipment<br><br>Staff will be equipped with chemical resistant safety suits and equipment to sanitize streets. They will oversee removing of human waste, as well as eliminating odor from the streets and sidewalks through sanitation efforts. | **$211,551.11**<br>(Salaries $206,000.00<br>PPE & Equipment $5,551,11) |
| Solid Waste | Three (3) Equipment Operators Overtime Salaries | **$87,328.80** |
| Solid Waste | Equipment Costs<br><br>(Water Truck, Rear Loader, Street Sweeper, Hawk) | **$174,454.80** |
| Solid Waste | Six (6) Waste Collectors<br><br>Dedicated to Homeless Encampment Clean-ups and deployed throughout the entire City to only Homeless Encampment Sites | **$206,000.00**<br>(Salaries) |
| Solid Waste | Supervisor<br><br>Dedicated to Homeless Encampment Clean-ups | **$48,531.60**<br>(Salaries) |
| | | **$833,492.31** |

# __Homeless Clean Up Log__

|  |
|---|
|  |

Location

|  |
|---|
|  |

Initial Cleanup Date

|  |
|---|
| Yes / No |

Heavy Equipment/Machinery Needed

|  |
|---|
|  |

Start Time

|  |
|---|
|  |

End Time

## Please check organization and list contact:

☐ City of Miami Homeless Outreach                              _____

☐ City of Miami Neighborhood Service Centers              _____

☐ City of Miami Department of Solid Waste                   _____

☐ City of Miami Police                                                  _____

☐ City of Miami Code Compliance                                 _____

☐ City of Miami Commissioners Offices (District and Contact) _____

☐ Other City of Miami Departments                             _____

☐ Miami-Dade Homeless Trust                                      _____

☐ Downtown Development Authority                             _____

☐ Miami-Dade Florida Department of Health                 _____

☐ Providers (Organization and Contact)                       _____

|  |
|---|
|  |

Date of Follow Up Cleanup #1

|  |
|---|
|  |

Date of Follow Up Cleanup #2

10

**APPENDIX A**

**DHS Neighborhood Service Center Homeless Locations**

| | |
|---|---|
| **OVERTOWN** | |
| N.W. 10-11th Streets between N.W. 4th Avenue-6th Avenue | |
| N.W. 17th Street starting at N.W. 5th Avenue | |
| N.W. 13th Street and N.W. 1st Court | |
| Residential location N.W. 12th Street and along areas between N.W. 1st Court and 2nd Avenue | |
| N. Miami Avenue between N.W. 20-22 Streets | |
| **LITTLE HAITI** | |
| 551 NW 71st (Nu-Way Building) | |
| 80th and NE 3rd Avenue | |
| 79th St and NW 1st Pl (next to the laundromat) | |
| NE 54th St and N. Miami Avenue/3 NE 54th Street (Rear of Family Dollar) | |
| 7848 NW 1st Avenue (Empty Lot) | |
| NW 79th St and I95 (Under the overpass) | |
| 180 NE 64th Street (Empty lot) | |
| **WYNWOOD** | |
| 300 NW 29th Street | |
| 2010 NW 1st Avenue/2010 NW 1st Ct./2101 NW Miami Ct./2101 NW 1st Avenue/2100 NW Miami Ct. | |
| 2136 NW 1st Avenue | |
| 2145 NW 2nd Avenue | |
| 80 NW 20th Street | |
| 301 NW 37th Street | |
| 51 NW 27th Street | |
| **MODEL CITY** | |
| I-95 NW 62nd Street (Underpass) | |
| Corner of NW 61st Street and NW 7th Avenue (Carver Theater) | |
| 6820 NW 17th Avenue | |
| **COCONUT GROVE** | |
| Alice Wainwright Park (2845 Brickell Avenue) | |
| Peacock Park (2820 McFarlane Road) | |
| Grand Avenue between Hibiscus Street thru Douglas Road (SW 37 Ave) | |
| **DOWNTOWN** | |
| SW 1st Ct and SW 2nd Street | |
| SW 2nd Avenue and SW 2nd Street | |
| SW 2nd St and N. River Drive | |
| North Miami Avenue and SW 1st and 2nd Street | |
| SW 1st Court and S. Miami Avenue and SW 1st Street | |
| South Miami Avenue and SW 3rd Street | |
| **BRICKELL** | |
| SW 2nd to 4th Avenue and 6th Street (location goes up to the SW 2nd Avenue bridge) & entrance to SW 7th St. | |
| SW 3rd to 4th Avenue and 5th St/SW 3rd to 4th Avenue and 7th Street/SW 3rd Avenue and 10th to 11th Street | |
| SW 2nd to SW 3rd Avenue and SW 8th Street | |
| SW S. Miami Court and SW 26th Road | |

**APPENDIX B**





**PATROL**                                          **Departmental Order 11**
                                                              **Chapter 10**

**HOMELESS**

Section

10.1   Policy
10.2   Organization
10.3   Responsibility
10.4   Mission
10.5   Definitions
10.6   Procedures
10.7   Property

**10.1   POLICY:**  It is the policy of the City of Miami Police Department to ensure that personnel are sensitive to the needs and rights of our Homeless population, as well as knowledgeable of the department's arrest policies concerning such persons.

**10.2   ORGANIZATION:**  The City of Miami has a policy that we shall not arrest visibly homeless persons who live in public for performing acts, criminalized as misdemeanors, such as sleeping, eating, lying down, or sitting in public, when there is no available shelter.  It is not a crime to be homeless.  This policy should not be construed as protecting persons (whether homeless or not) from arrest for engaging in any other type of criminal activity.

**10.3   RESPONSIBILITY:**  It is the responsibility of all City of Miami Police Officers, whether working in an on-duty or off-duty capacity, to abide by this Departmental Order.

**10.4   MISSION STATEMENT:**  We must continue to vigorously do our job and enforce the law's which were enacted to ensure a safer community, while extending compassion for homeless persons.

**10.5   DEFINITIONS:**

**10.5.1**   A "homeless person".  An individual is considered a "homeless person" if he or she " lacks a fixed, regular and adequate night time residence and has a primary night time residency that is:  (a) a supervised publicly or privately operated shelter designed to provide temporary living accommodations; (b) an institution that provides a temporary residence for individuals intended to be institutionalized; or (c) a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings.  The term "homeless person"  does not include any person imprisoned or otherwise detained pursuant to an Act of Congress or a state law".  The term "homeless person" does not include any person identified as a registered sex offender under section 775.21 Fla. Stat., as amended, or sexual predator under section 775.215 Fla. Stat., as amended, or sections 21-277 to 21-2185 Miami-Dade County Code.  An officer is allowed to make reasonable inquiry to make this determination.

**10.5.1.2**   An "available shelter" means a shelter for a period of at least, with a bed, or a mat at least (3) inches thick, at no cost to the homeless person, within the territorial boundaries of the City or within one mile thereof, or if agreed to by the homeless person, within Miami-Dade County, that treats homeless persons with dignity and respect, imposes no religious requirements, and unless agreed to

07/14

EXHIBIT B

by the homeless person, does not impose involuntary substance abuse or mental health treatment as a condition for shelter.

**10.5.1.3   "PUBLIC PROPERTY":**  "Public Property" includes all property owned by any governmental entity (federal, state or local).  "Public Property" shall not include property which has become subject to

**10.5.1.4**   A leasehold interest, management agreement or other possessory interest of a nongovernmental lessee, licensee or manager, which is operated as a private business.  A public park shall always be public property within the meaning of this definition.

**10.5.1.3.1 "EXEMPT PUBLIC PROPERTY":**   The following are "exempt public properties"  (1) City of Miami, City Hall, 3500 Pan American Drive; (2) Miami Riverside Center, 444 SW 2nd Avenue; (3) City of Miami Fire Stations; (4) City of Miami Police Stations and (5) City of Miami NET (Neighborhood Enhancement Team) Offices.  A homeless person's presence in the interior of an "exempt public property" is not a trespass within the meaning of 10.6.2.3.3 (11) where the homeless person's activities are reasonably related to the governmental business activities normally performed within these physical structures.

**10.6   PROCEDURES:**

**10.6.1** An officer always has the right to approach any individual including a homeless person to allay any suspicions an officer may have about the individual, and ascertain that no criminal activity is occurring.

**10.6.2**   At any time, and for any reason a law enforcement officer may approach a homeless person, who has not been observed engaging in any criminal conduct, to advise him or her of shelters, services, or assistance which are currently available.  The officer may also call for the assistance of an outreach worker.  The homeless person may or may not accept the advice or referral or he/she may even walk away from the area prior to the outreach worker/arriving.  The rationale is to pro-actively have an outreach worker address the homeless person with referrals.  If such an approach and advice occurs by a law enforcement officer, that officer shall complete a Field Information Card, or its electronic equivalent, with the facts of the incident, the referral and indicate at the top of the card "Homeless".   The officer will turn the pink Field Information Card, or its electronic equivalent, in to his supervisor.  The supervisor will check the Field Information Card for completeness, sign the top right hand corner with his name and IBM number and deliver to the Records Unit daily.  In the case of a homeless person who refuses and who has refused assistance in the past thirty (30) days, a new Field Information Card, or its electronic equivalent, is not required to be completed for each encounter as long as the prior-filed Field Information Card, or its electronic equivalent, is update with the new date of contact with the homeless person.    The pink Field Information Card, or its electronic equivalent, shall be filed with the Records Unit within the Miami Police Department.

**10.6.2.1**   When a homeless person meets the criteria for involuntary examination under Florida Law (§394.463, Fla. Stat., as amended) "Baker Act" a law enforcement officer may, in his discretion, take the homeless person to the nearest receiving facility for involuntary examination.  If the homeless person is taken to such a receiving facility for involuntary examination, a copy of the "Baker Act Forms" shall be filed with the nearest receiving facility.   In addition, the officer shall complete an Field Information Card, or its electronic equivalent, The officer will turn the pink Field Information, or its electronic equivalent, card in to his supervisor.  The supervisor will check the card for completeness, sign the top right hand corner with his name and IBM number and deliver the Field Information Card to the Records Unit daily.

**10.6.2.2**   If a homeless person is observed violating a "Life Sustaining Conduct" misdemeanor, (as listed under 10.6.2.3.3) the law enforcement officer may exercise the following courses of conduct.

**10.6.2.3**   If an officer determines that an individual is a homeless person and through his observation determines that a "Life Sustaining Conduct" misdemeanor (as listed under 10.6.2.3.3) is occurring in his presence, he must first check to see if there is an available shelter.   The officer will contact the communications unit to ascertain if there is an available shelter.   If there is an available shelter, the officer will offer the shelter to the homeless person, if the homeless person chooses shelter rather than arrest.   An Outreach Team will respond to transport the homeless person to the shelter.   If the Outreach Team (if available) is unavailable the law enforcement officer will transport the homeless person.   If the homeless person is transported to a shelter, the officer will complete a Field Information Card, or its electronic equivalent, with the facts of the incident and indicate at the top of the card "Homeless". The officer will turn the pink Field Information Card in to his supervisor.   The supervisor will check the card for completeness, sign the top right hand corner with his name and IBM number and deliver the Field Information Card, or its electronic equivalent, to the Records Unit <u>daily</u>.

**10.6.2.3.1**   If the officer has probable cause to arrest the homeless person for a "Life Sustaining Conduct Misdemeanor," (as they are listed under 10.6.2.3.3) and there is an "available shelter" and the homeless person refuses the shelter, or if the sole available shelter at the time is a shelter from which the homeless person is barred from because of his own purposeful misconduct, criminal or otherwise, which occurred at that shelter, the officer may arrest the homeless person.   The officer must document on the A form, beyond the probable cause for the arrest, the offer of shelter, the refusal by the homeless person to accept the "available shelter," the name of the shelter, and the word "Homeless" should be written at the top of the Arrest Affidavit.   A copy of the Arrest Affidavit will be forwarded to the Miami Police Records Unit in conjunction with a pink Field Information Card, or its electronic equivalent.

**10.6.2.3.2**   If the officer has probable cause to arrest the homeless person for a "Life Sustaining Conduct Misdemeanor" (as they are listed under 10.6.2.3.3), and there is no "available shelter," the officer shall not make an arrest nor take any other police action (warnings, etc).   The officer will complete a Field Information Card, or its electronic equivalent, explaining the circumstances of the initial contact with the homeless person, the fact that there was no "available shelter," the fact that no arrest was made and the word "Homeless" should be written at the top of the card.   The officer will turn the pink Field Information Card, or its electronic equivalent, in to his supervisor.   The supervisor will check the Field Information Card for completeness, sign the top right hand corner with his name and IBM number and deliver the Field Information Card, or its electronic equivalent, to the Records Unit <u>daily</u>.   However, if the homeless person described above is observed committing one of the below listed "life sustaining conduct" misdemeanors, and the life sustaining conduct misdemeanor causes imminent threat of physical injury to the homeless person or other person(s), the law enforcement officer must warn the homeless person to stop and if they refuse to do so, may arrest them regardless of whether there is an available shelter.

**10.6.2.3.3**   "Life Sustaining Conduct Misdemeanors" are the following:

1. Being in park after hours. Current Provisions (38-3 1-13, F.S. 162.22)
2. Public nudity where necessary to carry on the daily necessities of life, such as bathing or responding to a call of nature.  If the public nudity is done intentionally in plain view of others and the exposure or exhibition of the sexual organs, or nakedness was in a vulgar, indecent, lewd or lascivious manner, the law enforcement officer may arrest the person regardless of whether there is an available shelter.  Moreover, in no circumstance shall public nudity be allowed for a call of nature if there

exists an open public restroom within one-quarter of a mile (1.320 feet) of the homeless person performing a call of nature.  Current Provisions (F.S. 800.03, 37-1, 38-62)

3.     Reserved
4.     Obstructing passage on sidewalks, except that after one warning, no person or persons may lie on the sidewalk in a perpendicular fashion blocking the sidewalk, or may obstruct a sidewalk in such a way as to endanger other persons by requiring them to walk onto a street where but for the obstruction, such persons would otherwise have been able to safely walk on the sidewalk.  Obstructing a street, road, or highway shall not be construed to be a "Life Sustaining Conduct   Misdemeanor" within the meaning of this departmental order.  Current Provisions 54-1 to 54-3, 37-3, FS 316.2045)
5.     Vehicles, living or sleeping in.  Current Provision (37-4)
6.     Loitering in Restrooms.  Current Provision (38-68)
7.     Littering, except if within 300 feet of a usable trash receptacle, a law enforcement officer must warn the homeless person to stop and if they refuse to do so, may cite them regardless of whether there is an available shelter.  Current Provision (FSS 403.314, 22-6, 38-17, 38-63)
8.     Camping in parks.  Current Provision.  (38-71)
9.     Use of facilities for other than intended purpose (e.g. sleeping on park bench).  Current Provisions (38-54).
10.    Reserved
11.    Trespass on "public property" other than structure or conveyance.  Current Provision.  (F.S. 810.09 (1).  Trespass on private property or in an "exempt public property" is not a "Life Sustaining Conduct Misdemeanor" within the meaning of this departmental order.

**10.6.2.3.4**    Nothing in 10.6.2.3.3 listing the "Life Sustaining Conduct Misdemeanors" shall prevent an immediate arrest under 800.04 FS entitled "Lewd, lascivious, or indecent assault or act upon or in presence of a child" if the officer has probable cause to make such an arrest.

**10.6.2.3.5**    Homeless Persons observed violating a misdemeanor, which is not classified above as "Life Sustaining Conduct Misdemeanors".  Under this category the existence of an available shelter will not dictate whether an arrest is effected.  However, officers can still refer homeless persons to the Outreach Team.  A referral to an appropriate shelter rather that an arrest might be a better solution to minor misdemeanor arrests.  In lieu of arrest the officer may warn the homeless person to stop the unlawful conduct, and refer the person to a shelter, or if the officer deems it appropriate, the officer may detain or arrest the homeless person.  If the homeless person is arrested, the word "Homeless", should be printed on the top of the "A" form.  A copy of which shall be filed with the Records Unit within the Miami Police Department.  If the officer makes a decision not to make an arrest, and a referral is made, the officer shall complete a Field Information Card, or its electronic equivalent, with the facts of the incident, the referral and indicate at the top, "Homeless".   The officer will turn the pink Field Information Card, or its electronic equivalent, in to his supervisor.   The supervisor will check the card for completeness, sign the top right hand corner with his name and IBM number and deliver the Field Information Card, or its electronic equivalent, to the Records Unit <u>daily</u>.

**10.7   PROPERTY:**

**10.7.1**  The City shall respect the personal property of all homeless persons.   Officers shall follow existing policies for taking custody of personal property.   In no event shall any officer destroy any

personal property known to belong to a homeless person, or readily recognizable as property of a homeless person unless it is contaminated or otherwise poses a health hazard to an officer or to members of the public.  Officers are not responsible for taking custody of mattresses.

**10.7.2**  The disposition of personal property shall never prevent an officer from effectuating an arrest. However, the following safeguards shall be undertaken by the arresting officer to preserve the property of a homeless person, to the extent feasible:

**10.7.2.1**  The arresting officer shall always attempt to secure personal items such as identification, medicines and eyeglasses and other small items of importance identified by the arrestee, which are not large or bulky, in accordance with the police department's existing procedures;

**10.7.2.2**  The arresting officer shall ensure that large or bulky items (which are not contaminated or otherwise pose a health hazard to the officers or to members of the public) are not abandoned at the point of arrest, but rather secured by an outreach worker and maintained by existing outreach procedures.  If an outreach worker is unavailable, then it must be secured by the arresting officer until an outreach worker becomes available to assume its maintenance in accordance with existing outreach procedures;

**10.7.3**  In no event shall any law enforcement officer destroy any personal property known to belong to a homeless person, or readily recognizable as property of a homeless person (i.e. clothing and other belongings organized or packaged together in a way indicating it has been abandoned) except as permissible by law (in accordance with the department's operating procedures), or if the property is contaminated or otherwise poses a health hazard to officers or to members of the public.

**10.7.4**  When a homeless person is placed in a shelter, large and bulky items, which are not contaminated or otherwise pose a health hazard or obvious safety issue, and that are not abandoned, shall be secured by an outreach worker and maintained in accordance with existing outreach procedures.