**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 22-CV-21939-BLOOM/OTAZO-REYES**

LATOYLA YASHEEN COOPER-LEVY,
PHILLIP SYLVERIN, SHERMAN RIVERS,
*and* JOSEPH SIMMONS,

     *Plaintiffs*,

     v.

CITY OF MIAMI,

     *Defendant*.

_____/

**DEFENDANT CITY OF MIAMI'S MOTION TO DISMISS**

VICTORIA MÉNDEZ, City Attorney
CHRISTOPHER ALLAN GREEN,
Senior Assistant City Attorney
KERRI L. McNULTY,
Senior Assistant City Attorney
BRYAN E. CAPDEVILA,
Assistant City Attorney
*Counsel for the City of Miami*
444 S.W. 2nd Avenue, Suite 945
Miami, FL  33130-1910
Tel.: (305) 416-1800
Fax: (305) 400-5071
Emails: bcapdevila@miamigov.com
Secondary Emails:  ddiaz@miamigov.com

## MOTION TO DISMISS

The Defendant, the City of Miami ("City"), files this Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs Latoyla Yasheen Cooper-Levy, Phillip Sylverin, Sherman Rivers, and Joseph Simmons (collectively, "Plaintiffs") brought this civil rights action under 42 U.S.C. § 1983, demanding injunctive relief, declaratory relief, and monetary damages. *See generally* Complaint ("Compl.") [ECF No. 1]. In support, Plaintiffs—four homeless individuals—argue the City has "persistent and widespread practice[s] and custom[s]" of (1) "seizing and destroying the property of homeless individuals," (2a) "seizing and destroying the personal property of homeless individuals without adequate notice," and (2b) "seizing the personal property of homeless individuals without providing a meaningful opportunity to challenge the deprivation." *Id.* ¶¶ 98, 103–05. Stated plainly, the Plaintiffs say the City violated their constitutional rights. But municipal liability was not sufficiently pled, in part, because Plaintiffs disregard that the City is operating within a public health and safety crisis. Based on the foregoing, and as set forth below, the Complaint should be dismissed, and the requested injunctive and declaratory relief should be dismissed *with prejudice* and for lack of standing.

## MEMORANDUM OF LAW IN SUPPORT

### PERTINENT PROCEDURAL HISTORY

Some history is necessary to understand Plaintiffs' Complaint. *See generally* Compl. ¶ 1. This Court recently found that it is "eminently difficult to discern contaminated property from sanitary property," specifically as it pertained to items in homeless encampments within the City of Miami. *Pottinger v. City of Miami*, 359 F. Supp. 3d 1177, 1192 (S.D. Fla. 2019), a*ff'd sub nom. Peery v. City of Miami*, 977 F.3d 1061 (11th Cir. 2020). This Court even "agree[d]" that there were "conditions of squalor" that resembled a "horror movie." *Pottinger*, 359 F. Supp. 3d at 1192 (internal quotation marks omitted). This Court made these findings in addressing the City's

substantial efforts with complying with a 1998 consent decree, "commonly referred to as the *Pottinger* Agreement," which this Court has since terminated. *Id.* at 1179, 1201.[1]

In this Court's decision to terminate the *Pottinger* Agreement, resolved less than three years ago, the City's "clean-up efforts" were substantially at issue. *Id.* at 1189. Following "*a seven-day evidentiary hearing*, the district court granted the City's request for termination [of the *Pottinger* Agreement] and denied the homeless class's motion for enforcement and contempt." *Peery*, 977 F.3d at 1068 (emphasis added). This Court found the clean-ups were necessary "due to health and sanitation concerns from the homeless encampments" within the City. *Pottinger*, 359 F. Supp. 3d at 1189. It was well-settled that these homeless encampments posed health and safety risks, as even "the Florida Department of Health notified the City" of at least one specific area of concern. *Id.* "Video evidence showed human feces, rats, and contaminated items in the area." *Id.* at 1190. There were women with "needles hanging out of different parts of their body," and "[m]any were collapsed lying on the street half naked." *Id.* (internal quotation marks omitted). "[N]eedles everywhere," and with "rats running around," this Court found the encampment undoubtedly posed great risks to public health. *Id.*

---

[1] This Court may take judicial notice of these facts. It is well-settled that judicial notice of court records and findings, especially when the plaintiff cites them in their pleading, is appropriate on review of a motion to dismiss. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Ladd v. City of West Palm Beach*, 681 F. App'x 814, 816 n.2 (11th Cir. 2017); *Desisto v. City of Delray Beach*, 618 F. App'x 558, 560 (2015). Typically, "[t]he prohibition against going outside of the facts alleged in the complaint protects against a party being caught by surprise when documents outside the pleadings are presented at that early stage." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1279 (11th Cir. 1999). Here, Plaintiffs referenced this Court's termination of the *Pottinger* Agreement as background, and they have an opportunity to discredit the propriety of taking judicial notice of that disposition in response to this Motion, so judicial notice is appropriate. *See Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1205 (11th Cir. 2004). Since the Plaintiffs are represented by several of the same attorneys that were involved in the litigation resulting in the *Pottinger* Agreement's termination, Plaintiffs also cannot fairly claim they are surprised by these facts. *Compare Pottinger*, 359 F. Supp. 3d at 1179, *with* Docket.

Given this context, this Court "agree[d]" "that orders to move during clean-up operations [were] essential to the public welfare." *Id.* at 1193. This Court, in fact, said the "squalor present prevented the clean-ups from being easy operations" because City workers had no real ability to "examine items one by one." *Id.* at 1199. This difficulty, and the public health risks, "would lead a City worker to discard more property than not" under the reasonable belief that such property might be contaminated. *Id.* Of course, there were unfortunate instances where City workers "mistakenly discarded valuable items due to the gravity of the unsanitary conditions" in the homeless encampments within the City of Miami. *Id.* These, and other findings, led to the termination of the *Pottinger* Agreement. *See generally id.*

On appeal, the U.S. Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") affirmed this Court's decision. *See generally Peery*, 977 F.3d at 1068. The homeless plaintiffs, in part, argued "that the real purpose of the clean-ups was to target and disperse the homeless and that the move-on orders and takings of property violated the consent decree [and other constitutionally-based rights]." *Id.* The Eleventh Circuit, though, agreed that "[t]he purpose of the clean-ups was to combat 'squalor and unsanitary conditions,' a goal that benefitted the homeless. *Id.* As a result, the Eleventh Circuit echoed the district court's determination "that property becomes contaminated when it is commingled with items that are contaminated or hazardous." *Id.* at 1070. This led the Eleventh Circuit to explain "City workers need not search through [a bag that has been contaminated or contains contaminated items] for still-clean items" because it poses "hazardous," "health and safety risks." *Id.*

In addition, the Eleventh Circuit reasoned that City workers need not "credit a non-owner's statement when determining whether property is abandoned," especially if a City worker needed "to discard contaminated property" or other items creating "a health hazard or obvious safety

issue." *Id.* (internal quotation marks omitted). Relatedly, the Eleventh Circuit concluded that "police move-on orders do not raise a constitutional issue." *Id.* at 1071. The cleanup orders, as such, were deemed necessary "to facilitate" their purpose—*i.e.*, cleaning—and not to harass homeless persons. *Id.* at 1072.

As a matter of course, "City workers took only items that were commingled with [items] that clearly pose health and security concerns—contaminated or hazardous items." *Id.* at 1074. City workers were also deemed to have "left notices [of stored property] at clean-up sites after taking property," and "the homeless acknowledge[d] there [was] evidence" for that finding. *Id.* The cited variances were treated as "isolated occurrences" or otherwise "d[id] not bear on the determination of present compliance." *Id.* Taking all of this together, the Eleventh Circuit agreed that the City would "continue [with *Pottinger* Agreement's purpose] after the termination of the decree" because "the City has a strong system in place to address homelessness." *Id.* at 1076. This unfortunate tension—that of individual rights and of a City's undisputed obligations to public health and safety—now sets the stage for the Complaint and this action, which is largely premised on arguments raised (and rejected) by this Court and the Eleventh Circuit. [2] *See* Compl. ¶¶ 1, 17–18, 21 (acknowledging the history and overlapping relevance of the *Pottinger* Agreement, this Court's 2019 termination of that consent decree, and subsequent appeal).[3]

---

[2] Perhaps, because Plaintiff's Complaint largely overlaps with the same set of facts the Honorable Judge Moreno considered in terminating the *Pottinger* Agreement, and Plaintiffs seek an injunction to revitalize that now-terminated consent decree, it might be appropriate for that District Court Judge to hear this apparent sequel to the case in which he held a seven-day evidentiary hearing. *See generally Peery*, 977 F.3d at 1068 (noting the district court held "a seven-day evidentiary hearing" regarding the *Pottinger* Agreement's termination).

[3] As previously mentioned, Plaintiffs' Counsel are aware of the findings and conclusions of law previously mentioned because several of them were the same attorneys in the litigation opposing the *Pottinger* Agreement's termination. *Compare* Docket, *with Peery*, 977 F.3d at 1066 and *Pottinger*, 359 F. Supp. 3d at 1179.

### The Complaint

The Plaintiffs are homeless and reside in the City of Miami. Compl. ¶¶ 11–14. Exemplifying the public health risks detailed by this Court previously, in January 2021, the Miami-Dade County Homeless Trust found of the 892 unsheltered individuals 555 lived in the City of Miami. *Id.* ¶ 16.

The City has an Administrative Policy regarding the Treatment of Homeless Persons' Property, APM-1-19. *Id.* ¶ 18 (citing Plaintiffs' Exhibit A, APM-1-19 Treatment of Homeless Persons' Property ("APM") [ECF No. 1] at 17–21[4])). It defines and sets forth procedures for cleanup operations and prescribes grounds for when storage of uncontaminated property is due, including when property appears to be abandoned or unaccompanied by its owner. *See generally* APM. The City Manager's APM instructs City officials to notify areas of scheduled cleanups seven days in advance. APM at 20.

The City also has a Police Departmental Order directing law enforcement officers to "respect the personal property of homeless persons" and not to destroy property they know to be— or otherwise is readily recognizable as—the property of homeless persons. Compl. at ¶ 20.

Each of the four Plaintiffs describe one unfortunate incident they endured with City workers. Three of the four Plaintiffs had their at-issue encounter transpire on the same day and (likely) at the same cleanup location with the same crew. Indeed, Mr. Sylverin, Mr. Rivers, and Mr. Simmons all assert that City workers appeared at an encampment "under the bridge on NW 11th Street between NW 5th Avenue and NW 3rd Avenue" or by "NW 11th Street near or under

---

[4] The City uses the pincite that appears on CM/ECF for all references to the APM because it is attached to the Complaint, not as a separate exhibit on CM/ECF.

the I-95 bridge" "on August 2, 2021." Compl. ¶¶ 59, 61, 70, 72, 82–83.[5] Ms. Cooper-Levy, however, had her incident transpire sometime in May 2021 by an encampment "located at Northwest 17[th] Street and 7th Avenue." *Id.* ¶ 45. All four Plaintiffs claim not to have received notice prior to the cleanup. *Id.* ¶¶ 49, 62, 74, 85. And two of Plaintiffs aver the City has seized and destroyed their property on other occasions; However, they provide no details, such as the date, location, or discarded property from these other incidents nor explain whether they personally observed these unspecified incidents. *See id.* ¶¶ 79, 89.

Plaintiffs advance two claims, and one is made up of two subclaims. *See id.* ¶¶ 92–109. First, Plaintiffs contend the City has a "persistent and widespread practice and custom of seizing and destroying the property of homeless individuals" in violation of their "right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution." *Id.* ¶¶ 97–98. Second, Plaintiffs argue the City has a "persistent and widespread practice and custom of seizing and destroying the personal property of homeless individuals without adequate notice" and "without providing a meaningful opportunity for plaintiffs to challenge the deprivation of property." *Id.* ¶ 103–04. This, they argue, is in violation of their due process rights "under the Fourteenth Amendment to the United States Constitution." *Id.* ¶ 109. As redress, Plaintiffs seek an injunction to enjoin the City "from repeating the unlawful policies, practices and conduct" by enjoining "*any* future confiscation and destruction of Plaintiffs' property absent a lawful justification accompanied by proper notice, a reasonable opportunity to be heard, and other due-process protections." *Id.* at 14, ¶ A (emphasis added). Plaintiffs further request declaratory judgment finding the City's "policies, practices, and conduct violated Plaintiffs' rights

---

[5] A Google search easily confirms these two locations are the same. Thus, judicial notice of this fact is warranted, and Plaintiffs have an opportunity to contest the propriety of taking judicial notice of this fact in response to this motion. *See generally* Fed. R. Evid. 201.

under the Fourth and Fourteenth Amendments of the United States Constitution." *Id.* at 14, ¶ B. They also seek damages. *Id.* at 14, ¶ C.

## STANDARD OF REVIEW

A well-pleaded complaint's factual allegations "must be enough to raise a right to relief above the speculative level"—with "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Legal conclusions, though, "are not entitled to the assumption of truth" and are insufficient to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Under this standard, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (internal quotation marks omitted).

There are exceptions to the well-trodden rule that factual allegations are to be accepted as true on a motion to dismiss. For instance, federal courts "need not accept legal conclusions couched as factual allegations." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, No. 20-MD-2924, 2020 WL 7864213 (S.D. Fla. Dec. 31, 2020) (Rosenberg, J.) (citing *Diverse Power, Inc. v. City of LaGrange, Ga.* 934 F.3d 1270, 1273 (11th Cir. 2019)). Likewise, courts "need not accept factual claims that are internally inconsistent." *Smith v. City of Fort Pierce*, No. 2:18-CV-14147, 2018 WL 5787269, at *6 (S.D. Fla. Nov. 5, 2018) (Rosenberg, J.) (citation omitted). Nor must they accept as true assertions "which run counter to facts of which the court can take judicial notice, conclusory allegations, [or] unwarranted deductions." *Junhao Su v. Bd. of Trustees of Fla. Int'l Univ.*, No. 12-CV-24265-JLK, 2014 WL 1340265, at *1 (S.D. Fla. Apr. 3, 2014) (King, J.) (citation omitted).

## ANALYSIS

The alleged incidents—especially, as more thoroughly detailed within the Complaint—are unfortunate. But the Plaintiffs have not shown municipal liability is appropriate. This is because,

based on Plaintiffs' assumed-as-true allegations, Plaintiffs have not constructed a plausible inference of a widespread custom or practice. Here's why.

## A. *Substantive Law*

"Ordinarily, a governmental entity cannot be held liable for the unconstitutional actions of its employees under 42 U.S.C. § 1983." *Simmons v. Bradshaw*, 879 F.3d 1157, 1173 (11th Cir. 2018). Indeed, the U.S. Supreme Court has "consistently refused to hold municipalities liable under a theory of *respondeat superior*." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).

In *Monell*, though, the Supreme Court cemented that a municipality can be liable for constitutional violations under § 1983 when "execution of a government[al] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Stated simply, a plaintiff must demonstrate "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Simmons*, 879 F.3d at 1173 (cleaned up).

Needless to say, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Brown*, 520 U.S. at 404. "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* To even begin to make such a showing, a custom or practice—the second requirement—must be "shown through the repeated acts of a final policymaker." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). Thus, a plaintiff ordinarily "must identify those officials who speak with final policymaking authority for that local governmental entity

8

concerning the act alleged to have caused the particular constitutional violation in issue." *Id.* This showing is difficult for any plaintiff to meet because the practice must be "so well-settled," "pervasive," "persistent and widespread" that the practice, itself, has "assume[d] the force of law. *See, e.g.*, *Denno v. Sch. Bd. of Volusia Cnty., Fla.*, 218 F.3d 1267, 1277 (11th Cir. 2000).

Even if a general custom or practice is shown, that is not enough for *Monell* purposes. A plaintiff must, in addition, establish "a persistent and widespread practice . . . about which the [municipal actors] knew or of which practice [they] had constructive knowledge" because, without such a showing, it indicates the allegations are "random acts or isolated incidents"; neither of which is sufficient to attribute the at-issue conduct to a municipality. *Denno*, 218 F.3d at 1277.

Deliberate indifference," which also forms part of the second requirement, "is a *stringent* standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [their] action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (cleaned up & emphasis added). No doubt, "the bar to establish municipal liability is *very high*." *Simmons*, 879 F.3d at 1169 (emphasis added); *see also Connick*, 563 U.S. at 70 ("[W]e must adhere to a 'stringent standard of fault,' lest municipal liability under § 1983 collapse into *respondeat superior*.").

In sum, proving municipality liability for constitutional violations is no easy feat because it demands a plaintiff to show a "municipality's own wrongful conduct caused [their] injury, not [just] that the municipality is ultimately responsible for the torts of its employees." *Connick*, 563 U.S. at 70 n.12.

### B. The Lack of a Policy, Custom, or Practice

As already mentioned, the City has several written policies designed to provide homeless individuals with notice prior to cleanup operations, an opportunity to retrieve uncontaminated confiscated objects, and protections to their property while also attempting to balance the City's

interest in maintaining public health and safety. But Plaintiffs' claims are not predicated on these policies. *See generally* Compl. (acknowledging the existence of these written policies).

They, instead, argue that the City has unofficial customs and practices that have caused the alleged Fourth and Fourteenth Amendment constitutional injuries. *See* Compl. ¶¶ 92–109. Although there are four Plaintiffs, there are, in truth, two sets of incidents at issue: (1) Ms. Cooper-Levy's May 2021 incident and (2) the remaining three Plaintiffs' August 2021 incident. Compl. ¶¶ 45, 59, 61, 70, 72, 82–83. This is because Mr. Sylverin, Mr. Rivers, and Mr. Simmons appear to have been at the same homeless encampment on the date in question. *See id.*

The Plaintiffs' last alleged incident transpired approximately one year ago. They provide no other cited examples of similar cases from before January 2021, the earliest of the two (to four) incidents. Further, their two (to four) incidents transpired within a three-month span. Viewed together, it cannot be said that these instances, by themselves, permit a plausible inference of any persistent and widespread practice. *See Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) ("The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of *continued duration*, rather than isolated occurrences." (citation omitted & emphasis added)).

Remember, this Court acknowledged that, unique to the City's homeless population, there would be instances where City workers might "discard[] valuable items due to the gravity of the unsanitary conditions" of homeless encampments within the City because of the difficulties of examining property.[6] *Pottinger*, 359 F. Supp. 3d at 1199.

___

[6] Plaintiffs, it's true, say their "personal property . . . was not abandoned, was not contaminated, and did not pose a health or safety issue" or "risk." Compl. ¶¶ 51, 66, 77, 87. But that is, frankly, a mere conclusion or otherwise amounts to legal conclusion couched as factual allegations. *See Iqbal*, 556 U.S. at 664 ("[M]ere conclusions[] are not entitled to the assumption of truth."); *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) ("Legal conclusions without adequate

Plaintiffs, in addition, must acknowledge—and it appears they have—that the City has no local comparator because most of all homeless persons within Miami-Dade County reside within the City. *See* Compl ¶ 16 (citing the Miami-Dade County Homeless Trust statistics). Despite acknowledging this fact, Plaintiffs have not identified statistics by which this Court can measure to what degree municipalities—specifically, those with comparably-sized homeless populations with similar (Court-acknowledged) public health and safety concerns—have discarded property belonging to a homeless person. *See generally* Compl.

Without comparators or other context, Plaintiffs' assertion of a widespread or pervasive custom/practice is not plausible. *See Denno*, 218 F.3d at 1278 (concluding the at-issue conduct was not attributable to the school board because the plaintiff never identified instances "of similar suspensions at other schools within the school district"); *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998) (rejecting plaintiff's reliance on case statistics because "[t]here was no evidence regarding the reasons for these dispositions or that any such dispositions were due to false arrests for only protected speech" as he had alleged); *Adams v. Custer*, No. 14-CV-80403-CIV, 2016 WL 155081, at *1, *19 (S.D. Fla. Jan. 12, 2016) (Hurley, J.) ("Without some way of comparing [the plaintiff's allegations] to other similar-sized police departments, the Court cannot infer anything about the PBSO practices in the use of deadly force.").

And, indeed, there is no question that they must identify substantially similar instances. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (explaining cited examples must be "*substantially similar* to the case at hand" for purposes of showing a widespread practice

---

factual support are entitled to no assumption of truth."). At best, they are left with only enough facts to infer the "mere possibility of misconduct" with regard to whether their property was commingled with contaminated materials, which is also not enough for a plausible claim for relief. *See Iqbal*, 556 U.S. at 664.

(emphasis added)); *Gold*, 151 F.3d at 1351 (deeming the statistics by themselves meaningless without additional context).

In any event, the Plaintiffs cannot show similar instances of due process violations—if any—because there are numerous exceptions to the general rule that due process entitles notice and an opportunity to be heard and a meaningful opportunity before an individual is deprived of their property. *See Zinermon v. Burch*, 494 U.S. 113, 132 (1990) (acknowledging the government may not be able to "anticipate and prevent a random deprivation of a liberty interest" making "postdeprivation remedies" sufficient for due process purposes, especially when "a predeprivation hearing" is not feasible). *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974) ("[D]ue process is not denied when postponement of notice and hearing is necessary to protect the public from contaminated food . . . or from misbranded drugs." (cleaned up)).[7]

"Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Brown*, 520 U.S. at 415. And two incidents—or four when viewed expansively—is not emblematic of any continued pattern of deliberate indifference to individual rights without more. *See Brooks v. Scheib*, 813 F.2d 1191, 1192–93 (11th Cir. 1987) (holding "ten citizens' complaints" about one officer fails to provide a municipality with notice that the "past complaints of police misconduct had any merit").

For this reason, based on these allegations, the Plaintiffs have shown two to four isolated instances within a three-month span, which is not enough for municipal liability, particularly since

---

[7] Ms. Cooper-Levy, moreover, does not detail how long she waited before seeking to reclaim her stored property. *See generally Compl.* And none of the other Plaintiffs claim their property was seized and stored. *See generally id*. So, that issue is not properly pled and otherwise not a case or controversy before this Court. *See Junhao Su*, No., 2014 WL 1340265, at *1(explaining conclusory allegations are not accepted as true); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (outlining that the claimed injury must be fairly traceable to the at-issue conduct).

the City is operating within its purview of protecting the public's health and safety. *See McDowell v. Brown*, 392 F.3d 1283, 1290–91 (11th Cir. 2004) (concluding that an "isolated incident, however unfortunate, does not demonstrate evidence of the [entity's] 'persistent' or 'widespread' policy").[8]

### C. Injunctive Relief is Ill-Suited

Injunctive relief is ill-suited in this action and, for reasons of futility, the claim for injunctive relief should be dismissed with prejudice. To begin, "[a]n injunction is an extraordinary remedy." *Bruce v. Reese*, 431 F. App'x 805, 807 (11th Cir. 2011). To obtain a permanent injunction, a plaintiff must succeed on the merits and make the traditional showings necessary for preliminary injunctive relief. *See Siegel v Lepore*, 234 F.3d 1163, 1213 (11th Cir. 2000). Thus, a plaintiff must show that: "(1) [they] suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff[s] and defendant, a remedy in equity is warranted; *and* (4) the public interest would not be disserved by a permanent injunction." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (emphasis added).

---

[8] Worth mentioning, two Plaintiffs—namely, Mr. Rivers and Mr. Simmons—say "the City has seized and destroyed [their] personal property" on other occasions. Compl. ¶¶ 79, 89. Neither one of them provides dates, locations, or other details as to what may have been destroyed. Nor do Mr. Rivers or Mr. Simmons explain how they *know* the City seized and destroyed their property and that it was not taken or discarded by a third party (*e.g.*, a nearby businessowner or homeowner, a fellow resident at a homeless encampment, etc.). These assertions also lack any other context, such as descriptions of their general area or how long they had been away from it (*e.g.*, whether they had been in jail, in a hospital, etc.). These specific paragraphs are legal conclusions couched as factual allegations, so they are owed no presumption of verity on a motion to dismiss. *See Womack v. Carroll Cnty., Ga.*, 840 F. App'x 404, 405 (11th Cir. 2020) ("[W]e need not accept as true the plaintiff's legal conclusions, including those couched as factual allegations."). Even if not purely legal conclusions, these paragraphs are too speculative to cross the line of plausibility. *See Doe v. Samford Univ.*, 29 F.4th 675, 686 (11th Cir. 2022) (citation omitted). Either way, they do not establish a widespread practice because the lack of factual content renders the number of prior encounters insufficient for a plausible showing of deliberate indifference.

### i. Irreparable Future Injuries

*First*, "a showing of irreparable harm is the *sine qua non* of injunctive relief." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (cleaned up). The injury "cannot be undone through monetary remedies." *Berber v. Wells Fargo Bank, N.A.*, 760 F. App'x 684, 686 (11th Cir. 2019). And "past injuries," even if "irremediable," are not enough. *Ala. v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133 (11th Cir. 2005). In other words, "the asserted irreparable injury must be neither remote nor speculative, *but actual and imminent*." *Siegel*, 234 F.3d at 1176 (emphasis added)).

Here, although the Plaintiffs submit allegations of prior injuries, their claimed-of anticipated injuries are not actual or imminent. If at all, they have made an inference that their fear of future injuries is possible, rendering them too speculative to warrant injunctive relief. *See id.* The Plaintiffs' claim for injunctive relief, therefore, could be dismissed for failure to state a claim for relief on this basis alone. *See Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015) ("Because Lary established *neither a likelihood of future harm nor the inadequacy of his remedy at law*, he was not entitled to an injunction." (emphasis added)). More fundamentally Plaintiffs have blurred the lines between whether there is a "danger" of property seizures/destruction and whether "they will suffer irreparable injury"—that is, destruction of something that cannot be compensated in the future—"unless the injunction issues." *Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020) (cleaned up) (acknowledging the risk posed by COVID-19 but vacating the district court's injunction for not addressing the separate question of whether prisoners faced an irreparable injury without an injunction's issuance).

### ii. The Availability of Other Remedies

*Second*, as to whether there are other remedies available at law (*e.g.*, monetary damages), the Plaintiffs cannot make a plausible showing on this requirement either. This is largely because this Court—and even the Plaintiffs—must admit that, even if the Plaintiffs face a non-speculative risk of property seizures/destruction, whether there are monetary remedies available at law depends on the particular kind of property that has been seized or destroyed.[9] Implicit in the Plaintiffs' request for damages, moreover, is a recognition that monetary damages can sometimes adequately compensate for the loss of property. *See generally* Compl. at 14, ¶ C. Thus, the request for injunctive relief and monetary damages appears to be internally inconsistent as pled. *Cf. Mech v. Sch. Bd. of Palm Beach Cnty.*, No. 13-80437-CIV, 2014 WL 12650695, at *2 (S.D. Fla. Oct. 17, 2014) (Marra, J.) (rejecting the assertion that the requested injunction was negated by the claim for damages because, as pled, the request for damages was delineated to a separate claim, which did not seek injunctive relief). Because of this inconsistency, Plaintiffs negated or, at least, diminished the strength of their assertion that monetary damages are insufficient. *See Campos v. I.N.S.*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998) (stating courts "need not accept factual claims that are *internally inconsistent*, facts which run counter to facts of which the court can take judicial notice, *conclusory allegations*, *unwarranted deductions*, or mere legal conclusions asserted by a party" (emphasis added)).

In the City's view, state tort law can, in many instances, provide individual plaintiffs an adequate remedy to be compensated should future harms arise. *See generally Coddington v. Staab*, 716 So. 2d 850, 851 (Fla. 4th DCA 1998) (defining the tort of trespass to personal property); *Clemente v. Horne*, 707 So. 2d 865, 866 (Fla. 3d DCA 1998) (defining the tort of intentional

---

[9] The City maintains homeless persons have adequate remedies to retrieve uncontaminated property. *See generally* APM at 20–22 (describing procedures for cleanup operations when the homeless owner is not present and storage of items encountered during such operations).

infliction of emotional distress); *City of Cars, Inc. v. Simms*, 526 So. 2d 119, 120 (Fla. 5th DCA 1988) (defining the tort of conversion). The Eleventh Circuit agreed that homeless persons could always "seek relief in an *individual* action" under § 1983 if they suspected that their "civil rights [were] violated." *Peery*, 977 F.3d at 1072 (emphasis added). Because this factor necessitates a fact-intensive inquiry that considers only prospective harms, and other adequate remedies exist under the City's administrative procedures or through other litigation methods, Plaintiffs cannot meet their burden at showing no other remedies are available at law.

### iii. The Balance of Hardships

*Third*, the balance of hardships inquiry sways in the City's favor. Although Plaintiffs describe their individual harms thereby demonstrating their hardship, the greater risk is to public health and safety and, within that ambit, the homeless population living within unsanitary conditions. Related to the balance of hardships, the requested injunction is impermissibly vague as to how it could be accomplished because it chiefly relies on legal conclusions. *See generally* Compl. at 14, ¶ A (seeking to enjoin the City "from *any* future confiscation and destruction of Plaintiffs' property absent a lawful justification accompanied by proper notice, a reasonable opportunity to be heard, and other due process protections" (emphasis added)). Without more specificity, the City and its agents could never receive proper notice of the requirements that are to be imposed upon them. *See* Fed. R. Civ. P. 65(d) ("Every order granting an injunction and every restraining order must . . . state its terms specifically . . . [and] describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.").

The Eleventh Circuit, for instance, has explained that the requirement for specificity contained in Fed. R. Civ. P. 65 is "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a

decree too vague to be understood." *S.E.C. v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012) (cleaned up). And "the degree of particularity required [in a court's order enjoining a party] depends on the nature of the subject matter." *Id.* (cleaned up). But the proposed injunction is so broadly pled that it stretches far beyond this Court's authority. *See id.* For this reason, the balance of hardships tips in the City's favor because it is impossible to accurately comply with the proposed injunction's (vague) terms,[10] and the City has a well-settled interest in the public's health and safety.

### iv. The Public Interest

Finally, whether the public interest would be harmed by the requested injunction is neutral, at best, but actually weighs in the City's favor. The requested injunction *facially* appears limited only to these Plaintiffs. *See generally* Compl. at 14, ¶ A. Framed this way, Plaintiffs imply that their injunction is narrowly tailored and would not create public health and safety issues.

They are mistaken. In truth, the requested injunction is far more expansive in operation. If Plaintiffs prevail on their injunction, which facially appears limited only to them, there would be no practical way for the City to apply it narrowly and thus serve the public. Put contextually, City workers at cleanup events would have no knowledge of whether they are interacting with one of the Plaintiffs or any of the other hundreds of homeless persons within the City's boundaries (who will likely claim entitlement to the injunction). This action, in other words, is not about the

---

[10] For example, Plaintiffs never clarify what they mean by "a lawful justification" or what constitutes "a reasonable opportunity to be heard." *See generally* Compl. at 14, ¶ A. Are they pleading for strict adherence to the City's written policy, without taking into account the possibility of error, or are they pleading for something else? This degree of guesswork is exactly why the proposed injunction would pose significant hardships on the City and, in turn, would likely result in more difficulties with understanding what this Court might expect in the future. *See Swain*, 961 F.3d at 1293 ("The district court therefore erred in failing to consider the damage its proposed injunction may cause" (cleaned up)).

Plaintiffs' unfortunate circumstances; it is an attempt to resurrect—on behalf of all of the City's homeless—something this Court and the Eleventh Circuit agreed needed to be terminated.

Regardless of whether it is framed only to the Plaintiffs or to all homeless persons, the Eleventh Circuit already established that cleanup operations in the City, which sometimes have resulted in seized or destroyed property, are in place for public health and safety reasons. *See Peery*, 977 F.3d at 1070. This Court, as well, "sympathize[d]" with that unfortunate reality but recognized its necessity "due to the gravity of the unsanitary conditions" and difficulties City workers faced with the task of examining all of the items in a homeless encampment that are often "commingled with food, soiled materials, and garbage." *Pottinger*, 359 F. Supp. 3d at 1199.

Given this backdrop, Plaintiffs are overlooking that "[o]ur Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States to guard and protect," not courts. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (cleaned up); *see also Swain*, 961 F.3d at 1293 (same). An injunction, therefore, would result in the City having no meaningful way of serving the public's health and safety from the biohazardous conditions posed by homeless encampments—realities this Court and the Eleventh Circuit settled. Viewed together, this factor is either neutral—if this Court accepts the requested injunction on its face without considering its consequences—or sways entirely in the City's favor. Under either scenario, Plaintiffs have not met their burden on this factor.

Here, the anticipated injury is far too speculative and blurs the lines between the risk of general harm and the risk of irreparable injury. There is no amendment that could cure that deficiency because irreparable injury is a highly fact-intensive inquiry in this context, which no amendment could predict until the injury transpires. In a similar vein, there appears to be adequate

remedies under the City's administrative procedures and in state tort law, eliminating the need for an injunction. Plaintiffs proposed injunction should, therefore, be stricken from the Complaint.

### C. The Declaratory Relief is Ill-Suited

The Plaintiffs' request for declaratory judgment is equally improper. In the Complaint, they seek a "[d]eclaratory judgment" stating the City's alleged "policies, practices, and conduct *violated* Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution." Complaint at 14, ¶ C (emphasis added).

The Declaratory Judgment Act "grants federal courts discretion to decide whether to issue declaratory relief." *Ministerio Evangelistico Int'l v. United Specialty Ins. Co.*, 2017 WL 1363344, at *1, *1 (S.D. Fla. Apr. 5, 2017) (Moreno, J.). It permits a court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). "The point of a declaratory judgment is to permit 'actual controversies to be settled before they ripen into violations of law,' not to adjudicate past conduct." *Great Lakes Reinsurance (UK) PLC v. TLU Ltd.*, 2008 WL 828122, at *1 (S.D. Fla. Mar. 27, 2008) (Marra, J.) (citation omitted). "Injuries sustained from 'past conduct' will not support a claim for declaratory relief absent a showing 'that such conduct has continued or will be repeated in the future." *Mech*, 2014 WL 12650695, at *2 (citation omitted).

Here, as requested, the Plaintiffs do not seek a declaratory judgment on their rights in the future—the proper mechanism for declaratory judgment. They seek an order from this Court stating that the City "violated" their rights in the past. *See* Compl. at 14, ¶ A. As this claim is untethered to future conduct, this Court should dismiss with prejudice and thus strike the Plaintiffs' request for declaratory relief as to prior conduct because no amendment could authorize this Court to issue a declaratory judgment on past conduct. *See Mech*, 2014 WL 12650695, at *2.

**D. Lack of Standing for Injunctive and Declaratory Relief**

Plaintiffs also lack standing to bring claims for injunctive and declaratory relief. "[D]eclaratory judgment may only be issued in the case of an actual controversy." *Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277, 1284 (11th Cir. 2012) (cleaned up). "That is, under the facts alleged, there must be a substantial *continuing* controversy between parties having adverse legal interests." *Id.* (cleaned up & emphasis added). To do so, "a plaintiff must allege facts from which it appears there is *a substantial likelihood* that he will suffer injury in the future." *Id.* (cleaned up & emphasis added)). A plaintiff seeking injunctive relief must meet this same standard. *See id.*

In their Complaint, the Plaintiffs did not sufficiently allege a likelihood of future injury, much less "a substantial likelihood that [they] will suffer [such] injur[ies] in the future." *Id*. None of the Plaintiffs identify any violation that has transpired over the last year. Nor did they identify harms of a continuing nature to indicate a *substantial* likelihood that injuries shall transpire. Moreover, as previously argued, the Plaintiffs explicitly requested declaratory relief on *past* conduct. *See generally* Compl. at 14, ¶ A.

Under these circumstances, the Plaintiffs lack standing to request declaratory and injunctive relief, and the two forms of relief should be stricken from the Complaint. *See Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999).

<u>**CONCLUSION**</u>

Based on the foregoing, the Complaint should be dismissed for failure to state a claim. As for Plaintiffs' claims for injunctive and declaratory relief, they should be dismissed with prejudice because the City believes no amendment could remedy the deficiencies identified herein.

Respectfully submitted,

VICTORIA MÉNDEZ, City Attorney
CHRISTOPHER ALLAN GREEN,
Senior Assistant City Attorney
KERRI L. McNULTY,
Senior Assistant City Attorney
BRYAN E. CAPDEVILA,
Assistant City Attorney
*Counsel for the City of Miami*
444 S.W. 2nd Avenue, Suite 945
Miami, FL  33130-1910
Tel.: (305) 416-1800
Fax: (305) 400-5071
Email: bcapdevila@miamigov.com
Secondary Email:  ddiaz@miamigov.com

By: */s/ Bryan E. Capdevila*
    Bryan E. Capdevila,
    Assistant City Attorney
    Florida Bar No. 119286
    *Counsel for the City of Miami*
    Telephone: (305) 416-3180
    Facsimile: (305) 416-3190

By: */s/ Kerri L. McNulty*
    Kerri L. McNulty,
    Senior Assistant City Attorney
    Florida Bar No. 16171
    *Counsel for the City of Miami*
    Telephone: (305) 416-1891
    Facsimile: (305) 416-3190

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I therefore certify that the foregoing document has been served on all counsel of record via transmission of a Notice of Electronic Filing (or "NEF") generated by CM/ECF. Lastly, I certify that, to my knowledge, there are no other persons in need of service via an alternative authorized method.

By: */s/Bryan E. Capdevila*
Bryan E. Capdevila
Assistant City Attorney
Florida Bar No. 119286