UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 22-CV-21939-BLOOM/Otazo-Reyes

LATOYLA YASHEEN COOPER-LEVY,
et al.,

     Plaintiff,

vs.

CITY OF MIAMI,

     Defendant.
_____/



DEPOSITION OF NATASHA COLEBROOKE-WILLIAMS

TAKEN ON BEHALF OF THE PLAINTIFF

JULY 25, 2023
9:30 A.M. TO 4:09 P.M.

LEGAL SERVICES OF GREATER MIAMI
4343 WEST FLAGLER STREET, SUITE 100
MIAMI, FLORIDA 33134

REPORTED BY:
ANDIE FABIAN, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



```
 1                    APPEARANCES OF COUNSEL

 2    ON BEHALF OF THE PLAINTIFF:

 3         JODI SIEGEL, ESQUIRE
           CHELSEA LEE DUNN, ESQUIRE
 4         SOUTHERN LEGAL COUNSEL, INC.
           1229 NORTHWEST 12TH AVENUE
 5         GAINESVILLE, FLORIDA 32601
           (352) 271-8890
 6         JODI.SIEGEL@SOUTHERNLEGAL.ORG
           CHELSEA.DUNN@SOUTHERNLEGAL.ORG
 7
           JOCELYN ARMAND, ESQUIRE
 8         LEGAL SERVICES OF GREATER MIAMI, INC.
           4343 WEST FLAGLER STREET, SUITE 100
 9         MIAMI, FLORIDA 33134
           (305) 438-2403
10         JARMAND@LEGALSERVICESMIAMI.ORG

11         BENJAMIN WAXMAN, ESQUIRE
           BLACK SREBNICK P.A.
12         201 SOUTH BISCAYNE BOULEVARD, SUITE 1300
           MIAMI, FLORIDA 33131
13         305-371-6421
           BWAXMAN@ROYBLACK.COM
14         (REMOTELY VIA ZOOM)

15    ON BEHALF OF THE DEFENDANT:

16         BRANDON LUIS FERNANDEZ, ESQUIRE
           BRYAN CAPDEVILA, ESQUIRE
17         CITY OF MIAMI, OFFICE OF CITY ATTORNEY
           444 SOUTHWEST 2ND AVENUE
18         MIAMI, FLORIDA 33130-1910
           305-416-1800
19         BFERNANDEZ@MIAMIGOV.COM
           BCAPDEVILA@MIAMIGOV.COM
20

21

22

23

24

25
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 3

```
 1                    INDEX OF EXAMINATION

 2   WITNESS: NATASHA COLEBROOKE-WILLIAMS
                                                  PAGE
 3   DIRECT EXAMINATION
          BY JODI SIEGEL, ESQUIRE                    6
 4
     CROSS EXAMINATION
 5        BY BRANDON LUIS FERNANDEZ, ESQUIRE       168

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 4

1                    INDEX OF EXHIBITS

2     EXHIBIT                 DESCRIPTION                    PAGE
      PLAITNIFF'S:
3
      EXHIBIT 1          NOTICE OF TAKING DEPOSITION            7
4
      EXHIBIT 2          APM 1-19                               38
5
      EXHIBIT 3          AMENDED APM 1-19                       40
6
      EXHIBIT 4          COMPOSITE OF INVENTORY STORAGE
7                        INVOICES                              105

8     EXHIBIT 5          INVENTORY STORAGE FORMS 2023          106

9     EXHIBIT 6          YELLOW NOTICES                        118

10    EXHIBIT 7          WHITE NOTICES                         118

11    EXHIBIT 8          DRAFT STREET CLEANUP AND
                         ENCAMPMENT RESOURCE PLAN 2021         147
12
      EXHIBIT 9          MIAMI POLICE DEPARTMENTAL
13                       ORDER 11, SECTION 10                  147

14    EXHIBIT 10         CITY RESOLUTION R-21-0160             151

15    EXHIBIT 11         CITY RESOLUTION R-21-0372             153

16    EXHIBIT 12         CITY RESOLUTION R-21-0379             154

17    EXHIBIT 13         FILE ID 10624                         157

18    EXHIBIT 14         FILE ID 10623- ORDINANCE FIRST
                         READING                               159
19
      EXHIBIT 15         HOMELESS MASTER CLEANUP LOG           160
20
      EXHIBIT 16         LOG FROM FEBRUARY 28, 2022 -
21                       OCTOBER 14, 2022                      162

22    EXHIBIT 17         MEMO                                  165

23    EXHIBIT 18         MEMO                                  164

24    EXHIBIT 20         ACKNOWLEDGEMENT OF RECEIPT            166

25



```
 1          DEPOSITION OF NATASHA COLEBROOKE-WILLIAMS

 2                      JULY 25, 2023

 3          THE COURT REPORTER:  We are now on the record.

 4     Today's date is July 25th, 2023, and the time is

 5     approximately 09:36 a.m.

 6          We are here for the deposition of Natasha

 7     Colebrooke-Williams, as Corporate Representative,

 8     in the matter of Latoyla Yasheen Cooper-Levy v.

 9          the City of Miami; Case Number 22-cv-21939-

10     BLOOM/Otazo-Reyes, in the United States District

11     Court Southern District of Florida, Miami Division.

12          Our current location is at Legal Services of

13     Greater Miami Inc, 4343 West Flagler Street, Suite

14     100, Miami, Florida 33134.

15          The Court Reporter is Andie Fabian with

16     Universal Court Reporting.

17          Would Counsels please introduce themselves for

18     the record?

19          MS. SIEGEL:  Yes, this is Jodi Siegel, Counsel

20     for Plaintiffs.

21          MS. ARMAND:  Jocelyn Armand, Counsel for

22     Plaintiffs.

23          MR. FERNANDEZ:  Brandon Fernandez and Bryan

24     Capdevila for the City of Miami.

25          MS. SIEGEL:  And just for the record, we have
```



Universal
Court Reporting
CLEAR VALUE. EVERY CASE.

 1          some law clerks observing.  Chelsea Dunn, Southern

 2          Legal on behalf of Plaintiffs, and Benjamin Waxman,

 3          also on behalf of Plaintiffs.

 4              MR. FERNANDEZ:  One more thing.  We also have

 5          a law clerk as well present.

 6              THE COURT REPORTER:  Thank you very much.

 7          Counsel, you may proceed.

 8    Thereupon:

 9                   NATASHA COLEBROOKE-WILLIAMS

10    was called as a witness, and after having been first

11    duly sworn, testified as follows:

12                        DIRECT EXAMINATION

13    BY MS. SIEGEL:

14        **Q     All right.  Good morning, Ms. Colebrooke-**

15    **Williams.**

16        A    Good morning.

17        **Q    And is that how you referred to -- I should**

18    **refer to you, Ms. Colebrooke-Williams.**

19        A    Mrs. Colebrooke-Williams.

20        **Q    Mrs. Colebrooke-Williams.  Okay.  I will try**

21    **to remember.  Have you been deposed before?**

22        A    No.

23        **Q    Okay.  So, the main thing to remember is, if I**

24    **ask a question you don't understand, please ask to have**

25    **it rephrased.  If you need a break, you can take a break**



1   at any time.  But the point here, you are representing

2   the City, so this isn't necessarily your opinion or your

3   under -- your personal experience.

4           But it's what the City of Miami as a

5   Defendant, what their position is and what the City

6   knows.

7           So, you know, again, please, if you cannot

8   answer a question, you can say, you know, you don't

9   know, you don't -- you can't answer it or whatever.

10  You're not ready to answer that particular question.

11          So, this is, you know, a conversation in that

12  way. And what I wanted you to do is to look at Exhibit

13  1, which is the Notice of deposition.

14          (Thereupon, Plaintiffs' Exhibit 1 was entered

15          into the record.)

16  BY MS. SIEGEL:

17     Q   And since this is a 30(b)(6), again, we sent

18  these topics to the City in advance of the deposition

19  and are -- have you seen this before?

20     A   Yes.

21     Q   Okay.  And are you prepared to respond to

22  questions on these topics?

23     A   Some.

24     Q   Which ones are you not able to at this point?

25  Well, let's just go through it.  So, APM 1-19, are you



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 8

```
 1   prepared on that?

 2        A     Yes.

 3        Q     Okay.  The Draft Street Clean-Up?

 4        A     Yes.

 5        Q     The Resolutions?

 6        A     Yes.

 7        Q     The Clean-Ups?

 8        A     Yes.

 9        Q     The Property Storage?

10        A     Some of the questions.

11        Q     Okay. Property left at Clean-Up?

12        A     Yes.

13        Q     The Property Destruction?

14        A     Some of the questions.

15        Q     Okay.  Plaintiffs' Clean-Ups?

16        A     No.

17        Q     The August 2021 Clean-Up?

18        A     Well, I have -- can you explain that question,

19   please?  In terms of --

20        Q     Well, when we'll get there and when -- if

21   there are questions you don't know, then we'll get to

22   that.

23        A     Right.

24        Q     So, at this point we don't know on that one.

25   And Plaintiffs' Property?
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 9

```
 1      A    No.
 2      Q    Okay.  Is there something -- the ones that you
 3  only know some or you said no to, is there something
 4  more you could do to prepare to get an understanding of
 5  those?
 6      A    I can't answer that.
 7      Q    Okay.  Well, we will proceed and see what you
 8  know and see what we can do about what you don't know.
 9  How did you prepare for today?
10      A    I met with City officials.
11      Q    And who did you meet with?
12      A    Department heads, staff, and the City
13  Attorney's Office.
14      Q    Okay.  And when did you begin preparing?
15      A    I'll say in the last -- we had an initial
16  meeting some weeks ago, and then in the last 24 hours.
17      Q    Okay.  And if you had more time, would there
18  be more you would do to prepare?
19           MR. FERNANDEZ:  Object to the form.  Go ahead
20      and answer if you can.
21  BY MS. SIEGEL:
22      Q    Is there some -- let me put it, is there
23  something you didn't have time to prepare?
24           MR. FERNANDEZ:  Same objection.
25  BY MS. SIEGEL:
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 10

1      Q     Which you can answer.  He -- the objections

2   are made for the record.  That's -- I should have said

3   that as part of the ground rules.

4      A     There may have been opportunity to prepare.

5   There may have been more to do.

6      Q     Okay.  Have you read the complaint?

7      A     I did.

8      Q     And did you review documents?

9      A     Some documents.

10     Q     Do you remember which documents?

11     A     The APM.

12     Q     Okay.

13     A     The Draft Plan, correspondence -- e-mail

14   correspondence.

15     Q     Okay.

16     A     More or less that's it.

17     Q     Okay.  What is your current position?

18     A     Assistant City Manager.

19     Q     And how long have you been Assistant City

20   Manager?

21     A     January of 2021.

22     Q     What were you before that?

23     A     Chief of Staff for the City of North Miami.

24     Q     Okay.

25           THE COURT REPORTER:  I'm sorry, could you say



 1          that a little louder?

 2                THE WITNESS:  Chief of staff for the City of

 3          North Miami.

 4                THE COURT REPORTER:  Thank you.

 5    BY MS. SIEGEL:

 6          Q    And how long were you in that position?

 7          A    I don't know the exact date.  I was with the

 8    City of North Miami for 12 years.

 9          Q    Okay.

10          A    But not in that position per se.

11          Q    Okay.  That's fine.  And what was your highest

12    education degree?

13          A    Master's Degree.

14          Q    And what was that in?

15          A    Mass Communication.

16          Q    And where was that from?

17          A    FIU.

18          Q    What are your responsibilities as Assistant

19    City Manager?

20          A    I represent the manager in overseeing six

21    departments.

22          Q    And what departments?  Making you remember a

23    lot now.

24          A    Human Services, Code Compliance, GSA, IT,

25    Solid Waste.  Did I give you six?



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 12

1        Q     That was five.

2        A     Can you repeat the ones I gave you?

3        Q     Solid Waste, Human Services, Code Compliance,

4   GSA, IT.

5        A     Who did I leave?

6        Q     Well, that's okay.  When it comes to you,

7   it'll pop up as the next question.

8        A     I need to tell you.

9        Q     Whoever they are, they'll feel left out,

10  right.

11              And what's your -- do you have a relationship

12  with the police department?

13       A     I do have a relationship.

14       Q     And can you explain what that relationship is?

15       A     We work together on different issues that

16  arise depending on the department.  My department

17  sometimes overlap in terms of operations.

18       Q     And do you have any supervisory capacity over

19  the police department?

20       A     No.

21       Q     So, in an organizational chart, is the City

22  Manager position and the Police chief at the same level

23  or how would you describe that?

24       A     The Police --

25              MR. FERNANDEZ:  Object to form.  Go ahead.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 13

1   BY MS. SIEGEL:

2       Q    Go ahead.

3       A    The Police department reports directly to the

4   City Manager.

5       Q    Okay.  Very good.  So, the City Manager has

6   supervisory control, but you as Assistant City Manager

7   does not?

8       A    That's correct.

9       Q    Okay.  And I assume you report to the City

10  Manager?

11      A    I report to the City Manager.

12      Q    And who is the current City Manager?

13      A    Art Noriega.

14      Q    And how long has he been in that position?

15      A    I do not know.

16      Q    Do you -- was it before January of 2021, as

17  far as you remember?

18      A    Yes.

19      Q    Okay.  So, I want to just get an

20  organizational structure of the City.  How many

21  commissioners are there?

22      A    Five.

23      Q    And is the mayor in addition to those five or

24  one of those five?

25      A    In addition to.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 14

1      Q    Okay.  And is the mayor elected in the City of

2   Miami?

3      A    Yes.

4      Q    And who appoints the City Manager?

5      A    Who?  The council -- the commission.

6      Q    Okay.  Can you describe the responsibilities

7   of the City Manager?

8      A    Chief Executive of the City.

9      Q    And what does that mean?  What are more

10   specific responsibilities?

11      A    He oversees the day-to-day operations.

12      Q    And what is the relationship between the City

13   Manager and the City commissioners?

14      A    Explain the question.

15      Q    Well, is there a relationship?

16      A    He reports to the commission.

17      Q    He reports to the commission.  Very good,

18   thank you.  Does the City use the term Clean-Up?

19      A    Yes.

20      Q    And what is a Clean-Up?

21      A    Servicing areas that are in need of cleaning.

22      Q    Is it specifically homeless areas that need

23   cleaning?

24      A    No, not homeless areas alone.

25      Q    So, Clean-Up may be any place that might need



1   cleaning?

2       A    Could be --

3            MR. FERNANDEZ:  Object to form.  Go ahead.

4       A    It could be illegal dumping that needs to be

5   cleaned-up.

6   BY MS. SIEGEL:

7       Q    Okay.  And just with regards to cleaning up --

8   well, are you familiar with the term Homeless Hotspots?

9       A    Yes.

10      Q    And what is that?

11           MR. FERNANDEZ:  Object to form.  Go ahead.

12  BY MS. SIEGEL:

13      Q    Or how does the City use that term?

14      A    It's interchangeable with the term encampment.

15      Q    Okay. So, what is encampment or hotspot what--

16           MR. FERNANDEZ:  Object to form.  Go ahead.

17      A    An encampment is 10 or more individuals that

18  are homeless in a particular area; most often the public

19  right of way.  Also, where there is reoccurring litter

20  and debris.

21  BY MS. SIEGEL:

22      Q    So, when we refer to Clean-Ups of homeless

23  hotspots or encampments, which departments have a role

24  in that?

25      A    Human Services, Police and Solid Waste.



1      Q     And I'm going to go through the roles in that

2   in a minute -- but what is the Downtown Development

3   Agency?

4           MR. FERNANDEZ:  Object to form.  Answer if you

5      can.  Outside the scope of the notice.  Go ahead.

6      A    I don't have particulars about their

7   functions.  I can't answer that question.

8   BY MS. SIEGEL:

9      Q    Okay.  Do they have a role in the homeless

10  Clean-Ups at all?

11          MR. FERNANDEZ:  Same objection.  Go ahead.

12     A    Not to my knowledge.

13  BY MS. SIEGEL:

14     Q    What is the role of the -- in homeless Clean-

15  Ups of the Department of Human Services?

16     A    Repeat the question.

17     Q    What's the role of the Department of Human

18  Services in homeless and encampment Clean-Ups?

19     A    They coordinate the actual noticing and they

20  also provide outreach to the homeless in an effort to

21  provide wraparound services or place in a shelter or

22  some form of housing.

23     Q    And what is the role of Solid Waste?

24     A    Solid Waste is to remove any debris, litter,

25  to clean the public right of way, sanitize the area.

1      Q     And what's the role of the Police department?

2      A     Police department provides security.  They

3   also provide background checks when we're placing

4   individuals into shelters.  And that's the extent, more

5   or less.

6      Q     Who is the current director of the Department

7   of Human Services?

8      A     The position is currently vacant.  There is an

9   interim director.

10      Q     Who is the interim?

11      A     David Gilbert.

12      Q     David Gilbert.  Okay.  And was Mr. Coro the

13   prior department head?

14      A     Yes.

15      Q     And when did Mr. Coro leave?

16      A     Approximately?

17      Q     Approximately, it was in 2023?

18      A     Yes.

19      Q     And what is the relation -- is there a

20   relationship with the Department of Human Services and

21   the City Commissioner?

22          MR. FERNANDEZ:  Object to form.

23      A     Repeat the question or provide clarity.

24   BY MS. SIEGEL:

25      Q     Does the Department of Human Services in any



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 18

```
 1    way report to the City Commissioner?

 2            MR. FERNANDEZ:  Object to form.  Go ahead.

 3        A    No.  Report?

 4    BY MS. SIEGEL:

 5        Q    Do they provide information at City Commission

 6    meetings, for example?

 7            MR. FERNANDEZ:  Object to form.

 8        A    No different than any other department.  All

 9    directors provide reports to the commission, but it's at

10    the direction of the City Manager.

11    BY MS. SIEGEL:

12        Q    Okay.  Does the City have a line item in the

13    budget for Clean-Ups?

14            MR. FERNANDEZ:  Object to form.  Go ahead.

15        A    I don't know.

16    BY MS. SIEGEL:

17        Q    Do the -- does the Department of Human

18    Services have a line item for Clean-Ups?

19        A    That's --

20            MR. FERNANDEZ:  Object to form, as to line

21        item.

22            MS. SIEGEL:  Okay.

23            MR. FERNANDEZ:  But go ahead.  Answer if you

24        can.

25        A    Can you repeat your question with clarity,
```



 1   please?

 2   BY MS. SIEGEL:

 3        Q    Well, is there an estimate of how much it

 4   costs to conduct Clean-Ups annually for the City?

 5        A    No, not to my knowledge.

 6        Q    Are the costs absorbed within each department?

 7             MR. FERNANDEZ:  Object to form.

 8        A    I have not seen an itemized budget particular

 9   to departments.

10   BY MS. SIEGEL:

11        Q    And if there was a budget from any department

12   that included itemized costs for Clean-Ups, would the

13   City Manager's office see it?

14             MR. FERNANDEZ:  Form, compound, hypothetical.

15        Go ahead.

16        A    Repeat your question.

17   BY MS. SIEGEL:

18        Q    Would the City Manager -- does the City

19   Manager see each department's budgets?

20        A    Yes.

21        Q    And so, if there were a line item for Clean-

22   Ups in any of the department budgets, the City Manager

23   would see it.  Is that correct?

24             MR. FERNANDEZ:  Object to form.  Go ahead.

25        A    Repeat your question.



 1   BY MS. SIEGEL:

 2        Q    So, the City Manager sees -- does the City

 3   Manager approve each department's budgets?

 4             MR. FERNANDEZ:  Object to form.  Go ahead.

 5        A    The City's budget is approved by the City

 6   Commission.

 7   BY MS. SIEGEL:

 8        Q    And how does it get to the City Commission?

 9        A    It's presented by the City Manager.

10        Q    Okay.  And does the City Manager have any role

11   in, developing department budgets?

12             MR. FERNANDEZ:  Object to form.

13        A    There is a review process.

14   BY MS. SIEGEL:

15        Q    And how does that work?

16             MR. FERNANDEZ:  Object to form.  You can

17        answer.

18        A    The department is presented through the budget

19   department.  The budget department reports to the CFO.

20             The CFO presents to the City Manager.  The

21   manager then allows for it to be presented to the

22   commission level.

23   BY MS. SIEGEL:

24        Q    Okay.  How many unsheltered people live in the

25   City?



 1          A      That number changes; I don't know currently

 2     today what it is.

 3          Q      **What's an approximate number?**

 4          A      I want to say in --

 5                 MR. FERNANDEZ:  Object to the form.

 6          A      I don't know.  There -- I don't know the

 7     number. I don't know what the -- I can't recall the last

 8     census number.

 9     BY MS. SIEGEL:

10          Q      **What's the source of those numbers?**

11                 MR. FERNANDEZ:  Object to the form.

12                 MS. SIEGEL:  What is wrong with that question?

13                 MR. FERNANDEZ:  You're asking what are the

14          source of the numbers? The numbers that she doesn't

15          know about.  That's my objection. You answer can --

16                 MS. SIEGEL:  Well, the City has --

17                 MR. FERNANDEZ:  And it's outside the scope of

18          the topics, if you ask me.

19     BY MS. SIEGEL:

20          Q      **Does the City know how many unsheltered people**

21     **are?**

22          A      A census count is conducted by the Homeless

23     Trust along with the Human Services Department.

24          Q      **And is -- does the Homeless Trust conduct,**

25     **counts for the county or for the City?**



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 22

```
 1        A    The county.  But it does point out what the

 2   county is within the City.

 3        Q    Wait -- it does what?  Say that again.

 4        A    It does include -- it's broken.  It is a count

 5   of the entire county, but a number is provided for the

 6   City of Miami in terms of what the census number is.

 7        Q    Does the City conduct its own count?

 8        A    No, not to my knowledge.

 9        Q    So, it relies on the numbers from the Homeless

10   Trust counts?

11        A    Yes.

12        Q    And do you know whether the numbers of

13   unsheltered people in the City has increased or

14   decreased since January, 2021?

15        A    Decreased.

16        Q    And again, you base that on the Homeless Trust

17   numbers?

18        A    Yes.

19        Q    And what about 2022, has it increased or

20   decreased since January 2022?

21        A    Decreased.

22        Q    And do you know what point in time the counts

23   are conducted?

24        A    Can't recall.

25        Q    Okay.  And how many shelter beds are there in
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023        Page 23

```
1    the City?

2           MR. FERNANDEZ:  Object to form.  Go ahead.

3       A    Will use clarity, when you say shelter beds.

4    BY MS. SIEGEL:

5       Q    Do you know what -- a shelter bed.  How would

6    the City, define shelter bed?

7       A    So, we have shelter beds with Camilla's house.

8    The last approved agreement designates a 100 shelter

9    beds to the City -- for City use.

10      Q    For City use.  And of those beds, how many are

11   24-hour beds?

12      A    And --

13      Q    Roughly between 24 hour beds, and then, you

14   know, the longer term is there just a rough estimate if

15   you don't know the exact?

16      A    I believe --

17          MR. FERNANDEZ:  Object to the form.  Go ahead.

18      A    I believe the current contract does not

19   separate 24 hours from long term.

20   BY MS. SIEGEL:

21      Q    Okay.  So, the current contract allows for

22   flexibility in that number?

23      A    Correct.  But I don't have the contract with

24   me.  So, that's -- this is based on memory.

25      Q    That's fine.  Okay.  And when it -- you say
```



1  that 100 beds are reserved for the City, are some

2  specifically reserved for Police, some for the homeless

3  outreach workers, or how is that worked?

4      A    Of those 100 beds, approximately for -- are

5  for the DDA.

6      Q    That's the Downtown Development Association.

7  Okay.

8      A    And the others are for the City as a whole. I

9  don't know the breakdown between Police and I'm looking

10  at -- I'm telling you just for the City.

11     Q    Okay.  And --

12     A    I'm not talking loud at all?

13     Q    Yeah, if you could speak up it would be

14  helpful.

15          MS. SIEGEL:  You want to move that closer?

16          THE COURT REPORTER:  No, I think it's good.

17  BY MS. SIEGEL:

18     Q    Okay.  Are shelter beds regularly available

19  for people during Clean-Ups?

20          MR. FERNANDEZ:  Object to form.

21     A    I wouldn't know that.

22  BY MS. SIEGEL:

23     Q    Okay.  Do you know if there's a waiting list

24  for shelter beds?

25     A    Not to my knowledge.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 25

```
1      Q    Meaning there isn't one as, or you just don't

2   know?

3      A    I wouldn't know that.

4      Q    You wouldn't know that.  Okay.  All right. So,

5   do you know any of the Plaintiffs in this case?

6      A    I do not.

7      Q    And I'll just ask you by name just to make

8   sure.  Latoyla Cooper-Levy.  Do you know her?

9      A    No.

10     Q    Phillip Silverman?

11     A    No.

12     Q    Sherman Rivers?

13     A    No.

14     Q    And Joseph Simmons?

15     A    Nope.

16     Q    Okay.  What?

17          MR. FERNANDEZ:  I said, I bumped the chair

18     off.

19          MS. SIEGEL:  Sorry.  There's no worries.

20   BY MS. SIEGEL:

21     Q    I missed something.  Does the City of

22   knowledge of the Clean-Up specifically involving those

23   four Plaintiffs?

24     A    Repeat it?

25     Q    Does the City have knowledge of the Clean-Ups
```



1   specifically involving those four Plaintiffs?

2      A    The City?

3      Q    Yes.

4           MR. FERNANDEZ:  Object to the form.

5           MS. SIEGEL:  What's wrong with that question?

6           MR. FERNANDEZ:  I think it's overbroad, but

7      you can answer, right.  Go ahead and answer if you

8      can.

9      A    Yes.

10  BY MS. SIEGEL:

11     Q    Okay.  And does the City of knowledge of what

12  happened to any of the property that Plaintiffs' claim

13  has been destroyed?

14          MR. FERNANDEZ:  Same objection.

15     A    I do not know.

16  BY MS. SIEGEL:

17     Q    Does the City have any storage forms for any

18  of the Plaintiffs?

19     A    I do not know.

20     Q    Was that something you attempted to prepare

21  yourself on?

22     A    No.

23     Q    And is there a reason for that?

24          MR. FERNANDEZ:  Object to the form.

25     A    Not sufficient time.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 27

```
 1  BY MS. SIEGEL:
 2      Q    And a lot of times Attorneys will ask
 3  questions that just are obvious, we have to get them on
 4  the record.  But do you -- does the City have knowledge
 5  of any voluntary disposal forms for the Plaintiffs?
 6      A    I do not know.
 7      Q    Are there any other documents regarding the
 8  Plaintiffs' property that the City has?
 9      A    I do not know.
10      Q    Any, body cams of the Plaintiffs'?
11      A    I do not know.
12      Q    And any field investigation forms?
13          MR. FERNANDEZ:  Object to form.
14      A    I do not know.
15  BY MS. SIEGEL:
16      Q    Okay.  And what would you do to find out the
17  answers to those questions?
18      A    Consult --
19          MR. FERNANDEZ:  Object to form.  Go ahead.
20          MS. SIEGEL:  Don't have to have an attitude
21      about it.  Just object.
22          MR. FERNANDEZ:  I just -- I did object.  You
23      go ahead.  You can answer the question.
24      A    Consult with personnel staff.
25  BY MS. SIEGEL:
```



1      Q     And you didn't have time to do that on this

2   particular types of questions?

3              MR. FERNANDEZ:  Object to form.

4   BY MS. SIEGEL:

5      Q     Does the City dispute that any of the

6   Plaintiffs' property was destroyed?

7              MR. FERNANDEZ:  Object to form.  Overbroad.

8      A     I do not --.

9              THE COURT REPORTER:  I'm sorry.  I couldn't

10         hear the response.

11      A     I do not know.

12   BY MS. SIEGEL:

13      Q     Does this -- does the City contend that the

14   property was stored?

15             MR. FERNANDEZ:  Object to form.  As to

16          property, as to whose property as to when?  Go

17          ahead and answer.

18             MS. SIEGEL:  Okay.  Well --

19      A     I --

20   BY MS. SIEGEL:

21      Q     And we can set the stage a little. I mean,

22   we're talking about the Plaintiffs' property in that

23   was -- that is the subject of this complaint.

24      A     Okay.  The answer is, I don't know.

25      Q     Okay.



```
 1              MR. FERNANDEZ:  Same objection.

 2   BY MS. SIEGEL:

 3       Q    Thank you.  So, at this time, the City does

 4   not know what happened to the property that is alleged

 5   to be destroyed in this complaint.  Is that correct?

 6              MR. FERNANDEZ:  Object to form, overbroad.

 7       A    Correct.

 8   BY MS. SIEGEL:

 9       Q    Okay.  All right.  And I'm -- I have questions

10   about the property in this complaint.  It maybe -- you

11   may agree to just come back after you've had time to

12   prepare.

13              I mean, if you're not ready today, you did say

14   in the beginning you weren't prepared on Plaintiffs'

15   Clean-Ups.

16              So, I'm going to go through some questions and

17   if you don't know any of them, then maybe we should just

18   put that off for another day.

19                   For example, for Ms. Cooper-Levy's

20   identification documents, US passport, birth

21   certificate, Social Security card, that she claims was

22   destroyed in May of 2021.

23              Were any of those determined by the City to be

24   contaminated?

25       A    I don't know.
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 30

1       Q    Would you know whether any of the items by any

2    of the Plaintiffs were contaminated?

3            MR. FERNANDEZ:  Object to form, outside the

4       scope.

5       A    I would not know.

6    BY MS. SIEGEL:

7       Q    Okay.  Or abandoned, same thing with any of

8    the property in that that's talked about in this

9    complaint?

10           MR. FERNANDEZ:  Same objection.

11   BY MS. SIEGEL:

12      Q    Okay.

13      A    I wouldn't know.

14      Q    I think we need to put this item, I don't know

15   if it's an item a topic aside.

16           MR. FERNANDEZ:  Sure.

17           MS. SIEGEL:  And come back.

18           MR. FERNANDEZ:  Yeah.

19           MS. SIEGEL:  Yes.

20           MR. FERNANDEZ:  This we'll revisit.  It later

21      at the end -- at the -- towards the end of today.

22      Come back.

23   BY MS. SIEGEL:

24      Q    Do you know how long Clean-Ups of homeless

25   hotspots has been conducted in the City? Approximately,



1  I know you haven't been here for --

2      A    Right, so --

3      Q    You know, a 100 years, but --

4      A    I don't know what was done prior to 2021.

5      Q    Okay.  And remind me when you came here in

6  2021?

7      A    January 2021.

8      Q    January.  Okay.  Have homeless, encampment

9  Clean-Ups been conducted since you've been assistant

10  City Manager?

11     A    Yes.

12     Q    And do you personally have any involvement in

13  the Clean-Ups operations?

14     A    Explain -- expand -- clarify the question.

15     Q    Do you have any role in the Clean-Ups?

16     A    Are you asking physically on site?

17     Q    Any -- in any capacity you supervise -- do

18  you, you know, schedule in which I'm sure you don't,

19  but, you know, those types of activities?

20     A    I do have a role.

21     Q    Okay.  And what would your role be?

22     A    I'm aware of the plan, the approach, Human

23  Services reports directly to me.

24     Q    Are you aware of the Homeless Assistance

25  Project of the Department of Health -- Department of

UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

```
 1   Human Services?
 2       A    Repeat it.
 3       Q    Homeless Assistance Project?
 4       A    No.
 5       Q    Okay.  Do you know then whether they were
 6   responsible for Clean-Ups before the HEAT Team?
 7       A    No, I don't know who that is.  I don't know
 8   what that is.
 9            MR. FERNANDEZ:  Object to form.  It's just not
10       in -- I don't see it in the topics.
11            MS. SIEGEL:  I'm trying to lay a foundation --
12       Clean-Ups.
13            MR. FERNANDEZ:  No problem.  I'm sorry -- I
14       just got to make sure.  I just got to -- I just got
15       to lay my foundation.  I'm sorry.  Go ahead.
16   BY MS. SIEGEL:
17       Q    Okay.  Are you aware of the HEAT Team?
18       A    Yes.
19       Q    And do you know when the HEAT Team started?
20       A    Maybe late '21.
21       Q    Do you have any reason to think it wasn't,
22   begun in August of 2021?
23       A    No reason to believe it may have been.
24       Q    Okay.  What were the City's reasons for -- or
25   what are the City's reasons for conducting Clean-Ups of
```



1    homeless hotspots?

2        A    Primary reason is to provide outreach and

3    assistance to the homeless in terms of -- primary reason

4    is to provide outreach and assistance to the homeless

5    population in terms of placement in shelters or housing,

6    Also, to rid of any debris and any public health

7    concerns.  Keep the public right of way clean.

8        Q    And how frequently are Clean-Ups conducted of

9    the homeless hotspots?

10       A    Several times a week in various locations.

11       Q    And do they continue to this date?

12       A    Yes.

13       Q    And what is the role of the HEAT Team in

14   conducting Clean-Ups?

15       A    The Heat team does Clean-Ups from beginning to

16   end.  They have full responsibility.

17       Q    And who -- and when I say who, I mean whether

18   it came from a department, the commission, the mayor,

19   just what entity made the decision to form the HEAT

20   Team?

21            MR. FERNANDEZ:  Go ahead.

22       A    Administration.

23   BY MS. SIEGEL:

24       Q    Executive.  Not when you say administration,

25   who does that mean, City Manager?



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 34

 1      A     Executive mean, it was proposed by a director

 2   approved by the manager.  Executive directors are our

 3   executives.

 4      **Q     Okay.  So, a director of a department?**

 5      A     Proposed.

 6      **Q     Proposed the --**

 7      A     The acronym, the term HEAT Team, and it was

 8   approved by the manager to move forward.

 9      **Q     And which director?**

10      A     The Police Chief.

11      **Q     And when you say the Police Chief proposed the**

12   **acronym, did the Police Chief?**

13      A     They so, --

14            MR. FERNANDEZ:  You have to wait for her to

15      finish her question.

16            THE WITNESS:  I'm sorry.

17            MS. SIEGEL:  It's okay.

18            MR. FERNANDEZ:  So, to wait for her to finish

19      your questioning because the Court Reporter only

20      has two hands.  Okay?

21            THE WITNESS:  My apologies.

22            MR. FERNANDEZ:  No Problem.  Okay.  Go ahead.

23      Sorry.

24            MS. SIEGEL:  We probably answer a better

25      question than I'm asking.



UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

```
 1            THE WITNESS:  But --
 2   BY MS. SIEGEL:
 3       Q    Okay.  So, the Police -- you said the Police
 4   Chief proposed the acronym, but did the Police Chief
 5   propose the entity and the role of the HEAT Team?
 6       A    I don't know.  The collaboration continued to
 7   evolve, so I can't identify what one person proposed the
 8   collaboration.
 9       Q    So, what entity approved of the HEAT Team?
10   I -- and I can ask more.  I mean, did -- does the City
11   man -- would the City Manager approve of the creation of
12   the HEAT Team?
13       A    Yes.
14       Q    And would the commission also approved the
15   creation of the HEAT Team --
16            MR. FERNANDEZ:  Object to form.  Go ahead.
17   BY MS. SIEGEL:
18       Q    Did the commission approve the creation of the
19   HEAT Team?
20       A    I don't recall this going to commission.
21       Q    And what about the mayor?  Did the mayor
22   approve the creation of the HEAT Team?
23       A    I don't know.
24       Q    Okay.  Are there goals for the HEAT Team?
25   Meaning like how would success of the HEAT Team be
```



1  measured, what would the City Manager look at?

2          MR. FERNANDEZ:  Object to form.  Go ahead.

3      A    You're asking me what the manager would think?

4  BY MS. SIEGEL:

5      Q    Well, with the City -- I mean as the

6  representative of the City?

7      A    Okay.  A reduction in our homeless population.

8      Q    Is it a goal of the City to reduce the

9  property belonging to homeless individuals?

10         MR. FERNANDEZ:  Object to form.

11     A    No.

12  BY MS. SIEGEL:

13     Q    Is it a goal of the City to make homeless

14  individuals less visible to the public?

15     A    No.

16         MR. FERNANDEZ:  Object to form.  Go ahead.

17         THE WITNESS:  Sorry.

18         MR. FERNANDEZ:  It's okay.

19  BY MS. SIEGEL:

20     Q    Are there any other goals of the HEAT Team

21  besides reduction in homeless population?

22     A    No.

23     Q    What is the current staffing of the HEAT team?

24  And let's start by looking at the Police.  Do you know

25  how many Police are assigned to the HEAT Team?



```
 1        A     No.

 2        Q     Do you know how many department of Human

 3   Services staff are assigned?

 4        A     I know approximately.

 5        Q     Approximately?

 6        A     Four.

 7        Q     And what are those four positions that you

 8   know of?

 9        A     I don't know exact titles.

10        Q     Okay.

11        A     One is a coordinator and outreach team

12   referred to his Green Shirts.

13        Q     And what about Solid Waste?  Do you know how

14   many are assigned to the HEAT Team?

15        A     I don't know the number of personnel.

16        Q     Do you know whether anything changed about how

17   Clean-Ups are conducted of homeless hotspots?  When the

18   HEAT Team began approximately August 2021?

19             MR. FERNANDEZ:  Object to form.

20        A     Nothing I can recall off the bad in terms of

21   changes.

22   BY MS. SIEGEL:

23        Q     You're have to speak up.

24        A     No changes that I can speak of.

25        Q     Okay.
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 38

```
 1      A    From memory.
 2      Q    And do you know what a rapid response team is?
 3           MR. FERNANDEZ:  I am going to object to form.
 4      A    Yes.
 5   BY MS. SIEGEL:
 6      Q    What is that?
 7      A    Respond to smaller areas where there are
 8   complaints of assistance needed as it relates to
 9   homeless issues.
10      Q    And do you know the composition of that team?
11   Like how many from Police, are there any from Solid
12   Wastes?
13      A    No.
14      Q    Okay.  Do you know whether Green Shirts are
15   assigned?
16      A    I don't know for sure.
17      Q    Do you know if -- come back to that.  All
18   right. Are you familiar with the City's Policy APM 1-19?
19      A    Yes.
20      Q    And it's says that Exhibit 2.
21           (Thereupon, Plaintiffs' Exhibit 2 was entered
22           into the record.)
23   BY MS. SIEGEL:
24      Q    What does APM stand for?
25      A    Administrative policy.
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 39

1    Q    And this one in Exhibit 2 is dated 1/14/2019.

2    Are you familiar with this version of the policy?

3    A    I am.

4    Q    And can you tell me whose signature that is?

5    A    Emilio T. Gonzalez according to the document.

6    Q    Okay.  I see it's typed up there.  And then

7    you're -- we're assuming that that's the same?

8    A    Right.

9    Q    Okay.

10   A    That's the only, otherwise I wouldn't know

11   that signature.

12   Q    Okay.  And what are -- how do I ask this? What

13   are administrative policies like, what do they cover,

14   aside from this particular one, what is the purpose of

15   administrative policies?

16   A    The way in which the City is to govern itself

17   in conducting business contingent upon the topic, the

18   subject.

19   Q    And this has the City Manager said issued by,

20   I assume that means approved by -- I mean, did the City

21   Manager approve all administrative policies?

22   A    Yes.

23   Q    And, does the commission have any role in I

24   approving administrative policies?

25   A    No.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 40

```
1     Q    And then if you look at Exhibit 3.

2          (Thereupon, Plaintiffs' Exhibit 3 was entered

3          into the record.)

4   BY MS. SIEGEL:

5     Q    We'll come back to the specifics of these, but

6   I'm just trying to get the overall view.  Number 3,

7   there's a routing document routing form, and attached to

8   it is APM 1-19 and the dates in the column of the

9   routing form are August 30th, 2021, August 26th, 27th,

10  but all in August of 2021.  Are you familiar with this

11  version of the APM?

12    A    Yes.

13    Q    2019.  And then if you turn to the second

14  page, it has Arthur Noriega, who was the City Manager at

15  that point in time.  Is that correct?

16    A    Correct.

17    Q    And what is the process for establishing the,

18  APMs?  How does it work in the City Government?

19    A    It varies.

20    Q    Okay.  So, for -- let's just talk about this

21  particular one then.  How did the original -- where does

22  it start, like how did they get developed?

23    A    I can't speak to the original.  I wasn't here.

24    Q    Okay.  Then let's talk about the amended.  Do

25  you were in office at that point in time?
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 41

```
 1      A    Correct.
 2      Q    So, how does this get -- how do administrative
 3  procedures get amended?  What's the process?
 4      A    The amendment was recommended by the
 5  department head based on past experiences.  Then it was
 6  vetted through the City Attorney's office and then
 7  approved by the City Manager.
 8      Q    Do you know if there is a document routing
 9  form for the original APM?
10      A    I do not know.
11      Q    Is that something that just began in 2021 or--
12      A    I don't know.  Routing forms were in place
13  when I started.
14      Q    Okay.  Is the APM at Exhibit 3 the current
15  APM 1-19?
16      A    Yes.
17      Q    And what is your role?  I see that you -- your
18  name is on the Exhibit 3 version.  What is your role in
19  signing this?
20      A    Review it prior to it going to the City
21  Manager.
22      Q    And what do you look for in reviewing it?
23      A    I review the details, I also ensure that it
24  has been reviewed by the appropriate departments before
25  it comes to me based on the routing form.
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 42

1     Q     And who does -- who within the City does the
2   APM 1-19 apply to?  Well, I could ask it different, but
3   who needs to comply within the City APM 1-19?
4     A     All City Officials.
5     Q     And how would the City Official?
6     A     Anyone dealing with the homeless that
7   encounters it -- encounter the homeless representing the
8   City are to comply with this APM.
9     Q     Okay.  So, I assume that covers Department of
10  Human Services personnel?
11    A     That cover -- covers Department of Human
12  Services personnel.
13    Q     And Department of Solid Waste personnel?
14    A     Yes.
15    Q     And what about the Police?
16    A     Yes, as long as it doesn't but they have a
17  procedure that under the scope indicates any exceptions,
18  that is the departmental order Chapter 10.
19    Q     Okay.
20    A     So, that supersedes the APM.
21    Q     Got you.  So, there's a Departmental Order,
22  and the Police are obliged to comply with the
23  departmental order over the APM?
24    A     Yes.
25    Q     Okay.  Is there anyone in the City who has



1  responsibility for ensuring that the City personnel on

2  the HEAT Team follows the APM?

3      A    The reporting structure, so of the change.

4      Q    So, how does that work in this in the City of

5  Miami?

6      A    The manager for the homeless division is

7  Sergio Torres.  He in return reports to the Director of

8  Human Services and reports to me and I report to the

9  City management.

10     Q    And what about the opposite way of how does

11 Mr. Torres ensure that the people below him are

12 complying?

13     A    Repeat the question you're asking me.  Go

14 ahead and repeat your question.

15     Q    So, you said that Mr. Torres reports to you,

16 you report to the --

17     A    No.

18     Q    Manager or whoever.  Okay.  Mr. Torres reports

19 to the department head?

20     A    Correct.

21     Q    Department head reports.  I missed a step, so

22 I'm asking the other way.  So, that's how Mr. Torres is,

23 fits within the reporting structure up to the City

24 Manager, but what about the people below him?

25          Does Mr. Torres have any responsibility for



1  ensuring that the people underneath him in the City

2  structure comply with APM?

3      A    Yes.

4      Q    And how does he do that?

5          MR. FERNANDEZ:  Answer if you can.

6      A    I can't -- I don't know what procedures, I

7  can't -- I don't know what Mr. Torres is doing to ensure

8  that following the training is an element.

9  BY MS. SIEGEL:

10      Q    So, in -- do you know if compliance with APM

11  1-19, is part of any of the City personnel's performance

12  review?

13      A    I do not know.

14          THE COURT REPORTER:  Sorry, could you repeat

15      the response?

16          MS. SIEGEL:  What?

17          MR. FERNANDEZ:  She says she didn't know.

18          THE COURT REPORTER:  Okay.

19  BY MS. SIEGEL:

20      Q    How does the City ensure that City personnel

21  that are responsible for conducting homeless Clean-Ups,

22  are aware of the amend -- are aware of APM?

23      A    APMs are distributed department wide, that's

24  the form of communication and training.

25      Q    So, they're distributed in what fashion?

```
 1       A    Some are distributed via E-mail.  Some are

 2  handed because not all personnel has E-mail.

 3       Q    And, would it be Mr. Torres's responsibility

 4  to ensure that the people within the Department of Human

 5  Services are aware of the APM?

 6       A    Not Human Services.  Within the homeless

 7  division, yes.

 8       Q    With the homeless division within the

 9  Department of Human Services?

10       A    Yes, ma'am.

11       Q    Got it.  Forgot that little step.  And he's

12  the director of that division?

13       A    He is not a director, I remember -- I don't

14  know his exact title.  I believe its manager.

15       Q    Okay.  Is there a difference in City

16  terminology between directors and managers?

17       A    Yes.

18       Q    And what's the difference?

19       A    He is not an executive the director is an

20  executive and responsible for the department.

21       Q    Okay.

22            MS. SIEGEL:  Why don't we take a five-minute,

23       maybe 10 if you need it, but take a little break.

24            MR. FERNANDEZ:  Sure.

25            (Thereupon, a short discussion was held off
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 46

```
 1                     record.)

 2                     (Deposition resumed.)

 3                     THE COURT REPORTER:  It's 10:32 a.m.  We're

 4          back on the record.

 5     BY MS. SIEGEL:

 6          Q    Just a couple follow-up questions from what we

 7     were talking about.  I had asked you about how APMs in

 8     general are distributed, how was the original APM

 9     distributed?

10          A    I wasn't here.

11          Q    As a City representative, do you not know

12     that?

13          A    I do not know how the APM prior to 2021 was

14     distributed.

15          Q    And then how was the APM -- amended APM 1-19

16     distributed?

17                     MR. FERNANDEZ:  Asked and answered.  Go ahead.

18                     MS. SIEGEL:  I don't think she answered about

19          this particular one she was answering in general.

20     BY MS. SIEGEL:

21          Q    I mean, there's a routing form, so, but how,

22     how does it get distributed to people that aren't on the

23     routing form --

24                     MR. FERNANDEZ:  Object to form.

25          A    It's distributed through the manager of the
```



1   homeless division to the outreach team.

2   BY MS. SIEGEL:

3       Q    And do you know in what format?

4       A    I do not know in what format.

5       Q    And a different topic.  You had said something

6   about when I asked what are the goals of the HEAT Team

7   one was to reduce the homeless population.

8            And do you -- what's the reason for the City

9   wanting to reduce the homeless population within the

10  City?

11      A    We would like to provide shelter or long-term

12  housing for individuals that are homeless.

13      Q    And do you know the names of the Green Shirts

14  that are assigned to the HEAT Team?

15      A    I do not know them.  Know the names.

16      Q    And you mentioned a coordinator.  Do you know,

17  who are you referring to is?

18      A    The coordinator is David Roseman.

19      Q    Okay.  Does the City agree that homeless

20  people are permitted to own property?

21      A    Yes.

22      Q    And are they permitted to own tents?

23      A    Yes.

24      Q    Would the City agree that tents are their

25  homes?



```
 1                  MR. FERNANDEZ:  Object to form.  Go ahead.

 2        A    Yes.

 3   BY MS. SIEGEL:

 4        Q    Are they permitted to keep personal property

 5   within their tents?

 6        A    Yes.

 7        Q    What about chairs?

 8        A    The APM reference the removal of furniture.

 9   So, it's contingent upon whether or not it's blocking

10   the right of way.

11        Q    Okay.  So, if it's not blocking the right of

12   way, they could own the chair or other furniture?

13        A    Yes.

14        Q    And what about mattresses if it's not blocking

15   the right of way?

16                  MR. FERNANDEZ:  Object to form.  Go ahead.

17        A    Unsure.

18                  THE COURT REPORTER:  Is that unsure?

19                  THE WITNESS:  Unsure.

20                  THE COURT REPORTER:  Okay.  Sorry.

21   BY MS. SIEGEL:

22        Q    Aside from the description of what you -- I

23   can't remember the phrase of your direction from the top

24   down, people reporting to each other --

25        A    Okay.
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 49

1      Q      There's a phrase you mentioned.

2      A      I don't recall the phrase I used.

3      Q      Knowing whatever that phrase is, aside from

4    the reporting structure up and down --

5      A      Um-hum.

6      Q      The reporting structure does anyone have in

7    the City have the specific responsibility for training

8    outreach workers on the APM?

9      A      Yes.

10      Q      And who is that?

11      A      It is the responsibility of Sergio Torres to

12    ensure that outreach workers are trained on the APM.

13      Q      And do you know how he does that?

14      A      I do not know the exact steps taken, I do know

15    that there are on the -- in the field training and

16    orientation for individuals that are hired.

17      Q      And does the City have any process for

18    determining whether Mr. Torres is actually conducting

19    the training or the training is being conducted?

20      A      Repeat your question.

21      Q      Is there any process within the City to ensure

22    that Mr. Torres, who has the responsibility for training

23    that Mr. Torres is actually providing, ensuring that

24    training is conducted of the outreach workers?

25      A      There is oversight by the director.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 50

1    Q    The director of Human Services or --

2    A    The director of Human Services.

3    Q    I forget the directors and managers.  It's not

4    in my vocabulary.  So, oversight by director.  And how

5    does -- what are some activities or action items that

6    the director would do to ensure that?

7    A    He follows-up in writing, he asked for

8    briefings from Mr. Torres.  He at the time, the previous

9    director personally visited the site to ensure that

10   Mr. Torres and the outreach team was aware the APM.

11   Q    Are you talking about Mr. Coro?

12   A    Yes.

13   Q    Okay.  And, what about the process for

14   ensuring that the Solid Waste personnel are trained in

15   APM 1-19?

16   A    The director of Solid Waste ensured that the

17   team assigned to the HEAT Team -- the team assigned to

18   the HEAT Team was aware of the APM.

19   Q    Okay.

20   A    And they really serve in a capacity at the

21   direction of the outreach team, outreach employees or

22   Police advising when they should discard of items.

23   Q    Can you repeat that last part?

24   A    Solid Waste?

25   Q    Um-hum.



1    A    They're made aware by the director.

2    Q    **Okay.**

3    A    Of the APM.

4    Q    **And do you again -- do you know how the**

5    **director does that?**

6    A    He meets with his team.

7    Q    **And what about the police department?  How'd**

8    **you -- how does the HEAT Team from the Police**

9    **department, who is the responsibility within the Police**

10   **department to ensure that the HEAT Team is aware of the**

11   **APM?**

12   A    Everyone within the reporting structure has

13   the responsibility to make sure that their direct

14   reports are aware and trained as it relates to the APM

15   and the departmental order.

16   Q    **And is there any -- yeah negative consequence**

17   **within the City structure for not complying with the**

18   **APM 1-19?**

19        MR. FERNANDEZ:  Object to form.  Go ahead.

20   A    There are disciplinary steps for not complying

21   with any City policies and procedures.

22   BY MS. SIEGEL:

23   Q    **What are those?**

24   A    The director has the right to do progressive

25   discipline, whether it's verbal warnings, write-ups, and



1    it continues to elevate.

2        Q    And has the City since January, 2021

3    disciplined anyone for not complying with the APM 1-19?

4        A    I do not know.

5        Q    Who would know that?

6        A    Personnel department, Human Service, I mean,

7    human resources would know whether or not any personnel

8    has received disciplinary action due to violating the

9    APM 1-19, there would be a record or the department

10    director.

11        Q    Okay.

12        A    Depends on the form of discipline.

13        Q    Is there any documentation of training City

14    personnel and how to store and dispose of homeless

15    property?  So, aside from just reporting back and forth,

16    is there any actual documentation?

17        A    I don't know.

18        Q    And who would know that?

19        A    The department director

20        Q    Of each department?

21        A    Yes, ma'am.

22        Q    So, if we look at Exhibit 3, this is the

23    current APM 1-19 and if you look at the bottom right is

24    where we have Bates numbers and there's a DEFOOO258 and

25    that's the first page of the APM.



1        A     Got it.

2        Q     Okay.  There are definitions, the first

3    definition is contaminated or dangerous items.  And so,

4    the different items that are examples, it does say

5    included but not limited to hazardous materials.  How

6    would the City define hazardous materials?

7             MR. FERNANDEZ:  Object to form.

8             MS. SIEGEL:  Why?  What's wrong with that

9        question?

10             MR. FERNANDEZ:  Withdrawal.  Go ahead.  You

11        can answer the question.

12        A     I know that present a hazard to health and

13    safety of City personnel or the public is how they would

14    define it.

15    BY MS. SIEGEL:

16        Q     And is that definition written out in any

17    document in the City?

18        A     It's written out in APM 1-19.

19        Q     Where does it define hazardous materials?

20        A     Contaminated -- definitions A, contaminated or

21    dangerous items are those items that present a hazard to

22    health or safety of the City personnel or the public.

23             Include -- items include but are not limited

24    to hazardous material, flammable.  Example, pools,

25    propane tanks, fabric contained with human or animal

LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 54

```
 1   waste, fabric contain -- contaminated with flammable
 2   substances.  And then it provides examples.
 3       Q    Right.  And it also says wet fabric just to
 4   continue that.
 5       A    Right.
 6       Q    I understand that those are examples of what's
 7   a hazard to the health and safety of City personnel or
 8   the public.
 9            But if a -- someone who, like a Green Shirt
10   who has responsibility under this APM to actually make a
11   determination about what's contaminated or dangerous,
12   how would they know what -- is there any further
13   information to help them understand what a hazardous
14   material is?
15            MR. FERNANDEZ:  Form, compound.  Go ahead.
16       A    Can you break up the question, please?
17   BY MS. SIEGEL:
18       Q    Is there any other document or any other
19   information that the City provides to the Green Shirts
20   about what is a hazardous material?
21       A    I'm not aware of any additional documents, but
22   there is training on site provided to Green Shirts.
23       Q    And what additional information is provided in
24   training to help them understand what the hazardous
25   material?
```



 1      A    They're -- they have the opportunity to see

 2  firsthand things that can be hazardous such as needles,

 3  waste on sidewalk, soiled material.  So, firsthand

 4  experience with an experienced Green Shirt or

 5  coordinator.

 6      Q    Okay.  So, the same question for flammable

 7  materials.  Is there any other information besides

 8  what's presented in the APM, or Green Shirts to

 9  understand what flammable materials are?

10      A    No.  Same answer.

11      Q    Okay.  Fabric contaminated with human or

12  animal waste?  Any more, any other documentation?

13      A    No.

14      Q    And fabric contaminated with flammable

15  substances?

16      A    Same answer.

17      Q    Okay.  And what about wet fabric?  How is that

18  defined?

19      A    How is wet fabric defined?

20      Q    Yes.  Is there any further definition of wet

21  fabric?

22      A    No.

23      Q    And how is wet fabric a hazard to the health

24  and safety of City personnel or the public?

25      A    It depends on how it's wet, what it's wet


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

1  with, and also whether or not it has mold as defined in

2  the APM.

3      Q    So, I think I forgot all of what you just

4  said, if a fabric is wet, it has no mold, has no urine

5  or feces or flammable substances, is that a hazard to

6  health and safety of City personnel?

7           MR. FERNANDEZ:  Form.  Hypothetical, go ahead.

8      A    According to the APM?

9  BY MS. SIEGEL:

10     Q    Yes.

11     A    Based on my interpretation, it would not be.

12     Q    And is that a City response or your own

13  response?

14           MR. FERNANDEZ:  Object to the form.  Go ahead.

15           MS. SIEGEL:  Well, it's a fair question --

16     A    Based on the APM.

17  BY MS. SIEGEL:

18     Q    Okay.

19     A    It's a City response.

20     Q    Okay.  Thank you.  Okay.  Is an item

21  hazardous, if it is soiled?

22     A    Soiled with?

23     Q    With human waste?

24     A    Yes.

25     Q    And it -- and what -- I guess what is



 1   hazardous about that by itself, an item that is soiled?

 2        A    Unattended -- I -- can you ask the question

 3   again.

 4        Q    We're just still just talking about

 5   definitions --

 6        A    Right.

 7        Q    Okay.  So, if there is an item that is soiled

 8   with human waste, why is that contained within the

 9   definition of contaminated?

10        A    Leaf fluids and waste can be hazardous and

11   it's defined in the City's APM as being contaminated.

12        Q    And do you know what the City relies on to

13   include items that are soiled within the definition of

14   contaminated?

15             MR. FERNANDEZ:  Object to form.

16   BY MS. SIEGEL:

17        Q    Are there any studies, you know, or anything

18   like that that the City relies on to put that in the

19   definition?

20        A    I do not know the source.

21        Q    And what about wet fabric?  Do you know what

22   the City relies on to put wet fabric within the

23   definition of contaminated?

24        A    Mold, if it has formed mold according to the

25   APM.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 58

1        Q    Is there any consideration given by the City

2    to providing more Porta-Potties to decrease the amount

3    of fabric that is soiled?

4              MR. FERNANDEZ:  Object to form.  Go ahead.

5        A    Repeat your question.

6    BY MS. SIEGEL:

7        Q    Is there any consideration by the City given

8    to provide more Porta-Potties in the area of homeless

9    hotspots?

10       A    No.

11             MR. FERNANDEZ:  Object to form.  Go ahead. Let

12        her finish the question.  Okay.

13             THE WITNESS:  Sorry.

14             MR. FERNANDEZ:  Go ahead.

15             MS. SIEGEL:  You can let me finish before you

16        object.

17             MR. FERNANDEZ:  Well, yeah sorry.  Go ahead.

18    BY MS. SIEGEL:

19       Q    Okay.  Is there any consideration given by the

20    City to provide more Porta-Potties in the areas of

21    homeless hotspots?  Where Clean-Ups are conducted in

22    order to decrease the amount of fabric that's -- that is

23    has been soiled?

24             MR. FERNANDEZ:  Objection, hypothetical

25        compound.  Go ahead.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023        Page 59

```
 1        A     No.

 2   BY MS. SIEGEL:

 3        Q     Is there any consideration to drying wet

 4   fabric, so that it doesn't have the risk of becoming

 5   molding?

 6              MR. FERNANDEZ:  Object to form.  Go ahead.

 7        A     No.

 8   BY MS. SIEGEL:

 9        Q     Would you agree that there would be minimal

10   risk of developing mold if the wet fabric is allowed to

11   dry?

12              MR. FERNANDEZ:  Object to form.  Go ahead.

13        A     Do I agree or the City agree?

14        Q     The City.

15        A     No.

16   BY MS. SIEGEL:

17        Q     Is it fair to say that and the weather

18   conditions in Miami that an unsheltered person's

19   clothing and property can likely become wet?

20              MR. FERNANDEZ:  Object to form.  Go ahead.

21        A     Yes.

22   BY MS. SIEGEL:

23        Q     Have you -- and this is directed at you

24   personally.  Have you personally been to any of the

25   Clean-Ups?
```



Universal
COURT REPORTING
CLEAR VALUE. EVERY CASE.

```
 1      A    Yes.

 2      Q    And when was that?

 3      A    I don't have an exact date.

 4      Q    Was it when you first started or more recent?

 5      A    I would say about mid-way of my tenure.

 6      Q    Okay.  So, 2022 give or take?

 7      A    Correct.

 8      Q    Yeah, it's fine.  I don't need to know the

 9   exact date.  Have you personally witnessed any

10   contamination?

11      A    Elaborate on that question, please.  Are you

12   asking me contamination of personal items?

13      Q    Yes, I should have said that, yes

14   contamination of personal items of homeless people's

15   property?

16           MR. FERNANDEZ:  Object to form.  Go ahead.

17      A    No, my attendance at Clean-Ups or at a Clean-

18   Up was not added for an extended time.

19   BY MS. SIEGEL:

20      Q    Okay.

21      A    So, I did not see it from beginning to end.

22      Q    And about how much time -- and first of all,

23   were you at more than one or just one?

24      A    So, there -- because they occur so often, I

25   passed them, but I've attended one for a short period of
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023        Page 61

```
 1   time.  I can't give you an estimate in terms of time

 2   because it was so long ago --

 3       Q    Um-hum.

 4       A    And it was not there long enough to see the

 5   actual discarding of any material or personal property.

 6   So, that part of it I did not see.

 7       Q    Okay.  Has the City conducted any research on

 8   best practices for how to handle contaminated personal

 9   property?

10            MR. FERNANDEZ:  Object to the form.  Outside

11       the scope, go ahead.

12       A    No, not to my knowledge.

13   BY MS. SIEGEL:

14       Q    And has the City conducted any trainings? And

15   you can define training how you want, you can tell me

16   what that means to you.  But, wait let me finish, on how

17   to conduct Clean-Ups to minimize the risk of spreading

18   contamination?

19       A    Ask the question again?

20       Q    Has the City conducted any trainings for

21   workers on how to conduct Clean-Ups to minimize risk of

22   spreading contamination?

23       A    Yes.

24       Q    And how is that training conducted?

25       A    Solid Waste personnel is trained on which
```

LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 62

```
 1  chemicals, material and procedures should be taken to

 2  sanitize areas in general and as it relates to

 3  hotspots/encampments.

 4      Q    And what about the Green Shirt workers?  Are

 5  they trained about how to minimize the risk of spreading

 6  contamination?

 7      A    Yes.

 8      Q    And how is that conducted?

 9      A    By the Human Services homeless division.

10      Q    And do you know -- can you give any more

11  description of what the training consists of?

12      A    No.

13      Q    And who would know that?

14      A    Sergio Torres.

15      Q    Okay.

16      A    There -- is it okay to go?

17           MR. FERNANDEZ:  Go ahead.

18           MS. SIEGELO:  Go ahead.  If you have something

19      to add, you can add.

20           MR. FERNANDEZ:  Yeah.

21      A    The Green Shirts are also trained by the

22  Homeless Trust.

23  BY MS. SIEGEL:

24      Q    Okay.  So, we haven't talked about that -- how

25  does the Homeless Trust fit within the City structure?
```



```
1        A     Funding.

2        Q     What does that mean?

3        A     They provide funding for services that are

4    provided to the homeless population.

5        Q     And is it an independent agency?

6        A     It's --

7        Q     Is it a City agency?

8        A     No, it's governed by Miami-Dade County.

9        Q     Okay.  And so, they provide funding and they

10   also provide training.  And so, what training do you

11   know of that they provide?

12       A     They provide training to the Green Shirts,

13   whether it is the way in which they do outreach or the

14   phone lines for individuals that are calling in for

15   shelter wraparound services and they have a board that

16   meets in which the director of human services has

17   representation.

18       Q     Okay.  And so, training with regard to

19   minimize the risk of spreading contamination, how do you

20   know that's a part of what they train Green Shirts on?

21       A     I --

22             MR. FERNANDEZ:  Object to form.  Go ahead.

23       A     I do not know definitively, but they do have

24   extensive training for the -- for Green Shirts. Whether

25   or not it covers that area, I don't know.
```



1   BY MS. SIEGEL:

2       Q     Okay.  And who would know at the Homeless

3   Trust, do you know?

4       A     The curriculum for training?

5       Q     Yeah.

6       A     Would be Vicky Millett -- Victoria Millet,

7   sorry, I said Vicky.

8       Q     Does the City provide PPE personal, you know,

9   forget what that stands for, Personal Protection

10  Equipment?

11      A     Yes.

12      Q     Do you know what PPE is?

13      A     Yes.

14      Q     Okay.  Does the City provide PPE for Green

15  Shirts?

16      A     Yes.

17      Q     And what kind of PPE?

18      A     Whatever's needed, whether it's gloves, there

19  were face masks provided during the pandemic.  That's

20  pretty much it.

21      Q     And is there training on how to use the PPE?

22      A     Yeah, there should be.  I don't know.

23      Q     Okay.  And whose responsibility is it to

24  ensure that the PPE is used?

25      A     The department director is responsible for



 1   ensuring that the manager of the division is enforcing

 2   policies.

 3        Q    Is PPE required to be used or is it just --

 4   well, I'll just stop there.  Is it required?

 5             MR. FERNANDEZ:  Object to form.  Go ahead.

 6        A    I don't know whether or not it is your

 7   requirement.

 8   BY MS. SIEGEL:

 9        Q    And how does the City ensure that PPE is

10   safely disposed of?

11        A    I don't know the procedure.

12        Q    Who's responsible for that?  Of the -- let's

13   just stick with the Green Shirts.  If they have, or have

14   used PPE who would be responsible for ensuring the safe

15   disposal?

16        A    The department -- the division manager Sergio

17   Torres.

18   BY MS. SIEGEL:

19        Q    Okay.  Do you know whether Green Shirt are

20   provided with chemical resistant safety suits?

21        A    I don't know.

22        Q    Do you know whether Solid Waste is provided

23   chemical resistant safety suits?

24             MR. FERNANDEZ:  Object.  Outside the scope of

25        the notice.  Go ahead.



1    A    Safety suits?  Define safety suits.

2  BY MS. SIEGEL:

3    Q    It's just --

4    A    From head to toe?

5    Q    Yeah.

6    A    No, I've never -- I mean, I don't know.  They

7  have PPE but I don't know if they have safety suits.

8    Q    Okay.  I'm not saying they have to have them,

9  I'm just going through all the questions.

10       Okay.  So, who -- when a Clean-Up is being

11  conducted of a homeless hotspot, who makes the decision

12  about whether a particular piece of personal property is

13  contaminated?

14    A    A Green Shirt.

15    Q    Are any other people authorized to make that

16  decision?  Are Police -- let's just go through the

17  people.  Are Police authorized to make that decision?

18    A    Yes.

19    Q    Are green -- Solid Waste?

20    A    No.

21    Q    Okay.  Are guidelines provided on how to

22  determine whether a particular piece of property is

23  contaminated?

24    A    Yes.

25    Q    And is there anything more than the APM 1-19



1    that we've discussed?

2        A    Nothing additional, according to my knowledge.

3        Q    If an item is contaminated, is there any

4    consideration that the City gives as to whether that

5    item could be sanitized?

6            MR. FERNANDEZ:  Object to form.  Go ahead.

7        A    No.

8    BY MS. SIEGEL:

9        Q    Is there any consideration given to whether a

10   particular item is low risk or high risk for public

11   health hazard?

12           MR. FERNANDEZ:  Object to form.  Go ahead.

13       A    The APM doesn't give levels to what -- how

14   contaminated it is.

15   BY MS. SIEGEL:

16       Q    Okay.  And does the City give any

17   consideration to the public health risk in about whether

18   moving a particular contaminated piece of property

19   exists?

20           MR. FERNANDEZ:  Object to form.  Go ahead.

21   BY MS. SIEGEL:

22       Q    It was a little convoluted.  You want me to

23   say, it again does this -- is there a public health

24   risk, in moving -- picking up a piece of contaminated

25   property and moving it?



1          MR. FERNANDEZ:  Object to form.  Go ahead.

2     A    Due to not being a public health expert, I

3   cannot answer that question.

4   BY MS. SIEGEL:

5     **Q    Okay.  So, again, you would not know, I assume**

6   **whether there's less risk in keeping a particular piece**

7   **of property where it is?**

8     A    Right.

9          MR. FERNANDEZ:  Object to form.  Go ahead.

10  BY MS. SIEGEL:

11    **Q    Okay.  Do -- the onsite workers, the Green**

12  **Shirts or the Police once they've made a determination**

13  **about whether a particular piece of property is**

14  **contaminated, do they inspect each piece or dispose of**

15  **it in bulk?**

16         MR. FERNANDEZ:  Object to form.  Go ahead.

17    A    According to the APM they are to inspect each

18  piece before they can deem something to be contaminated.

19  They cannot make a decision based on bulk.

20  BY MS. SIEGEL:

21    **Q    Okay. And do you know if that actually**

22  **happens?**

23    A    I am not physically at Clean-Ups.  So, based

24  on briefings and updates from City officials, directors,

25  it is happening where they are determining based on

LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 69

1   items what is contaminated and what is not.

2       Q    So, if a particular piece of property or

3   determined to be contaminated for example, luggage, are

4   outreach workers instructed to open the luggage and go

5   through it?

6            MR. FERNANDEZ:  Form.  Hypothetical, go ahead.

7       A    I don't know what the onsite instruction would

8   be for luggage that is contaminated and whether or not

9   they're expected to go through it.

10  BY MS. SIEGEL:

11      Q    Okay.  What about tents?

12           MR. FERNANDEZ:  Same objection.  Go ahead.

13      A    They are expected to go through tents.

14  BY MS. SIEGEL:

15      Q    And what about abandoned property, can the

16  City dispose of abandoned property?

17      A    Can they, or do they?

18      Q    Well, can they, first of all?

19      A    Okay.  I -- may I look at the APM?

20      Q    Okay.

21      A    Can you repeat your question, please?

22      Q    Yes.  Can the City dispose of items that are

23  determined to be abandoned?

24      A    No, they are not to dispose of the items that

25  are abandoned.



1    Q    And do you know whether the City does dispose

2  of items that are abandoned based in practice?

3    A    Based in practice they do not dispose of non-

4  contaminated items that are abandoned.

5    Q    And what happens, so if it is abandoned and

6  contaminated, are they allowed to dispose of that?

7    A    If --

8          MR. FERNANDEZ:  Object to form.  Go ahead.

9    A    If it is contaminated and impose a public

10  health concern, yes, but personal items are to be

11  stored.

12  BY MS. SIEGEL:

13    Q    Okay.  So, if it's not contaminated, but it is

14  abandoned, then those items are supposed to be stored

15  according to City policy?

16          MR. FERNANDEZ:  Object to form.  Go ahead.

17    A    According to practice, that is the question

18  was earlier, what's the practice, the store items that

19  are abandoned.

20  BY MS. SIEGEL:

21    Q    Well, I'm asking both.  So, let's go through

22  any one is, can they, which to me is do they have the

23  authority under the City policy.  So, let's just start

24  with that.  Non-contaminated abandoned property.

25          Does City policy allow them to aba -- dispose



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023       Page 71

1    of abandoned non-contaminated property?

2        A    The policy doesn't reference abandoned

3    property.  It referenced unattended.

4        Q    Okay.  And -- okay.  We'll get, is there a

5    difference between unattended and abandoned?

6        A    Abandoned would be things that are left for

7    multiple days that are untagged, not labeled and have

8    been sitting there.

9        Q    Okay.  So, that particular type of property,

10   what does policy allow the City to do to it?

11       A    The policy does not reference that kind of

12   property.  It does not --

13       Q    Okay.  So, what happens in practice?

14       A    Okay.  In practice, those items are stored.

15       Q    And how does the City, or are -- is there

16   documentation of that type of property that is stored?

17       A    Yes.

18       Q    And what is that documentation?

19       A    There's an inventory form that is completed by

20   the Green Shirts.

21       Q    Yeah, just speak up a little more.

22       A    Inventory form. I'm sorry, I don't speak loud.

23       Q    I know, I understand, I do but we still have

24   to get it on the record.  So, we'll go through inventory

25   forms in a minute.  What if property is just wet?  What



1    happens under the policy to that property?

2         MR. FERNANDEZ:  Objection, hypothetical.  Go

3       ahead.

4       A    Is it contaminated?  I don't understand your

5    question?

6    BY MS. SIEGEL:

7       Q    If property is just wet and there's nothing

8    else about it's just personal property of homeless

9    people, that's wet.  What does the policy allow Green

10   Shirt workers to do with that property?

11      A    Unattended wet property?  Is that what we're

12   referencing?  That's just wet, not contaminated.

13      Q    Just wet.

14      A    In that instance it would be to store the

15   property.

16      Q    And in practice we talked about that.  The

17   last question was -- what does the APM provide?  What

18   happens in practice to wet property?

19      A    I don't know.

20         MR. FERNANDEZ:  Well, hold on, Objection,

21      hypothetical.  Go ahead.

22      A    In practice? I can't -- I don't know.

23   Particular to wet -- uncontaminated property.  What

24   happens to it, I do not know.

25   BY MS. SIEGEL:



1    Q    Okay.  What happens in practice if a Green

2  Shirt is not available to make that determination about

3  whether a particular piece of property is contaminated?

4              MR. FERNANDEZ:  Objection.  Go ahead.

5    A    Repeat the question.

6  BY MS. SIEGEL:

7    Q    What happens in practice if a Green Shirt is

8  not available to make a determination about a particular

9  piece of property and whether it's contaminated?

10             MR. FERNANDEZ:  Object to form.  Go ahead.

11   A    It's either Police or Green Shirt or it's left

12  alone.

13  BY MS. SIEGEL:

14   Q    Are there procedures in place to double check

15  that property of homeless people and Clean-Ups is

16  searched for personal or valuable items before it is

17  disposed?

18             MR. FERNANDEZ:  Object to form.  Go ahead.

19   A    The procedures are based on the APM that

20  you're supposed to check property.

21  BY MS. SIEGEL:

22   Q    And so, in practice, are there any procedures

23  to double check that happens?

24   A    I hate to ask you to repeat it again.

25   Q    That's okay.  Are there any procedures in



1   place to double check that personal property of homeless

2   people is searched for valuables personal property

3   before it is disposed of?

4           MR. FERNANDEZ:  Object to form.  Go ahead.

5      A    There are no written procedures that I'm aware

6   of.

7   BY MS. SIEGEL:

8      Q    And in practice, do you know, if there's any

9   procedures?

10          MR. FERNANDEZ:  Same objection.

11     A    Properties checked by Green Shirts to see

12  whether or not it's contaminated before it's disposed

13  of.  Those are the procedures.

14  BY MS. SIEGEL:

15     Q    Okay. So, there's no other procedures in

16  place?

17     A    Not that I'm aware of.

18     Q    Okay.

19          MR. FERNANDEZ:  Object to form.

20  BY MS. SIEGEL:

21     Q    This policy applies -- does this policy only

22  apply to homeless person's property?

23     A    APM 1-19?

24     Q    Yes.

25     A    Only applies to the treatment of homeless



 1  person's property according to the subject.

 2      Q    Okay.  Does the City treat property belonging

 3  to people who are not homeless any differently?

 4          MR. FERNANDEZ:  Object to form.  Go ahead.

 5      A    I don't understand your question.

 6  BY MS. SIEGEL:

 7      Q    Well, if this applied -- is there any APM on

 8  treatment of non-homeless people's property?

 9          MR. FERNANDEZ:  Object to form outside the

10      scope of the notice.  Go ahead.

11      A    I don't know whether or not there are any APMs

12  referring to properties of non-homeless individuals.

13  BY MS. SIEGEL:

14      Q    Well, what's the reason for distinguishing a

15  policy of treatment of property only for homeless

16  persons?

17      A    Because we have a homeless division that

18  services, the homeless population and addresses

19  encampment areas.  And we want to ensure that personnel

20  is being respectful of the personal items that belong to

21  the homeless.

22      Q    And if Green Shirts come across property, are

23  they required to distinguish whether it is a homeless

24  person's property or a non-homeless person's property?

25          MR. FERNANDEZ:  Form, hypothetical.  Go ahead.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023       Page 76

1       A     When -- can you define what you mean by come

2   across?

3   BY MS. SIEGEL:

4       Q     **Well, when a Clean-Up is conducted.**

5       A     Okay. So, within their function of a Clean-Up?

6       Q     **Yeah.**

7       A     Okay.  Not just walking down the street.

8       Q     **Well, we'll get to that now.**

9       A     So, can you repeat your question for me again?

10      Q     **Okay.  In conducting a Clean-Up then, how do**

11  **Green Shirts distinguish between property that belongs**

12  **to a homeless person and property that belongs to a non-**

13  **homeless person?**

14            MR. FERNANDEZ:  Hypothetical.  Go ahead.

15      A     Because the Green Shirts are conducting

16  outreach, they are familiar with the population and have

17  built relationships with the homeless community.

18            They also do a lot of human interaction and

19  conversations with not only the individual that's the

20  owner of the property, but the other individuals staying

21  within the encampment.

22            And they are trained based on practical

23  experience to be able to identify property that belongs

24  to homeless individuals.

25  BY MS. SIEGEL:



1    Q    And what about the rapid response team -- how

2  would they distinguish between homeless people's

3  property and non-homeless people's property?

4    A    The rapid response team, as I understand, is

5  an extension of the HEAT Team.  It's the same personnel,

6  same training.  It's just a smaller operation of the

7  HEAT Team in terms of their functions.

8    Q    And, are you aware that the rapid response

9  team has been told to us in the deposition does not

10  include Green Shirts?

11         MR. FERNANDEZ:  Object to form.

12    A    Earlier you asked me about whether or not

13  Green Shirts were a part of it and I said I did not

14  know.

15  BY MS. SIEGEL:

16    Q    So, going through -- so do Police not when I'm

17  talking about Green Shirts, we're moving on to Police.

18         Do Police Officers in conducting Clean-Ups

19  make determinations about whether a property is

20  contaminated?

21    A    They do.

22    Q    And, do they make determinations about whether

23  property is abandoned?

24    A    I'm unsure.

25    Q    And do they make determinations about whether



1    property can be disposed of?

2        A    In some instances.

3        Q    And who directs solid -- well, does Solid

4    Waste make determinations about either contaminated or

5    abandoned?

6        A    No.

7        Q    Do they get their direction from Green Shirts?

8        A    Yes.

9        Q    And do they also get direction from Police?

10       A    Yes.

11       Q    And so, their role is to dispose a property

12   that someone else has determined needs to be disposed

13   of.  Is that fair?

14       A    Fair.

15       Q    Okay.  Do you know if there's a limit to the

16   amount of personal property a homeless person can own?

17       A    No limit.

18       Q    Do you know if there is -- have you heard --

19   how do I say this?  Well, is there a City Directive that

20   only an amount that property that can fit inside a 3X3

21   container is allowed for homeless people?

22            MR. FERNANDEZ:  Object to form.

23       A    I am not aware of that -- of a City Directive.

24   I have never heard that.

25   BY MS. SIEGEL:



1    Q    Okay.  Or that they can only homeless people

2    may only have one bag with essential homeless property

3    in it?

4    A    I have never heard that.

5    Q    Okay.

6    A    Sorry for cutting you off.

7         MR. FERNANDEZ:  I didn't.

8    BY MS. SIEGEL:

9    Q    Okay.

10        MR. CAPDEVILA:  Jodi, in the next five-

11        minutes, can you find a stopping point?

12        MS. SIEGEL:  We can.  Right now?

13        (Thereupon, a short discussion was held off

14        record.)

15        (Deposition resumed.)

16        THE COURT REPORTER:  11:43 a.m.  We are back

17        on record.

18   BY MS. SIEGEL:

19   Q    All right. I wanted to go through the

20   procedures that are set forth in the APM. So, if you can

21   look at the second page, and its Bates Number DEF29.

22        Do you see where there's a heading procedure?

23   A    Yes.

24   Q    The first procedure under the heading general

25   procedure says that "City personnel will attempt to



 1  secure personal items such as identification medicines

 2  and eyeglasses and other small items of importance

 3  identified by the homeless person or readily identified

 4  as intimate personal property."  How is this done by the

 5  City?

 6       A    The APM also speaks to the homeless person

 7  being able to tag or label their items.  That's one way.

 8            And then they also, personnel goes through

 9  material and identify things that are either medication,

10  forms of identification such as driver's license,

11  passports, eyeglasses, small items that are personal and

12  of importance.

13            And they complete an inventory form and they

14  store them and provide notice on where the item can be

15  retrieved.

16       Q    And when you say they, are you referring to

17  Green Shirts?

18       A    I'm referring to the Green Shirts.

19       Q    Are you also referring to Police?

20       A    I'm referring to the Green Shirts.

21       Q    Okay.  So, the Green Shirts go through items

22  to try to find the items you mentioned.  And we'll get

23  to the storing part, in a minute.

24       A    Okay.

25       Q    So, how can the City ensure that, all homeless


Universal
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023        Page 81

1    property is -- let me think of how to say this.  Well,

2    when does a Green Shirt go through se -- attempting to

3    secure personal items?

4            MR. FERNANDEZ:  Object to form.

5        A    In practice, the Green Shirts go through when

6    they consider the items to be abandoned.  And this is

7    based on briefings that I've received from department

8    director another personnel.

9    BY MS. SIEGEL:

10       Q    Okay.  So, when something is considered to be

11   abandoned is one reason that they go through.  Are there

12   other reasons that they would go through personal

13   property of homeless people?

14           MR. FERNANDEZ:  Objection the form.  Go ahead.

15       A    No.

16   BY MS. SIEGEL:

17       Q    And then how can the City ensure that Green

18   Shirts go through all property that is abandoned to look

19   for an attempt to secure personal items?

20           MR. FERNANDEZ:  Object to the form.  Go ahead.

21       A    Clarity.  Did you say can?

22   BY MS. SIEGEL:

23       Q    Can.

24       A    Can they ensure?

25       Q    Yeah.  Do they ensure?



 1               MR. FERNANDEZ:  Same objection.

 2     A    Unfortunately you can't ensure anything.  But

 3  it is encouraged and communicated that they are to store

 4  personal items.

 5  BY MS. SIEGEL:

 6     **Q    And, I guess this goes back to the double**

 7  **checking.  Is there any process in place to try to**

 8  **ensure that Green Shirts do this?**

 9               MR. FERNANDEZ:  Object to form.  Go ahead.

10     A    There is training administrative policies.

11  There is oversight by the department -- the division

12  manager by the department director.

13          Those are the things in place to encourage and

14  try to enforce compliance with the APM and that

15  individuals are -- individuals in terms of outreach

16  team, Green Shirts are sorting and storing personal

17  items.

18  BY MS. SIEGEL:

19     **Q    Are any of those people you mentioned in the**

20  **City structure on site with Green Shirts?**

21               MR. FERNANDEZ:  Form to scope.

22     A    David Roseman is on site and Sergio Torres as

23  the manager of the homeless division is on site, I

24  cannot speak to whether or not he is on site at every

25  Clean-Up.



```
 1   BY MS. SIEGEL:
 2      Q    And, are they overseeing on site the Green
 3   Shirt's attempt to secure personal items?
 4           MR. FERNANDEZ:  Object to form.  Go ahead.
 5      A    If there is a manager or a coordinator, it is
 6   expected that there would be some oversight.
 7   BY MS. SIEGEL:
 8      Q    But the City cannot say for sure whether the
 9   people on site are, in fact supervising the Green
10   Shirts.  Is that correct?
11           MR. FERNANDEZ:  Object to form.  Go ahead.
12      A    Clarity, please.  Can you repeat the question?
13   BY MS. SIEGEL:
14      Q    Well, these other -- these -- there's Green
15   Shirts and then there's other people on site and the
16   Green -- when the Green Shirts are going through
17   personal property to attempt to secure personal items.
18           Is anyone of these other people you mentioned
19   on site, are they observing the Green Shirts?
20      A    Everyone --
21           MR. FERNANDEZ:  Object to form.  Go ahead.
22      A    Everyone on site has the APM and is observing
23   and whether or not they are in a place of supervision,
24   they are paying attention to whether or not personal
25   items are being disposed of.
```



```
1   BY MS. SIEGEL:
2        Q    And that's the expectation?
3        A    That is the expectation.  And that is what is
4   being done based on briefings that I have received from
5   the director who reports directly to me, both directors
6   because you have a Solid Waste Director and you have a
7   Human Services Director.
8        Q    And the Police don't report to you.  Is that
9   correct?
10       A    The Police Chief and the Police Department
11  does not report to me.
12       Q    The APM talks about contaminated property may
13  be disposed of.  Would you agree with that?
14       A    Yes.
15       Q    And is disposed the same -- what is disposed
16  of?  It may seem obvious, but is it taken by Solid Waste
17  and put --
18       A    It's discarded.
19       Q    Okay.  And where does that go?  Do you know
20  where the --
21       A    You're asking me where our dump site is?
22       Q    Where does Solid Waste take the material
23  that's disposed of in the homeless property Clean-Ups?
24       A    They dispose of it where you dispose of trash
25  and, solid waste.  And so, there's different sites where
```



1  you can de -- you can dump trash.

2      Q    Okay.  Are they City sites or are they owned

3  by the county?  Do you know?

4      A    They are owned by the county.

5      Q    In number -- Roman numeral 1.2, it talks about

6  property that poses a health or safety concern, may be

7  dispose of.  Do you see that in A?

8      A    Which one is it?  Numeral --

9      Q    2A homeless property that is contaminated or

10 otherwise poses a health or safety concern.

11     A    Okay.

12     Q    Is there any further definition of what

13 concern would be?

14         MR. FERNANDEZ:  Object to form.  Go ahead.

15     A    I'm sorry, I don't know where you are.

16 BY MS. SIEGEL:

17     Q    And one we're under procedures.

18     A    Oh, okay.

19     Q    And then 1.2A.

20     A    Okay.  What about it?

21     Q    It uses the term health and safety concern. I

22 was just wondering if there's anything that defines

23 concern.

24     A    There's no definition written out within the

25 APM to define safety concern, but anything -- go ahead.



1    Q    Okay.  So, would that be up to the Green

2   Shirts to interpret it in there and their actions on the

3   ground.

4    A    Green Shirts and Police.

5    Q    And Police.  And 12D -- wait, is that where I

6   was going?  I'm sorry.  B, it says, "The City's not

7   responsible for taking custody of mattresses. A

8   postal -- upholstered furniture or other bulky items on

9   public property and may dispose of those items."  Is --

10   what is a bulky item?

11    A    Bulky trash or bulky items, you have things

12   such as furniture, dressers being dropped off that block

13   the right of way.

14        You have couches blocking the right of way, I

15   think it's really contingent or depending on whether or

16   not the right of way is blocked.

17    Q    And under the APM bulky items such as those

18   are permitted to be disposed of.  Is that correct?

19    A    Yes.

20    Q    Even if not contaminated?

21    A    Yes, if it is blocking the right of way.

22    Q    Are -- do you know if notices are provided

23   before bulky items are destroyed?

24    A    There notices particular to bulky items,

25   there's notices provided particular to Clean-Ups that



```
 1   are inclusive of bulky items.
 2       Q    And -- okay.  So, we'll come back to notices
 3   in a little bit.  Oh, number D or letter D, "The City
 4   may prohibit the presence of unattended property in
 5   specified areas where the presence of such unattended
 6   property poses the threat or risk to the health and
 7   safety."
 8            And what are -- what specified areas, is there
 9   anything that's defining what that means?
10            MR. FERNANDEZ:  Object to form.  Go ahead.
11       A    There's no definition throughout the APM
12   defining specified areas.
13   BY MS. SIEGEL:
14       Q    Is there something in practice that would
15   identify what that means?
16       A    Public right of way.
17       Q    Okay.  Are the procedures for disposal the
18   same for contaminated health and safety risks unattended
19   and bulky items?
20            MR. FERNANDEZ:  Object to form.  Go ahead.
21       A    Repeat the question.
22   BY MS. SIEGEL:
23       Q    Are procedures for disposal the same for
24   contaminated items, health and safety risks unattended
25   and bulky items?
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 88

```
 1      A    No.
 2      Q    What are the procedures for disposing of
 3    contaminated items?
 4      A    When you -- well, may I answer that, it not
 5    going -- when I say, no, I'm referring to unattended.
 6      Q    Okay.
 7      A    Right.  You still have to go through and
 8    identify personal items and store them.
 9      Q    Okay.
10      A    That's the difference in the procedure.
11      Q    Okay.  So, if I were to take unattended out,
12    and are the procedures the same for disposing of
13    contaminated health and safety risks and bulky items?
14      A    Yeah.
15           MR. FERNANDEZ:  Object to form.  Go ahead.
16      A    Yes.
17    BY MS. SIEGEL:
18      Q    Okay.  So, --
19      A    The difference was the unattended.
20      Q    Unattended.  Very good.  And again, we'll go
21    through unattended in a second.  The Roman numeral II
22    talks about tagged labeled homeless person's property.
23           What does the APM require the City to do in
24    notifying homeless people that they have to tag
25    property?
```



1     A    I don't understand your question.

2     **Q    Does the City notify homeless people that they**

3  **need to tag their property?**

4          MR. FERNANDEZ:  Object to form.  Go ahead.

5  BY MS. SIEGEL:

6     **Q    In practice, sorry.**

7     A    In practice, yes, there is verbal, on the

8  ground outreach in addition to written notices of Clean-

9  Ups occurring.

10         And at that time, the information is provided

11  that there will be a Clean-Up and the encouragement to

12  tag and label items according to briefings and

13  information from City officials.

14     **Q    And you said written notices.  Do the written**

15  **notices say anything about tagging property?**

16         MR. FERNANDEZ:  Object to form.  Go ahead.

17     A    I would have to look at it, but off of, I

18  don't recall.

19  BY MS. SIEGEL:

20     **Q    Are tags provided by the City to homeless**

21  **people?**

22     A    I don't know.

23     **Q    So, homeless people are expected to get tags**

24  **on their own if they want their property tagged.**

25     A    I said --



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 90

```
 1              MR. FERNANDEZ:  Object to form.  Go ahead.
 2      A    I said I don't know if they're provided in the
 3    previous question.
 4    BY MS. SIEGEL:
 5      Q    Okay.  So, if property is unattended -- first
 6    of all, how do you being the City -- how does the City
 7    define what unattended property is?
 8              MR. FERNANDEZ:  Asked and answered.  Go ahead.
 9      A    Unattended property is -- one moment. Property
10    that is left and there is no individual present to a --
11    with the property that's unattended.
12    BY MS. SIEGEL:
13      Q    And if it's unattended but tagged, what
14    happens to that property?
15      A    In practice unattended property is not moved.
16      Q    So, in practice, unattended but tagged
17    property is not stored, is that what you're saying?
18      A    Yes.
19      Q    Okay.  And what does the policy say that those
20    items should be collected and stored?  And I'll point
21    you, this isn't a memory game.
22      A    I see it.
23      Q    Yeah.  Under 2A -- 2.2A, I guess.  They
24    collected and held for a period of 90 days.  Do you see
25    that?
```



1      A    I do.  So, in policy it should be collected

2  and stored.

3      Q    Do you know what an inventory storage form is?

4      A    Yes.

5      Q    Have you seen them?

6      A    I have.

7      Q    And, the -- are inventory storage forms, it's

8  supposed to be completed for any stored property?

9      A    Yes.

10     Q    And do you know if in practice if that is

11 done?

12     A    Yes.

13     Q    Yes.  You know, or yes, it's done.

14     A    Yes.

15     Q    That's one of those unfortunate compound?

16     A    Yes.  In practice I have been informed.

17     Q    Okay.

18     A    That they are done.

19     Q    Okay.  And, is a copy provided to the owner

20 and we're talking about unattended and tagged?

21     A    Well --

22          MR. FERNANDEZ:  -- Hold on.

23     A    No.

24          MR. FERNANDEZ:  Hold on.  Object to form.  Go

25     ahead.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 92

1  BY MS. SIEGEL:

2      Q    Yeah, I understand what you're -- you've --

3  already said in practice it doesn't happen.

4      A    Already said in practice unattended is not

5  moved, so.

6      Q    Yeah, no, I got you.

7      A    What are we talking about?

8      Q    We're not -- we're moving on.  I forgot you

9  said that.  Okay.  So, if there is an inventory storage

10  form for property that is to be stored in another

11  circumstance, would a copy of that storage form be given

12  to the owner?

13          MR. FERNANDEZ:  Form, hypothetical.  Go ahead.

14      A    So, in practice we are storing abandoned

15  property, abandoned --

16  BY MS. SIEGEL:

17      Q    Well -- okay. Let's just stop. So, what

18  gets -- what property gets stored?

19      A    What property would get stored?

20      Q    Yeah.

21      A    Personal items.

22      Q    Okay.

23      A    That are not contaminated would be stored.

24      Q    Okay.  And for -- so a storage form would be

25  filled out for that?



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 93

```
 1        A    Yes.
 2        Q    Okay.  And then would a copy of that be given
 3   to the owner?
 4        A    There would be no owner present if it's
 5   abandoned.
 6        Q    Okay.  So, on -- in what you're saying in
 7   practice is that the only property that gets stored is
 8   abandoned, so there's no owner known.
 9        A    Right.  But to retrieve your items is
10   indicated on the notice that was posted in advance of
11   the Clean-Up.
12        Q    Okay.  And that's -- and that's fine.  And
13   like I said, we'll talk about the notices in a little
14   more detail, but so it's clear if it's abandoned,
15   there's no owner known, there's no way to give a copy of
16   the form to the owner.  That's what you're saying?
17             MR. FERNANDEZ:  Object to form.  Go ahead.
18        A    Right.
19   BY MS. SIEGEL:
20        Q    I mean it's an obvious statement that
21   sometimes we just have to ask.  So, is there any other
22   property where an individual is known -- or where the
23   property's owner is known that gets stored by the City?
24        A    According, to the APM if you choose to go into
25   shelter and unable to take all your items you can also
```



```
 1   have your items stored.
 2       Q    Okay.  And would an inventory storage form be
 3   filled out in that circumstance?
 4       A    According to the APM, yes.
 5       Q    And do you know in practice whether that's
 6   done?
 7       A    Yes, according to briefings.
 8       Q    Okay.  And is a copy of the form given to the
 9   owner in that circumstance?
10       A    According to the briefings I've received, yes.
11       Q    And you described these briefings, but are
12   there regular briefings where you get this from -- this
13   information from?
14       A    Yes.
15       Q    And who attends those briefings?
16       A    I have directors meetings, which includes the
17   director of human services.  I also have one-on-one
18   meetings with my department heads when necessary.
19            There's E-mail correspondence if necessary.
20   There's multiple ways to keep me abreast on things that
21   are occurring.
22       Q    And how often do the directors report to you
23   about the practice of what's going on in homeless
24   hotspot Clean-Ups?
25            MR. FERNANDEZ:  Object to form.  Go ahead.
```

1      A    I can't give you any particular timeframe. In

2    some instances it's more often than others.  I can tell

3    you during the early -- during 2021 -- early on in 2022,

4    there was quite a bit of conversation around it because

5    the Clean-Ups were increasing, so there's also reports.

6    BY MS. SIEGEL:

7      **Q    Written reports?**

8      A    Yes.

9      **Q    Are you aware of a storage container at the**

10   **Department of Human Services that stored property up**

11   **until a week or two ago, approximately?**

12     A    Yes, ma'am.

13     **Q    Was all of -- was the storage form completed**

14   **for all of the property that was stored for homeless**

15   **persons in that container?**

16          MR. FERNANDEZ:  Object to form.  Go ahead.

17     A    I do not know.

18   BY MS. SIEGEL:

19     **Q    Where in the City are these forms maintained?**

20     A    I do not know.

21     **Q    And do you know when the City began using that**

22   **storage container?**

23     A    I don't know.

24     **Q    Was it before you got there?**

25     A    It was prior to me starting with the City.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 96

1     Q    Okay.  Have you been to the container?

2     A    I have not.

3     Q    Do you know who oversees the storage facility?

4     A    The homeless division, which --

5     Q    Do you know of the person?

6     A    The actual staff person responsible for the

7  home -- container, I do not know the name.

8     Q    Okay.  Do you know if there was a list of all

9  the items that were stored in the container, like do, do

10 they maintain a list of the items?

11    A    I don't know.

12    Q    Okay.  Do you know how they were organized in

13 the container?

14    A    I do not know.

15    Q    Do you know where -- do you know that the

16 storage container up until a week or so ago was -- I

17 don't know how to cease to be used not -- it's no longer

18 in use?

19    A    Yes.

20    Q    And where is that?  Is there a current place

21 where items are stored?

22    A    Yes.

23    Q    And where is that?

24    A    Storage facility.

25    Q    And where's -- which storage facility?  A



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023        Page 97

```
1    private that the City contracts with?

2        A    Yes.

3        Q    Okay.  And --

4        A    Not a lease, right.  When you say contract,

5    are you reflecting?

6        Q    Yeah.  Yes.

7        A    Okay.

8        Q    Yeah, lease is our contract.  And do you know

9    the name of the storage company?

10       A    I do not.

11       Q    And do you know where it is?

12       A    I want to say off of 5th Street.  I believe in

13   2nd Ave not 100% sure of the exact address.

14       Q    And is it like multiple containers, like those

15   storage units that you, you know, you can have multiple?

16       A    I haven't been to the space.  I do not know.

17       Q    Do not know.  Okay.  Do you know if all of the

18   property from the storage container was moved to the new

19   facility?

20       A    That is what I have been advised by the

21   department director.

22       Q    And was the old container -- if I go by old

23   and new, we can distinguish between the two. Is that

24   okay?

25       A    I'm clear.
```



1      Q     Is the -- was the old container air
2  conditioned?
3      A     No.
4      Q     Is the new one air conditioned?
5      A     Yes.
6      Q     And was the old container ventilated?
7      A     I don't -- I don't believe.
8            MR. FERNANDEZ:  Object to form.  Go ahead.
9  BY MS. SIEGEL:
10     Q     Were there any windows or any kind of
11  ventilation system in the old container?
12     A     Based on the visual that I saw, no, I did see
13  a picture.
14     Q     And in the new one?
15     A     I don't know if there's windows, but I know
16  there's AC.
17     Q     Okay.  Do you know since January 1st, 2021 to
18  a week or two ago in the old container whether
19  medication had been stored?
20     A     Based on -- I don't know.  I mean, I don't --
21  I don't know because I didn't review inventory lists nor
22  did I go in the space.
23     Q     Okay.  So, you again wouldn't know if you
24  currently are storing medication?
25     A     No.



1     Q     What was the process for emptying and moving

2  the container?  Like who actually did that?

3     A     The interim director oversaw the process with

4  the homeless division manager.

5     Q     And did the City hire a moving company?

6     A     I don't know.

7     Q     You don't know.  Okay.  Were Green Shirts

8  involved?

9     A     I don't know.

10    Q     Okay.  Does the City attempt to contact

11 homeless people whose property have been stored in the

12 old container we're talking about, did -- so I guess it

13 should go from does to, did.  Did the City attempt to

14 contact homeless people whose property was stored?

15          MR. FERNANDEZ:  Object to form.  Outside the

16      scope of the notice.  Go ahead.

17    A     According to the APM, they are supposed to

18 contact homeless.

19 BY MS. SIEGEL:

20    Q     Okay.  Which is why it's within the scope of

21 the topics.  And do you know how many attempts are

22 required to be made?

23    A     I believe the APM requires three attempts.

24    Q     And do you know whether three attempts are

25 done in practice?



1      A    I don't know.

2      Q    And do you know the method by which they

3   contact homeless people?

4      A    No.

5           THE COURT REPORTER:  Can you repeat that

6      answer a little louder?

7      A    No.

8           MS. SIEGEL:  You can scream.  We won't take it

9      personally, anyway.

10  BY MS. SIEGEL:

11     Q    And what are -- what processes used -- so

12  there's two types of property that you told me about.

13  One where, you know, the homeless person's -- I mean the

14  owner of the property because they went to shelter and

15  they asked for property to be stored.

16          Then there's abandoned property where we don't

17  know the owner, right?

18     A    Correct.

19     Q    Okay.  So, for property that is abandoned, how

20  does the City go about attempting to find out who the

21  owner is?

22     A    It's noticed where you can retrieve items.

23     Q    Okay.

24     A    Personal items.

25     Q    And then for the property where we know the



1    owner, do you know the method by which the City contacts

2    those people?

3              MR. FERNANDEZ:  Asked and answered.  Go ahead.

4    BY MS. SIEGEL:

5        Q    I don't think you answered the method.

6        A    In that instance, the form would be completely

7    filled out with their contact information because they

8    were present, so -- but they also know where to retrieve

9    their items.

10       Q    So, whatever contact information is on the

11   form then?

12       A    And they also know where to retrieve their

13   items.

14       Q    Okay.

15             MS. SIEGEL:  All right.  I think we can break

16        for lunch.

17             MR. FERNANDEZ:  What, 30 minutes?

18             MS. SIEGEL:  Sure.

19             MR. FERNANDEZ:  Yeah.

20             MS. SIEGEL:  Okay.  Call me.

21             MR. FERNANDEZ:  All right.  We'll take a 30

22        minute break.  We'll come back at 12:45.

23             MS. SIEGEL:  Okay.

24             MR. FERNANDEZ:  All right.

25             (Thereupon, a short discussion was held off



```
 1                    record.)

 2                    (Deposition resumed.)

 3            THE COURT REPORTER:  And we're back on the

 4       record.  It's 12:48 p.m.

 5  BY MS. SIEGEL:

 6       Q    All right.  Going back to the new storage

 7  container, who decided there needed to be a new storage

 8  container?

 9       A    The homeless division is no longer operating

10  on the site as a whole, so there was a need to move off

11  the site because the county has taken back possession of

12  the property.

13       Q    So, that office is closed also?

14       A    Yes, personnel is being moved as well.

15       Q    Got you.  Okay.  And when did this occur just

16  the storage container part, not the offices.  When did

17  that close the old one?

18       A    It's been about two weeks since they've moved

19  the content from the old container to the storage

20  location.

21       Q    Okay.  So, just so that when we're reading

22  this later in life and when we want to look at two

23  weeks, it was two weeks before, today was July 11th, so

24  approximately?

25       A    Approximately.
```



1     Q     Okay.

2     A     And July 11th, is what date?

3     Q     **That is a Tuesday, two weeks before today?**

4     A     Yeah, I would say about two weeks.

5     Q     **Okay.  Was any property thrown away in the**

6  **move?**

7     A     What was communicated to me was that

8  everything would be moved from the container to the new

9  storage space.  I do not know if anything was discarded

10  in that process.

11     Q     **And do you know what was the reason for**

12  **selecting this particular storage company?**

13     A     I know there was a desire to make sure that it

14  was a ventilated space with AC.

15     Q     **Okay.  And City personnel had testified about**

16  **that the old storage container was almost outgrown, that**

17  **they, you know, they were utilize using up all the**

18  **space.**

19           **Is that an issue I mean, is there -- we'll**

20  **start with, is there unlimited storage available in the**

21  **new container?**

22           MR. FERNANDEZ:  Object to form.  Go ahead.

23     A     Unlimited.  There's nothing unlimited.

24  BY MS. SIEGEL:

25     Q     **And that's fine. So, you say it's not**



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023        Page 104

1    unlimited, so then what, do you know what the limits

2    are?

3        A    I do not know the dimensions of the storage

4    space.

5        Q    Is it just one storage space or there are

6    multiple?

7        A    I do not know.

8        Q    Okay.  And then what about forms, is the City

9    with the new storage container utilizing the same forms?

10       A    Currently forms are being reviewed.  I do not

11   know if new forms have been implemented today.

12       Q    And what is the reason for -- excuse me,

13   wanting a new form?

14       A    There's new leadership right now.  You have an

15   interim director that is reviewing process across the

16   board throughout the department.  There is new

17   leadership in the department.

18       Q    Okay.

19       A    And there is a interim director that is

20   reviewing process across the board, not only in the

21   homeless division, but for the department as a whole.

22       Q    Okay.  And do you know what on the old storage

23   form is being considered to be changed on a, under the

24   review?

25       A    I have not received the proposed changes to



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 105

```
1  date.
2      Q    Okay.  Well, if we can look at Exhibit 4.
3           (Thereupon, Plaintiffs' Exhibit 4 was entered
4           into the record.)
5  BY MS. SIEGEL:
6      Q    Exhibit 4 is a Composite of inventory storage,
7  invoices.  Some are for from 2020 through, well, 2019,
8  2022.
9           I think that's as old as they go as 2019.
10 This came to us in one batch.  And just so you're aware
11 there's another batch at Exhibit 5, we'll talk about
12 separately that are more recent.
13     A    Okay.
14     Q    But do you -- is this the old form that has
15 been used?
16     A    This is the only form I'm aware of.
17     Q    Okay.  And there is another form that got used
18 by someone somewhere along the line, it's the last page
19 of this Exhibit.
20          It seems to be the same information, just a
21 different looking form.  But have you seen that form?
22     A    I have not, and it says Dade County.
23     Q    Okay.
24     A    Homeless Trust, whereas the form I'm familiar
25 with says City of Miami.
```

LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 106

1    Q    Okay.  And then the ones in the next Exhibit

2  Number 5 are inventory storage forms that are hard to

3  read, but the ones you can read have 2023 on them.

4         (Thereupon, Plaintiffs' Exhibit 5 was entered

5         into the record.)

6  BY MS. SIEGEL:

7    Q    Have you seen these forms?

8    A    These forms in particular completed?

9    Q    Yes.

10   A    No, I haven't seen these completed forms.

11   Q    Do you know what these forms are they from the

12 storage unit itself?

13   A    They're the inventory forms that we've been

14 referencing.

15   Q    Yes.  Do you know where these forms were

16 located before they took a picture and sent to us?

17   A    No.

18   Q    Okay. And what about the ones in Exhibit 4. Do

19 you know where those were located before, we got them?

20   A    No.

21   Q    And the City in their response to a request

22 for admission admitted that these are all the forms that

23 for property completed by the City since January 1st,

24 2021.  Is that your understanding?

25   A    Yeah.



1          MR. FERNANDEZ:  Form.  Go ahead.  You can

2      answer if you can.

3      A    That's my understanding.

4  BY MS. SIEGEL:

5      Q    At the bottom we can just go to Exhibit 4. And

6  at the bottom there is a place for someone to check off.

7  I have received all of the above listed property, or I

8  choose not to claim my property.  I understand it'll be

9  thrown away.

10          If they're not signed, does that mean that the

11  person never came to claim this property?

12      A    If -- what part of the form is not signed?

13      Q    The bottom part where a consumer can check off

14  one of those two boxes?

15      A    I don't know if in practice that mean no one

16  came and picked up the items.

17      Q    And then on a few pages in, I don't have the

18  Bates version in front of me, the number, but there's

19  one for a Spencer Brown.

20      A    Is that part of Exhibit 5?

21      Q    4.

22      A    4.  Okay.

23          MR. FERNANDEZ:  Next page.

24      A    Okay.  Spencer.

25  BY MS. SIEGEL:



1    Q    Yes.  And so, for Spencer Brown, this is dated

2  November 27th, 2019 when it was stored.  It's a gray

3  roll on the suitcase.

4            MS. ARMAND:  You want the Bates?

5            MS. SIEGEL:  Yeah, sure.

6            MS. ARMAND:  MIA FLA 0000017.

7            MS. SIEGEL:  Thank you.  I just found it.

8            MS. ARMAND:  It's fine.

9  BY MS. SIEGEL:

10   Q    So, at the bottom that is signed by Spencer

11 Brown, but no box was checked.  So, how do we know what

12 happened to this property?

13           MR. FERNANDEZ:  Object to form.

14   A    I do not know.  And I want to point out its

15 dated 2019; I was not here.

16 BY MS. SIEGEL:

17   Q    That's correct.  It was before you got there.

18 But you are City Representative just --

19   A    And I don't know.

20   Q    Okay.  So, according to policy, one of those

21 should have been checked.  Is that correct?

22   A    According to the form, yes.  One of those

23 should have been checked.

24   Q    And then Exhibit 5 would you agree that the

25 first page is illegible?



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 109

```
 1       A    I agree.
 2       Q    And that if we go through -- there's 11 more
 3  pages that are illegible.
 4            MR. FERNANDEZ:  Object to form.
 5       A    I'll have to count.  You said 11?
 6  BY MS. SIEGEL:
 7       Q    Yes.  If you would?
 8       A    Yes.
 9       Q    So, how would a homeless person be able to
10  retrieve property if there was, if the inventory storage
11  form was illegible?
12            MR. FERNANDEZ:  Form, hypothetical, go ahead.
13       A    Hypothetically speaking, they could describe
14  the items that they're here. They're trying to retrieve,
15  but I do not know.
16  BY MS. SIEGEL:
17       Q    And do you know whether that has occurred?
18       A    Based on feedback, yes.  That a Homeless
19  person could describe their items.  Items and be
20  provided their items based on description.
21       Q    That they could do you know whether it has
22  happened?
23            MR. FERNANDEZ:  Object to form.  Go ahead.
24       A    I don't recall.
25  BY MS. SIEGEL:
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 110

1      Q    And then was there property in the old

2    container that was stored without a form attached?

3      A    I don't know.

4      Q    So, I'm sorry.  If you go to, at the bottom

5    right MIA FLA 120891, there's a -- I'll wait till you

6    get there.

7      A    891?

8      Q    Yes.  Okay.  And it's a laptop and a cell

9    phone.  Are you on that page?

10     A    Yes.

11     Q    Okay. And this -- do you know whether Jemele

12   Jackson is a Green Shirt?

13     A    I do not know.

14     Q    But according to this, he's the one who stored

15   the items?

16     A    According to the inventory form dated, I'm

17   assuming it's 2/7/23.  He or she did store the items as

18   a staff person.

19     Q    Okay.

20     A    On how it form is completed.

21     Q    And do you know whether this property is still

22   being stored?

23     A    I wouldn't know.

24     Q    And it doesn't have a name of who it belonged

25   to.  Does that mean that this was abandoned property or

```
 1   what?

 2       A    It could mean that --

 3            MR. FERNANDEZ:  Objection, go ahead.

 4       A    It may very well mean that the items were

 5   abandoned and the intent was to store in case somebody

 6   claims them.

 7   BY MS. SIEGEL:

 8       Q    And what's the purpose of storing property

 9   that's -- first of all, we can agree a laptop and a cell

10   phone are valuable.  Is that correct?  You have to say

11   it loud.

12       A    Yes.

13       Q    And what's the purpose of storing valuable

14   property where we don't know whose it is instead of just

15   leaving it there for that person to retrieve?

16            MR. FERNANDEZ:  Object to form.  Go ahead.

17       A    Providing the opportunity for the individual

18   to claim their items, their personal property.

19   BY MS. SIEGEL:

20       Q    But they could have claimed them if they were

21   left in the same place where they were retrieved from.

22   Couldn't they?

23            MR. FERNANDEZ:  Form, hypothetical.  Go ahead.

24       A    They could have.

25   BY MS. SIEGEL:
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 112

1     Q     And so do you know the reasons for taking

2    valuable property from a site and placing it in storage?

3     A     Abandoned property, being clear from a public

4    right of way is --

5     Q     Well, do we know this is abandoned.  And do we

6    know this is from a public right away --

7          MR. FERNANDEZ:  Object to form.  Go ahead.

8     A     We discussed that the items that were stored

9    were abandoned in practice.

10   BY MS. SIEGEL:

11    Q     So, there's nowhere though on the form that

12   well -- that identifies how it was determined to be

13   abandoned versus unattended?

14          MR. FERNANDEZ:  Object to form.  Go ahead.

15    A     In practice, unattended items are not stored.

16   BY MS. SIEGEL:

17    Q     Okay.  So, we're assuming because that's what

18   the City, says is the practice that's what happened

19   here.  That this is abandoned?

20          MR. FERNANDEZ:  Object to form.

21   BY MS. SIEGEL:

22    Q     Okay.  Is property photographed before it's

23   taken to storage?

24    A     May I refer to the APM?

25    Q     Yes.



1      A    Can you repeat your question?

2      Q    **Is property photographed before it's being**

3   **taken to be stored?**

4      A    According to the APM, no.

5      Q    **And where are you pointing out that?**

6      A    I went through during a Clean-Up operations

7   Section 4.

8      Q    **And is property photographed before it's**

9   **disposed of?**

10          MR. FERNANDEZ:  Object to form.

11     A    I do not recall seeing that in the APM.

12  BY MS. SIEGEL:

13     Q    **And what about at practice?**

14          MR. FERNANDEZ:  Object to form.

15     A    That has not been indicated to me by staff.

16  BY MS. SIEGEL:

17     Q    **Meaning you have not been informed that**

18  **property is photographed before being disposed?**

19     A    Correct.

20     Q    **Okay.  When are items required to be**

21  **photographed by the APM?**

22     A    According to the APM, I do not see where items

23  are required to be photographed at any stage of the

24  process.

25     Q    **And are they -- does the APM use whenever**



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 114

1   possible they should be photographed?

2       A    I do not see there being a need to photograph

3   property in the APM.

4       Q    So, for example, if you go to page 4, which is

5   DEF000261, there is number 3 at the top, whenever

6   possible City personnel will photograph the homeless

7   property prior to the Clean-Up operation. Do you see

8   that?

9       A    I see it.  I missed it earlier.

10      Q    Okay.  Do you know whether City personnel

11  photograph homeless property prior to Clean-Up?

12      A    The reports reflect a photograph of the entire

13  space and officer is also aware, body-worn cameras,

14  which adds a level of transparency.

15      Q    And the photographs that you described, where

16  are they maintained?

17      A    They are included in the reports that are

18  provided by the heat team where they're stored, I do not

19  know.

20      Q    And do you know what system there is to

21  organize the photographs?

22      A    I do not.

23      Q    Who would know that?

24      A    I would say both the police department as well

25  as the human services director.



1    Q    So, I gather you wouldn't know whether they're

2    searchable?

3    A    If you body-worn camera footage is searchable.

4    Photographs, I don't know where they're.

5    Q    How are body-worn cameras searchable?

6    A    For public record requests.  Are you referring

7    to the general public?  How would the general public

8    obtain body-worn camera?

9    Q    Not just obtain, but to search through, for

10   example, and find body-worn camera of, you know, a

11   particular person. Can you search by a particular

12   person?

13   A    Yes.

14   Q    And by a particular date?

15   A    Yes.  And there is a procedure in place on the

16   way body-worn camera footage is to be handled that is

17   maintained by the police department.

18   Q    And is -- what items can a Homeless person

19   take to a shelter?

20        MR. FERNANDEZ:  Object to form scope, but go

21      ahead.

22   A    It depends on what shelter, and I don't know

23   the regulations for each shelter.

24   BY MS. SIEGEL:

25   Q    Do different shelters have different limits on



1   the amount of property a homeless person can bring with

2   them?

3        A    I don't know the policies for the shelters.

4        Q    And who would know that?

5        A    Whomever administer whoever manages the

6   shelters as well as the Green Shirts for Sergio Torres.

7        Q    Is -- do you know if property is photographed

8   before it is being taken.  If in the circumstance of an

9   individual going to a shelter and they are asking for

10  the property to be stored?

11          MR. FERNANDEZ:  Object to form.  Go ahead.

12       A    I don't know if photos are taken.

13  BY MS. SIEGEL:

14       Q    I'm sorry, repeat that.

15       A    I do not know if photos are taken.

16       Q    And when you described the photos that you're

17  aware of, you said it was of the whole scene, I guess I

18  don't remember the exact words you said.

19          Are photos taken of particular pieces of

20  personal property at any time?

21       A    I don't know if photos are taken of personal,

22  particular individual items.

23       Q    And do you know if photos are taken of any

24  property to document when it's being disposed of?

25          MR. FERNANDEZ:  Object to form.  Go ahead.



1      A    I don't know.

2  BY MS. SIEGEL:

3      Q    In the old APM notices were required to be

4  posted 7 days prior to Clean-Up and then amended 3 days.

5  Do you -- would you agree with that in the new version

6  has the 3 days and the old version at 7 days?

7      A    Yes, 72 hours.

8      Q    And what is the reason for the change in

9  timeframe?

10     A    The frequency of Clean-Ups.

11     Q    The what?

12     A    Frequency of Clean-Ups increased.

13     Q    Okay.  And so why did -- the frequency of

14  Clean-Ups increase.  So, why did the notices have to be

15  changed?

16     A    You were visiting a site multiple times within

17  a week and the 72-hours was not the -- was the minimal

18  notice and oftentimes there was more advanced notice

19  than 72-hours.

20     Q    The APM at section room renewal for number 2

21  says that the notice will inform individuals of the date

22  of the cleaning and provide the phone number and address

23  of the Veteran Affairs Homeless Assistance Program

24  Division in the Department of Human Services where

25  property can be re retrieved.  Is that done?

1     A    I'm reading?

2     Q    Yeah, no, I was just going to -- is that done

3  is a little vague, but it is that information included

4  on the notice?

5     A    I believe the majority of the notices included

6  all of that information.

7     Q    And -- Okay.  Whose responsibility is it to

8  ensure that notices are posted?

9     A    The assignment is given to the coordinator,

10  which is David Roseman.

11     Q    So, Exhibit 6.  And you want me to pull these

12  up?  I only printed in black and white, but if you want

13  to see anything in color, I certainly can.

14          But I represent to you that Exhibit 6, are all

15  yellow notices.

16          (Thereupon, Plaintiffs' Exhibit 6 was entered

17          into the record.)

18  BY MS. SIEGEL:

19     Q    Are you aware of these notices?

20     A    Yes.

21     Q    And then Exhibit 7 are what City personnel

22  refer to as white notices.

23          (Thereupon, Plaintiffs' Exhibit 7 was entered

24          into the record.)

25  BY MS. SIEGEL:



1    Q    Are you familiar with those?

2    A    Give me one second.

3    Q    Yeah.

4    A    Thank you.

5    Q    And, again, we can show you the color if you

6  want.

7    A    Okay.  Yes.

8    Q    Which of are -- the yellow notices still being

9  used today?

10   A    I don't know what notices are being used

11 today.

12   Q    Okay.  So, you don't know if the white notices

13 are either then -- do you know what the reason was for

14 changing from yellow to white?

15   A    Changing from yellow to white?

16   Q    Well, the Exhibit 6 again, or what I'm

17 referring to is the yellow notices these are from 2021,

18 the ones that we have copies of anyway.

19   A    Right.

20   Q    The white notices don't have years on them.

21 So, I can tell you that people testified these are from,

22 2022 and 2023 and that there was a change?

23        MR. FERNANDEZ:  Object to form.  Go ahead.

24 BY MS. SIEGEL:

25   Q    Do you know whether there's been a change from



1  these --

2      A    The change was --

3      Q    Yellow notices to white notices?

4      A    Change was -- so I don't know, colors.

5      Q    Okay.

6      A    Right.  So, based on the discussion, the

7  change was to provide advanced notice that site would be

8  visited multiple days.

9          Right.  So, the white notice indicates the

10  days in which the site would be visited.  So, the

11  example Exhibit 7 outlines that it'll be cleaned

12  Tuesday, Wednesday, and Thursday.  So, it's given

13  advance notice of multiple days.

14      Q    Okay.  And so going back to look at Exhibit 6

15  these are do have one date identified.  So, for example,

16  at the third page in it says August 25th, 2021, it'll be

17  cleaned on that date.

18          So, it's not multiple dates is what you're

19  saying?

20          MR. FERNANDEZ:   Object to form. Go ahead.

21      A    Yes.

22  BY MS. SIEGEL:

23      Q    And do you notice on that particular one that

24  it says posted 8/24 the day before?

25      A    Which one are you --



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023       Page 121

1           MR. FERNANDEZ:  Object to form.  Go ahead.

2      A    Which one are we referring to now because

3   we've been going back and forth and forth.

4   BY MS. SIEGEL:

5      Q    Yeah, I tried to --

6           MR. FERNANDEZ:  On 6 page 3.

7      A    Yeah, so it where --

8   BY MS. SIEGEL:

9      Q    Exhibit 6.

10     A    Okay.

11     Q    Which are what I called, well not just me.

12     A    Okay.

13     Q    City personnel say these are the yellow forms

14  and if you want to show, why don't you just show her?

15     A    So you're saying what -- repeat your question.

16     Q    Okay.  So, this particular form has one date

17  on it, 8/25/21 is telling people it's going to be

18  cleaned on that particular date.  Is that right?

19          MR. FERNANDEZ:  Object to from.

20     A    No, that's not right.  You mean not the same

21  day the day before?

22  BY MS. SIEGEL:

23     Q    No, just the top.  It says, be advised, this

24  area will be cleaned on 8/25/21.  So, it's telling the

25  homeless person that that's the date it's going to be

1   cleaned on?

2      A    Correct.

3      Q    And then at the bottom it was when it was

4   posted the day before?

5           MR. FERNANDEZ:  Object to form.  Go ahead.

6   BY MS. SIEGEL:

7      Q    Is that right?

8      A    According to what you're posting.  According

9   to what you're showing me, there's the dates is the day

10  before.

11     Q    Okay.  And the -- let me just, so this 8/25/21

12  was about the time that the APM was amended. If you look

13  at Exhibit 3, the City Manager actually approved it on

14  the August 30th.

15          So, prior to August 30th, would the original

16  APM be in effect?

17          MR. FERNANDEZ:  Form, compound.  Go ahead.

18     A    Can I ask you to go back to your statement?

19  You state that the manager approved it on 30th?

20  BY MS. SIEGEL:

21     Q    Well, on August 30th, 2021 and Exhibit 3 on

22  the routing form is when the City Manager seems to have

23  signed it.

24     A    That's not the City Manager's signature.

25     Q    Art Noriega?



1      A    That's not his signature.

2      Q    Well, okay, I see that you're right. Somebody

3  signed it for him.  When was it -- let's put it this

4  way, when was the new APM what's the effective date?

5      A    I don't have a date because it's not indicated

6  on the APM.

7      Q    Would it be before the City Manager received

8  it, would it be?

9           MR. FERNANDEZ:  Object to form.

10 BY MS. SIEGEL:

11     Q    What's the process for approving and when an

12 APM becomes effective?

13     A    Routing forms are AC company documentation

14 that goes to the manager.  But in this case, I can't say

15 when he signed it because the APM is not dated. The

16 form, that's not his signature.  I'm just pointing that

17 out, so --

18     Q    Well I see that.  But from the City's

19 perspective, when did this APM become effective.  Is

20 there any way to tell that?

21     A    I don't have an answer on those.  I don't have

22 a Defendants update.

23     Q    Okay.  Well, is there any way that it would've

24 been effective before August 30th.  Just by looking at

25 the routing form?



1              MR. FERNANDEZ:  Object to form.

2    BY MS. SIEGEL:

3         Q    And knowing the process of how APMs get

4    approved?

5         A    I don't know.

6         Q    Okay.  Regardless, going back to the notice,

7    regardless of which -- so you don't know which APM was

8    in effect on 8/24/2021.  Is that correct?

9         A    Correct.

10        Q    Okay.  Regardless of which one, whether it was

11   the old or the current revised is one day notice from

12   posting to cleaning sufficient under either APM?

13             MR. FERNANDEZ:  Object to form.  Go ahead.

14        A    One day notice would not be sufficient under

15   either.

16   BY MS. SIEGEL:

17        Q    Okay.  That was a very long and involved way

18   to get to that?

19             MR. FERNANDEZ:  Move to strike.

20   BY MS. SIEGEL:

21        Q    Do you know whether City's have conducted

22   Clean-Ups with less than three days' notice?

23        A    I don't know was not brought to my attention.

24        Q    Who's -- I mean, you told me that Mr. Roseman

25   is the one responsible for posting notices.  Is that

1    what --

2        A    For the coordination of things, yes.

3        Q    Yes, okay.  Would Mr. Roseman be responsible

4    for ensuring that the proper amount of time between

5    posting and cleaning occurs?

6        A    Yes, I'm sorry.

7        Q    And going to the Exhibit 6.

8            MS. ARMAND:  Can I bring it up for you?

9            MS. SIEGEL:  Yes, please.

10           MS. ARMAND:  Sorry, pictures again.  I ran

11       into another one.

12   BY MS. SIEGEL:

13       Q    And that was it.  Yeah.  Okay.  Does this --

14   you can just stay on the one, to make it easier to read.

15           MS. ARMAND:  Okay.

16   BY MS. SIEGEL:

17       Q    Does this notice have the number and address

18   of the Vet Affairs and Homeless assistance in Department

19   of Human Services, where property can be retrieved?

20       A    It has a number.  I don't have the other

21   information records.

22       Q    And does this notice used by the City indicate

23   the time of the Clean-Up?

24       A    No, just the date.

25       Q    Has -- so in Exhibit 7, the new notices has



1    the APM been revised to reflect the new form of the

2    notices?

3                MR. FERNANDEZ:  Object to form.  Go ahead.

4        A    Can you ask the question again, I don't

5    understand it.

6    BY MS. SIEGEL:

7        Q    Well, has this form been approved by the City

8    in any way the white -- I'm sorry.  If you can go to the

9    Exhibit 7.

10               MS. ARMAND:  Sorry.

11               MS. SIEGEL:  It's okay.

12               MS. ARMAND:  I'm trying to get rid of this bar

13        up here.  It's 7.

14               MS. ARMAND:  Yeah, I know, but I'm trying to

15        get rid of this little, like, there we go.  Okay.

16   BY MS. SIEGEL:

17       Q    Okay. Did City approve this notice the format?

18       A    Yes.

19       Q    And who would approve that which entity or

20   director or manager or whatever?

21       A    It would be within the department.  Who in the

22   department, I do not know.

23       Q    Okay.  So, within the Department of Human

24   Services?

25       A    Yes.



1    Q    So, the Department of Human Services has the

2    authority to change the format of the notices?

3    A    Yes.

4    Q    And does this notice -- you can go through all

5    of them and you can look in your book too, but do these

6    notices indicate the date of posting?

7    A    No.

8    Q    And do you have information as to why not?

9    A    I do not.

10   Q    And if a -- what's the purpose of these

11   notices?

12   A    To inform the individuals that there would be

13   a Clean-Up to secure their personal belongings and also

14   to provide a mechanism for individuals to reach out to

15   the City for housing or shelter assistance.

16   Q    By calling that number that's listed?

17   A    Yes, ma'am.

18   Q    And these notices in Exhibit 7 you've already

19   said that they have this aerial will be cleaned Tuesday,

20   Wednesday, and Friday.  So, it gives three different

21   dates?

22   A    Yes.

23   Q    And do you -- wait do they come on all three

24   dates or is it just that that it they may, the City may

25   come and do a Clean-Up on any of those dates?



1    A    The intention is all three days.

2    Q    So, a homeless individual would need to remove

3    their property all three days?

4         MR. FERNANDEZ:  Object to form.

5    A    Yes.

6  BY MS. SIEGEL:

7    Q    And do notices get posted that the City is

8    going to be cleaning up on a certain day and then the

9    Clean-Up doesn't happen?

10   A    There are times when Clean-Ups do not happen

11  on the day they are scheduled, but it's also indicated

12  in the notice that weather permitting, but there's other

13  variables that may prevent a Clean-Up from occurring.

14   Q    Okay.  Are notices posted for the rapid

15  response Clean-Ups?

16   A    I do not know.

17   Q    And who would know that?

18   A    Department.

19   Q    Human Services?

20   A    Human Services Department or the Police

21  Department.

22   Q    I'm trying to keep you on track for 2:30, but

23  you tell me if it comes up to that.  And is a homeless

24  person expected to move all of their property for a

25  Clean-Up?



```
 1              MR. FERNANDEZ:  Object to form.

 2       A    Okay.  Ask the question for me again, please.

 3  BY MS. SIEGEL:

 4       Q    Sure.  Are homeless individuals expected to

 5  move all of their property before Clean-Up?

 6       A    The items that they would like to secure their

 7  personal items, yes.  Otherwise, they're subject to

 8  being stored if they're not contaminated.

 9       Q    Do City personnel assist homeless individuals

10  in moving their property?

11              MR. FERNANDEZ:  Object to scope of moving. Go

12       ahead.

13       A    Right.  I was going to ask you to expand on

14  what does moving mean when you say move -- assist them

15  in moving them.

16  BY MS. SIEGEL:

17       Q    Well, the prior question was that their

18  homeless people are expected to move all of their

19  property.

20              So, I'm now asking whether City personnel

21  assist in moving that property that they want moved?

22              MR. FERNANDEZ:  Same objection.

23       A    Not they do not assist with moving property.

24  They assist by storing the things that they cannot take

25  and the things that are not contaminated.
```



1  BY MS. SIEGEL:

2      Q    And what if an individual is not physically

3  able to move their personal property?

4          MR. FERNANDEZ:  Form, hypothetical.  Go ahead.

5      A    Then their items would be stored according to

6  the policy.

7  BY MS. SIEGEL:

8      Q    And does the City obtain consent from homeless

9  people, who say they want their personal property

10  voluntarily destroyed or discarded?

11          MR. FERNANDEZ:  Object to form.  Go ahead.

12      A    According to the policy, yes.

13  BY MS. SIEGEL:

14      Q    And in practice?

15          MR. FERNANDEZ:  Same objection.

16      A    In practice, they don't discard items unless

17  they're contaminated.

18  BY MS. SIEGEL:

19      Q    Well, I thought we if we're talking about

20  personal property where a homeless individual -- let me

21  think how to ask this.

22          So, do homeless people ever tell Green Shirts

23  or police that they want some of their property

24  discarded?

25      A    Yes.



1              MR. FERNANDEZ:  Object to form.

2              MS. SIEGEL:  What's wrong with these

3        questions?

4              MR. FERNANDEZ:  They're overbroad.  That's an

5        overbroad question.

6              MS. SIEGEL:  Okay.

7              MR. FERNANDEZ:  It's just my objection.  You

8        can answer.

9         A    I'm sorry.  That --

10   BY MS. SIEGEL:

11        Q    Well -- you, it seemed to be, you were kind of

12   saying two different things.  That's why I'm trying to.

13        A    Okay.  So, ask your question again. I'm sorry.

14        Q    That's okay.  Does the City -- the original

15   question was, does the City obtain consent from a

16   Homeless person who tells Green Shirts or police that

17   they want some of their property discarded?

18        A    I don't know.

19        Q    And is -- does the APM require consent in that

20   circumstance?

21        A    Yes.

22        Q    And but you don't know in practice whether

23   that happens?

24        A    I don't.

25        Q    And do you know whether there's written



1    documentation of consent in those circumstances?

2        A    I don't know.  There is a form which is the

3    waiver to voluntarily dispose of property form.

4        Q    And do you know if that's used?

5        A    I don't know if there are any.  I don't know

6    if it's used or if there's been a consent to discard.

7        Q    Yeah.  Okay.  Well, that's fair.

8        A    May I take a break please?

9        Q    Yes, certainly.  I was trying to hold off till

10   2:30, but --

11           THE WITNESS:  I only need five minutes.

12           MS. SIEGEL:  That's fine. I always like

13       breaks.

14           (Thereupon, a short discussion was held off

15       record.)

16           (Deposition resumed.)

17           THE COURT REPORTER:  1:46 p.m., we are back on

18       the record.

19   BY MS. SIEGEL:

20       Q    Who would know about the consents, whether

21   consents occur in practice?

22       A    The Homeless Division.

23       Q    And who specifically?

24       A    Sergio Torres.

25       Q    I assume the same answer that you don't know,



1   but I just want to ask to get it on the record.  Are you

2   aware of any verbal consents by Homeless people who want

3   their property discarded?

4        A    I would not know I'm not on site.

5        Q    And do you know whether consents are tracked

6   by name in any way?

7        A    I do not know.

8        Q    Do you know whether a homeless person could

9   obtain a copy of the consent of their own consent if

10  they wanted to?

11       A    I don't know.

12       Q    All right.  So, when a homeless person is not

13  present, and do you know whether City employees enter

14  tents on during a Clean-Up operation?

15           MR. FERNANDEZ:  Object to form and

16       hypothetical.  Go ahead.

17       A    In practice, what is communicated is if there

18  is no movement or the tent appears to be abandoned based

19  on multiple visits and interaction with the site, then

20  yes.

21  BY MS. SIEGEL:

22       Q    And what's the purpose of entering a tent?

23       A    If it's abandoned, you don't know the

24  conditions or whether or not it's anything contaminated.

25  In many instances, it's blocking the public right of



1   way.  Those are reasons.

2        Q    Do you know whether the City obtains a warrant

3   to enter tents?

4             MR. FERNANDEZ:  Object to form.

5        A    I don't know.

6   BY MS. SIEGEL:

7        Q    Do you know whether a warrant would be needed

8   to enter a tent?

9             MR. FERNANDEZ:  Object to form.

10       A    It's on the public right of way. I don't know.

11  BY MS. SIEGEL:

12       Q    Okay.  Do you know whether the City has ever

13  obtained a warrant to enter a tent of a homeless person?

14            MR. FERNANDEZ:  Object to form.

15       A    I do not know.

16  BY MS. SIEGEL:

17       Q    Do you know who might know?

18       A    You can ask the Police Department.

19       Q    So, items that are you disposed of.  So, for

20  example, you said contaminated property can be disposed

21  of.  Is that correct?

22       A    Yes, ma'am.

23       Q    Okay.  Is there a notice posted informing of

24  the homeless individuals that this property was disposed

25  of?



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 135

```
 1     A    Not to my knowledge.
 2     Q    And I think you said that abandoned property
 3  would not be disposed of.  Is that -- did you say that?
 4     A    No.
 5          MR. FERNANDEZ:  Object to form.
 6  BY MS. SIEGEL:
 7     Q    Okay.  Abandoned property could be disposed
 8  of?
 9     A    Abandoned property could be disposed of, but
10  practice is abandoned property is stored.
11     Q    Okay.
12     A    And anything that is contaminated is disposed
13  of.
14     Q    I see.  So, the policy allows for -- sorry,
15  allows for abandoned property to be disposed of, but in
16  practice at a stored.  Is that what you're saying?
17     A    Correct.
18     Q    Okay.  And we talked before about who had the
19  authority to determine if property was contaminated.
20  What about abandoned, do Green Shirts have the authority
21  to determine whether property is abandoned?
22     A    Yes.
23     Q    Do police officers?
24     A    Yes.
25     Q    And solid waste?
```

LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 136

```
 1      A    No.
 2      Q    Okay.  So, if property is not abandoned, so
 3  we're talking about, I guess unattended, but
 4  unidentified property but City personnel believe it's
 5  contaminated, it needs to be destroyed.
 6           Does the City notify try to find the person
 7  and notify the person that they're going to destroy the
 8  property?
 9           MR. FERNANDEZ:  Form.  Compound, go ahead.
10      A    Would you like to break it up?
11  BY MS. SIEGEL:
12      Q    Well, there's a -- sure.
13      A    I'm not sure that it can be.  I mean, does
14  this --
15           MR. FERNANDEZ:  Answer if you can.
16      A    Okay.  So, there is no notification that I'm
17  aware of left behind for contaminated items that have
18  been discarded.
19  BY MS. SIEGEL:
20      Q    Okay.  And what about soiled clothes that are
21  on the ground does the City -- look, forget it.  We'll
22  stick with that.
23           Who -- again, this is just a little bit
24  different question than the other ones.  Who is the
25  authority to determine if the property will be
```

1   destroyed, the green shirts?

2       A    Yes.

3       Q    And the officers?

4       A    Yes.

5       Q    And not the solid waste?

6       A    No.

7       Q    Okay.  Who is the responsibility for ensuring

8   that only abandoned or contaminated property is disposed

9   of?

10      A    Ask the question again please.

11      Q    Who has the responsibility for ensuring that

12  only abandoned or contaminated property is disposed of

13      A    Ensuring that only it is the responsibility of

14  the Green Shirts and police to indicate what needs to be

15  disposed of.

16      Q    Is there a process for someone to challenge

17  the decision to destroy property?

18          MR. FERNANDEZ:  Object to form.  Go ahead.

19      A    Any complaints about the process can be

20  elevated up the chain of command.  So, if a Green Shirt

21  as an example, dispose of something, they, an individual

22  can always file a complaint with the supervisor or

23  manager and continue up the chain.

24  BY MS. SIEGEL:

25      Q    Okay.  So, a homeless person would file a



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 138

1    complaint with the City where in the City would the

2    complaint be filed that?

3        A    No, there's no written process that I can

4    identify, but Green Shirts are managed by the human

5    service department, which has a, currently an interim

6    director.

7        Q    Okay.  But where would the complaint be filed

8    if it's filed is the right word -- where how would a

9    Homeless person initiate that process?

10       A    You, we have 311, which is a service where

11   constituents can call and their complaints or concerns

12   are directed to the right department.

13            We also -- it's a government facility, so you

14   can show up to the administrative building and go

15   directly to the department and voice any questions or

16   concerns which this is government.

17       Q    And is there a guideline for how long the City

18   should wait before destroying any personal property of

19   homeless individuals?

20            MR. FERNANDEZ:  Object to form, is the scope

21       of property.  Go ahead.

22       A    The APM referenced that personal items are to

23   be kept 90 days.

24   BY MS. SIEGEL:

25       Q    That's if they're storing them?


Universal
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 139

```
 1      A    Correct.

 2      Q    What about for items that are determined to be

 3 destroyed.  Are they stored before they're destroyed?

 4      A    So ask a question fully.

 5      Q    Is there any guideline for how long a City

 6 should wait until they destroy, abandoned, or

 7 contaminated personal property of homeless individuals?

 8      A    Okay.  Contaminated property is destroyed once

 9 identified.

10      Q    Okay.

11      A    Abandoned property that is not contaminated is

12 stored.  The APM calls for you to hold personal items 90

13 days.  The practice is the department has not gotten rid

14 of any items.  They haven't discarded items after 90

15 days is the practice. But the APM calls for 90 days that

16 they keep them stored.

17      Q    Okay.  So, is it your testimony that no

18 abandoned property is destroyed on site at a Clean-Up?

19           MR. FERNANDEZ:  Object to form. You can

20      answer.  Go ahead.

21      A    No.

22 BY MS. SIEGEL:

23      Q    Well that's what I'm trying to understand. So,

24 you say it's stored for 90 days?

25      A    No, you asked me what the practice was.  No,
```



1  you asked me what's the policy APM and we'll refer to

2  the section APM Section 45A says "Any personal items

3  such as identification medication, eyeglasses, and other

4  small items of important readily identifiable as

5  intimate personal property will be collected in hell for

6  a period of 90 days."  That's the APM.

7      Q    Okay.  So, that's personal small property?

8      A    Right.

9      Q    For lack of a better word.  Okay.

10     A    The practice is they have been very

11 conservative and after 90-days they still have kept the

12 items stored.  They as in the green shirts, the homeless

13 division.

14     Q    Okay.  So, I see where we're -- talking past

15 each other. So personal, small property, eyeglasses, et

16 cetera are stored.  What about -- is there any other

17 type of property that would be considered abandoned and

18 destroyed on site?

19     A    Not contaminated property that posed a health

20 concern to the public.

21     Q    So, if it's not contaminated and it's but

22 considered to be abandoned, even if it's like a tent, it

23 would be stored.  That's what I'm trying to distinguish

24 what you're saying about abandoned property not

25 contaminated?



1      A    I don't have an answer for that.

2      Q    Okay.  And other like furniture, if it's

3  abandoned, what would happen to that?

4           MR. FERNANDEZ:  Object to form.  You can

5      answer.  Go ahead.

6      A    Is it depends on if it's blocking the public

7  right away, if it is considered illegal dumping, if it

8  is contaminated, it would be disposed of.

9  BY MS. SIEGEL:

10     Q    So, talking about the old container, what was

11 the process for people to retrieve their property. What

12 would they do?

13     A    According to the form, they would contact the

14 Homeless Assistance Program.

15     Q    And in practice, is that what happens?

16          MR. FERNANDEZ:  Object to Form.

17     A    I don't know what happens in practice.

18 BY MS. SIEGEL:

19     Q    And was the old site -- do you know if the old

20 site was accessible by public transit?

21          MR. FERNANDEZ:  Object to Form.

22     A    I don't know the public transportation route,

23 but, yes.

24 BY MS. SIEGEL:

25     Q    And what about the new site?



```
 1      A    It's --

 2           MR. FERNANDEZ:  Same objection.  Go ahead.

 3           THE WITNESS:  I'm sorry, say that again.

 4           MR. FERNANDEZ:  I said same objection.  Go

 5      ahead and answer.

 6      A    Public transportation, I'm sure is within the

 7   area.

 8   BY MS. SIEGEL:

 9      Q    Is there any kind of ability to recover

10   property once the City disposes of it to the county

11   facility?

12      A    Highly unlikely, no.

13      Q    So, once the solid waste picks up the property

14   at the Clean-Up, is it recoverable at any time after

15   that?

16      A    No.

17      Q    Do you know the cost to dump the -- what's

18   picked up at a Clean-Up, like an annual cost?  Is there

19   an estimate for that?

20      A    No.

21      Q    Do you know why solid waste reports on how

22   many tons were picked up?  Is that -- do you know what

23   it's used for that information?

24           MR. FERNANDEZ:  Object to Form.  Facts not in

25      evidence.  Go ahead.
```

LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023     Page 143

```
1        A    No.

2   BY MS. SIEGEL:

3        Q    Do you know if they do report that?

4        A    They do.

5        Q    Okay.  Do you know if they continue to report

6   that?

7        A    Based on verbal reports from the director.

8   Yes.

9        Q    Is that information used by your office at all

10  in making any determinations about Clean-Ups?

11       A    Making, determinations about Clean-Ups, yes.

12       Q    Well, is the information used at all by your

13  office?

14       A    I'm unsure, it may be in the reports.  I would

15  have to re familiar -- become re familiar with the

16  reports to answer that.

17       Q    What reports are those?  Did they have a name

18  that you're aware of?

19       A    The Heat team does render a report.

20       Q    Do you read that?

21       A    The Heat team renders a report.

22       Q    So, the Heat team is composed of collaboration

23  between police solid waste and Department of Human

24  Services, is what you've said.  Which entity comes up

25  with a Clean-Up schedule?
```



 1      A      Human Services.

 2      Q      **That was a question at the end. Do you know --**

 3      A      It's Human Services, but of course there is

 4   input from the police department.

 5      Q      **And what kind of information is used in making**

 6   **that schedule?**

 7      A      When you ask, what kind of information are you

 8   asked -- are you -- what influences the decision?

 9      Q      **Yes.**

10      A      Okay.  So, observation of the community,

11   constituent complaints or concerns.

12      Q      **Do commissioners get involved in asking for**

13   **certain locations to be cleaned up?**

14      A      District Offices will -- for areas where there

15   has been an influx of either homeless gathering in terms

16   of blocking of right of ways or encampments starting to

17   establish or an increase of complaints to their office.

18      Q      **And when you say District Office, what does**

19   **that?**

20      A      The commissioner's office there are dis--

21   referred to as district offices and located within the

22   districts of the City.

23      Q      **And how is -- how are the locations and the**

24   **times of the Clean-Ups communicated to the Heat team?**

25      A      There is a scheduled that is established,



1   which I am not copied on.  So, I don't know the

2   mechanism in which they're distributed.

3       **Q    Are -- is there -- are there logs kept?**

4       A    Yes, ma'am.

5       **Q    And who receives a copy of that documentation?**

6       A    The report is provided to the City Manager,

7   copying myself and then distribute to the City

8   commission.

9       **Q    Is data collected about Clean-Ups?**

10      A    Yes.

11      **Q    What kind of data?**

12      A    Shelter placement, I believe tonnage, but I'm

13  not sure.  Location, dates, photos.

14      **Q    Does the City analyze that data?**

15          MR. FERNANDEZ:  Object to form.  Go ahead.

16      A    Yes.

17  BY MS. SIEGEL:

18      **Q    And are there reports made after Clean-Ups**

19  **that has an analysis of the data?**

20      A    No, not that I've been included on or

21  received.

22      **Q    Okay.  So, what is analyzed?**

23      A    They are used to discuss ways in which to

24  improve the efforts of the City and also to reflect

25  whether or not there has been any improvement in the



1  areas.

2      **Q    Has the City identified any concerns with the**

3  **Clean-Up procedures in order to improve?**

4      A    Yes.

5      **Q    What are some of those improvements?**

6      A    As I mentioned earlier, the directors in the

7  process of the interim director -- excuse me, is in a

8  process of -- in the process of doing a process review

9  of the department as a whole and I'm pending his

10  recommendations for change.

11      **Q    Is there a timeframe set for that review?**

12      A    No.

13      **Q    And are you part -- you as personal you part**

14  **of the -- that discussion?**

15      A    I have been briefed as in terms of his

16  efforts.  But, again, I'm waiting for his proposal and

17  his update in terms of things that will be improved or

18  he is proposing to change.  He is in the interim,

19  director.

20      **Q    Correct.  Okay.  Are you aware of any specific**

21  **concerns at this time?**

22      A    There is currently a need to hire additional

23  personnel where there is, vacancies.  So, there's also

24  an opportunity to work on training.

25      Because you'll be bringing in -- because we



1    will be bringing in new hires.

2        Q    Okay.  If you can go to Exhibit 8.

3             (Thereupon, Plaintiffs' Exhibit 8 was entered

4             into the record.)

5    BY MS. SIEGEL:

6        Q    This is the Draft Street Clean-Up and

7    encampment resource plan and it says 2021.  Have you

8    seen this before?

9        A    Yes.

10       Q    Do you know who drafted it?

11       A    Milton Vickers.

12       Q    And what was that person's position?

13       A    Director of Human Services.

14       Q    Okay.  Was it ever approved as final?

15       A    It was not approved as final.

16       Q    Was it utilized in any way?

17       A    Components of it was utilized.

18       Q    Do you know which components?

19       A    The commencement of the Clean-Ups of

20   encampments in terms of outreach and collaborating with

21   Solid Waste and Human.

22       Q    Okay.  We can turn to Exhibit 9.

23            (Thereupon, Plaintiffs' Exhibit 9 was entered

24            into the record.)

25   BY MS. SIEGEL:



1    Q    This is the Miami Police Department --

2    departmental order 11, chapter 10.  Are you familiar

3    with this?

4    A    I only -- am familiar because it is referenced

5    in the APM, but I have not reviewed it.

6    Q    Okay.  Is this an official policy at the City?

7    A    I am -- to assume based on the APM, that it is

8    a policy, that is part of the police department.

9    Q    And, did the City Manager have any role in

10    approving it?

11    A    I do not know.

12    Q    And the police chief I see --

13    A    I do not know because I don't know when it

14    was --

15    Q    Okay.

16    A    -- Implemented.

17    Q    Would these be questions for the police chief?

18    A    It would be more appropriate to direct these

19    questions to the police department.

20    Q    Do you know what the process is for developing

21    a policy in the police department?

22    A    I do not.

23    Q    Do you know any of the -- well, that's too

24    broad.  Do you know whether this policy only applies to

25    police?



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 149

1      A    Yes.

2      Q    **Yes, it does only apply to police?**

3      A    Yes.

4      Q    **Yes.  Okay.  And does it only apply when**

5   **police are effectuating an arrest?**

6           MR. FERNANDEZ:  Object to Form.

7      A    I do not know.

8   BY MS. SIEGEL:

9      Q    **Okay.  What is the reason for the City to need**

10  **both an APM 1-19 and this departmental order?**

11     A    I don't know.

12     Q    **Okay.  We can take a five minutes break to --**

13          MR. FERNANDEZ:  Sure.

14          THE WITNESS:  It's 2:15.

15          MR. FERNANDEZ:  You have a thing at 2:30,

16     right?

17          THE WITNESS:  I know you need a -- you have a

18     2:30, so --

19          MR. FERNANDEZ:  Okay.

20          MS. SIEGEL:  We'll just take a -- I just need

21     to --

22          MR. FERNANDEZ:  Okay.  Perfect.

23          MS. SIEGEL:  -- Talk.  Have a couple

24     questions.

25          (Thereupon, a short discussion was held off



 1              record.)

 2              (Deposition resumed.)

 3              THE COURT REPORTER:  It's 2:25 p.m.  We're

 4       back on the record.

 5  BY MS. SIEGEL:

 6       **Q    Okay.  I just wanted to confirm, since you**

 7  **haven't reviewed the departmental order, that you don't**

 8  **know the contents of it or how it's applied or used?**

 9       A    Correct.

10              Okay.  I wanted to talk about City

11  Resolutions. What is your understanding of the purpose

12  of a resolution?

13              MR. FERNANDEZ:  Object to Form.  Go ahead.

14       A    Provides direction to administration based on

15  its commission directives.

16  BY MS. SIEGEL:

17       **Q    Are resolutions binding on City departments to**

18  **comply with?**

19       A    Yes.

20       **Q    And how are they communicated to City**

21  **personnel?  What's the method?**

22       A    Department directors attend commission meeting

23  and they are aware based on conversation reading, they

24  are expected to read the agenda based on the content of

25  the resolution.



1              Their responsibilities are clearly outlined in

2    the resolutions.

3        Q    And that's how the department heads learn

4    about it. And then is the responsibility then for

5    department heads to communicate it to the people under

6    them?

7        A    Correct.

8        Q    You can go to Exhibit 10.  Which is City

9    Resolution R-21-0160 and it's dated April 8th, 2021.

10             (Thereupon, Plaintiffs' Exhibit 10 was entered

11             into the record.)

12   BY MS. SIEGEL:

13       Q    Sorry, I thought, I had the highlighted

14   version in here.  So, are you familiar with this one? I

15   don't know if I asked that. Got -- got sidetracked

16   there.

17       A    Yes.

18       Q    Okay.  And what does this City Resolution

19   direct the City Manager to do?

20       A    Directing the City Manager to -- for the

21   coordination and frequency among City departments to

22   facilitate biweekly cleanings of areas considered to be

23   hotspots of reoccurring homeless encampments for the

24   purpose of improving cleanliness of City streets.

25             And sidewalks as recommended by the Department



1  of Human Services during a discussion of Di-8 at the

2  City Commission on April 8th, 2021.

3      Q    And were, -- do you know what the frequency

4  was before this, of the cleanings of the hotspots?

5      A    The frequency prior to this, I'm not certain

6  if it was consistent in terms of how many times a week.

7  So, I don't know the frequency, Clean-Ups were

8  occurring, but I don't know the frequency.

9      Q    Okay.  And do you know the frequency after

10  this resolution?

11      A    Biweekly, cleanings?

12      Q    And did that actually occur?

13      A    Yes.

14      Q    Okay.  And on the 1, 2, 3 -- fourth, whereas

15  it says an encampment is considered to be 10 or more

16  unsheltered homeless individuals living in close

17  proximity to one another in an obviously visible

18  location.

19          Is that -- does that continue to be what an

20  encampment is?

21      A    Yes.

22          MR. FERNANDEZ:  It's 2:30, I didn't mean to

23      cut you off.

24          MS. SIEGEL:  That's fine --

25          MR. FERNANDEZ:  Okay.



1          MS. SIEGEL:  What, no.

2          MR. FERNANDEZ:  Let's take a break until you

3      finish handling official business.

4          (Thereupon, a short discussion was held off

5          record.)

6          (Deposition resumed.)

7          THE COURT REPORTER:  It's 3:25 p.m.  We're

8      back on record.

9  BY MS. SIEGEL:

10     Q    Okay.  If we can go to Exhibit 11.

11         (Thereupon, Plaintiffs' Exhibit 11 was entered

12         into the record.)

13  BY MS. SIEGEL:

14     Q    Which is a resolution R-21-0372, and are you

15  familiar with this resolution?

16     A    Yes.

17     Q    And did this resolution increase the Clean-

18  Ups to three times a week?

19     A    Yes.

20     Q    Was there anything else, this resolution

21  instructed?

22     A    No, same collaborations, just increase the

23  frequency of Clean-Up.

24     Q    Okay.

25         THE COURT REPORTER:  Could you repeat that



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023          Page 154

1      louder please?

2            THE WITNESS:  Same collaboration, just

3      increase the frequency of the Clean-Ups.

4            THE COURT REPORTER:  Thank you.

5   BY MS. SIEGEL:

6      Q    And in the -- I don't know what this is

7   called, the heading in bold where it says a Resolution

8   of the Miami City Commission at the end of that it says,

9   preventing a genuine public health threat.  Do you see

10  that?

11     A    Yes.

12     Q    And, do you know what a genuine public health

13  threat means in terms of this particular resolution?

14     A    I would associate it with, contaminated and

15  hazardous items that pose a public health concern.

16     Q    Okay.  And Exhibit 12 is Resolution R-21-0379.

17          (Thereupon, Plaintiffs' Exhibit 12 was entered

18          into the record.)

19  BY MS. SIEGEL:

20     Q    And this -- at the bottom of that first page

21  and the, whereas closet references APM 1-19.  You see

22  that?

23     A    Yes.

24     Q    Okay.  What is the -- what is this City

25  Resolution direct the City Manager to do?



1      A     So, directing the City Manager to request that

2  the Miami Police Department, District Commander's place

3  emphasis on homeless issues, particularly -- particular

4  to each district and endeavor to secure available

5  shelter or alternate housing arrangements for homeless

6  person.

7           It also directs the City Manager to have Miami

8  PD assist during cleaning of certain locations

9  considered to be hot spots or reoccurring homeless

10 encampments.

11     **Q     And is -- are these -- this involvement of the**

12 **Miami Police Department was this new as of this**

13 **resolution or put it another way.  Was the Miami Police**

14 **Department doing this prior to this resolution?**

15     A     The Miami Police Department was involved prior

16 to this resolution.

17     **Q     Okay.  And so, acknowledging that the Miami**

18 **Police Department was already involved, what's the**

19 **purpose of a resolution, directing them to be involved?**

20     A     I cannot speak to the purpose of the

21 resolution as I believe this was sponsored.  I don't

22 know who the sponsor is, but it -- I don't know who the

23 sponsor is and what type of --

24     **Q     What is the significance of a -- of the**

25 **sponsor?  I'm just not sure of how City Resolutions**



1    are -- go through the process and with a sponsor.

2              But, why would the sponsor be important to

3    know and to answer that?

4        A    So, the sponsor is the individual who puts the

5    item on the commission agenda.  So, the nature as to why

6    it was placed on the agenda would need to be directed to

7    the sponsor.

8        Q    Okay.  And I'm sorry if I asked this before,

9    but City Resolutions are voted on by the entire

10   commission.  Is that right?

11       A    Yes, ma'am.

12       Q    Okay.  And let's see where's that one.  On the

13   second page, it talks about in one of the -- whereas, 1,

14   2, 3, 4 down.

15             Mayor -- City Manager directed to take any and

16   all lawful actions, to prevent health hazards from being

17   created and combat the further spread of, COVID-19

18   caused by communities of homeless encampments living on

19   the City's sidewalks and right of ways. Do you see that?

20       A    I see it.

21       Q    Okay.  How do Clean-Ups accomplish, preventing

22   and combating the further spread of COVID?

23       A    Clean-Ups involve the sanitation of public

24   right of ways and any -- the streets and so forth for

25   water truck and sanitation is conducted by solid waste.



1            So, the sanitation is a preventative measure

2    for COVID.

3        Q    Okay.  Was -- were there any studies presented

4    as far as -- you know, to the City commission about the

5    spread of infectious disease by engaging in Clean-Ups?

6        A    I'm not aware of any studies presented.

7        Q    All right.  We can go to Exhibit 13.

8            (Thereupon, Plaintiffs' Exhibit 13 was entered

9            into the record.)

10   BY MS. SIEGEL:

11       Q    So, this is -- when it says File ID 10624 and

12   then the -- you know, previous resolutions we looked at

13   had an R-21- and a number.

14           What's the file number?  I'm just trying to

15   figure out how to refer to this as a -- because the next

16   page has the resolution, but there's no resolution

17   number.

18           So, is the file number the same as the City

19   Resolution number?

20       A    They're different.  I don't know how the file

21   number is -- the File ID number is used, but when you

22   look at an agenda, it referenced a file number and it

23   referenced a resolution number.  So, they're not the

24   same thing.

25       Q    Okay.  And, so do you -- I mean, this says



1   final action date and is blank.  So, I assume this, but

2   it is signed on the next page.  Do you see that it is

3   signed?

4        A    I do see where it is signed.

5        Q    Okay.  And so -- would there be a resolution

6   number for this?

7        A    There should be a resolution number.

8        Q    Okay.  But you don't know what it is if --

9        A    I do not know.

10       Q    You haven't memorized them all?

11       A    No.

12       Q    Okay.  That's -- it is -- and it's signed on

13   September 1st, 2021.  Just for the record, we can put it

14   in timeframe.

15            This also talks about Clean-Ups to at least

16   three times a week at hotspots.  And was that enacted?

17       A    Yes.

18       Q    And this talks about enhancing coordination

19   among the departments.  Was that implemented?

20       A    Yes.

21       Q    And how was it in -- how was the coordination

22   enhanced at that point in time, in September of 2021.

23       A    I would -- this is around the time after this

24   resolution, was the establishment of the Heat team,

25   which involved more of a collaboration amongst the

1  departments and the identification, the outreach

2  efforts, and the cleaning of the different encampments

3  and/or hotspots.

4      Q    Okay.  And is it your understanding that the

5  HEAT team began in August of 2021?

6      A    I don't know the exact date that the Heat team

7  was launched.

8      Q    Okay.  Exhibit 14.

9          (Thereupon, Plaintiffs' Exhibit 14 was entered

10          into the record.)

11 BY MS. SIEGEL:

12     Q    This is -- says "File ID 10623" and it says

13 "Ordinance first reading."  Can you tell me -- are you

14 familiar with this?

15     A    Yes.

16     Q    And on the last page we can see it was signed

17 by the City attorney on September 2nd, 2021, but on the

18 first page where it says ordinance, there's no final

19 action date.  So, it was this ordinance enacted?

20          MR. FERNANDEZ:  Go ahead and answer if you

21     want.

22     A    Enacted, as in --

23 BY MS. SIEGEL:

24     Q    Was it passed by the commission?

25     A    Yes.



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023      Page 160

1    Q    And, do you know when it was passed?

2    A    I don't know the date of the commission

3    meeting.

4    Q    And does this make encampment in public places

5    in the City a misdemeanor?

6         MR. FERNANDEZ:  Object to Form.

7    BY MS. SIEGEL:

8    Q    I can direct you to --

9    A    Yes.

10   Q    Okay.  And do you know whether this ordinance

11   is being enforced?

12   A    What is being communicated to me is that it is

13   not being enforced.

14   Q    Okay.  So, Exhibit 15, is a entitled, Homeless

15   Master Clean-Up log.

16        (Thereupon, Plaintiffs' Exhibit 15 was entered

17        into the record.)

18   BY MS. SIEGEL:

19   Q    And it's a spreadsheet that looks like it's

20   from September 23rd, 2020, to July 30th, 2021.  Have you

21   seen this before?

22   A    Yes.

23   Q    Are these types of reports provided to you?

24   A    Not on a consistent basis.  This report is no

25   longer -- this form of reporting is no longer being used



1    to my knowledge.

2        Q    And when it was being used, would it be sent

3    to you?

4        A    Yes.

5        Q    And what is the -- what purpose is served by

6    reporting this information in this type of log?

7        A    This was the format in which the director was

8    able to show work being done within the community -- the

9    homeless community and effort the implementation of the

10   plan.

11       Q    Do you know who prepared this?

12       A    I am unsure which director I was receiving

13   this from, and I don't know if a staff member of the

14   Human Service Department was preparing it on behalf of

15   the director.

16       Q    Okay.  Did this -- do you know whether this

17   reporting of the Clean-Ups went to the commission at

18   all?

19       A    Exhibit 15?

20       Q    Yes.

21       A    I can't recall.

22       Q    And what did you use it for or did you use

23   this information?

24       A    For information only.  Just to be aware that

25   they are in fact providing Clean-Ups of encampment.  It



1   may -- I would -- I believe it would've been shared with

2   the City Manager.

3       Q    Okay.  And we had talked before about

4   photographs and you mentioned there are photographs of

5   the scene and they were put on a log.  Is this what you

6   were referring to?

7       A    I was referring to this log as well as the

8   current reporting structure.

9       Q    And, so now that we're looking at this, are

10  you aware of any other photos, aside from what's put

11  into one of those two logs?

12      A    No, I -- the only photos I received is in a

13  reporting structure.

14      Q    Okay.  All right.  The next Exhibit 16.

15           (Thereupon, Plaintiffs' Exhibit 16 was entered

16           into the record.)

17  BY MS. SIEGEL:

18      Q    And again, if you want to look at any of this

19  in color, we can bring it up, because they have some

20  very nice color coding.

21           This appears to be a log from February 28th,

22  2022- October 14th, 2022.  Is that what it appears to be

23  to you?

24      A    That's what it appears to me.

25      Q    Okay.  So, the last log was July -- end of



1    July 30th, 2021.  And this one begins February 28th,

2    2022.  Are you aware of any log for the time in between

3    these two logs?

4        A    When you said the last one, you're referring

5    to Exhibit 15th?

6        Q    Yes.

7        A    And the last date you said was what date?

8        Q    July 30th, 2021 -- well, July 22nd, please.

9        A    Okay.  July 22nd?

10       Q    Yes.

11       A    Yes.  I'm not aware of any reports in between.

12       Q    Okay.

13       A    I don't have anything committed to members.

14       Q    And do you know who prepares this version?

15       A    No, of the log.

16       Q    Okay.  And do you -- did you receive this?

17       A    I do not recall receiving Exhibit 16.

18       Q    And then this one's again, seems to end in

19   October -- apparently October 14th, or so.  Are you

20   aware of 2022, are you aware of any logs that are made

21   for after that date?

22       A    I'm aware of the Heat team reports that are

23   provided.

24       Q    So, what is currently being provided?

25       A    Reports from the Heat team.



877-291-3376
www.ucrinc.com

LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023    Page 164

1    Q    And what is - it's a different format?

2    A    It's a different format.

3    Q    And what is in -- what are in those?

4    A    Currently, the format is Exhibit 18.

5    Q    Okay.  So, Exhibit 18 is a Memo format?

6         (Thereupon, Plaintiffs' Exhibit 18 was entered

7         into the record.)

8    A    Yes.

9  BY MS. SIEGEL:

10   Q    And, there's statistics in there, but it's not

11 a day-by-day log.  Is that correct?

12   A    No, it's a weekly report.

13   Q    And do you know when this format started?

14   A    Which format?  I remember --

15   Q    I'm sorry.  Exhibit 18.

16   A    This started -- the Memo format started

17 following commission directive to receive a weekly

18 report.

19   Q    Okay.  So, this says it's going to the

20 Assistant Chief of police from Commander --

21   A    Chin-Quee.

22   Q    Chin-Quee, does this -- but you're saying this

23 also goes to the commission?

24   A    Yes.

25   Q    Okay.



1    A    The reports currently go from police to the

2  City Manager.

3    **Q    And then the City Manager relays it to the**

4  **commission?**

5    A    It is then distributed through City Manager

6  staff to the commission.

7    **Q    And then Exhibit 17 is a different format of a**

8  **Memo.**

9         (Thereupon, Plaintiffs' Exhibit 17 was entered

10        into the record.)

11  BY MS. SIEGEL:

12    **Q    This one is to you from Director Coro dated**

13  **March 23rd, 2022. Is this -- or do you still re -- do**

14  **you -- did you receive this report?**

15    A    I did, but if you look at page two, it is the

16  same report as Exhibit 18.  It's from where Coro was

17  receiving it from police.  He sent it to me, I sent it

18  to the manager, the manager sent it to the commission.

19    **Q    Okay.**

20    A    So, the only difference that changes instead

21  of it going through multiple departments is going

22  directly from police to the City Manager and then to the

23  commission.

24    **Q    Okay.  Did you have any role in responding to**

25  **the City of Miami's response to the request for**



1    admissions?

2         A    No.

3         Q    Did anyone in the City Manager's office --

4         A    Not --

5         Q    -- That you -- that you're aware of?

6         A    -- Not that I'm aware of.

7         Q    Okay.  All right.  Well, the last Exhibit 20.

8              (Thereupon, Plaintiffs' Exhibit 20 was entered

9              into the record.)

10   BY MS. SIEGEL:

11        Q    Which I meant to ask way back when we were

12   talking about the APM when it was originally

13   implemented.

14             I know you weren't here -- I mean here, you

15   weren't in your position in 2019, but this Exhibit 20 is

16   an Acknowledgement of Receipt dated January 15th, 2019.

17             And then there's a lot of people listed in

18   their signatures with the APM attached, what is this

19   Acknowledgement of Receipt of?

20        A    Acknowledgement, based on what I'm observing

21   and Exhibit 20, it is acknowledgement that these

22   individuals received a copy of APM 1-19.

23        Q    And do you know if there is an Acknowledgement

24   of Receipt of the amended version?

25        A    I do not know.



1    Q    Is that a typical procedure?

2    A    Yes, particularly if you do not have Email.

3    Q    Okay.  And -- does the acknowledgement -- what

4  is -- does the acknowledgement mean anything more than

5  actually just receiving it?  Does it mean anything like

6  reading it, for example?

7    A    It is seen as you understand and accept that

8  you have a copy of the procedures and the expectations

9  of the City when it comes to implementing that APM.

10   Q    And was -- does it mean in any way that there

11 was any discussion or training about the contents of

12 this APM?

13        MR. FERNANDEZ:  Object to Form.  Go ahead.

14   A    I don't know.

15        MS. SIEGEL:  Okay.  We can take a five minutes

16    break.  I just want to --

17        MR. FERNANDEZ:  Sure.

18        (Thereupon, a short discussion was held off

19        record.)

20        (Deposition resumed.)

21        THE COURT REPORTER:  All right.  We're back on

22    record.

23        MS. SIEGEL:  All right.  We don't have any

24    more questions, but after you're done, we do want

25    to go through the topics that we discussed earlier.



```
 1                    CROSS EXAMINATION

 2  BY MR. FERNANDEZ:

 3       Q    Okay.  Assistant City Manager, Ms. Colebrooke-

 4  Williams.  How's it going today?

 5       A    Good.

 6       Q    I'm Brandon Fernandez.  I represent the City

 7  of Miami.  I know you've been here for a while and I'll

 8  just have one to two questions for you.  Okay?

 9       A    Okay.

10       Q    Earlier you talked about, that you are

11  involved in briefings.

12       A    Yes.

13       Q    Okay.  And is that when the directors of

14  departments brief you on issues that pertain to their

15  job duties and roles?

16       A    Yes.

17       Q    And do you rely on those directors who provide

18  you accurate information regarding what's going on the

19  ground?

20       A    Yes.

21       Q    Okay.  I have nothing else.

22            MS. SIEGEL:  That's it?

23            MR. FERNANDEZ:  That's it.  I know.

24            MS. SIEGEL:  Okay.

25            MR. FERNANDEZ:  Okay.
```



1        MS. SIEGEL:  Good.

2        MR. FERNANDEZ:  So, we're done.  We're going

3     to read please.

4        MS. SIEGEL:  Well, wait.  We're not done yet.

5        MR. FERNANDEZ:  We're not done, okay.  No,

6     follow up?

7        MS. SIEGEL:  No, I don't have follow up, but I

8     want to get on the record the topics and what we

9     discussed.

10        MR. CAPDEVILA:  Sure. One thing, do you

11     want -- should we just read her depo and then

12     continue the discussion?  Is that possible?  Should

13     we let her go, I guess, is the question?

14        MS. SIEGEL:  I'm sorry.

15        MR. CAPDEVILA:  Could we say, we're reading

16     her deposition and then continue?

17        MS. SIEGEL:  Yes, it's already --

18        MR. CAPDEVILA:  Let's do that so that she

19     can --

20        MS. SIEGEL:  That's fine.

21        MR. CAPDEVILA:  Get out.  I'm getting you out

22     of here.

23        THE WITNESS:  Is this for you or you want to

24     give it to me?

25        MS. SIEGEL:  You can have it if you want --



1            MS. ARMAND:  You can have it if you want to.

2            MS. SIEGEL:  I can't imagine.  You do?

3            THE WITNESS:  I do want it.

4            MS. SIEGEL:  Do you?

5            MS. ARMAND:  You do?

6            MS. SIEGEL:  Okay.  Wow.

7            THE WITNESS:  Thank you.

8            MS. ARMAND:  A gift from us to you.

9            THE WITNESS:  I appreciate the gift.

10            MR. CAPDEVILA:  All right.  Thank you so much.

11            MS. SIEGEL:  It's the red binder that you

12       like.  Right?

13            MR. CAPDEVILA:  Okay.

14            MS. SIEGEL:  All right.  So, where's the

15       topics?

16            MR. CAPDEVILA:  Okay.  So, I already started

17       drafting an e-mail.  So, just let the record

18       reflect that we had a discussion off record.

19            While Ms. Colebrooke was out of the room and

20       on the call for, I think, the City Manager.

21       Don't -- you don't have to speak on that. We agreed

22       that.

23            MS. SIEGEL:  Thank you.

24            MR. CAPDEVILA:  The following topics, like it

25       could be designated or stipulated.  The first one



1    is (1)(a) developmental policy, where I have

2    written here, possibly designable/debatable.

3         I don't know if that's a real word.  I'll just

4    say stipulated and designated from here on out.

5    One, developmental policy, how is it developed?

6         Two, who was involved limited to whether the

7    commissioners or the City Manager were part of the

8    discussion?

9         Three, when was the development of the

10   prior APM?

11        Four, what were the reason for the

12   development?  And five, the revised APM effective

13   date moving on 4-H, which is personnel and

14   equipment used during Clean-Ups.

15        We discussed that it was design -- it could be

16   designated or stipulated to based, on what Director

17   Sanders, of solid waste said.  Moving on to 4-I the

18   cost of Clean-Ups --

19        MS. SIEGEL:  Well, so he can talk about the

20   solid waste personnel and certainly the equipment--

21        MR. CAPDEVILA:  Right.

22        MS. SIEGEL:  -- But the personnel from the

23   police and personnel from Department of Human

24   Services, we would like an official answer as to

25   it.


Universal
COURT REPORTING
CLEAR VALUE. EVERY CASE.

877-291-3376
www.ucrinc.com

1          MR. CAPDEVILA:  The personnel and equipment

2     used in all, like the PPEs you meant?

3          MS. SIEGEL:  No, I'm talking about the

4     personnel, not equipment is certainly within solid

5     waste --

6          MR. CAPDEVILA:  Sure.

7          MS. SIEGEL:  -- But personnel.

8          MR. CAPDEVILA:  I could have sworn that was in

9     interrogatories and --

10         MS. SIEGEL:  Well, we could look at that and

11    see if it's covered.

12         MR. CAPDEVILA:  We'll double check that.

13         MS. SIEGEL:  It's possible.

14         MR. CAPDEVILA:  That's possible also, that

15    could be, a stipulated --

16         MS. SIEGEL:  Yes, that probably --

17         MR. CAPDEVILA:  Based on what all --

18         MS. SIEGEL:  I know is that she didn't know.

19    But, you're right, it might be in an interrogatory.

20         MR. CAPDEVILA:  She couldn't recall.  Right.

21         MS. SIEGEL:  Yes.  Okay.

22         MR. CAPDEVILA:  So, we'll just say

23    interrogatories could be stipulated to their -- and

24    yes, I'll look into that.

25         MS. SIEGEL:  Okay.



1          MR. CAPDEVILA:  Moving on to 4-I cost of

2     Clean-Ups, although the witness said that she

3     didn't believe there was a line item.

4          I'm going to look into, whether there's any

5     way to calculate the cost of Clean-Ups on a -- you

6     want to say monthly level or weekly level or --

7          MS. SIEGEL:  However, it -- you can figure it

8     out.  Annual, monthly, it doesn't matter, but --

9          MR. CAPDEVILA:  Roughly -- a rough estimate.

10    We'll see.

11         MS SIEGEL:  What she said was that she thought

12    there might be some information in each

13    department's budgets.  So, that's just one way to

14    look at it --

15         MR. CAPDEVILA:  Okay.

16         MS. SIEGEL:  Or to look for it, I meant.

17         MR. CAPDEVILA:  To the best of our ability,

18    we'll stay on that.

19         MS. SIEGEL:  Okay.

20         MR. CAPDEVILA:  4-L, and --

21         MS SIEGEL:  And again, because we just want a

22    30(b)(6) answer, if there's no way to calculate it,

23    there's no way.  And that's --

24         MR. CAPDEVILA:  That's what I understood. But

25    if there truly is no way, I want to make sure --



1          MS. SIEGEL:  Yes.

2          MR. CAPDEVILA:  -- You get that stipulation.

3     Okay.

4          MS. SIEGEL:  Yes.  Perfect.  Got you.

5          MR. CAPDEVILA:  Great.  4-L, notices provided

6     prior to a Clean-Up, the areas of concern were

7     rapid response.  Does rapid response provide

8     notices?

9          This might be designable through Commander

10    Chin-Quee's deposition testimony.  We will look

11    into this.  Which notices are used, that might be

12    something, that --

13         MS. SIEGEL:  Currently.

14         MR. CAPDEVILA:  -- Currently, that might be,

15    something that could be designated by the director

16    or Sergio Torres or Commander Chin-Quee I have to

17    look into that.  When did they switch so we can get

18    a clear --

19         MS. SIEGEL:  Yes.

20         MR. CAPDEVILA:  -- Answer on that.  That'd be

21    delightful.

22         MS. SIEGEL:  That would be delightful.

23         MR. CAPDEVILA:  4-M, forms used during Clean-

24    Ups.  I think that could be designated through

25    various deposition testimony.  Right.  We'll say

1    forms used during Clean-Up/after Clean-Ups.

2         MS. SIEGEL:  Yes.

3         MR. CAPDEVILA:  Right, because, I know we

4    talked about some of the forms that came up after,

5    but that's fine.

6         5-B location and current container contents.

7    So, the -- as we discussed, and as she indicated,

8    there was a move of property from our now evicted

9    location into a new storage facility.  The revised

10   forms, or rather there were forms that solely

11   started to fade and deteriorate over time with the

12   ink.

13        So, the revised forms will now have a more

14   detailed itemization and a fresher ink for all of

15   us to be able to read it, and a site inspection

16   would likely cure this topic.

17        So, receiving those revised forms and the site

18   inspection will cure this topic.  Agreed?

19        MS. SIEGEL:  Agree.

20        MR. CAPDEVILA:  All right.  5-G, process for

21   retrieving property.  I believe this could be

22   designated through various green share testimony,

23   including Sergio Torres, Christian Candelier and I

24   don't recall if Jamele Jackson testified to this.

25   But we -- I think that could be designated?



1     MS. SIEGEL:  Okay.

2          MS. CAPDEVILA:  The tagging and labeling a

3     property.  This could be designated, I believe,

4     through Director Coro.

5          The issues that are -- that the Plaintiffs are

6     seeking is, number one, what is the City's position

7     on tagging/labeling property that is left behind at

8     a Clean-Up.

9          Scene two, when did the blue bag program

10    start, which was detailed by Director Coro.

11         Three, is the Blue Bag program still being

12    used for, what are the City's intent, Sorry.  What

13    is the City's intent with that program in the

14    future?

15         Five, how often are looked bags tagged when

16    they are seen on-- at a Clean-Up site?  Is that

17    well said?

18         MS. SIEGEL:  That makes sense, perfect.

19         MR. CAPDEVILA:  We believe this could be

20    something stipulated to, based on the limited

21    knowledge that our employees have of the August

22    2nd, 2021, date and the May 2021, incident

23    involving Ms. Cooper.  Anything else?

24         MS. SIEGEL:  I'm looking, let me just look

25    through and see if there's something else --


UNIVERSAL
COURT REPORTING
CLEAR VALUE. EVERY CASE.

1      MR. CAPDEVILA:  And just for the record, I

2    want to mention that the revised forms were

3    received by me last night.  That's all.

4      MS. SIEGEL:  There is another topic that isn't

5    highlighted, but 7-E the waiver for voluntarily Don

6    Terry disposal of property or other forms, which we

7    understand from the request for admission, those

8    forms aren't being used.

9      So, that's why we went into the consent and

10   she didn't know anything about consent or

11   documentation or anything about how, what that

12   process is.  So, I would highlight that.

13      MR. CAPDEVILA:  So, you're saying waiver for

14   voluntary disposal --

15      MS. SIEGEL:  Of property or other forms and

16   that's the whole.

17      MR. CAPDEVILA:  And just to clarify, when you

18   say waiver for voluntary disposal of property,

19   you're referring to the form that was proposed by

20   Milton Vickers in the Draft Street Clean-Up

21   Encampment?

22      MS. SIEGEL:  No, I think it's in the APM.

23      MR. CAPDEVILA:  Well, it's referenced in the

24   APM, I see.

25      MS. SIEGEL:  Yes.



1          MS. ARMAND:  I mean, yes, it talks about it in

2     the --

3          MS. SIEGEL:  And, so if that's not being used,

4     how do you get that?  What's the substitute consent

5     process?

6          MR. CAPDEVILA:  Okay.  I believe that could be

7     designated through Commander Chin-Quee, Sergeant

8     Vera.

9          MS. SIEGEL:  Okay.  What's --

10         MR. CAPDEVILA:  And I think some other Green

11    Shirts, but let me look into that as to what ways

12    is voluntary disposal being --

13         MS. SIEGEL:  Documented.

14         MR. CAPDEVILA:  -- Documented --

15         MS. SIEGEL:  Right.  Whatever, yes.

16         MR. CAPDEVILA:  -- In some way or another.

17         MS. SIEGEL:  Yes.  Okay.

18         MR. CAPDEVILA:  And what is the position of a

19    written waiver for voluntary disposal property?

20         MS. SIEGEL:  Yes.

21         MR. CAPDEVILA:  As opposed to voluntary --

22    voluntarily handing it for storage.

23         MS. SIEGEL:  Right.  It's the disposal, not

24    the storage.

25         MR. CAPDEVILA:  Which --



1          MS. SIEGEL: But --

2          MR. CAPDEVILA:  Which -- did you need a

3     stipulation on that as well, for the -- for

4     voluntarily giving the property?

5          MS. SIEGEL:  Storage?

6          MS. ARMAND:  Well, the storage,

7          MS. SIEGEL:  No.  It's the disposal that we're

8     concerned about.

9          MR. CAPDEVILA:  I might give it up.

10          MS. SIEGEL:  Well, give it, I like --

11          MR. CAPDEVILA:  --the stipulations.  I might

12     not.  Let me just take that back, okay, until --

13          MS. SIEGEL:  You can throw in any stipulation

14     you want, but --

15          MR. CAPDEVILA:  Okay.  All right.

16          MS. SIEGEL:  All I think that -- I think

17     that's it.

18          MS. ARMAND:  I think that's it.

19          (Deposition concluded at 4:09 p.m.)

20          (Reading and signing of the deposition by the

21          witness has been reserved.)

22

23

24

25



1              CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF MIAMI-DADE

4

5        I, ANDIE FABIAN, Court Reporter and Notary Public

6    for the State of Florida, do hereby certify that I was

7    authorized to and did digitally report and transcribe

8    the foregoing proceedings, and that the transcript is a

9    true and complete record of my notes.

10       I further certify that I am not a relative,

11   employee, attorney or counsel of any of the parties, nor

12   am I a relative or employee of any of the parties'

13   attorneys or counsel connected with the action, nor am I

14   financially interested in the action.

15       Witness my hand this 7th day of August, 2023.

16

17

18   _Andie Fabien_

19

20   _____

21   ANDIE FABIAN, COURT REPORTER
     NOTARY PUBLIC, STATE OF FLORIDA

22

23

24

25



```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA

 3    COUNTY OF MIAMI-DADE

 4

 5        I, ANDIE FABIAN, the undersigned authority, certify

 6    that NATASHA COLEBROOKE-WILLIAMS personally appeared

 7    before me and was duly sworn on the 25th day of July,

 8    2023.

 9

10        Witness my hand this 7th day of August, 2023.

11

12

13

14    _____
      ANDIE FABIAN, COURT REPORTER
      NOTARY PUBLIC, STATE OF FLORIDA
15    Commission No.:  HH 262411
      Commission Exp:  05/09/2026
16

17

18

19

20

21

22

23

24

25
```



LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI
Colebrooke-Williams, Natasha on 07/25/2023        Page 182

```
1    DATE:      August 7, 2023
     TO:        Natasha Colebrooke-Williams
2    C/O
                Brandon Luis Fernandez, Esquire
3               City Of Miami, Office of City Attorney
                444 Southwest 2nd Avenue
4               Miami, Florida 33130-1910

5    IN RE:    Latoyla Yasheen Cooper-Levy vs. City of Miami
     CASE NO:  22-CV-21939-BLOOM/Otazo-Reyes
6

7    Dear Ms. Colebrooke-Williams,

8         Please take notice that on March 24, 2023, you gave
     your deposition in the above-referenced matter.  At that
9    time, you did not waive signature.  It is now necessary
     that you sign your deposition.  You may do so by
10   contacting your own attorney or the attorney who took
     your deposition and make an appointment to do so at
11   their office.  You may also contact our office at the
     below number, Monday - Friday, 9:00 AM - 5:00 PM, for
12   further information and assistance.
          If you do not read and sign your deposition within
13   thirty (30) days, the original, which has already been
     forwarded to the ordering attorney, may be filed with
14   the Clerk of the Court.
          If you wish to waive your signature, sign your name
15   in the blank at the bottom of this letter and promptly
     return it to us.
16
     Very truly yours,
17
     Andie Fabian, Court Reporter
18   Universal Court Reporting
     (954)712-2600
19

20   I do hereby waive my signature.

21

22

23   _____
     Natasha Colebrooke-Williams
24   Cc: via transcript:
                              Jocelyn Armand, Esquire
25                    Brandon Luis Fernandez, Esquire
```



```
1    Errata Sheet

2

3    NAME OF CASE: LATOYLA YASHEEN COOPER-LEVY vs CITY OF MIAMI

4    DATE OF DEPOSITION: 07/25/2023

5    NAME OF WITNESS: Natasha Colebrooke-Williams

6    Reason Codes:

7         1. To clarify the record.

8         2. To conform to the facts.

9         3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                        _____
```



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO: 22-cv-21939-BLOOM/Otazo-Reyes

LATOYLA YASHEEN COOPER-LEVY,
*et al.,*
   Plaintiffs,

  v.

CITY OF MIAMI

   Defendant.
_____/

**PLAINTIFFS' RE-NOTICE OF TAKING DEPOSITION OF
DEFENDANT CIT OF MIAMI UNDER FED. R. CIV. P. 30(b)(6)**

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30(b)(6) counsel for Plaintiffs will take the deposition of **Defendant City of Miami** on **July 25, 2023, starting at 9:30 a.m.** and continuing from day to day until complete. The deposition will take place at **Legal Services of Greater Miami, Inc., 4343 W. Flagler Street, Ste. 100, Miami, Florida 33134**.

The deposition shall be upon oral examination, before UNIVERSAL COURT REPORTING, or an officer duly authorized by law to take depositions using stenographic means in the State of Florida. The oral examination will continue from day to day until completed. The deposition is being taken for the purpose of discovery, for use at trial, or both and for such other purposes as permitted under the Federal Rules of Civil Procedure and other applicable law. Pursuant to Fed. R. Civ. P. 30(b)(6), the City of Miami is required to designate and produce one or more



witnesses who are knowledgeable with respect to each specific subject and is prepared to testify fully on behalf of the Defendant on the following topics:

1.   APM 1-19
   a.   Development of the policy
   b.   Amendment of the policy
   c.   Distribution of the policy and training to City employees about the policy
   d.   Purpose of the policy
   e.   Is the policy binding on employees or merely a guideline?
   f.   Implementation/Enforcement
   g.   Definitions
   h.   Forms identified in the policy

2.   DRAFT 2021 Street Clean Up and Encampment Resource Plan
   a.   Development of the Draft Plan
   b.   Why the Draft Plan was not approved
   c.   Whether the Draft Plan was utilized in any way, and if so, how
   d.    Budget listed in the Draft Plan

3.   Resolutions
   a.   R-21-0160 (4/8/21) – Purpose & development of resolution, including information, documents, and date relied upon, but excluding the deliberative process
   b.   R-21-0379 (9/13/21) – Purpose & development of resolution, including information, documents, and date relied upon, but excluding the deliberative process
   c.   R-21-0372 (9/13/21) – Purpose & development of resolution, including information, documents, and date relied upon, but excluding the deliberative process

4.   Clean-Ups
   a.   Purpose
   b.   Roles of Human Services, Solid Waste, MPD (Prior to HEAT Team and after)
   c.   HEAT Team – Purpose and Operations
   d.   Distinction between homeless hotspot vs encampment
   e.   Geographic scope of Clean-Ups
   f.   Process in selection of locations for clean-up operations and steps the City uses to conduct a Clean-Up.
   g.   Oversight of Clean-Up Operations

    h.     Personnel and equipment used during Clean-Ups
    i.     Cost of Clean-Ups
    j.     Frequency of Clean-Ups
    k.     Coordination of Clean-Ups
    l.     Notices provide prior to a Clean-Up
    m.     Documentation, including any logs created by the City and forms used by the City during Clean-Ups
    n.     Photos of Clean-Ups

5.     Property Storage
    a.     Inventory Storage forms or other written notices provided to owners of property
    b.     Location and current container contents
    c.     Forms for current container contents
    d.     Forms for container contents that were retrieved by property owners
    e.     Photos of the Storage Unit
    f.     Process to tag and label property stored by the City
    g.     Process for retrieving property that is stored by the City
    h.     Process for what the City does with Property for people going to shelter
    i.     Process for handling unattended property
    j.     Process to remove property from the Container

6.     Property left at Clean-Up Site
    a.     Photos
    b.     Tagging and labeling property

7.     Property Destruction
    a.     Process and decision to destroy property, including whether contaminated or health hazard.
    b.     Safeguards when disposing of contaminated or hazardous property.
    c.     Training and supervision of persons responsible for decision to destroy property.
    d.     Inspection and inventory of property
    e.     Waiver for Voluntary Disposal of Property or other forms
    f.     Photos
    g.     Process to challenge decision to destroy property.

8.     Plaintiffs' Clean-Ups
    a.     May 2021 Clean-Ups involving Cooper-Levy

        i.     Processes used at that time for cleanups, property storage and destruction

b.    August 2021 Clean-Up
        i.     Processes used at that time for cleanups, property storage and destruction

c.    Plaintiffs' property
        i.     Whether contaminated
        ii.    Whether destroyed
        iii.   Whether stored

DATED:  July 13, 2023

        Respectfully submitted,

        *Attorneys for Plaintiffs:*

        /s/ Jeffrey M. Hearne
        Jeffrey M. Hearne, FBN: 512060
        jhearne@legalservicesmiami.org
        Jocelyn Armand, Fla. Bar No.44264
        jarmand@legalservicesmiami.org
        LEGAL SERVICES OF GREATER MIAMI, INC.
        4343 W Flagler Street, Suite 100
        Miami, FL 33134
        Tel. / Fax : (305) 438-2403

        Stephen Schnably**
        schnably@law.miami.edu
        University of Miami School of Law
        1311 Miller Drive, Law Lib. G472
        Coral Gable, FL 33146
        Tel: (305) 284-4817
        Cooperating Attorney, ACLU of Florida
        ** Pro Hac Vice

        Jodi Siegel, Fla. Bar No. 511617
        Jodi.siegel@southernlegal.org

Chelsea Dunn, Fla. Bar No. 1013541
Chelsea.dunn@southernlegal.org
SOUTHERN LEGAL COUNSEL, INC.
1229 NW 12th Avenue
Gainesville, FL 32601
Tel: (352) 271-8890
Fax: (352) 271-8347

Benjamin Waxman, Fla. Bar No. 403237
bwaxman@royblack.com
Benjiwaxman@gmail.com
BLACK SREBNICK P.A.
201 S. Biscayne Blvd., Suite 1300
Miami, FL 33131
Tel:   305-371-6421
Fax:   305-358-2006
Cooperating Attorney, ACLU of Florida

Daniel Tilley, Fla. Bar No. 102882
dtilley@aclufl.org
ACLU FOUNDATION OF FLORIDA
4343 West Flagler St., Suite 400,
Miami, FL 33134
Tel: (786) 363-2714

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 13th day of July 2023, a true and correct copy of the foregoing document was served on all counsel of record by email transmission to Defendant's counsel as listed below.

      Kerri L. McNulty
      Email: klmcnulty@miamigov.com

      Bryan Capdevila
      Email: BCapdevila@miamigov.com

      Margaret Snyder
      Email: MSnyder@miamigov.com


           /s/ *Jeffrey M. Hearne*
          ATTORNEY FOR PLAINTIFFS


      *** Universal Court Reporting to cover this deposition (877) 291-3376*



| POLICY NUMBER:<br><br>**APM- 1- 19**<br><br>DATE:<br><br>1/14/2019<br><br>ISSUED BY:<br><br>*Emilio T. Gonzalez*<br>City Manager/Designee<br><br>SIGNATURE | **CITY OF MIAMI**<br><br>**ADMINISTRATIVE POLICY** | REVISIONS |
|---|---|---|
| | | **REVISED SECTION**  Created |
| | | **DATE OF REVISION**  01/14/2019 |

---

**SUBJECT:**     **TREATMENT OF HOMELESS PERSONS' PROPERTY**

---

**Purpose**

The purpose of this policy is to establish a standard practice for the handling, temporary storage, and disposition of property belonging to homeless persons.

**Scope**

This Administrative Policy shall apply to all City employees, whether probationary, classified, unclassified, executive, temporary, or part-time, except employees of the Miami Police Department shall be bound by and follow the procedures set forth in Departmental Order 11 Chapter 10, or any existing Departmental Order addressing the treatment of homeless persons' property, to the extent there is any conflict between this Administrative Policy and any Departmental Order.

**Definitions**

A. "Contaminated or Dangerous Items" are those items that present a hazard to the health and safety of City Personnel or the public. These items include, but are not limited to, hazardous materials, flammable materials (e.g., propane tanks), fabric contaminated with human or animal waste, fabric contaminated with flammable substances (e.g., oil or petroleum products), wet fabric (mold hazard), etc.

B. "Homeless Person" shall mean a person who lacks a fixed, regular, and adequate night-time residence and has a primary night-time residency that is: (a) supervised publicly or privately operated shelter designed to provide temporary living accommodations; (b) an institution that provides a temporary residence for individuals intended to be institutionalized; or (c) a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings. The term "homeless person" does not include any person imprisoned or otherwise detained pursuant to an Act of

---

PLAINTIFF'S EXHIBIT

**2**

MIAFLA000001

City of Miami                                                            APM 1-19: Treatment of Homeless Persons' Property

Congress or a state law. 42 U.S.C. §11301, et seq. (1994).

C. "Homeless Person's Property" or "Homeless Property" shall mean personal property known to belong to a homeless person, or readily recognizable as property of a homeless person (i.e., bedding or clothing and other belongings organized or packaged together in a way indicating it has not been abandoned).

**Procedures**

**I.    General procedures:**

1. City Personnel will attempt to secure personal items such as identification, medicines and eyeglasses and other small items of importance identified by the Homeless Person or readily identifiable as intimate personal property.

2. Notwithstanding anything herein:

   a. Homeless Property that is contaminated or otherwise poses a health or safety concern to City Personnel or to members of the public may be disposed of.

   b. The City is not responsible for taking custody of mattresses, upholstered furniture, or other bulky items on public property, and may dispose of those items.

   c. Nothing herein prevents the disposal of items reasonably belied to be refuse.

   d. The City may prohibit the presence of unattended property in specified areas where the presence of such unattended property poses a threat or risk to the public health of safety.

**II.   Tagged/Labeled Homeless Persons' Property:**

1. In order to aid the City in its ability to readily identify and handle the property of homeless persons, the City requires that all homeless individuals who wish to identify their personal property place a tag or label with their name and contact information (telephone and/or email) on the outside of any such property, such that City employees can easily identify the property as belonging to a specific individual and will have a means of contacting that individual with regard to any actions taken as to that property.

2. Whenever a City employee encounters unattended but tagged/labeled homeless persons' property, the following procedure shall be employed:

   a. Any personal items such as identification, medicines and eyeglasses and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel, and a copy of that

MIAFLA000002

form will be provided to the Homeless Person by e-mail (if provided/available).

b.  Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

c.  Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding, photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel, and a copy of that form will be provided to the Homeless Person by e-mail (if provided/available).

d.  Whenever possible, City personnel will photograph the homeless property prior to taking action.

e.  Following any such action described above, the City will attempt to contact the homeless individual identified on that tag/label to inform them of the disposition of their unattended property, and to notify them of any stored property and the method through which the homeless person can claim that property. Three (3) attempts at contact will be made. The City shall document any such attempts.

## III.   When a Homeless Person accepts voluntary placement in shelter:

1.  When a Homeless Person accepts placement in a shelter, City personnel will request the Homeless Person to secure the personal items that they wish to take to shelter with them. These items should include, at a minimum, any identification, medication, eyeglasses, and electronics in the homeless person's possession.

2.  City personnel will request that the Homeless Person identify any of their remaining Homeless Property that they are willing to voluntarily discard. When a homeless person voluntarily agrees to discard property, they will be asked to sign a Waiver for Voluntary Disposal of Property Form.

3.  Any remaining Homeless Property that cannot be taken to the shelter, which is not contaminated or does not otherwise pose a health hazard or obvious safety issue, will be documented, secured, and stored by City personnel. The Homeless Person will be required to sign an Inventory Storage Form, and a copy of that form will be provided to the Homeless Person. Any such stored property will be held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed.

4.  Whenever possible, City personnel will photograph the homeless property prior to taking action.

MIAFLA000003

IV.   **During a Cleanup operation:**

1.   All Cleanup operations will be coordinated by the Department of Human Services.

2.   City personnel will place notices of Cleanup operation, at least seven (7) days prior to the cleaning date.  The notice will inform individuals of the date of cleaning and will provide the phone number and address of the Veterans Affairs/Homeless Assistance Program Division in the Department of Human Services, where any collected Homeless Property can be retrieved.

3.   Whenever possible, City personnel will photograph the Homeless Property prior to the Cleanup operation.

4.   Cleanup operation when the Homeless Person is present:

   a.   City Personnel will inform the Homeless Person that the Cleanup is about to commence and request that they relocate themselves with their Homeless Property. These items should include, at a minimum, any identification, medication, eyeglasses, and electronics in the homeless person's possession.

   b.   City personnel will request that the Homeless Person identify any of their remaining Homeless Property that they are willing to voluntarily discard.  When a homeless person voluntarily agrees to discard property, they will be asked to sign a Waiver for Voluntary Disposal of Property Form.

   c.   Any remaining Homeless Property that cannot be left on the site, which is not contaminated or does not otherwise pose a health hazard or obvious safety issue, shall be documented, secured, and stored by City personnel. The Homeless Person will be required to sign an Inventory Storage Form, and a copy of that form will be provided to the Homeless Person. Any such property will be held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed.

5.   Cleanup operation when the Homeless Person is not present:

   a.   Any personal items such as identification, medicines and eyeglasses and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.

   b.   Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

   c.   Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding,

MIAFLA000004

photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.

d.  If the property was tagged/labeled, the City will attempt to contact the individual identified as the property owner in the manner set forth in section II, above. If the property was not tagged/ labeled, the City will post a notice at the location of the property disposition, notifying the potential owner of the property that their property was either discarded or stored, and informing the reader of how to contact the City to discuss that property.

V.  **Procedures for unattended and unidentified (untagged/unlabeled) Homeless Property:**

1.  The Department of Human Service shall be contacted prior to City personnel taking action with respect to Homeless Property.

2.  Any personal items such as identification, medicines and eyeglasses and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.

3.  Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

4.  Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding, photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days. An Inventory Storage Form will be completed by City personnel.

VI.  **Storage Procedures**

1.  The City homeless property storage site will be accessible by public transit or other means accessible to persons with low income.

2.  When Homeless Property is collected by City personnel it should be labeled with the date of its removal and location from which it was removed to assist with its being reclaimed by its owners. Bags may be used to keep items collected from the same sites together.

MIAFLA000005



**CITY OF MIAMI**
**DOCUMENT ROUTING FORM**

ORIGINATING DEPARTMENT: __Human Services__
DEPT. CONTACT PERSON: __William Porro__               EXT._____
NAME OF OTHER CONTRACTUAL PARTY/ENTITY: _____**APM 1-19**_____

IS THIS AGREEMENT A RESULT OF A COMPETITIVE PROCUREMENT PROCESS?  ☐ YES  ☐ NO
TOTAL CONTRACT AMOUNT: $_____      FUNDING INVOLVED? ☐ YES  ☐ NO

TYPE OF AGREEMENT:
☒ MANAGEMENT AGREEMENT                    ☐ PUBLIC WORKS AGREEMENT
☐ PROFESSIONAL SERVICES AGREEMENT         ☐ MAINTENANCE AGREEMENT
☐ GRANT AGREEMENT                         ☐ INTER-LOCAL AGREEMENT
☐ EXPERT CONSULTANT AGREEMENT             ☐ LEASE AGREEMENT
☐ LICENSE AGREEMENT                       ☐ PURCHASE OR SALE AGREEMENT

OTHER: (PLEASE SPECIFY) _____

PURPOSE OF ITEM (BRIEF SUMMARY): _____
_____

COMMISSION APPROVAL DATE: ___/___/___   FILE ID:_____ ENACTMENT NO.:_____

IF THIS DOES NOT REQUIRE COMMISSION APPROVAL, PLEASE EXPLAIN: _____
_____

| ROUTING INFORMATION | Date | PLEASE PRINT AND SIGN |
|---|---|---|
| APPROVAL BY DEPARTMENTAL DIRECTOR | | PRINT: William Porro<br>SIGNATURE: William Porro |
| SUBMITTED TO RISK MANAGEMENT | | PRINT: ANN-MARIE SHARPE<br>SIGNATURE: N\|A |
| SUBMITTED TO CITY ATTORNEY  Matter ID: 21-1818<br>Approved as to legal form : Domini J. Gibbs | 8/26/2021 | PRINT: VICTORIA MENDEZ<br>SIGNATURE: N/A |
| APPROVAL BY ASSISTANT CITY MANAGER | 8/27/01 | PRINT: Natasha Colebrook-Williams<br>SIGNATURE: |
| RECEIVED BY CITY MANAGER | 8/30/21 | PRINT: ART NORIEGA<br>SIGNATURE: |
| 1) ONE ORIGINAL TO CITY CLERK, | | PRINT:<br>SIGNATURE: |
| 2) ONE COPY TO CITY ATTORNEY'S OFFICE, | | PRINT:<br>SIGNATURE: |
| 3) REMAINING ORIGINAL(S) TO ORIGINATING DEPARTMENT | | PRINT:<br>SIGNATURE: |

**PLEASE ATTACH THIS ROUTING FORM TO ALL DOCUMENTS THAT REQUIRE**
**EXECUTION BY THE CITY MANAGER**

PLAINTIFF'S EXHIBIT
**3**

DEF000257

| POLICY NUMBER:<br><br>**APM- 1-19**<br><br>DATE:<br><br><br>ISSUED BY:<br><br>*Arthur Noriega. V.*<br>City Manager/Designee<br><br>SIGNATURE | **CITY OF**<br>**MIAMI**<br><br><br><br>**ADMINISTRATIVE**<br>**POLICY** | **REVISIONS**<br>REVISED **REVISED** DATE OF<br>SECTION **SECTION** **REVISION**<br>Created<br>Revised |

---

**SUBJECT:**  TREATMENT OF HOMELESS PERSONS' PROPERTY

**Purpose**

The purpose of this policy is to establish a standard practice for the handling, temporary storage, and disposition of property belonging to homeless persons.

**Scope**

This Administrative Policy shall apply to all City employees, whether probationary, classified, unclassified, executive, temporary, or part-time, except employees of the Miami Police Department shall be bound by and follow the procedures set forth in Departmental Order 11 Chapter 10, or any existing Departmental Order addressing the treatment of homeless persons' property, to the extent there is any conflict between this Administrative Policy and any Departmental Order.

**Definitions**

A. "Contaminated or Dangerous Items" are those items that present a hazard to the health and safety of City Personnel or the public. These items include, but are not limited to, hazardous materials, flammable materials (e.g., propane tanks), fabric contaminated with human or animal waste, fabric contaminated with flammable substances (e.g., oil or petroleum products), wet fabric (mold hazard), etc.

B. "Homeless Person" shall mean a person who lacks a fixed, regular, and adequate night-time residence and has a primary night-time residency that is: (a) supervised publicly or privately operated shelter designed to provide a temporary residence for individuals intended to be institutionalized; or (c) a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings. The term "homeless person" does not include any person imprisoned or otherwise detained pursuant to an Act of Congress or a state law. 42 U.S.C. §11301, et seq. (1994).

DEF000258

City of Miami                                                    APM 1-19: Treatment of Homeless Persons' Property

C. "Homeless Person's Property" or "Homeless Property" shall mean personal property known to belong to a homeless person, or readily recognizable as property of a homeless person (i.e., bedding or clothing and other belongings organized or packaged together in a way indicating it has not been abandoned).

**Procedures**

I. **General Procedures**

1. City Personnel will attempt to secure personal items such as identification, medicines and eyeglasses and other small items of importance identified by the Homeless Person or readily identifiable as intimate personal property.

2. Notwithstanding anything herein:

   a. Homeless Property that is contaminated or otherwise poses a health or safety concern to City Personnel or to members of the public may be disposed of.

   b. The City is not responsible for taking custody of mattresses, upholstered furniture, or other bulky items on public property, and may dispose of those items.

   c. Nothing herein prevents the disposal of items reasonably belied to be refuse.

   d. The City may prohibit the presence o unattended property in specified areas where the presence of such unattended property poses a threat or risk to the public health of safety.

II. **Tagged/Labeled Homeless Persons' Property:**

1. In order to aid the City in its ability to readily identify and handle the property of homeless persons, the City requires that all homeless individuals who wish to identify their personal property place a tag or label with their name and contact information (telephone and/or email) on the outside of any such property, such that City employees can easily identify the property as belonging to a specific individual and will have a means of contacting that individual with regard to any actions taken as to that property.

2. Whenever a City employee encounters unattended but tagged/labeled homeless persons ' property, the following procedure shall be employed:

   a. Any personal items such as identification, medicines, eyeglasses, and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose o the property if unclaimed. An Inventory Storage Form will be completed by City personnel, and a copy of that form will be provided to the Homeless Person by e-mail (if provided/available).

DEF000259

b. Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

c. Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding, photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel, and a copy of that form will be provided to the Homeless Person by e-mail (if provided/available).

d. Whenever possible, City personnel will photograph the homeless property prior to taking action.

e. Following any such action described above, the City will attempt to contact the homeless individual identified on that tag/label to inform them of the disposition of their unattended property, and to notify them of any stored property and the method through which the homeless person can claim that property. Three (3) attempts at contact will be made. The City shall document any such attempts.

III. **When a Homeless Person Accepts Voluntary Placement in Shelter:**

1. When a Homeless Person accepts placement in a shelter, City personnel will request the Homeless Person to secure the personal items that they wish to take to shelter with them. These items should include, at a minimum, any identification, medication, eyeglasses, and electronics in the homeless person's possession.

2. City personnel will request that the Homeless Person identify any of their remaining Homeless Property that they are willing to voluntarily discard. When a homeless person voluntarily agrees to discard property, they will be asked to sign a Waiver for Voluntary Disposal of Property Form.

3. Any remaining Homeless Property that cannot be taken to the shelter, which is not contaminated or does not otherwise pose a health hazard or obvious safety issue, will be documented, secured, and stored by City personnel. The Homeless Person will be required to sign an Inventory Storage Form, and a copy of that form will be provided to the Homeless Person. Any such stored property will be held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed.

4. Whenever possible, City personnel will photograph the homeless property prior to taking action.

IV. **During a Cleanup Operation:**

1. All Cleanup operation will be coordinated by the Department of Human Services' Homeless Outreach Team.

2. City personnel will place notices of Cleanup operation, at least seventy-two (72) hours prior to the cleaning date. The notice will inform individuals of the date of cleaning and will provide the phone number

DEF000260

and address of the Veterans Affairs/Homeless Assistance Program Division in the Department of Human Services, where any collected Homeless Property can be retrieved.

3. Whenever possible, City personnel will photograph the Homeless Property prior to the Cleanup operation.

4. Cleanup operation when the Homeless Person is presented:

   a. City Personnel will inform the Homeless Person that the Cleanup is about to commence and request that they relocate themselves with their Homeless Property. These items should include, at a minimum, any identification, medication, eyeglasses, and electronics in the homeless person's possession.

   b. City personnel will request that the Homeless Person identify any of their remaining Homeless Property that they are willing to voluntarily discard. When a homeless person voluntarily agrees to discard property, they will be asked to sign a Waiver for Voluntary Disposal of Property Form.

   c. Any remaining Homeless Property that cannot be left on the site, which is not contaminated or does not otherwise pose a health hazard or obvious safety issue, shall be documented, secured, and stored by City personnel. The Homeless Person will be required to sign an Inventory Storage Form, and a copy of that form will be provided to the Homeless Person. Any such property will be held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed.

5. Cleanup operation when the Homeless Person is not present:

   a. Any personal items such as identification, medicines, eyeglasses, and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property unclaimed. An inventory Storage Form will be completed by City personnel.

   b. Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

   c. Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding, photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.

   d. If the property was tagged/labeled, the City will attempt to contact the individual identified as the property owner in the manner set forth in section II, above. If the property was not tagged/labelled, the City will post a notice at the location of the property that their property was either discarded or stored, and informing the reader of how to contact the City to discuss that property.

DEF000261

V.   **Procedures for Unattended and Unidentified (Untagged/Unlabeled) Homeless Property:**

1. The Department of Human Service specifically the City's Homeless Outreach Team shall be contacted prior to City personnel taking action with respect to Homeless Property.

2. Any personal items such as identification, medicines, eyeglasses, and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.

3. Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

4. Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding, photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days. An Inventory Storage Form will be completed by City personnel.

VI.   **Storage Procedures**

1. The City homeless property storage site will be accessible by public transit or other means accessible to persons with low income.

2. When Homeless Property is collected by City personnel it should be labeled with the date of its removal and location from which it was removed to assist with its being reclaimed by its owners. Bags may be used to keep items collected from the same sites together.

DEF000262

| POLICY NUMBER:<br><br>__APM- 2 - 92__<br><br>DATE:<br>__March 3, 2003__<br><br>ISSUED BY:<br>__Linda Haskins__<br>City Manager/Designee<br><br>*[signature]*<br>SIGNATURE | **CITY OF MIAMI**<br><br><br>**ADMINISTRATIVE POLICY** | REVISIONS | |
|---|---|---|---|
| | | REVISED SECTION | DATE OF REVISION |
| | | Created | 07/22/92 |
| | | Revised | 06/18/97 |
| | | Revised | 03/08/05 |
| | | Page 1 of 1 | |

**SUBJECT:     ESTABLISHING ADMINISTRATIVE POLICIES**

**PURPOSE:** To amend the guidelines and procedures for creating new or revising prevailing administrative policies.

Effective this date, this administrative policy will supersede LMP-2-92 and all previous directives relating to the establishment and/or revision of administrative and/or labor/ management policies.

**The Policy will be as Follows:**

I       All departments creating new or revising prevailing administrative policies shall submit the proposed policy draft to the Department of Employee Relations, Labor Relations Division.

II      The Office of Labor Relations will review the administrative policy for language and content and recommend changes, if necessary. Upon completion of their review, the proposed policy shall then be forwarded to the City Manager/Designee for final approval. Assignment of appropriate indexing and implementation date will be the responsibility of the Department of Employee Relations, Labor Relations Division.

III     The APM should include the following:

A     Subject

B     Purpose

C     Policy in detail

IV     __Form or exhibit, where applicable__

V      Any policy submitted for review shall not conflict with any labor agreement provision, Civil Service Rule or any other Administrative Policy in effect.

VI     The Department of Employee Relations, Labor Relations Division will be responsible for dissemination of the approved APM to all departments.

DEF000263

DEF000264



City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0701

Name: _Turin_        _Herno_                              2 | 6 |19
    LAST              FIRST              MI              Date Stored

☒ Male    ☐ Female    ☐ Family    ☐ Unknown Person    Race:    ☐ White    ☒ Black

Location Picked Up From: _62 st N.E 4th Ave (Empty lot)._

Police Intervention: ☐ Yes ☒ No    Case No.: _N/A_    Arrest: ☐ Yes ☒ No

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | 2 | Bikes. |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | Storage 2/6/19 |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_Herno Turin_                                                              2 | 6 |19
    Consumer's Name              Consumer's Signature                    Date

_C. Wilson_                                                               2 | 6 |19
    Staff's Name                 Staff's Signature                       Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

**PLAINTIFF'S EXHIBIT 4**

_____          _____          ____|____|____
    Consumer's Name              Consumer's Signature                Date

_____          _____          ____|____|____
    Staff's Name                 Staff's Signature                   Date

D | CM/NT 007 Rev. 06/14 | **Distribution:  White** - Office; **Canary** - Consumer; **Pink** - Storage Clerk

MIAFLA000013



## City of Miami
### Homeless Assistance Program
# INVENTORY / STORAGE INVOICE

0679

Name: **DAWSON     TREVOR**
LAST                    FIRST                    MI

Date Stored: 03 | 13 | 19

☑ Male   ☐ Female   ☐ Family   ☐ Unknown Person   Race: **B**   ☐ White   ☑ Black

Location Picked Up From: **A A ARENA**

Police Intervention: ☑ Yes  ☐ No   Case No.:        Arrest: ☐ Yes  ☑ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 1 | GREEN BAG W/ CLOTHES & PAPERWORK |
| 2 | 1 | BLACK SHOULDER BAG W/ PAPERWORK |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_____
Consumer's Name

**TONY WITHERSPOON**
Staff's Name

Consumer's Signature

Staff's Signature

Date

Date: 03 | 13 | 19

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____
Consumer's Name

Consumer's Signature

Date

_____
Staff's Name

Staff's Signature

Date

| D | CM/NT 007 Rev. 06/14 | **Distribution:** White - Office; Canary - Consumer; Pink - Storage Clerk |

MIAFLA000014

METROPOLITAN DADE COUNTY
DADE COUNTY HOMELESS TRUST
MIAMI HOMELESS ASSISTANCE PROGRAMS
OUTREACH ASSESSMENT AND PLACEMENT

STORAGE IDENTIFIER

03 | RL
MONTH  INITIAL

## INVENTORY/STORAGE INVOICE

NAME: _Anthony_ _Autry_  DATE STORED: 03/06/2019 TO BE PICKED UP: 04/06/2019
          LAST              FIRST

[ ] S/F [✓] S/M [ ] FAMILY    [ ] UNKNOWN PERSON - LOCATION _SW 2nd Ct & 17th Rd._

POLICE INTERVENTION [ ] NO [✓] YES    CASE # _1903070017163_

| ITEM # | QUANTITY | DESCRIPTION |
|--------|----------|-------------|
| 1 | 1 | Bicycle (Pink) |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the Dade County Homeless Trust and/or the City of Miami, Office of Homeless Programs will not be responsible for the property stored.

I understand that if the articles are not retrieved by the pick-up date, they may be discarded.
I also understand that I may make arrangements for an extensions by calling OHP on a monthly basis. (Initial____)

X _Anthony Quian Autry_   03/06/2019      _Ricky Leah_
CONSUMER'S SIGNATURE        DATE         STAFF'S SIGNATURE

*************************************************************************

[ ]   I HAVE RECEIVED ALL OF THE ABOVE LISTED PERSONAL PROPERTY.

[ ]   I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____   _____   _____
CONSUMER'S SIGNATURE        DATE         STAFF'S SIGNATURE
*************************************************************************
CONTACT ATTEMPTS:

| STAFF | PLACE CALLED/VISITED | PERSON CONTACTED | DATE |
|-------|---------------------|------------------|------|
| | | | |
| | | | |
| | | | |

UNCLAIMED ARTICLES DISCARDED ON: _____ BY: _____

com 10-1      WHITE-OFFICE          YELLOW-CONSUMER          PINK-STORAGE CLERK

_450 SW 5th St._

MIAFLA000015



City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0687

Name: ABARA ALBERT
LAST — FIRST — MI

Date Stored: 5 11 2019

☑ Male  ☐ Female  ☐ Family  ☐ Unknown Person  Race: ☐ White  ☐ Black

Location Picked Up From: Chapman-1

Police Intervention: ☐ Yes  ☐ No   Case No.:

Arrest: ☐ Yes  ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 10 | Clothings (pants, shirts |
| 2 | 5 | Documents (papers sheets) |
| 3 | 10 | Razors |
| 4 | 15 | Shampoos, soaps, creams |
| 5 | 1 | Red Suit case |
| 6 | 1 | Brown Bag |
| 7 | 1 | Gray luggage carrier on wheels |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

Albert Abara
Consumer's Name

Consumer's Signature

Date: 5 11 2019

Jamie Jordan
Staff's Name

Staff's Signature

Date: 5 11 2019

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY.

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

Albert Abara
Consumer's Name

Consumer's Signature

Date: 5 11 2019

Jamie Jackson
Staff's Name

Staff's Signature

Date: 5 11 2019

D | CM/NT 007 Rev. 06/14 | Distribution: **White** - Office; **Canary** - Consumer; **Pink** - Storage Clerk

COUPON NO. **62**

**Article** *Spencer JBrown*

**Price**

DATE PROMISED

City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0738

Name: *Brown* LAST , *Spencer* FIRST , *J.* MI

Date Stored: 11 / 27 / 2019

☒ Male  ☐ Female  ☐ Family  ☐ Unknown Person

Race: ☐ White  ☐ Black

Location Picked Up From: *C r A T*

Police Intervention: ☐ Yes  ☒ No   Case No.:

Arrest: ☐ Yes  ☒ No

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | | Gray/ Rollow Suit case |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_____
Consumer's Name

_____
Consumer's Signature

Date: 11 / 27 / 2019

_____
Staff's Name

_____
Staff's Signature

Date: 11 / 27 / 2019

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

*Spencer Brown*
Consumer's Name

_____
Consumer's Signature

Date: 11 / 27 / 2019

_____
Staff's Name

_____
Staff's Signature

Date: 11 / 27 / 2019

D | CM/NT 007 Rev. 06/14 | **Distribution: White** - Office; **Canary** - Consumer; **Pink** - Storage Clerk

MIAFLA000017



City of Miami
Homeless Assistance Program
## INVENTORY / STORAGE INVOICE

0390

Name: GARCON , SEM           12|10|19
LAST          FIRST         MI      Date Stored

☑ Male      ☐ Female      ☐ Family      ☐ Unknown Person    Race: ☐ White   ☑ Black

Location Picked Up From: MACY'S

Police intervention: ☐ Yes ☑ No    Case No.:           Arrest: ☐ Yes ☑ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 1 | BLACK COT W/ METAL FRAME |
| 2 | 1 | BLK GARBAGE BAG W/ BLANKETS + CLOTHES |
| 3 | | |
| 4 | | |
| 5 | | 3B |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

SEM GARCON          X Sem Garcon          12 | 10 | 19
Consumer's Name         Consumer's Signature        Date

T. WITHERSPOON        CMWOW            12 | 10 | 19
Staff's Name          Staff's Signature         Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____        _____        | | |
Consumer's Name           Consumer's Signature         Date

_____        _____        | | |
Staff's Name            Staff's Signature          Date

D | CM/NT 007 Rev. 06/14 | **Distribution: White** - Office; **Canary** - Consumer; **Pink** - Storage Clerk

MIAFLA000018



S A/whole
01 19
Shelf

## City of Miami
## Homeless Assistance Program
# INVENTORY / STORAGE INVOICE

Name: JORDAN             Stephen        C                    12 R6T2d9
      LAST              FIRST           MI                   Date Stored

☑ Male      ☐ Female      ☐ Family      ☐ Unknown Person    | Race:   ☐ White    ☑ Black

Location Picked Up From: CIPT

Police Intervention:  ☐ Yes  ☑ No   Case No.:              Arrest:  ☐ Yes  ☑ No

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | 2 | Speaker |
| 2 | 1 | Reciever |
| 3 | 1 | Purple Roll on SuiTCASE |
| 4 | 1 | Red + black Roll-on SuiTCASE |
| 5 | 1 | ox K CARRY Bag |
| 6 |  |  |
| 7 |  |  |
| 8 |  |  |
| 9 |  |  |
| 10 |  |  |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

Steven Jordan                    Steven Jordan                    12 26 209
Consumer's Name                  Consumer's Signature             Date

Mr                               Mr                               12 26 2d9
Staff's Name                     Staff's Signature                Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

Steven Jordan                    Steven Jordan                    12 26 209
Consumer's Name                  Consumer's Signature             Date

Mr                               Mr                               12 26 2d9
Staff's Name                     Staff's Signature                Date

D   CM/NT 007 Rev. 06/14    **Distribution:  White** - Office; **Canary** - Consumer; **Pink** - Storage Clerk

MIAFLA000019



0117

# City of Miami
## Homeless Assistance Program
# INVENTORY / STORAGE INVOICE

Name: __Rugut__ __Bonathan__ __Bonathan__ __M__
LAST       FIRST       MI

Date Stored: 01 16 2020

☑ Male    ☐ Female    ☐ Family    ☐ Unknown Person    Race: ☐ White   ☐ Black

Location Picked Up From: __CP J__

Police Intervention: ☐ Yes ☑ No    Case No.:    Arrest: ☐ Yes ☑ No

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | 1 | Red Sleeping Bag. |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_Janahan Bugle_    _Jonahan Bugle_    01 16 2020
Consumer's Name      Consumer's Signature      Date

_Mr__    _Mr__    01 16 2020
Staff's Name      Staff's Signature      Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____    _____    _____
Consumer's Name      Consumer's Signature      Date

_____    _____    _____
Staff's Name      Staff's Signature      Date

D | CM/NT 007 Rev. 06/14 | **Distribution: White** - Office; **Canary** - Consumer; **Pink** - Storage Clerk

MIAFLA000020



City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0378

Name: _WATER_ , _Anthony_ _L_
       LAST          FIRST          MI

Date Stored: 03|16|2020

☑ Male   ☐ Female   ☐ Family   ☐ Unknown Person   Race: ☐ White   ☐ Black

Location Picked Up From:

Police Intervention: ☐ Yes ☐ No   Case No.: ___   Arrest: ☐ Yes ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 1 | BIK CARRY ON - SuiTCASE |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

✗ _Anthony Waters_          ✗ _Anthony Waters_          03|16|2020
   Consumer's Name             Consumer's Signature          Date

_M.L._                        _M._                          03|16|20
   Staff's Name                Staff's Signature             Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____          _____          |   |
   Consumer's Name                  Consumer's Signature              Date

_____          _____          |   |
   Staff's Name                     Staff's Signature                 Date

D | CM/NT 007 Rev. 06/14 | **Distribution: White** - Office; **Canary** - Consumer; **Pink** - Storage Clerk

MIAFLA000021



City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0386

Name: AleXANDeR CAANN

LAST                    FIRST          MI

07/27/2020
Date Stored

☑ Male        ☐ Family        ☐ Family        ☐ Unknown Person        Race: ☐ White   ☑ Black

Location Picked Up From: N.E 78ST — N.E 2 AVE

Police Intervention: ☐ Yes  ☐ No    Case No.:                Arrest: ☐ Yes  ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 1 | 4K Trash Bag — Shoes/Jacket |
| 2 | 1 | |
| 3 | 1 | Rollon CASE (Grey) |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

UnABLE To Sign                    UnABLE To Sign                    7/27/2020
Consumer's Name                   Consumer's Signature              Date

Mr...                             Mr...                             7/27/2020
Staff's Name                      Staff's Signature                 Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

Consumer's Name                   Consumer's Signature              Date

Staff's Name                      Staff's Signature                 Date

D  CM/NT 007 Rev. 06/14     Distribution:  White - Office; Canary - Consumer; Pink - Storage Clerk

MIAFLA000022

City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0719

_(handwritten left margin)_ 74 (1) Black Trash Bag of 78th St NE 5th ave

Article   Price

_(handwritten)_ Unknown

| | FIRST | MI | Date Stored |
|--|-------|----|-------------|

9 1 20

☐ Female    ☐ Family    ☐ Unknown Person    Race: ☐ White    ☐ Black

_(handwritten)_ 78th st NE. 5th ave

Police Intervention:    ☐ Yes   ☐ No    Case No.:    Arrest:   ☐ Yes   ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | | |
| 2 | | ① Black Trash Bag |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

| Consumer's Name | Consumer's Signature | Date |
|-----------------|---------------------|------|
| Willie Rachel | | 9 1 20 |
| Staff's Name | Staff's Signature | Date |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

| Consumer's Name | Consumer's Signature | Date |
|-----------------|---------------------|------|
| Staff's Name | Staff's Signature | Date |

MIAFLA000023



City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0381

Name: _FULTON_     _JENISON_
    LAST          FIRST       MI

Date Stored: 9|2|20

☑ Male    ☐ Female    ☐ Family    ☐ Unknown Person    Race:  ☐ White   ☑ Black

Location Picked Up From: _N.W. 7 Ave 28 St_

Police Intervention: ☐ Yes ☑ No   Case No.:     Arrest: ☐ Yes ☑ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 4 | BLACK BAGS |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_____  _____  _____
Consumer's Name        Consumer's Signature     Date

_C. Jordan_                        9|2|20
Staff's Name        Staff's Signature       Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____  _____  _____
Consumer's Name        Consumer's Signature     Date

_____  _____  _____
Staff's Name        Staff's Signature     Date

D  CM/NT 007 Rev. 06/14    **Distribution: White** - Office; **Canary** - Consumer; **Pink** - Storage Clerk

MIAFLA000024



# City of Miami
## Homeless Assistance Program
# INVENTORY / STORAGE INVOICE

0261

Name: **Perry** _LAST_ , **Howard** _FIRST_ **K.** _MI_          12 | 30 | 20 _Date Stored_

☑ Male   ☐ Female          ☐ Family   ☐ Unknown Person    Race: ☐ White   ☑ Black

Location Picked Up From: **Chapman North**

Police Intervention: ☐ Yes ☑ No    Case No.:          Arrest: ☐ Yes ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 2 | Black, black w/ green trim |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

✗ **Howard Perry**
_Consumer's Name_          ✗ _Consumer's Signature_          12 | 31 | 20 _Date_

**Tanya Martin**
_Staff's Name_          _Staff's Signature_          12 | 31 | 20 _Date_

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☑ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

**Howard Perry**
_Consumer's Name_          _Consumer's Signature_          1 | 28 | 21 _Date_

_Staff's Name_          _Staff's Signature_          1 | 28 | 21 _Date_

| D | CM/NT 007 Rev. 06/14 | **Distribution:** White - Office; Canary - Consumer; Pink - Storage Clerk |

MIAFLA000025

METROPOLITAN DADE COUNTY
DADE COUNTY HOMELESS TRUST
MIAMI HOMELESS ASSISTANCE PROGRAMS
OUTREACH ASSESSMENT AND PLACEMENT

STORAGE IDENTIFIER

| | |
|---|---|
| MONTH | INITIAL |

## INVENTORY/STORAGE INVOICE

NAME: _Stagg_ _Silvia_   DATE STORED: _3/2/22_ TO BE PICKED UP: _06/02/22_
       LAST       FIRST

[✓] S/F   [ ] S/M   [ ] FAMILY      [ ] UNKNOWN PERSON - LOCATION _____

POLICE INTERVENTION   [ ] NO   [ ] YES      CASE # _____

| ITEM # | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | (1) | Big Blue Sut case |
| 2 | | |
| 3 | (1) | Blk Bag Chrry on |
| 4 | | |
| 5 | (1) | Tent |
| 6 | | |
| 7 | (1) | Black lugged Crry |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence.  I agree that the Dade County Homeless Trust and/or the City of Miami, Office of Homeless Programs will not be responsible for the property stored.

I understand that if the articles are not retrieved by the pick-up date, they may be discarded.
I also understand that I may make arrangements for an extensions by calling OHP on a monthly basis.  (Initial_____)

_____   _____   _____
CONSUMER'S SIGNATURE         DATE            STAFF'S  SIGNATURE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[ ]   I HAVE  RECEIVED ALL OF THE ABOVE LISTED PERSONAL PROPERTY.

[ ]   I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____   _____   _____
CONSUMER'S  SIGNATURE         DATE            STAFF'S  SIGNATURE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONTACT ATTEMPTS:

| STAFF | PLACE CALLED/VISITED | PERSON CONTACTED | DATE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

UNCLAIMED ARTICLES DISCARDED ON: _____   BY: _____

COM 10-1      WHITE-OFFICE                YELLOW-CONSUMER                PINK-STORAGE CLERK

MIAFLA000026

**City of Miami**
**Homeless Assistance Program**
# INVENTORY / STORAGE INVOICE

0434

Name: Fernandez     Edvardo
LAST              FIRST          MI          Date Stored

☐ Male          ☐ Female          ☐ Family          ☐ Unknown Person     Race:   ☐ White     ☐ Black

Location Picked Up From:

Police Intervention:   ☐ Yes   ☐ No    Case No.:                    Arrest:   ☐ Yes   ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days** from the **Date Stored** as shown above, they will be discarded.

_____        _____        _____
Consumer's Name              Consumer's Signature         Date

_____        _____        _____
Staff's Name                 Staff's Signature            Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

**PLAINTIFF'S EXHIBIT**

**5**

_____        _____        _____
Consumer's Name              Consumer's Signature         Date

_____        _____        _____
Staff's Name                 Staff's Signature            Date

D | CM/NT 007 Rev. 06/14   Distribution: White - Office; Canary - Consumer; Pink - Storage Clerk

CamScanner

MIAFLA120883



City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0756

Name: **Williams** , **Kyomi** , ____
LAST          FIRST          MI

10 | 27 | 21
Date Stored

☐ Male    ☑ Female    ☑ Family    ☐ Unknown Person    Race: ☐ White  ☑ Black

Location Picked Up From: ____

Police Intervention: ☐ Yes ☑ No    Case No.: ____    Arrest: ☐ Yes ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 2 | BLACK TRASH BAGS |
| 2 | 1 | Purple SUITCASE |
| 3 | 1 | CLOTHES BASKET |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

**Kyomi Williams**
Consumer's Name

Consumer's Signature

10 | 27 | 21
Date

**Alain Gonzalez**
Staff's Name

Staff's Signature

10 | 27 | 21
Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

X ____
Consumer's Name

Consumer's Signature

|   |   | Date |

____
Staff's Name

Staff's Signature

|   |   | Date |

D  CM/NT 007 Rev. 06/14    **Distribution: White - Office; Canary - Consumer; Pink - Storage Clerk**

CS CamScanner

INVENTORY STORAGE INVOICE

City of Miami

Date Stored: 4/14/23

Name: Scott, Milton, MI
LAST    FIRST    MI

☐ Family   ☐ Unknown Person   ☐ White   ☑ Black

☐ Male   ☐ Female

Location Picked Up From:   Arrest: ☐ Yes   ☐ No

Police Intervention: ☐ Yes   ☐ No   Case No.:

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 1 | Cooler (orange) |
| 2 | 2 | Black garbage bags |
| 3 | 1 | Red bag with working tools |
| 3 | 1 | Hand truck |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in 180 days from the Date Stored as shown above, they will be discarded.

Milton Scott
Consumer's Name

Milton Scott
Consumer's Signature

Date: 4/14/23

Jamille Jackson
Staff's Name

Staff's Signature

Date: 4/14/23

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

Consumer's Name

Consumer's Signature

Date

Staff's Name

Staff's Signature

Date

CM/NT 007 Rev. 06/14   Distribution: White - Office; Canary - Consumer; Pink - Storage Clerk

CS CamScanner

# City of Miami
## Homeless Assistance Program
### INVENTORY / STORAGE INVOICE

0430

Name: Scott, Wilton

LAST    FIRST    MI

☐ Male    ☐ Female    ☐ Family    ☐ Unknown Person

Race: ☐ White    ☑ Black

Date Stored: 4/14/23

Location Picked Up From:

Arrest: ☐ Yes    ☐ No

Police Intervention: ☐ Yes    ☐ No    Case No.:

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 1 | Cooler (orange) |
| 2 | 2 | Black jacket, fuss |
| 3 | 1 | Red Bag with working tools |
| 4 | 1 | Hand truck |
| 5 | | |
| 6 | | |

CamScanner

MIAFLA120886



## City of Miami
### Homeless Assistance Program
### INVENTORY / STORAGE INVOICE

0430

Name: **Scott** _____ **Milton** _____ _____
LAST _____ FIRST _____ MI

Date Stored: **4|14|23**

☐ Male ☐ Female ☐ Family ☐ Unknown Person Race: ☐ White ☑ Black

Location Picked Up From:

Police Intervention: ☐ Yes ☐ No   Case No.: _____   Arrest: ☐ Yes ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 |  | Cooler (Orange) |
| 2 | 2 | Black garden bags |
| 3 | 1 | Red bag with working tools |
| 4 | 1 | Hand truck |
| 5 |  |  |
| 6 |  |  |
| 7 |  |  |
| 8 |  |  |
| 9 |  |  |
| 10 |  |  |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in 180 days from the Date Stored as shown above, they will be discarded.

**Victory Scott**
Consumer's Name

**Milton Scott**
Consumer's Signature

Date: **4|14|23**

**Jamille Jackson**
Staff's Name

_____
Staff's Signature

Date: **4|14|23**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____
Consumer's Name

_____
Consumer's Signature

Date: __|__|__

_____
Staff's Name

_____
Staff's Signature

Date: __|__|__

D | CM/NT 007 Rev. 06/14 | Distribution: White - Office; Canary - Consumer; Pink - Storage Clerk

CS CamScanner

MIAFLA120887

THE CITY OF MIAMI · FLORIDA

# City of Miami
## Homeless Assistance Program
# INVENTORY / STORAGE INVOICE

**0416**

Name: _____
LAST                    FIRST                    MI

☐ Male    ☐ Female    ☐ Family                          Date Stored: _____

Location Picked Up From: _____    ☐ Unknown Person    Race:  ☐ White   ☐ Black

Police Intervention:  ☐ Yes  ☐ No    Case No.: _____    Arrest:  ☐ Yes  ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_____        _____        _____
Consumer's Name                  Consumer's Signature              Date

_____        _____        _____
Staff's Name                     Staff's Signature                 Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____        _____        _____
Consumer's Name                  Consumer's Signature              Date

_____        _____        _____
Staff's Name                     Staff's Signature                 Date

Distribution:  White - Office; Canary - Consumer; Pink - Storage Clerk

CamScanner

MIAFLA120888

# City of Miami
## Homeless Assistance Program
## INVENTORY / STORAGE INVOICE

0893

Name: _____
      LAST            FIRST      MI      Date Stored

❏ Male    ❏ Female    ❏ Family    ❏ Unknown Person    Race:   ❏ White   ❏ Black

Location Picked Up From: _____

Police Intervention:  ❏ Yes  ❏ No   Case No.: _____   Arrest:  ❏ Yes  ❏ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days** from the Date Stored as shown above, they will be discarded.

_____    _____   Date
Consumer's Name           Consumer's Signature

_____    _____   Date
Staff's Name           Staff's Signature

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

❏ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

❏ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____    _____   Date
Consumer's Name           Consumer's Signature

_____    _____   Date
Staff's Name           Staff's Signature

| D | CM/NT 007 Rev. 06/14 | Distribution: **White** - Office; **Canary** - Consumer; **Pink** - Storage Clerk |

CS CamScanner

MIAFLA120889

# City of Miami
## Homeless Assistance Program
### INVENTORY / STORAGE INVOICE

0429

Name: Gar Finkell , Joyce

LAST    FIRST    MI

☐ Male    ☑ Female

Date Stored: 4 112 123

Location Picked Up From: NW 175t 7ct

☐ Family    ☐ Unknown Person    Race: ☐ White    ☐ Black

Police Intervention: ☐ Yes  ☐ No    Case No.:

Arrest: ☐ Yes  ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 1 | Blue folder with Documents |
| 2 | 1 | Bottle of pills |
| 3 | 2 | Camillus House ID's |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in 180 days from the Date Stored as shown above, they will be discarded.

_____    _____    |  |
Consumer's Name            Consumer's Signature        Date

_____    _____    |  |
Staff's Name               Staff's Signature           Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____    _____    |  |
Consumer's Name            Consumer's Signature        Date

_____    Jamille Jackson    4 112 123
Staff's Name               Staff's Signature           Date

| D | CM/NT 007 Rev. 06/14 | Distribution: White - Office; Canary - Consumer; Pink - Storage Clerk |

CS CamScanner

MIAFLA120890

City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0464

Name:

| | LAST | | FIRST | | MI | | | Date Stored |
|---|---|---|---|---|---|---|---|---|

☐ Male
☐ Female

Location Picked Up From: ☐ Family ☐ Unknown Person | Race: ☐ White ☐ Black

Police Intervention: NW 12 St lare

☐ Yes ☐ No | Case No.: | Arrest: ☐ Yes ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 1 | Laptop |
| 2 | 1 | Cellphone |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed *above was* inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if th article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

| Consumer's Name | Consumer's Signature | Date |
|---|---|---|
| Jamilla Jackson | | 2 1 23 |
| Staff's Name | Staff's Signature | Date |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

| Consumer's Name | Consumer's Signature | Date |
|---|---|---|
| Staff's Name | Staff's Signature | Date |

CM/NT 007 Rev. 06/14

CamScanner

MIAFLA120891

City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0905

Name: _____

| LAST | FIRST | MI | Date Stored |

❑ Male   ❑ Female   ❑ Family   ❑ Unknown Person   Race: ❑ White   ❑ Black

Location Picked Up From: _____

Police Intervention: ❑ Yes   ❑ No   Case No.: _____   Arrest: ❑ Yes   ❑ No

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in 180 days from the Date Stored as shown above, they will be discarded.

_____   _____   _____
Consumer's Name            Consumer's Signature         Date

_____   _____   _____
Staff's Name               Staff's Signature            Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

❑ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

❑ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____   _____   _____
Consumer's Name            Consumer's Signature         Date

_____   _____   _____
Staff's Name               Staff's Signature            Date

Rev. 06/14   **Distribution:** White - Office; Canary - Consumer; Pink - Storage Clerk

CamScanner

MIAFLA120892

**City of Miami**
**Homeless Assistance Program**
# INVENTORY / STORAGE INVOICE

0257

Date Stored

| | FIRST | MI | Race: | ☐ White | ☐ Black |

Name: _____ LAST _____   ☐ Family   ☐ Unknown Person

☐ Male   ☐ Female   Arrest: ☐ Yes   ☐ No

Location Picked Up From:

Police Intervention: ☐ Yes   ☐ No   Case No.:

DESCRIPTION

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_____   _____   Date _____
Consumer's Name              Consumer's Signature

_____   _____   Date _____
Staff's Name                 Staff's Signature

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____   _____   Date _____
Consumer's Name              Consumer's Signature

_____   _____   Date _____
Staff's Name                 Staff's Signature

D | CM/NT 007 Rev. 06/14   **Distribution:** White - Office; Canary - Consumer; Pink - Storage Clerk

CamScanner

MIAFLA120893

City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0256

Name: _____
LAST , FIRST , MI

□ Male   □ Female   □ Family   □ Unknown Person

Date Stored: 2 | 4 | —

Location Picked Up From: _____

Race: □ White   □ Black

Police Intervention: □ Yes   □ No   Case No.: _____

Arrest: □ Yes   □ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_____   _____   _____
Consumer's Name            Consumer's Signature       Date

_____   _____   _____
Staff's Name               Staff's Signature          Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357

□ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

□ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____   _____   _____
Consumer's Name            Consumer's Signature       Date

_____   _____   _____
Staff's Name               Staff's Signature          Date

D | CM/NT 007 Rev. 06/14    Distribution: White - Office; Canary - Consumer; Pink - Storage Clerk

CS CamScanner

City of Miami
Homeless Assistance Program
**INVENTORY / STORAGE INVOICE**

0252

Name: _____
     LAST             FIRST        MI     Date Stored

☐ Male   ☐ Female   ☐ Family   ☐ Unknown Person   Race: ☐ White ☐ Black

Location Picked Up From:

Police Intervention: ☐ Yes ☐ No   Case No.:   Arrest: ☐ Yes ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 2 | B |
| 2 | 1 | |
| 3 | 4 | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_____   _____   _____
Consumer's Name   Consumer's Signature   Date

_____   _____   _____
Staff's Name   Staff's Signature   Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____   _____   _____
Consumer's Name   Consumer's Signature   Date

_____   _____   _____
Staff's Name   Staff's Signature   Date

D | CM/NT 007 Rev. 06/14   Distribution: White - Office; Canary - Consumer; Pink - Storage Clerk

CS CamScanner

MIAFLA120895

**City of Miami**
**Homeless Assistance Program**
**INVENTORY / STORAGE INVOICE**

0419

Name: _____

Date Stored: 2/15/23

LAST _____ FIRST _____ MI _____

☐ Male ☐ Female ☐ Family ☒ Unknown Person    Race: ☐ White ☐ Black

Location Picked Up From: _____

Police Intervention: ☒ Yes ☐ No    Case No.: _____    Arrest: ☐ Yes ☒ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | 1 | Walker |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_____ Consumer's Name    _____ Consumer's Signature    _____ Date

_____ Staff's Name    _____ Staff's Signature    _____ Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____ Consumer's Name    _____ Consumer's Signature    _____ Date

_____ Staff's Name    _____ Staff's Signature    _____ Date

D | CM/NT 007 Rev. 06/14    Distribution: White - Office; Canary - Consumer; Pink - Storage Clerk

CamScanner

MIAFLA120896

City of Miami
Homeless Assistance Program
## INVENTORY / STORAGE INVOICE

0415

|  |  | FIRST | MI | | Date Stored |
|---|---|---|---|---|---|
| **Name:** | LAST | | | | |

☐ Family    ☐ Unknown Person    **Race:**   ☐ White    ☐ Black

☐ Male    ☐ Female

**Location Picked Up From:**

**Police Intervention:** ☐ Yes ☐ No    **Case No.:**    **Arrest:** ☐ Yes ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

| Consumer's Name | Consumer's Signature | Date |
|---|---|---|
| Staff's Name | Staff's Signature | Date |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

| Consumer's Name | Consumer's Signature | Date |
|---|---|---|
| Staff's Name | Staff's Signature | Date |

| D | CM/NT 007 Rev. 06/14 | **Distribution:** White - Office; Canary - Consumer; Pink - Storage Clerk |
|---|---|---|

CS CamScanner

MIAFLA120897

## City of Miami
### Homeless Assistance Program
# INVENTORY / STORAGE INVOICE

0436

Name: R_____  _____  _____
        LAST            FIRST         MI

☑ Male    ☐ Female    ☐ Family    ☐ Unknown Person

Date Stored

Location Picked Up From: NE _____

Race:  ☐ White   ☑ Black

Police Intervention: ☑ Yes  ☐ No    Case No.:

Arrest:  ☐ Yes  ☑ No

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in 180 days from the Date Stored as shown above, they will be discarded.

_____
Consumer's Name

_____
Consumer's Signature

____
Date

_____
Staff's Name

_____
Staff's Signature

____
Date

To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____
Consumer's Name

_____
Consumer's Signature

____
Date

_____
Staff's Name

_____
Staff's Signature

____
Date

D | CM/NT 007 Rev. 06/14 | Distribution:  White - Office; Canary - Consumer; Pink - Storage Clerk

CS CamScanner

MIAFLA120898

# City of Miami
## Homeless Assistance Program
# INVENTORY / STORAGE INVOICE

0892

Name: R_____   W_____ _____ , _____
LAST              FIRST        MI

☑ Male   ☐ Female

Date Stored

Location Picked Up From: _____ B_____

☐ Family   ☐ Unknown Person

Race:   ☐ White   ☐ Black

Police Intervention:   ☐ Yes   ☐ No   Case No.:

Arrest:   ☐ Yes   ☐ No

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | 7 | L_____ |
| 2 | 7 | _____ |
| 3 | 3 | _____ |
| 4 | 6 | Fishing Rods |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days** from the Date Stored as shown above, they will be discarded.

_____          _____
Consumer's Name                 Consumer's Signature          Date

_____          _____
Staff's Name                    Staff's Signature             Date

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____          _____
Consumer's Name                 Consumer's Signature          Date

_____          _____
Staff's Name                    Staff's Signature             Date

CMANT 007 Rev. 06/14   Distribution:   White - Office;   Canary - Consumer;   Pink - Storage Clerk

CS CamScanner

MIAFLA120899

City of Miami
Homeless Assistance Program
# INVENTORY / STORAGE INVOICE

0255

Name: _Clark_    FIRST _Seaver_    MI ___    Date Stored ___
LAST

☐ Family    ☐ Unknown Person    Race: ☐ White    ☐ Black

☐ Male    ☐ Female

Location Picked Up From: ___ _Mission_ ___    Arrest: ☐ Yes    ☐ No

Police Intervention: ☐ Yes   ☐ No    Case No.: ___

| ITEM No. | QUANTITY | DESCRIPTION |
|----------|----------|-------------|
| 1 | 1 | Luggage |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |

The property listed above was inventoried in my presence. I agree that the City of Miami Homeless Assistance Program will not be responsible for any property stored.

I understand that if the article(s) stored are not retrieved in **180 days from the Date Stored** as shown above, they will be discarded.

_____    _____    Date
Consumer's Name    Consumer's Signature

_____    _____    Date
Staff's Name    Staff's Signature

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To reclaim property please contact the Miami Homeless Assistance Program 1-877-994-4357**

☐ I HAVE RECEIVED ALL THE ABOVE LISTED PROPERTY

☐ I CHOOSE NOT TO CLAIM MY PROPERTY. I UNDERSTAND THAT IT WILL BE THROWN AWAY.

_____    _____    Date
Consumer's Name    Consumer's Signature

_____    _____    Date
Staff's Name    Staff's Signature

D | CM/NT 007 Rev. 06/14 | Distribution: White - Office; Canary - Consumer; Pink - Storage Clerk

CamScanner
MIAFLA120900









**OTICE**

THAT THIS AREA WILL BE
CLEANED ON

8 - 25 - 21

EMOVE ANY PERSONAL
BELONGINGS FROM THE SITE.

IF YOU WOULD LIKE TO RELOCATE TO
EMERGENCY HOUSING, PLEASE CALL 305.960.4980
(HELP) OR CONTACT THE OUTREACH WORKERS
WHOM WILL BE VISITING THE AREA FREQUENTLY

**THANK YOU**

City of Miami VAHS DHS          POSTED: 8 -24- 21





Office DEPOT®

# NOTICE

PLEASE BE ADVISED ON **THIS** WEEK

**MONDAY JANUARY 2nd - FRIDAY JANUARY 6th**

THIS AREA IN DIST. I WILL BE CLEANED TUES. 3rd, WED. 4th & THUR. 5th

WEATHER PERMITTING!

## PLEASE REMOVE ANY PERSONAL BELONGINGS FROM THE SITE.

IF YOU WOULD LIKE TO RELOCATE TO EMERGENCY HOUSING, PLEASE CALL 305.960.4980 (HELP) OR CONTACT THE OUTREACH WORKERS WHOM WILL BE VISITING THE AREA FREQUENTLY

## THANK YOU

City of Miami VAHS DHS

POSTED:

PLAINTIFF'S EXHIBIT

**7**

_____

PL000430



Office DEPOT®

# NOTICE

PLEASE BE ADVISED ON **THIS WEEK**

**MONDAY DECEMBER 19th - FRIDAY DECEMBER 23rd**

THIS AREA IN DIST. I WILL BE CLEANED MON. 19th, TUES. 20th, & WED. 21st

WEATHER PERMITTING!!

**PLEASE REMOVE ANY PERSONAL BELONGINGS FROM THE SITE.**

IF YOU WOULD LIKE TO RELOCATE TO EMERGENCY HOUSING, PLEASE CALL 305.960.4980 (HELP) OR CONTACT THE OUTREACH WORKERS WHOM WILL BE VISITING THE AREA FREQUENTLY

## THANK YOU

City of Miami VAHS DHS                    POSTED: _____

PL000431



Office DEPOT®

# NOTICE

THE CITY OF MIAMI · FLORIDA

PLEASE BE ADVISED ON **THIS WEEK**

**MONDAY DECEMBER 12th - FRIDAY DECEMBER 16th**

THIS AREA IN DIST. I WILL BE CLEANED MON. 12th, TUES. 13th, & WED. 14th

WEATHER PERMITTING!!

## PLEASE REMOVE ANY PERSONAL BELONGINGS FROM THE SITE.

IF YOU WOULD LIKE TO RELOCATE TO
EMERGENCY HOUSING, PLEASE CALL 305.960.4980
(HELP) OR CONTACT THE OUTREACH WORKERS
WHOM WILL BE VISITING THE AREA FREQUENTLY

## THANK YOU

City of Miami VAHS DHS        POSTED: _____

PL000432



Office DEPOT®

# ⊙NOTICE

PLEASE BE ADVISED ON **THIS WEEK**
**MONDAY DECEMBER 5th THRU FRIDAY DECEMBER 9th**
THIS AREA IN DIST. I WILL BE CLEANED MON. 5th, TUES. 6th, & WED. 7th

WEATHER PERMITTING!!

## PLEASE REMOVE ANY PERSONAL BELONGINGS FROM THE SITE.

IF YOU WOULD LIKE TO RELOCATE TO
EMERGENCY HOUSING, PLEASE CALL 305.960.4980
(HELP) OR CONTACT THE OUTREACH WORKERS
WHOM WILL BE VISITING THE AREA FREQUENTLY

## THANK YOU

City of Miami VAHS DHS                    POSTED: _____

PL000433



PL000434



Office DEPOT®

# NOTICE

PLEASE BE ADVISED ON **THIS WEEK**

## MONDAY NOV. 28 THRU FRIDAY DECEMBER 2nd

THIS AREA IN DIST. I WILL BE CLEANED MON. 28th, TUES. 29th, & WED. 30th

WEATHER PERMITTING!!
## PLEASE REMOVE ANY PERSONAL BELONGINGS FROM THE SITE.

IF YOU WOULD LIKE TO RELOCATE TO
EMERGENCY HOUSING, PLEASE CALL 305.960.4980
(HELP) OR CONTACT *THE* OUTREACH WORKERS
WHOM WILL BE VISITING THE AREA FREQUENTLY

## THANK YOU

City of Miami VAHS DHS                    POSTED: _____



PL000436



# NOTICE

PLEASE BE ADVISED ON **THIS WEEK**

## MONDAY OCTOBER 17th THRU FRIDAY OCT. 21st

THIS AREA IN DIST. V WILL BE CLEANED TUES. 18th, WED. 19th & FRI. 21st

WEATHER PERMITTING!!

## PLEASE REMOVE ANY PERSONAL BELONGINGS FROM THE SITE.

IF YOU WOULD LIKE TO RELOCATE TO EMERGENCY HOUSING, PLEASE CALL 305.960.4980 (HELP) OR CONTACT THE OUTREACH WORKERS WHOM WILL BE VISITING THE AREA FREQUENTLY

## THANK YOU

City of Miami VAHS DHS                    POSTED:

PL000437



**<u>City of Miami</u>**
**<u>Street Clean Up & Encampment Resource Plan</u>**
2021



PLAINTIFF'S
EXHIBIT

**8**

1

**Mission and Vision**

*To develop safe procedures so that communities in all five (5) districts are free of homeless encampments and debris while assisting those struggling with homeless by offering an easy transition to shelter and eventually more permanent housing.*

## Encampments and Homeless Clean Ups

**POPULATION – All Individuals and Families living on the street**

The 2021 census counted 555 homeless individuals living on the street in the City of Miami, a 15% decrease from the 2020 count at 654.

The population of homeless persons in downtown Miami and in the City overall fluctuates throughout the year based on various factors. What remains a constant challenge, however, is the debris, trash and solid waste left behind by homeless persons who live on the streets and other public areas of the City not intended for human habitation.  This includes human waste. The presence of human waste leads to an unsanitary environment and may also provide an environment for the spread of communicable diseases for both the homeless and surrounding residents and businesses.

The City of Miami currently provides homeless individuals assistance with placement into appropriate housing and/or shelter. The program provides outreach, assessment, placement, information, referral and transportation services to homeless individuals and families.  The program also employs and trains formerly homeless men and women through the Downtown Development Authority (DDA) and a service provide and expect to hire 6-10 individuals to be involved in the clean-ups.  All clean-up efforts will include the continuation of the outreach and resources provisions mentioned.

**PROJECT OVERVIEW**

To address these concerns, the City coordinates (and continue to coordinate) clean-ups in collaboration with other City Departments. The expanded and enhanced clean-ups include participation from:

- City of Miami of Human Services Clean Up Coordinator (FTE)
- City of Miami Homeless Outreach (FTE)
- City of Miami Neighborhood Service Centers (FTE)
- City of Miami Department of Solid Waste (FTE)
- City of Miami Police
- City of Miami Code Compliance (FTE)
- City of Miami Department of Innovation and Technology (as needed)
- City of Miami Communications (as needed)
- City of Miami Commissioners Offices (as needed)
- The Homeless Trust & Providers (Camillus House, Chapman House, Lotus House, Citrus Health -as needed)
- Miami-Dade Florida Department of Health (as needed)
- City of Miami Downtown Development Authority (as needed)

2

**PROTOCOL**

The City of Miami has identified homeless hot spots in the City of Miami. Each hot spot will consist of two clean ups per week.  During the clean ups overseen by the City's new Clean Up Coordinator, Homeless Outreach (Green Shirts) will offer shelter and resources to all individuals at each hot spot. Miami Police will address public access and enforcement. Department of Solid Waste will assist with street clean up and bulk pick up.  The Department of Human Services will also deploy the Neighborhood Service Center teams to assist residents and business owners. The clean-ups will be conducted in accordance with the requirements of APM 1-19. The Department of Human Services will maintain a list of homeless encampment hot spots. (See Appendix A)

<u>Resources and Specialized Teams include the following:</u>

**Department of Human Services**

- 1 Clean Up Coordinator
- 4 Homeless Outreach (Green Shirts)
- 1 Neighborhood Service Center Administrator (or equivalent from Commissioner's Office)

**Department of Solid Waste**

- 6 Staff (Waste Collectors)
- 3 Service Center Pick-up Trucks
- Sanitation Truck + Operator
- HAWK (combination crane and dump truck) + Operator
- Street Sweeper + Operator
- Water Truck + Operator
- 6 Sanitizers + Equipment

**Police & Code Compliance**

- 2 Officers (Neighborhood Resource Officers)
- 1 Code Compliance Officer

**PLAN**

<u>Schedule</u>: Clean ups will be conducted 2 times per week by location or as frequently as needed.  The required signage to alert the hot spot area will be posted seven (7) days prior to the clean-up. DHS Clean Up Coordinator is tasked with the responsibility of coordinating all clean ups related to homelessness in the City of Miami and documenting the posting of the notices. This employee is responsible for scheduling and coordinating all partners, teams and resources (internal and external).  This individual will attend all clean ups and supervise. Green Shirts will visit the site daily over the course of the seven (7) day posting and provide assistance.  We are recommending hiring two case managers (Licensed Clinical Social Workers, preferred). The sequencing of sites is prioritized by the negative impact they represent to the greatest number of residents and businesses in the area.  Teams will be deployed based

3

on need. It is recommended that a given area is completely cleared of encampments before the next area is addressed. All clean-up sites requiring heavy machinery will be conducted on Wednesdays, with follow up visits within the following week. The sites listed below are the first set of clean ups of major encampments (please see Appendix B).

|   | Site | Date |
|---|------|------|
| 1 | Overtown (NW 17 Street) | Wednesday, Feb 10, 2021 |
| 2 | Overtown (NW 13 Street & NW 11 Street) | Wednesday, Feb 17, 2021 |
| 3 | Area around Miami Rescue Mission Building | Wednesday, Feb 24, 2021 |
| 4 | Approach bridge between Downtown and Flagler | Wednesday, March 3, 2021 |

On the assigned day, significant number of beds through various shelter options will be made available. Outreach workers will arrive at the site in the morning and announce the start of the cleanup. Individuals will be interviewed by outreach workers, and basic information will be requested and documented.  All individuals will be given a choice to be transported to shelter, process for relocation to another city (if they have relatives or friends who would accept them) or simply told they can no longer occupy the public-right-of-way or private property.  Contaminated items will be discarded by the waste collectors.

Once the individuals have cleared the area and contaminated items are discarded, the area will be swept and properly disinfected for general and public use standards.   These areas will be monitored by the cleanup coordinator, outreach workers and police officers to ensure these sites are not repopulated.

Homeless Trust Continuum of Care (CoC)

The Homeless Trust will work to direct existing resources for homeless individuals and serve as an enhancement to clean-ups and large group feedings. These are in locations where City of Miami Green Shirts are deployed regularly. These services targeted to unsheltered persons experiencing homelessness include:

- Homeless Engagement and Outreach
  - Information regarding housing programs and opportunities offered through the CoC
  - Outreach staff for Homeless Management Information System input, administration of Vulnerability Assessments and Homeless Verifications
  - Information on area services for showers, mail, meals
  - Identification Assistance
  - Information on services targeting homeless sub-population (domestic violence, youth, veterans)
  - Distribution of Homeless Helpline cards
- Health Services
  - Providing educational and prevention materials:
    - COVID-19 social distancing recommendations, prevention, signs and symptoms
    - Hepatitis A
    - West Nile Virus
    - Needle Exchange

4

PRR000038

- Information on area community health centers
    - o Participation of partners including Camillus Health Concern, IDEA Exchange, Florida Department of Health in Miami-Dade providing:
        - Distribution of disease prevention supplies as available (face coverings, wipes, hand sanitizer)
        - COVID-19 Screening and Testing
        - Hepatitis A Vaccination
        - HIV Testing
        - Mobile Health
- Mental Health and Substance Services
    - o Information on area community mental/behavioral health centers, suicide prevention, etc., mental health and substance abuse counseling
    - o On site mental health and substance abuse counseling
- Legal Services

Homeless Trust Community Education

The Homeless Trust offers web-based orientations and educational opportunities for community groups and individuals:

- The CoC Homeless System of Care
    - o History, Structure and Accomplishments to Date
    - o Miami-Dade CoC Housing Strategies to End Homelessness
    - o Housing First Approach
    - o Prevention
    - o Diversion
    - o Outreach and Specialized Outreach
    - o Emergency Shelter
    - o Landlord Recruitment and Retention through the RentConnect Program
    - o Rapid Re-Housing
    - o Permanent Supportive Housing
- Nutritional Needs of Houseless Persons and Healthy Meal Planning for Street Feedings
- Trauma-Informed Care and Harm Reduction

Law Enforcement: Miami Police will be present at all clean ups.  Law enforcement will patrol areas after clean ups are completed. Miami Police and DHS will coordinate the attendance of Homeless staff at police roll calls to update police officers on the homeless services currently available. Police can recommend clients to the overnight bed.  Clients in overnight beds will have priority to extended beds.

Sanitation: Six (6) staff designated to key areas (Overtown, Downtown and Little Havana).  Staff will be equipped with chemical resistant safety suits and equipment to sanitize streets.  They will oversee removing of human waste, as well as eliminating odor from the streets and sidewalks through sanitation efforts.

Cameras: Solid Waste will work with DHS and provide ten (10) cameras.  Solid Waste, Miami Police and DHS will coordinate the monitoring of camera footage for illegal dumping and related Solid Waste

5

violations.  The purpose of the cameras is to (1) deter and detect illegal dumping around homeless encampments, (2) to identify unpermitted feeders in accordance with Large Group Feeding Ordinance, and (3) to detect drug use and drug sales in and around encampments. The cost involved with this setup includes installation and monitoring service. This cost is included in the overall clean-up budget. Locations include (please see Appendix B):

**DOWNTOWN**
- SW 2nd Street from the Warf to North Miami Avenue
- Parking lot on Miami River Drive near MRC and around FPL building
- SW 1 Street Parking lot West of Macy's
- Flagler Street and NW 1 Street West Bound

**OVERTOWN**
- NW 10/11 Streets between 4 and 6 Avenue
- NW12 Street between 1 Avenue and 2 Avenue
- NW 17 Street between NW 4 and 6 Avenue
- NW 13/14 Streets between 1 and 2 Avenue.

**LITTLE HAVANA**
- SW 5th and SW 6th Street (Jose Marti Park area)
- Location TBD

Placements: Homeless Outreach "Green Shirts" will continue offering shelter and resources to homeless individuals and families.  If clients refuse, they are required to move from the clean-up location.

Partner Engagement: Continue to further engage FDOT and Miami Dade County regarding all appropriately properties in the City of Miami regarding homeless individuals and encampments around clean ups. Engage City of Miami Department of Public Works and Resilience to identify locations where foliage, trees, art, and more may be added to improve the areas.

Property: As per Executive Order, we will follow City Manager's APM regarding personal property.

Shopping Carts: Police will enforce Florida State Statute 506.509 , which states that "Any person who is in possession of a shopping cart... with a registered name or mark shall be presumed to be in possession of stolen property and is guilty of a misdemeanor of the first degree."

Signage: Signs will be posted throughout the City that provide notice of the Large Group Feeding Ordinance, as well as signs that relate to ADA compliance and the blocking of sidewalks within the City of Miami. The Large Group Feeding permit allows the City to manage large group feedings in our public spaces with advance notice through printed signage (installed by Public Works), ensuring a safe and sanitary environment for our citizens. Signage is in accordance with City Code 54.9 and Miami21 10.1.3 SIGNS EXEMPTED FROM PERMIT REQUIREMENTS. Police and Code will be deployed together to the following areas where group feedings are common to conduct enforcement:

**DOWNTOWN**
- SW 2nd St between second Ave and North River Drive
- SW 2nd Street and 3rd Ave
- SW 1st Street along 1st Ave to Miami Ave

6

- S Miami Ave and 2nd Street, next to FedEx
- Bayfront Park
- North Miami Ave and 5th Street
- NE 6th Street and Miami Ave, around Christ Fellowship
- Flagler Street under I-95
- South and West of the MDC Government Center

**OVERTOWN**:
- NW 13th St and 1 Ct
- NW 14th St and 1st Ct
- NW 10th Ave and 4th St
- NW 10th Ave and 5th St
- NW 17th St and east of 7th Ave

**ALLAPATTAH**
- NW 17th St west of NW 7th Ave (Mother Teresa)
- NW 7 Ave under I-395
- Little Havana sites:
- SW 6th St and 3rd – 4th Ave

City of Miami Code Compliance, Miami Police and an accompanying Homeless outreach staff (Green Shirt) will inspect identified areas in residential and commercial downtown and will issue violations to property owners as needed if litter is left on property due to large group feedings.

A violation of the Large Group Feeding Ordinance shall be enforced jointly by Miami Police and Code Compliance against the individual or organization by the issuance of a civil code enforcement fine in the amount of $250.00 for a first occurrence and a civil fine in the amount of $500.00 for each subsequent occurrence in accordance with Chapter 2, Article X of the City Code. Repeat violations in anyone (1) calendar year may also subject the repeat violator to being precluded from receiving Large Group Feeding permits for a period of up to twelve (12) months. These procedures are to be determined.

**DUTIES**

**City of Miami - Homeless Outreach**
- The division of Homeless Outreach will post notices in the areas of the cleanup at least seven (7) days in advance and reserve beds to offer homeless individuals who may be impacted.
- Green Shirts will visit the site daily over the course of the seven (7) day posting and provide assistance.  Homeless Outreach personnel are dispatched daily, no fewer than 2 green shirts. We would like at least two green shirts deployed to homeless encampment clean-up sites on a permanent basis, split shifts (8am-6pm and 12pm-9pm). Homeless Outreach will invite agencies to participate (drug and alcohol partners, mental health partners).
- Homeless Outreach will provide guidance and instruction to assist with clean-up activities with Solid Waste and Neighborhood Service Centers.
- Homeless Outreach will properly handle, temporary store and/or dispose of property belonging to homeless persons in accordance with Administrative Policy - Treatment of Homeless Property dated 1/14/2019.
- Homeless Outreach's task force around mental health/substance abuse will work with providers. Task force will continue weekly meetings to discuss cases and patrol every morning.

7

**City of Miami Code Compliance**
- City of Miami Code Compliance will inspect identified areas in residential and commercial properties throughout the City of Miami.
- City of Miami Code Compliance will issue violations to property owners as needed.

**City of Miami – Solid Waste**
- The Solid Waste Department will provide an initial clean up per location using heavy equipment.
- Department of Solid Waste will also pressure wash. The Department will also work at night due to traffic safety concerns.
- The Department will consider additional cleanup events on Saturdays. This is with the goal of monitoring if the area remains clean as needed.
- The goal for the department is to address public health and sanitary concerns including but not limited to fecal matter, issues relating to the homelessness population, and litter.
- City of Miami Sanitation Code Enforcement Inspectors will educate local property owners to use environmentally safe chemicals that can be recommended to property owners for the maintenance of adjoining Public Right of Way (PROW) areas.

**City of Miami – Police Department**
- Police will accompany the clean-up detail.
- Police will patrol areas post clean up. When debris of encampments are beginning to form, Police will contact Homeless Outreach and Clean Up Coordinator to deploy appropriate teams.
- Police will take law enforcement action when appropriate.
- Police will address individuals found in a state of crisis through the Baker Act or Marchman Act when appropriate.

**City of Miami Neighborhood Service Centers**
- Neighborhood Service Centers will work with scheduling clean ups and be present at clean ups.
- All Centers with Pick-up Trucks and Waste Collectors will be deployed during clean-ups all over the City where homeless clean ups are scheduled.

**City of Miami Office of Communications**
- Communications will assist in public relations efforts through a joint Communication Plan.

**City of Miami Department of Innovation and Technology**
- The Department of Innovation and Technology will explore using 311 as a reporting mechanism for residents and business owners to report any concerns.
- The Department will also explore using 311 for homeless individuals who are seeking shelter.
- The Department, with DHS, will explore contractual services for a call center to assist our homeless population.

8

**PROPOSED BUDGET**

**Twelve (12) month Budget**

| Department | Description | Amount |
|---|---|---|
| Homeless Outreach | Two (2) Case Managers Salaries (Licensed Clinical Social Worker)<br><br>Assists in providing counseling services to mental health and substance abuse affected parties to decrease undesirable influences and outcomes. Assists in altering attitudes and behaviors of clients and makes recommendations for effective remedies. Works with assessment, placement, and case management staff along with clients and external resources to assist in developing Individual Service Strategies as appropriate. | **$99,800.00**<br>(Salaries) |
| Homeless Outreach & Solid Waste | 10 cameras<br><br>Installation, Surveillance & Software | **$5,826.00**<br>(Surveillance & Software $4,326.00 Installation $1,500.00) |
| Solid Waste | Six (6) Designated Sanitizing Staff and all PPE and equipment<br><br>Staff will be equipped with chemical resistant safety suits and equipment to sanitize streets. They will oversee removing of human waste, as well as eliminating odor from the streets and sidewalks through sanitation efforts. | **$211,551.11**<br>(Salaries $206,000.00 PPE & Equipment $5,551,11) |
| Solid Waste | Three (3) Equipment Operators Overtime Salaries | **$87,328.80** |
| Solid Waste | Equipment Costs<br><br>(Water Truck, Rear Loader, Street Sweeper, Hawk) | **$174,454.80** |
| Solid Waste | Six (6) Waste Collectors<br><br>Dedicated to Homeless Encampment Clean-ups and deployed throughout the entire City to only Homeless Encampment Sites | **$206,000.00**<br>(Salaries) |
| Solid Waste | Supervisor<br><br>Dedicated to Homeless Encampment Clean-ups | **$48,531.60**<br>(Salaries) |
| | | **$833,492.31** |

9

# Homeless Clean Up Log

|  |
|---|
|  |

Location

|  |
|---|
|  |

Initial Cleanup Date

| Yes / No |
|---|

Heavy Equipment/Machinery Needed

|  |
|---|
|  |

Start Time

|  |
|---|
|  |

End Time

## Please check organization and list contact:

☐ City of Miami Homeless Outreach _____

☐ City of Miami Neighborhood Service Centers _____

☐ City of Miami Department of Solid Waste _____

☐ City of Miami Police _____

☐ City of Miami Code Compliance _____

☐ City of Miami Commissioners Offices (District and Contact) _____

☐ Other City of Miami Departments _____

☐ Miami-Dade Homeless Trust _____

☐ Downtown Development Authority _____

☐ Miami-Dade Florida Department of Health _____

☐ Providers (Organization and Contact) _____

|  |
|---|
|  |

Date of Follow Up Cleanup #1

|  |
|---|
|  |

Date of Follow Up Cleanup #2

10

## APPENDIX A

### DHS Neighborhood Service Center Homeless Locations

| | |
|---|---|
| **OVERTOWN** | |
| N.W. 10-11th Streets between N.W. 4th Avenue-6th Avenue | |
| N.W. 17th Street starting at N.W. 5th Avenue | |
| N.W. 13th Street and N.W. 1st Court | |
| Residential location N.W. 12th Street and along areas between N.W. 1st Court and 2nd Avenue | |
| N. Miami Avenue between N.W. 20-22 Streets | |
| **LITTLE HAITI** | |
| 551 NW 71st (Nu-Way Building) | |
| 80th and NE 3rd Avenue | |
| 79th St and NW 1st Pl (next to the laundromat) | |
| NE 54th St and N. Miami Avenue/3 NE 54th Street (Rear of Family Dollar) | |
| 7848 NW 1st Avenue (Empty Lot) | |
| NW 79th St and I95 (Under the overpass) | |
| 180 NE 64th Street (Empty lot) | |
| **WYNWOOD** | |
| 300 NW 29th Street | |
| 2010 NW 1st Avenue/2010 NW 1st Ct./2101 NW Miami Ct./2101 NW 1st Avenue/2100 NW Miami Ct. | |
| 2136 NW 1st Avenue | |
| 2145 NW 2nd Avenue | |
| 80 NW 20th Street | |
| 301 NW 37th Street | |
| 51 NW 27th Street | |
| **MODEL CITY** | |
| I-95 NW 62nd Street (Underpass) | |
| Corner of NW 61st Street and NW 7th Avenue (Carver Theater) | |
| 6820 NW 17th Avenue | |
| **COCONUT GROVE** | |
| Alice Wainwright Park (2845 Brickell Avenue) | |
| Peacock Park (2820 McFarlane Road) | |
| Grand Avenue between Hibiscus Street thru Douglas Road (SW 37 Ave) | |
| **DOWNTOWN** | |
| SW 1st Ct and SW 2nd Street | |
| SW 2nd Avenue and SW 2nd Street | |
| SW 2nd St and N. River Drive | |
| North Miami Avenue and SW 1st and 2nd Street | |
| SW 1st Court and S. Miami Avenue and SW 1st Street | |
| South Miami Avenue and SW 3rd Street | |
| **BRICKELL** | |
| SW 2nd to 4th Avenue and 6th Street (location goes up to the SW 2nd Avenue bridge) & entrance to SW 7th St. | |
| SW 3rd to 4th Avenue and 5th St/SW 3rd to 4th Avenue and 7th Street/SW 3rd Avenue and 10th to 11th Street | |
| SW 2nd to SW 3rd Avenue and SW 8th Street | |
| SW S. Miami Court and SW 26th Road | |

11

**APPENDIX B**



PRR000046



PRR000047

**PATROL**                                                                              **Departmental Order 11**
                                                                                                      **Chapter 10**

## HOMELESS

Section

10.1  Policy
10.2  Organization
10.3  Responsibility
10.4  Mission
10.5  Definitions
10.6  Procedures
10.7  Property

**10.1  POLICY:**  It is the policy of the City of Miami Police Department to ensure that personnel are sensitive to the needs and rights of our Homeless population, as well as knowledgeable of the department's arrest policies concerning such persons.

**10.2  ORGANIZATION:**  The City of Miami has a policy that we shall not arrest visibly homeless persons who live in public for performing acts, criminalized as misdemeanors, such as sleeping, eating, lying down, or sitting in public, when there is no available shelter.  It is not a crime to be homeless.  This policy should not be construed as protecting persons (whether homeless or not) from arrest for engaging in any other type of criminal activity.

**10.3  RESPONSIBILITY:**  It is the responsibility of all City of Miami Police Officers, whether working in an on-duty or off-duty capacity, to abide by this Departmental Order.

**10.4  MISSION STATEMENT:**  We must continue to vigorously do our job and enforce the law's which were enacted to ensure a safer community, while extending compassion for homeless persons.

**10.5  DEFINITIONS:**

**10.5.1**  A "homeless person".  An individual is considered a "homeless person" if he or she " lacks a fixed, regular and adequate night time residence and has a primary night time residency that is:  (a) a supervised publicly or privately operated shelter designed to provide temporary living accommodations; (b) an institution that provides a temporary residence for individuals intended to be institutionalized; or (c) a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings.  The term "homeless person"  does not include any person imprisoned or otherwise detained pursuant to an Act of Congress or a state law".  The term "homeless person" does not include any person identified as a registered sex offender under section 775.21 Fla. Stat., as amended, or sexual predator under section 775.215 Fla. Stat., as amended, or sections 21-277 to 21-2185 Miami-Dade County Code.  An officer is allowed to make reasonable inquiry to make this determination.

**10.5.1.2**  An "available shelter" means a shelter for a period of at least, with a bed, or a mat at least (3) inches thick, at no cost to the homeless person, within the territorial boundaries of the City or within one mile thereof, or if agreed to by the homeless person, within Miami-Dade County, that treats homeless persons with dignity and respect, imposes no religious requirements, and unless agreed to

07/14



by the homeless person, does not impose involuntary substance abuse or mental health treatment as a condition for shelter.

**10.5.1.3   "PUBLIC PROPERTY":**  "Public Property" includes all property owned by any governmental entity (federal, state or local).  "Public Property" shall not include property which has become subject to

**10.5.1.4**  A leasehold interest, management agreement or other possessory interest of a nongovernmental lessee, licensee or manager, which is operated as a private business.  A public park shall always be public property within the meaning of this definition.

**10.5.1.3.1 "EXEMPT PUBLIC PROPERTY":**  The following are "exempt public properties"  (1) City of Miami, City Hall, 3500 Pan American Drive; (2) Miami Riverside Center, 444 SW 2nd Avenue; (3) City of Miami Fire Stations; (4) City of Miami Police Stations and (5) City of Miami NET (Neighborhood Enhancement Team) Offices.  A homeless person's presence in the interior of an "exempt public property" is not a trespass within the meaning of 10.6.2.3.3 (11) where the homeless person's activities are reasonably related to the governmental business activities normally performed within these physical structures.

**10.6   PROCEDURES:**

**10.6.1** An officer always has the right to approach any individual including a homeless person to allay any suspicions an officer may have about the individual, and ascertain that no criminal activity is occurring.

**10.6.2**   At any time, and for any reason a law enforcement officer may approach a homeless person, who has not been observed engaging in any criminal conduct, to advise him or her of shelters, services, or assistance which are currently available.  The officer may also call for the assistance of an outreach worker.  The homeless person may or may not accept the advice or referral or he/she may even walk away from the area prior to the outreach worker/arriving.  The rationale is to pro-actively have an outreach worker address the homeless person with referrals.  If such an approach and advice occurs by a law enforcement officer, that officer shall complete a Field Information Card, or its electronic equivalent, with the facts of the incident, the referral and indicate at the top of the card "Homeless".   The officer will turn the pink Field Information Card, or its electronic equivalent, in to his supervisor.  The supervisor will check the Field Information Card for completeness, sign the top right hand corner with his name and IBM number and deliver to the Records Unit daily.  In the case of a homeless person who refuses and who has refused assistance in the past thirty (30) days, a new Field Information Card, or its electronic equivalent, is not required to be completed for each encounter as long as the prior-filed Field Information Card, or its electronic equivalent, is update with the new date of contact with the homeless person.   The pink Field Information Card, or its electronic equivalent, shall be filed with the Records Unit within the Miami Police Department.

**10.6.2.1**   When a homeless person meets the criteria for involuntary examination under Florida Law (§394.463, Fla. Stat., as amended) "Baker Act" a law enforcement officer may, in his discretion, take the homeless person to the nearest receiving facility for involuntary examination.  If the homeless person is taken to such a receiving facility for involuntary examination, a copy of the "Baker Act Forms" shall be filed with the nearest receiving facility.   In addition, the officer shall complete an Field Information Card, or its electronic equivalent, The officer will turn the pink Field Information, or its electronic equivalent, card in to his supervisor.  The supervisor will check the card for completeness, sign the top right hand corner with his name and IBM number and deliver the Field Information Card to the Records Unit daily.

PRR000049

**10.6.2.2** If a homeless person is observed violating a "Life Sustaining Conduct" misdemeanor, (as listed under 10.6.2.3.3) the law enforcement officer may exercise the following courses of conduct.

**10.6.2.3** If an officer determines that an individual is a homeless person and through his observation determines that a "Life Sustaining Conduct" misdemeanor (as listed under 10.6.2.3.3) is occurring in his presence, he must first check to see if there is an available shelter. The officer will contact the communications unit to ascertain if there is an available shelter. If there is an available shelter, the officer will offer the shelter to the homeless person, if the homeless person chooses shelter rather than arrest. An Outreach Team will respond to transport the homeless person to the shelter. If the Outreach Team (if available) is unavailable the law enforcement officer will transport the homeless person. If the homeless person is transported to a shelter, the officer will complete a Field Information Card, or its electronic equivalent, with the facts of the incident and indicate at the top of the card "Homeless". The officer will turn the pink Field Information Card in to his supervisor. The supervisor will check the card for completeness, sign the top right hand corner with his name and IBM number and deliver the Field Information Card, or its electronic equivalent, to the Records Unit daily.

**10.6.2.3.1** If the officer has probable cause to arrest the homeless person for a "Life Sustaining Conduct Misdemeanor," (as they are listed under 10.6.2.3.3) and there is an "available shelter" and the homeless person refuses the shelter, or if the sole available shelter at the time is a shelter from which the homeless person is barred from because of his own purposeful misconduct, criminal or otherwise, which occurred at that shelter, the officer may arrest the homeless person. The officer must document on the A form, beyond the probable cause for the arrest, the offer of shelter, the refusal by the homeless person to accept the "available shelter," the name of the shelter, and the word "Homeless" should be written at the top of the Arrest Affidavit. A copy of the Arrest Affidavit will be forwarded to the Miami Police Records Unit in conjunction with a pink Field Information Card, or its electronic equivalent.

**10.6.2.3.2** If the officer has probable cause to arrest the homeless person for a "Life Sustaining Conduct Misdemeanor" (as they are listed under 10.6.2.3.3), and there is no "available shelter," the officer shall not make an arrest nor take any other police action (warnings, etc). The officer will complete a Field Information Card, or its electronic equivalent, explaining the circumstances of the initial contact with the homeless person, the fact that there was no "available shelter," the fact that no arrest was made and the word "Homeless" should be written at the top of the card. The officer will turn the pink Field Information Card, or its electronic equivalent, in to his supervisor. The supervisor will check the Field Information Card for completeness, sign the top right hand corner with his name and IBM number and deliver the Field Information Card, or its electronic equivalent, to the Records Unit daily. However, if the homeless person described above is observed committing one of the below listed "life sustaining conduct" misdemeanors, and the life sustaining conduct misdemeanor causes imminent threat of physical injury to the homeless person or other person(s), the law enforcement officer must warn the homeless person to stop and if they refuse to do so, may arrest them regardless of whether there is an available shelter.

**10.6.2.3.3** "Life Sustaining Conduct Misdemeanors" are the following:

1. Being in park after hours. Current Provisions (38-3 1-13, F.S. 162.22)
2. Public nudity where necessary to carry on the daily necessities of life, such as bathing or responding to a call of nature. If the public nudity is done intentionally in plain view of others and the exposure or exhibition of the sexual organs, or nakedness was in a vulgar, indecent, lewd or lascivious manner, the law enforcement officer may arrest the person regardless of whether there is an available shelter. Moreover, in no circumstance shall public nudity be allowed for a call of nature if there

PRR000050

exists an open public restroom within one-quarter of a mile (1.320 feet) of the homeless person performing a call of nature.  Current Provisions (F.S. 800.03, 37-1, 38-62)

3. Reserved

4. Obstructing passage on sidewalks, except that after one warning, no person or persons may lie on the sidewalk in a perpendicular fashion blocking the sidewalk, or may obstruct a sidewalk in such a way as to endanger other persons by requiring them to walk onto a street where but for the obstruction, such persons would otherwise have been able to safely walk on the sidewalk.  Obstructing a street, road, or highway shall not be construed to be a "Life Sustaining Conduct   Misdemeanor" within the meaning of this departmental order.  Current Provisions 54-1 to 54-3, 37-3, FS 316.2045)

5. Vehicles, living or sleeping in.  Current Provision (37-4)

6. Loitering in Restrooms.  Current Provision (38-68)

7. Littering, except if within 300 feet of a usable trash receptacle, a law enforcement officer must warn the homeless person to stop and if they refuse to do so, may cite them regardless of whether there is an available shelter.  Current Provision (FSS 403.314, 22-6, 38-17, 38-63)

8. Camping in parks.  Current Provision.  (38-71)

9. Use of facilities for other than intended purpose (e.g. sleeping on park bench).  Current Provisions (38-54).

10. Reserved

11. Trespass on "public property" other than structure or conveyance.  Current Provision.  (F.S. 810.09 (1).  Trespass on private property or in an "exempt public property" is not a "Life Sustaining Conduct Misdemeanor" within the meaning of this departmental order.

**10.6.2.3.4**   Nothing in 10.6.2.3.3 listing the "Life Sustaining Conduct Misdemeanors" shall prevent an immediate arrest under 800.04 FS entitled "Lewd, lascivious, or indecent assault or act upon or in presence of a child" if the officer has probable cause to make such an arrest.

**10.6.2.3.5**   Homeless Persons observed violating a misdemeanor, which is not classified above as "Life Sustaining Conduct Misdemeanors".  Under this category the existence of an available shelter will not dictate whether an arrest is effected.  However, officers can still refer homeless persons to the Outreach Team.  A referral to an appropriate shelter rather that an arrest might be a better solution to minor misdemeanor arrests.  In lieu of arrest the officer may warn the homeless person to stop the unlawful conduct, and refer the person to a shelter, or if the officer deems it appropriate, the officer may detain or arrest the homeless person.  If the homeless person is arrested, the word "Homeless", should be printed on the top of the "A" form.  A copy of which shall be filed with the Records Unit within the Miami Police Department.  If the officer makes a decision not to make an arrest, and a referral is made, the officer shall complete a Field Information Card, or its electronic equivalent, with the facts of the incident, the referral and indicate at the top, "Homeless".   The officer will turn the pink Field Information Card, or its electronic equivalent, in to his supervisor.   The supervisor will check the card for completeness, sign the top right hand corner with his name and IBM number and deliver the Field Information Card, or its electronic equivalent, to the Records Unit <u>daily</u>.

**10.7   PROPERTY:**

**10.7.1**  The City shall respect the personal property of all homeless persons.   Officers shall follow existing policies for taking custody of personal property.   In no event shall any officer destroy any

PRR000051

personal property known to belong to a homeless person, or readily recognizable as property of a homeless person unless it is contaminated or otherwise poses a health hazard to an officer or to members of the public.  Officers are not responsible for taking custody of mattresses.

**10.7.2**   The disposition of personal property shall never prevent an officer from effectuating an arrest.  However, the following safeguards shall be undertaken by the arresting officer to preserve the property of a homeless person, to the extent feasible:

**10.7.2.1**   The arresting officer shall always attempt to secure personal items such as identification, medicines and eyeglasses and other small items of importance identified by the arrestee, which are not large or bulky, in accordance with the police department's existing procedures;

**10.7.2.2**   The arresting officer shall ensure that large or bulky items (which are not contaminated or otherwise pose a health hazard to the officers or to members of the public) are not abandoned at the point of arrest, but rather secured by an outreach worker and maintained by existing outreach procedures.  If an outreach worker is unavailable, then it must be secured by the arresting officer until an outreach worker becomes available to assume its maintenance in accordance with existing outreach procedures;

**10.7.3**   In no event shall any law enforcement officer destroy any personal property known to belong to a homeless person, or readily recognizable as property of a homeless person (i.e. clothing and other belongings organized or packaged together in a way indicating it has been abandoned) except as permissible by law (in accordance with the department's operating procedures), or if the property is contaminated or otherwise poses a health hazard to officers or to members of the public.

**10.7.4**   When a homeless person is placed in a shelter, large and bulky items, which are not contaminated or otherwise pose a health hazard or obvious safety issue, and that are not abandoned, shall be secured by an outreach worker and maintained in accordance with existing outreach procedures.

07/14

PRR000052



# City of Miami

## Legislation

## Resolution: R-21-0160

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

**File Number: 8874**                                **Final Action Date:  4/8/2021**

A RESOLUTION OF THE MIAMI CITY COMMISSION DIRECTING THE CITY
MANAGER TO AMELIORATE THE COORDINATION AND FREQUENCY
AMONGST CITY OF MIAMI ("CITY") DEPARTMENTS TO FACILITATE BI-
WEEKLY CLEANINGS OF AREAS CONSIDERED TO BE HOT SPOTS OF
RECURRING HOMELESS ENCAMPMENTS FOR PURPOSES OF IMPROVING
THE CLEANLINESS OF CITY STREETS AND SIDEWALKS AS
RECOMMENDED BY THE DEPARTMENT OF HUMAN SERVICES DURING
THE DISCUSSION OF DI.8 AT THE CITY COMMISSION MEETING ON APRIL
8, 2021.

**SPONSOR(S): Commissioner Joe Carollo**

WHEREAS, the City Commission discussed DI.1 regarding homelessness at the April 8,
2021 City Commission meeting; and

WHEREAS, the discussion item was led by the director of the City of Miami's ("City")
Department of Human Services ("DHS"); and

WHEREAS, the purpose of the discussion was to improve the coordination, integration,
and frequency of collaborations amongst key City departments to improve the cleanliness of the
City's streets and efforts to reduce the population of unsheltered homeless persons in the City;
and

WHEREAS, an encampment is considered to be ten (10) or more unsheltered homeless
individuals living in relatively close proximity to one another in an obviously visible location; and

WHEREAS, a "hot spot" is a location within the City whereby recurring homeless issues
have occurred such as encampments, Florida Litter Law violations, and other public nuisances
that may result in public health hazards; and

WHEREAS, to prevent such a condition from developing, DHS recommended improved
collaborations between the City's Homeless Outreach Teams, Miami Police Department, and
Solid Waste Department in coordination with Neighborhood Service Center Administrators,
Continuum of Care providers, and Neighborhood Resource Officers to develop scheduled
maintenance routes in designated hot spots and increase the frequency of street clean-up
operations; and

WHEREAS, in accordance with Section 2-33(f) of the Code of the City of Miami, Florida,
as amended, the City Commission, by a majority vote, hereby deems this Resolution to be of an
emergency nature;

NOW, THEREFORE, BE IT RESOLVED BY THE COMMISSION OF THE CITY OF
MIAMI, FLORIDA:

PLAINTIFF'S
EXHIBIT

**10**

PRR000014

Section 1. The recitals and findings contained in the Preamble to this Resolution are adopted by reference and incorporated as if fully set forth in this Section.

Section 2. The City Manager is directed to effectuate the coordination and frequency amongst City departments to facilitate bi-weekly cleanings of areas considered to be hot spots of recurring homeless encampments for purposes of improving the cleanliness of City streets and sidewalks as recommended by DHS during the discussion of DI.8 at the City Commission meeting on April 8, 2021.

Section 3. This Resolution shall become effective immediately upon its adoption.

APPROVED AS TO FORM AND CORRECTNESS:

Victoria Mendez, City Attorney                6/14/2021

PRR000015





**Miami**
**FL**

**Resolution**
**R-21-0372**

ADOPTED
Sep 13, 2021 9:00 AM

**A RESOLUTION OF THE MIAMI CITY COMMISSION DIRECTING THE CITY MANAGER TO ENHANCE THE COORDINATION AND FREQUENCY AMONGST CITY OF MIAMI ("CITY") DEPARTMENTS TO FACILITATE THE CLEANING OF CERTAIN LOCATIONS, AT LEAST THREE TIMES A WEEK, AT AREAS CONSIDERED TO BE HOT SPOTS OF RECURRING HOMELESS ENCAMPMENTS FOR PURPOSES OF IMPROVING THE CLEANLINESS OF CITY STREETS AND SIDEWALKS WHILE PREVENTING A GENUINE PUBLIC HEALTH THREAT.**

## Information

| | | | |
|---|---|---|---|
| **Department:** | Commissioners and Mayor | **Sponsors:** | Vice Chair, District Three Joe Carollo |
| **Category:** | Elected Official Item | | |

## Attachments

Agenda Summary and Legislation

## Body/Legislation

WHEREAS, areas of recurring homeless encampments can become a site of human waste, trash, vermin, discarded needles, and the like posing a genuine public health threat; and

WHEREAS, a "hot spot" is a location within the City of Miami ("City") whereby recurring homeless issues have occurred such as encampments, Florida Litter Law violations, and other public nuisances that may result in public health hazards; and

WHEREAS, the Miami City Commission considered strategies regarding citywide clean-ups at locations known to have recurring homeless encampments at the April 8, 2021 City Commission meeting; and

WHEREAS, the discussion focused on the value of coordination, integration, and frequency of collaborations amongst key City departments to improve the cleanliness of the City's streets and efforts to reduce the population of unsheltered homeless persons in the City; and

WHEREAS, City Policy No. APM 1-19, titled "Treatment of Homeless Persons' Property" governs the a standard practice for the handling, temporary storage, and disposition of property belonging to homeless persons to ensure the City does not violate personal property rights of the homeless; and

WHEREAS, the City currently conducts regular scheduled cleanups and provide advance notice of upcoming operations at recurring sites where human waste, trash, needles, and the like are known to discarded; and

WHEREAS, to improve the cleanliness of City streets, sidewalks and to prevent threats of genuine public health treats from developing, it is appropriate to increase the collaborations between the City's Homeless Outreach Teams, Miami Police Department and Department of Solid Waste in coordination with Neighborhood Service Center Administrators, Continuum of Care providers, and Neighborhood Resource Officers to increase the frequency of street cleanup operations and scheduled maintenance routes at least three times a week at designated hot spots in the City;

NOW, THEREFORE, BE IT RESOLVED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:


PLAINTIFF'S EXHIBIT
**11**

PRR000428

3/9/23, 9:28 AM RESOLUTION OF THE MIAMI CITY COMMISSION DIRECTING THE CITY MANAGER TO ENHANCE THE COORDIN...

Case 1:22-cv-21939-BB Document 74-1 Entered on FLSD Docket 08/17/2023 Page 269 of 398

Section 1. The recitals and findings contained in the Preamble to this Resolution are adopted by reference and incorporated as if fully set forth in this Section.

Section 2. The City Manager is directed to enhance the coordination and frequency amongst City departments to facilitate the cleaning of certain locations, at least three times a week, at areas considered to be hot spots of recurring homeless encampments for purposes of improving the cleanliness of City streets and sidewalks while preventing a genuine public health threat.

Section 3. This Resolution shall become effective immediately upon its adoption.

## Meeting History

| Sep 13, 2021 9:00 AM | City Commission | City Commission Meeting |  Draft |
|---|---|---|---|

| **RESULT:** | **ADOPTED [4 TO 1]** |
|---|---|
| **MOVER:** | Joe Carollo, Commissioner, District Three |
| **SECONDER:** | Manolo Reyes, Commissioner, District Four |
| **AYES:** | Alex Diaz de la Portilla, Joe Carollo, Manolo Reyes, Jeffrey Watson |
| **NAYS:** | Ken Russell |

Select Language

Powered by Google **Translate**



# City of Miami

## Legislation

### Resolution: R-21-0379

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

---

**File Number: 10728**                                    **Final Action Date: 9/13/2021**

A RESOLUTION OF THE MIAMI CITY COMMISSION DIRECTING THE CITY
MANAGER TO REQUEST THAT MIAMI POLICE DEPARTMENT ("MPD")
DISTRICT COMMANDERS PLACE EMPHASIS ON HOMELESS ISSUES
PARTICULAR TO EACH DISTRICT AND ENDEAVOR TO SECURE
AVAILABLE SHELTER OR ALTERNATE HOUSING ARRANGEMENTS FOR
HOMELESS PERSONS; FURTHER DIRECTING THE CITY MANAGER TO
TAKE ANY AND ALL LAWFUL ACTIONS TO PREVENT HEALTH HAZARDS
CAUSED BY ENCAMPMENTS OF HOMELESS COMMUNITIES ON
SIDEWALKS AND RIGHT-OF-WAYS; FURTHER DIRECTING THE CITY
MANAGER TO HAVE MPD ASSIST DURING CLEANING OF CERTAIN
LOCATIONS CONSIDERED TO BE "HOT SPOTS" OF RECURRING
HOMELESS ENCAMPMENTS AND TO ASSIST WITH THE
TRANSPORTATION OF HOMELESS PERSONS TO AVAILABLE SHELTERS
OR ALTERNATE HOUSING FACILITIES TO PREVENT A PUBLIC HEALTH
HAZARD AND COMBAT THE FURTHER SPREAD OF THE CURRENT NOVEL
CORONAVIRUS PANDEMIC.

WHEREAS, areas of recurring homeless encampments can become a site of human
waste, trash, vermin, discarded needles, and the like posing a genuine public health threat; and

WHEREAS, a "hot spot" is a location within the City of Miami ("City") whereby recurring
homeless issues have occurred such as encampments, Florida Litter Law violations, and other
public nuisances that have a high likelihood of resulting in public health hazards; and

WHEREAS, an encampment is considered to be ten (10) or more unsheltered homeless
individuals living in relatively close proximity to one another in an obviously visible location; and

WHEREAS, the City Commission has considered strategies regarding Citywide clean-
ups at locations known to have recurring homeless encampments during various City
Commission meetings; and

WHEREAS, the City Commission discussions have focused on the value of
coordination, integration, and frequency of collaborations amongst key City departments to
improve the cleanliness of the City's streets and efforts to reduce the population of unsheltered
homeless persons in the City; and

WHEREAS, City Policy No. APM 1-19, titled "Treatment of Homeless Persons'
Property," governs the standard practice for the handling, temporary storage, and disposition of
property belonging to homeless persons to ensure the City does not violate personal property
rights of the homeless; and

PLAINTIFF'S
EXHIBIT

**12**

---

PRR000021

WHEREAS, the City currently conducts regular scheduled cleanups and provides advance notice of upcoming operations at recurring sites where human waste, trash, needles, and the like are known to discarded; and

WHEREAS, to improve the cleanliness of City streets and sidewalks and to prevent threats of genuine public health from developing, it is appropriate to increase the collaborations between the City's Homeless Outreach Teams, Miami Police Department ("MPD"), Department of Solid Waste, Neighborhood Service Center Administrators, Continuum of Care providers, and Neighborhood Resource Officers; and

WHEREAS, to strengthen the City's collaboration efforts, MPD commanders assigned to each Commission district should place emphasis on homeless issues particular to each district and endeavor to secure available shelter or alternate housing arrangements for homeless persons utilizing any available City resource necessary; and

WHEREAS, in addition to hot spot cleanings, the City Manager is directed to take any and all lawful actions prevent public health hazards from being created and combat the further spread of the current novel coronavirus ("COVID-19") pandemic caused by communities of homeless encampments living on the City's sidewalks and right-of-ways; and

WHEREAS, pursuant to Section 2-33(f) of the Code of the City of Miami, Florida, as amended, the City Commission, by a majority vote, deems this Resolution to be of an emergency nature in order to immediately protect the public health, welfare, and safety of the City's residents, visitors, and businesses;

NOW, THEREFORE, BE IT RESOLVED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:

Section 1. The Recitals in the Preamble to this Resolution are true and correct and are adopted by reference and incorporated as if fully set forth in this Section.

Section 2. The City Manager is hereby directed to request that MPD Commanders place emphasis on homeless issues particular to each district and endeavor to secure available shelter or alternate housing arrangements for homeless persons.

Section 3. The City Manager is further directed to take any and all lawful actions to prevent health hazards caused by encampments of homeless communities on sidewalks and right-of-ways.

Section 4. The City Manager is further directed to have MPD assist during cleaning of hot spot locations with recurring homeless encampments and to assist with the transportation of homeless persons to available shelters or alternate housing facilities to prevent a public health hazard and combat the further spread of the COVID-19 pandemic.

Section 5. This Resolution shall become effective immediately upon its adoption.

PRR000022

APPROVED AS TO FORM AND CORRECTNESS:

Victoria Mendez, City Attorney          11/2/2021

PRR000023



## AGENDA ITEM COVER PAGE

### File ID: #10624

### Resolution

### Sponsored by: Commissioner Joe Carollo

A RESOLUTION OF THE MIAMI CITY COMMISSION DIRECTING THE CITY MANAGER TO ENHANCE THE COORDINATION AND FREQUENCY AMONGST CITY OF MIAMI ("CITY") DEPARTMENTS TO FACILITATE THE CLEANING OF CERTAIN LOCATIONS, AT LEAST THREE TIMES A WEEK, AT AREAS CONSIDERED TO BE HOT SPOTS OF RECURRING HOMELESS ENCAMPMENTS FOR PURPOSES OF IMPROVING THE CLEANLINESS OF CITY STREETS AND SIDEWALKS WHILE PREVENTING A GENUINE PUBLIC HEALTH THREAT.

**PLAINTIFF'S EXHIBIT**

**13**



**City of Miami**

**Legislation**

**Resolution**

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

---

**File Number: 10624**                                         **Final Action Date:**

A RESOLUTION OF THE MIAMI CITY COMMISSION DIRECTING THE CITY MANAGER TO ENHANCE THE COORDINATION AND FREQUENCY AMONGST CITY OF MIAMI ("CITY") DEPARTMENTS TO FACILITATE THE CLEANING OF CERTAIN LOCATIONS, AT LEAST THREE TIMES A WEEK, AT AREAS CONSIDERED TO BE HOT SPOTS OF RECURRING HOMELESS ENCAMPMENTS FOR PURPOSES OF IMPROVING THE CLEANLINESS OF CITY STREETS AND SIDEWALKS WHILE PREVENTING A GENUINE PUBLIC HEALTH THREAT.

WHEREAS, areas of recurring homeless encampments can become a site of human waste, trash, vermin, discarded needles, and the like posing a genuine public health threat; and

WHEREAS, a "hot spot" is a location within the City of Miami ("City") whereby recurring homeless issues have occurred such as encampments, Florida Litter Law violations, and other public nuisances that may result in public health hazards; and

WHEREAS, the Miami City Commission considered strategies regarding citywide clean-ups at locations known to have recurring homeless encampments at the April 8, 2021 City Commission meeting; and

WHEREAS, the discussion focused on the value of coordination, integration, and frequency of collaborations amongst key City departments to improve the cleanliness of the City's streets and efforts to reduce the population of unsheltered homeless persons in the City; and

WHEREAS, City Policy No. APM 1-19, titled "Treatment of Homeless Persons' Property" governs the a standard practice for the handling, temporary storage, and disposition of property belonging to homeless persons to ensure the City does not violate personal property rights of the homeless; and

WHEREAS, the City currently conducts regular scheduled cleanups and provide advance notice of upcoming operations at recurring sites where human waste, trash, needles, and the like are known to discarded; and

WHEREAS, to improve the cleanliness of City streets, sidewalks and to prevent threats of genuine public health treats from developing, it is appropriate to increase the collaborations between the City's Homeless Outreach Teams, Miami Police Department and Department of Solid Waste in coordination with Neighborhood Service Center Administrators, Continuum of Care providers, and Neighborhood Resource Officers to increase the frequency of street cleanup operations and scheduled maintenance routes at least three times a week at designated hot spots in the City;

NOW, THEREFORE, BE IT RESOLVED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:

Section 1. The recitals and findings contained in the Preamble to this Resolution are adopted by reference and incorporated as if fully set forth in this Section.

Section 2. The City Manager is directed to enhance the coordination and frequency amongst City departments to facilitate the cleaning of certain locations, at least three times a week, at areas considered to be hot spots of recurring homeless encampments for purposes of improving the cleanliness of City streets and sidewalks while preventing a genuine public health threat.

Section 3. This Resolution shall become effective immediately upon its adoption.

APPROVED AS TO FORM AND CORRECTNESS:


_____
Victoria Méndez, City Attorney          9/1/2021



## AGENDA ITEM COVER PAGE

### File ID: #10623

### Ordinance

### First Reading

### Sponsored by: Joe Carollo, Commissioner

AN ORDINANCE OF THE MIAMI CITY COMMISSION AMENDING CHAPTER 37 OF THE CODE OF THE CITY OF MIAMI, FLORIDA, AS AMENDED, ENTITLED "OFFENSES-MISCELLANEOUS," MORE PARTICULARLY BY ADDING A NEW SECTION TO PROHIBIT ENCAMPMENTS ON PUBLIC PROPERTY; PROVIDING FOR DEFINITIONS AND PENALTIES; CONTAINING A SEVERABILITY CLAUSE AND PROVIDING AN EFFECTIVE DATE.



PLAINTIFF'S
EXHIBIT

**14**



# City of Miami

## Legislation

## Ordinance

---

**File Number: 10623**                                    **Final Action Date:**

---

AN ORDINANCE OF THE MIAMI CITY COMMISSION AMENDING CHAPTER 37 OF THE CODE OF THE CITY OF MIAMI, FLORIDA, AS AMENDED, ENTITLED "OFFENSES-MISCELLANEOUS," MORE PARTICULARLY BY ADDING A NEW SECTION TO PROHIBIT ENCAMPMENTS ON PUBLIC PROPERTY; PROVIDING FOR DEFINITIONS AND PENALTIES; CONTAINING A SEVERABILITY CLAUSE AND PROVIDING AN EFFECTIVE DATE.

WHEREAS, the City of Miami ("City") owns or maintains public properties that have associated outdoor areas including parking areas, greenspaces, lawns, landscaping, terraces, outdoor walkways, courtyards, and similar facilities which are generally open to the public but are not suitable for overnight use or camping; and

WHEREAS, such public outdoor areas exist for the purpose of facilitating ingress and egress to all buildings and facilities, and maintaining attractive and welcoming exteriors to all properties to be enjoyed by all members of the public; and

WHEREAS, the unauthorized use of public property for camping where the property in question is neither intended for nor designed as a camp site, campground, or site for temporary human habitation tends to impair, obstruct, or otherwise detract from the use for its intended purpose; and

WHEREAS, the act of unauthorized camping on public property tends to endanger the health, safety, and wellbeing of those engaged in such camping as well as the public at large;

NOW, THEREFORE, BE IT ORDAINED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:

Section 1. The recitals and findings found in the Preamble of this Ordinance are adopted by reference and incorporated as fully set forth in this Section.

Section 2. Chapter 37 of the Code of the City of Miami, Florida as amended, entitled "Offenses-Miscellaneous," is amended in the following particulars:[1]

"CHAPTER 37

OFFENSES-MISCELLANEOUS

\*        \*        \*        \*

Sec. 37-16.

(a)  Definitions.

---

[1] Words and/or figures stricken through shall be deleted. Underscored words and/or figures shall be added. The remaining provisions are now in effect and remain unchanged. Asterisks indicate omitted and unchanged material.

PL000442

Unless the particular provisions or the context otherwise requires, the definitions contained in this Section shall govern the construction, meaning, and application of words and phrases used in this Chapter.

*Code inspector* means the authorized agent or employee of the City so designated in Chapter 2, Article X, Code Enforcement whose duty it is to ensure code compliance.

*Encampment* means any one or more of the following:
1. The unauthorized use of fabric, metal, cardboard, or other materials as a tent or other temporary structure for living accommodation purposes or human habitation; or
2. The unauthorized use of a heating device in an area; or
3. The unauthorized accumulation of personal property (other than durable medical equipment) that would not fit in a container three feet high, three feet wide, and three feet deep.

*Department* means the Department of Human Services.

*Durable medical equipment* means equipment customarily used for medical purposes, able to withstand repeated use, and generally not useful to a person in the absence of illness or injury. Non-exclusive examples of such equipment include wheelchairs, canes, crutches, and portable oxygen tanks.

*Heating device* means a camp stove, grill, heater, or other container or device capable of generating or containing an open flame.

*Police Officer* means a law enforcement officer as defined in Section 943.10(1), Florida Statutes, as amended.

*Public place* means an outdoor area owned, managed, or controlled by the city to which the public has access, including public rights-of-way, parks, streets, sidewalks, hike and bike trails, transit facilities, underpasses, and parking lots.

(b) Prohibitions:

1. Encampment in a public place in the City is unlawful.
2. Any person who violates this Section shall be guilty of a misdemeanor and, upon conviction, shall be punished as provided in Section 1-13 of the Code or may be enforced by a civil violation as set forth in Chapter 2, Article X.

(c) Procedure for enforcement.

(1) A Police officer or Code inspector may issue a citation for a violation of this Article if prior to issuing the citation:

(i) The Police officer or Code inspector has tendered a written warning to the person stating that a failure to comply with the City's prohibition against encampment may result in the issuance of a citation to the person or in the person's arrest; and

(a) The written warning required by Subsection (c)(1)(i) of this Section may be accompanied by written information regarding the availability of medical treatment (including mental health treatment) or social services (including temporary shelter or drug or alcohol rehabilitation).

(ii)The officer has provided a reasonable time (two hours) for the person to pick up their belongings and comply with the prohibition, yet the person has not complied.

(2) A Police officer may arrest a person for a violation of this Article if prior to the arrest:
(i) The Police officer has tendered the written warning required by Subsection (c)(1)(i) of this Section and has provided a reasonable time (two hours) for the person to pick up their belongings and comply with the prohibition, yet the person has not complied;
(ii) The Police officer has verified that there is an available shelter bed for the person and they have refused the offer of shelter;
(iii) In the event of an arrest pursuant to this Section the Police officer will follow the established City policies for the handling and storage of the person's property.

*       *       *       *"

Section 3.  If any section, part of a section, paragraph, clause, phrase or word of this Ordinance is declared invalid, the remaining provisions of this Ordinance shall not be affected.

Section 4.  This Ordinance shall become effective thirty (30) days after final reading and adoption thereof.[2]

APPROVED AS TO FORM AND CORRECTNESS:


Victoria Méndez, City Attorney            9/2/2021

---

[2] This Ordinance shall become effective as specified herein unless vetoed by the Mayor within ten (10) days from the date it was passed and adopted. If the Mayor vetoes this Ordinance, it shall become effective immediately upon override of the veto by the City Commission or upon the effective date stated herein, whichever is later.

PL000444

Homeless Mats & Clean-up Log

| Date | Location | Clean Up | District | Clients Engaged | Placement | Partner Agencies Present | City of Miami Solid Waste | City of Miami Waste Collectors | City of Miami Green Shirts | City of Miami Police | City of Miami NSC | Garbage Tons | Notes |
|------|----------|----------|----------|-----------------|-----------|--------------------------|---------------------------|-------------------------------|----------------------------|----------------------|------------------|--------------|-------|
| (4X a week)Monday, Tuesday, Thrusday, & Friday | Flagler Street (Biscayne Blvd to I95) SW 1st Street & SW 2nd Street (I95 to Miami River) Major emphasis under the bridges and inbetween hotels and residential buildings. Miami River Walk (The Wharf to Bayfront Park) | Daily Clean ups | D2 | N/A | 9 | DDA | NA | 2 | 2 | 2 | N/A | NA | Cleanup coordinator (CC) and officers drive the area (independently) beginning at about 7:00 a.m. and make note of areas where homeless individuals have set up overnight camp or where there is garbage left over from evening/overnight street feedings. CC meets with officers and lead green shirt at predesignated point (corner of Flagler and 2nd Ave.) at about 7:30 to discuss findings. Avg. 9 placements per week or over 450 per year. High recitivism rate of individuals will be placed 3-4 times each. |
| 9/23/2020 | NW 1st Court and NW 12th street | Major | D5 | N/A | N/A | N/A | Sanitation Hawk | 6 | 2 | 1 | 1 | 2 | |
| 9/30/2020 | 12th Street-14th Street on 1st Place | Major | D5 | N/A | 4 | N/A | Sanitation Hawk | 4 | 2 | 1 | 1 | 1 | |
| 10/7/2020 | 11th Street between 4th and 6th Avenue | Major | D5 | N/A | N/A | N/A | Sanitation Hawk | 6 | 2 | 2 | 1 | 1 | |
| 10/21/2020 | 12-13th Streets between 1 Avenue and 2nd Avenue | Major | D5 | N/A | N/A | N/A | Sanitation Hawk | N/A | N/A | 1 | 1 | 1 | HAWK assisted with removal of a wooden makeshift structure that was attached to FDOT fence line obstructing the public right of way. |
| 10/24/2020 | Jose Marti Park, SW 5th and 6th ST between 3rd Ave and 4th Ave | Major | D3 | 11 | 5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 11 homeless individuals were engaged and 5 were placed in Red Roof Hotel . |
| 10/27/2020 | 17th Streets between 4th Avenue to 8th Avenue  Avenue | Major | D5 | N/A | 5 | N/A | Sanitation Hawk | N/A | 4 | 6 | 1 | 3 | 11 homeless individuals were engaged and 5 were placed in Red Roof Hotel . |
| 10/28/2020 | 10/11th Streets between N.W. 4th and N.W. 6th Avenue/ N.W. 7th Avenue Underpass and 14th | Major | D5 | N/A | 2 | N/A | Sanitation Hawk | 6 | 4 | 2 | 1 | 2 | Observed several homeless residents who are in need of psychological assistance. |

1



DEF000107

Homeless Magnet Clean-up Log

| Date | Location | Clean Up | District | Clients Engaged | Placement | Partner Agencies Present | City of Miami Solid Waste | City of Miami Waste Collectors | City of Miami Green Shirts | City of Miami Police | City of Miami NSC | Garbage Tons | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/4/2020 | Jose Marti Park, SW 6th St and 5st between 3rd and 4th Avenue | Major | D3 | 7 | 4 | City of Miami | Sanitation Hawk | 2 | 2 | 3 | 2 | 2 | 7 homeless individuals were engaged and 4 were placed in Red Roof Hotel . |
| 12/9/2020 | N.W. 10th Street-11th Street between 4-6th Avenue | Major | D5 | N/A | N/A | N/A | Sanitation Hawk | 4 | 3 | 4 | 1 | 1.5 | Observed several homeless residents who are in need of psychological assistance, drug rehabilitation.<br>The Overtown NET Team Police were present including Sgt. Hendrix and NRO Tasheba Pratt |
| 12/11/2020 | City Swale 1866 NW 47th Terr | Major | D5 | N/A | 2 | N/A | Sanitation Hawk | N/A | 4 | 2 | 1 | 2 | Observed 2 homeless residents who are in need of psychological assistance. |
| 12/22/2020 | City PROW 6973 NW 17th Ave | N/A | D5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| 1/15/2021 | NW 70 Street and I95 | Major | D5 | 0 | 0 | N/A | 0 | 1 | 1 | 0 | 0 | 0 | |
| 2/1/2021 | 5401 NW 7th Ave | N/A | D5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| 2/10/2021 | NW 17th Street from 5th to 9th Ave., NW 18th Ave. from 7th to 8th Ave. NW 7th Ave under expressway, 8th Ave 17th St. to 18th St.(across Highland Park Pavilion), NW 17th Ave from 5th to 7th Ave. | Major | D5 | 70 | 58 | Camillus House<br><br>Homeless Trust<br><br>FDOT | Sanitation Hawk Water Truck | 5 | 10 | 6 | 1 | 2 | Several homeless in need of psychological assistance, drug rehabilitation<br><br>Some individuals homeless due to Covid and loss of employment<br><br>FDOT maintenance team did not provide assistance with clean up, but closed the sidewalk for construction purposes. |
| 2/16/2021 | 1700 NW 58 Street | N/A | D5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| 2/22/2021 | NW 1st CT, 13th ST, Miami, under expressway | Major | D5 | 10 | 9 | N/A | N/A | N/A | 2 | N/A | N/A | N/A | Only before pictures for 2/22/2021 and 2/23/2021 for same location |
| 2/23/2021 | NW 1st CT, 13th ST, Miami, under expressway | Major | D5 | 13 | 7 | Homeless Trust | N/A | N/A | 2 | N/A | N/A | N/A | |

DEF000108

Homeless Matters Clean-up Log

| Date | Location | Clean Up | District | Clients Engaged | Placement | Partner Agencies Present | City of Miami Solid Waste | City of Miami Waste Collectors | City of Miami Green Shirts | City of Miami Police | City of Miami NSC | Garbage Tons | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/23/2021 | Coconut Grove - Peacock Park to Kennedy, WainWright Park | Special homeless outreach efforts w/Parks | D2 | | 2 | Parks | N/A | 2 | 2 | 1 | 1 | N/A | 6 refused shelter |
| 2/24/2021 | Area around Miami Rescue Mission Building | Major | D5 | N/A | 40 | Camillus House Homeless Trust | Sanitation Hawk Water Truck Street Sweeper | 8 | 10 | 5 | 1 | 8.41 | There were a group of protesters and one representative of the ACLU present |
| 3/1/2021 | Approach bridge between Downtown and Flagler Street | Maintenance | D2 | 9 | 4 | DDA | N/A | 1 | 3 | 3 | N/A | N/A | DHS was able to implement ahead of its scheduled execution for this Wednesday, March 3rd

4 pickup loads of garbage disposed of – weight unknown |
| 3/2/2021 | Domino Park, to SW 8th St. to River to SW 1st St. and 14th Ave. | Special homeless outreach efforts | D3 | 12 | 2 | Parks | N/A | 2 | 2 | 1 | 1 | N/A | 12 homeless individuals were engaged but 10 refused shelter. Garbage collected later coordinated by District Office and their waste collectors. |
| 3/9/2021 | 5401 NW 7 Ave | N/A | D5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| 3/9/2021 | Flagler Street & 12th Ave | Special homeless outreach efforts | D3 | 6 | 2 | N/A | N/A | 4 | 2 | 3 | N/A | N/A | 6 Clients were engage by Outreach and the NRO of D3. only 2 clietn accepted Placement. Waste Management Clean the area |
| 3/9/2021 | Flagler Street & 7th Ave | Special homeless outreach efforts | D3 | 7 | 0 | N/A | N/A | 4 | 2 | 2 | N/A | N/A | 7 Clients were engage by Outreach and the NRO of D3. All Clients refused service and asked to move along. Waste Management Clean the area |
| 3/9/2021 | Flagler Street & NW S. River Drive (Under the Bridge) | Special homeless outreach efforts | D3 | 0 | 0 | N/A | N/A | 4 | 2 | 2 | N/A | N/A | No Client were in the location but item were found under the bridge. Maxie (outreach) went through the items and then waste management cleaned the area. |
| 3/9/2021 | SW 8th street & 12th Ave (CVS) | Special homeless outreach efforts | D3 | 1 | 0 | N/A | N/A | 4 | 2 | 2 | N/A | N/A | 1 Clients were engage by Outreach and the NRO of D3. Client refused service and was asked to move along. Waste Management Cleaned the area. |
| 3/10/2021 | NW 18th Street and NW 7th Avenue | Major | D5 | N/A | 26 | N/A | Sanitation Hawk Water Truck | 5 | 7 | 6 | 3 | N/A | NRO Leonard and Outreach worker Willie Rachel conducted outreach and information activities the previous Monday and Tuesday to alert individuals residing there of the intent to clean up. |

DEF000109

Homeless Master Clean-up Log

| Date | Location | Clean Up | District | Clients Engaged | Placement | Partner Agencies Present | City of Miami Solid Waste | City of Miami Waste Collectors | City of Miami Green Shirts | City of Miami Police | City of Miami NSC | Garbage Tons | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/11/2021 | SW 1St. CT. and 2nd. Ave. | Major | D2 | 3 | 0 | Police | Sanitation | 1 | 1 | 2 | N/A | N/A | |
| 3/16/2021 | Miami River west of the 27th Ave bridge | Major | D1 | N/A | 3 | D1 Commissioner Office  2x Waste Collectors from Miami River Commission | N/A | 0 | 1 | 7 | 0 | N/A | Approximately seven (7) large bags of trash collected and about three (3) plywood planks and one crate picked up by City of Miami Solid Waste |
| 3/17/2021 | I95 and NW 38th Street between 3rd & 2nd Ave | Major | D5 | 0 | 0 | N/A | Sanitation Hawk Water Truck Street Sweeper | 5 | N/A | 2 | 1 | N/A | Eencampment was visited several times previously and none of the residents wanted shelter.  One single individual sleeping in the rafter of the embarkment told one of the outreach workers he was working on replacing stolen documents and after that he would accept shelter. The encampment was totally empty upon arrival. |
| 3/17/2021 | NW 3rd Ave 10 & 11th ST | Major | D5 | 30 | 10 | Police, NET | Sanitation | 7 | 10 | 6 | 8 | 1 | |
| 3/17/2021 | NW 1ST CT NW 1st Ave, 20 th ST Ave 15 th and 20 ST | Mayor | D2/D5 | 6 | 6 | Miami Police, | N/A | N/A | 1 | 1 | N/A | N/A | |
| 3/17/2021 | NW 1ST Ave 15 th and 20 ST | N/A | D2/D5 | 2 | 2 | Miami Police, | N/A | N/A | 1 | 1 | N/A | N/A | |
| 3/19/2021 | Peacock Park & Alice Wainwright Park | Maintenance | D2 | 5 | 0 | City of Miami Park Ranger | N/A | 2 | 3 | 5 | 0 | N/A | A total of 4 adult males & 1 adult female were offered shelter and all refused.  They were given a tresspass warning.  3 bags of trash, contaminated clothing and 3 shopping carts and 1 folding chair removed. |

4

DEF000110

Homeless Matters Clean-up Log

| Date | Location | Clean Up | District | Clients Engaged | Placement | Partner Agencies Present | City of Miami Solid Waste | City of Miami Waste Collectors | City of Miami Green Shirts | City of Miami Police | City of Miami NSC | Garbage Tons | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/24/2021 | N.W. 11 Street between 4th Avenue to 6th Avenue | Maintenance | D5 | N/A | 0 | Commissioner Hardemon's Office County Public Facilities and Public Works | 3 Sanitation, Hawk, Water truck | 2 | 0 | 4 | 1 | 1 | No green shirts were present as the outreach was conducted for debris removal only.

2 Representatives from County Commissioner Hardemon's Office were present
1 Representative from the County Public Facilities Department was present
The makeshift bicycle shop that was erected on County property was removed by County Public Works. Trespass signage will be erected in the next few days to deter future squatters. |
| 3/24/2021 | NW 18th Street between 7th and 8th avenues, NW 17th Street between 8th and 5th avenues | Major | D5 | 37 | 28 | N/A | 2 | 2 | 1 | 8 | 1 | N/A | The County also conducted a short, unscheduled clean up operation on NW 11th Street and 5th Avenue. NSC Administrator of Overtown Brandyss Howard required waste collectors, the crane and the garbage truck. |
| 3/24/2021 | NW 20th Street and NW 12th Avenue | Maintenance | D5 | N/A | 0 | N/A | 2 | 0 | 0 | 0 | 0 | N/A | |
| 3/28/2021 | Peacock Park & Alice Wainwright Park | Maintenance | D2 | 7 | 0 | Parks | N/A | 2 | 2 | 4 | N/A | N/A | 1 shopping cart and contaminated clothing items were removed from Alice Wainwright Park from the picnic shelter area. 1 adult female and 6 adult males at Peacock Park were offered shelter and they refused and trespass warnings were given. 1 adult male at Alice Wainwright was offered shelter and refused.  Trespass warning was given.  Park is currently under a beautification project and closed for public use. Contaminated items to include clothing and other articles were removed from Peacock Park.  The woman refused the assistant and she became aggressive and then she was arrested. |
| 3/31/2021 | NW 18th Street and NW 7th Avenue | N/A | D5 | N/A | N/A | N/A | 4 | N/A | N/A | N/A | N/A | N/A | |
| 4/7/2021 | Overtown NW 10th & NW 11th Street | Major | D5 | 35 | 3 | Police City of Miami | N/A | 6 | 6 | 5 | 2 | 1.5 | FDOT maintenance team was present, but provided minimal assistance in reference to cleaning up the  tents that are erected on their property, as well as the debris in between the tents and behind the fence line. |
| 4/7/2021 | Domino Park Plaza | Maintenance | D3 | N/A | 10 | Parks | N/A | N/A | N/A | N/A | N/A | N/A | |
| 4/14/2021 | NW 7th Avenue and NW 14th & 15th Streets/I95

NW 12th Avenue and NW 11th Avenue/ I95 | Major | D5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |  |

DEF000111

Homeless Mapping Clean-up Log

| Date | Location | Clean Up | District | Clients Engaged | Placement | Partner Agencies Present | City of Miami Solid Waste | City of Miami Waste Collectors | City of Miami Green Shirts | City of Miami Police | City of Miami NSC | Garbage Tons | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/15/2021 | Peacock Park & Alice Wainwright Park | Maintenance | D2 | N/A | 2 | Parks | N/A | 2 | 3 | 4 | N/A | N/A | Encountered a total of 5 adult males & 2 adult females. Two of the individuals (1 male & 1 female) were transported to available shelter options, and the others refused shelter. Said individuals were given trespass warnings. All individuals encountered were in the Peacock Park area (except 1 adult male in Alice Wainwright Park). Solid Waste Collectors removed contaminated items from Peacock Park. |
| 4/21/2021 | NW 10th and NW 11th Streets / NW 14th Street between NW 3rd and NW 4th Avenues (underpass) | Major | D5 | N/A | N/A | FDOT Camillus House | Sanitation Hawk Water Truck Street Sweeper | 6 | 5 | 15 | 1 | 2 | FDOT maintenance team was present, but provided minimal assistance in reference to cleaning up the tents that are erected on their property, but addressed debris behind the fence. The underpass location in which a homeless resident was residing based upon the report given by Officer Darion Williams, was not addressed by FDOT at the time of the outreach. 8 placements were made with 55 outreach engagements |
| 4/29/2021 | NW 79 Street, Expressway Underpass | N/A | D5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |  |
| 5/5/2021 | SW 8th Street and SW 12th - SW 23rd Avenues / West Flagler and 8th - 13th Avenues | Special Outreach Not a clean up | D3 | 16 | 8 | N/A | N/A | 0 | N/A | N/A | N/A | 0 | One individual was arrested |
| 5/6/2021 | Peacock Park & Alice Wainwright Park | Maintenance | D2 | 5 | 1 | Parks | N/A | N/A | 2 | 5 | N/A | N/A | Homeless Assistance Program (2 staff & 2 vehicles), Coconut Grove Miami Police (4 Officers, 1 PSA, & 5 vehicles), Solid Waste Collectors (2 staff & 2 vehicles), David Rosemond (1 vehicle), and I (1 vehicle) encountered a total of 2 adult males & 3 adult females. One of the individuals (1 adult female) was transported to available shelter options, and the others refused shelter. Said individuals were given trespass warnings. All individuals encountered were in the Peacock Park area. We removed contaminated items from Peacock Park & Alice Wainwright Parkems from Peacock Park. |
| 5/11/2021 | Underpass at NW 62 & 79 Streets | Maintenance | D5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |  |
| 5/12/2021 | NW 12th to 14th streets and 1st to 3rd avenues | Major | D5 | N/A | N/A | Camillus House | Sanitation Hawk Water Truck | 6 | 4 | 7 | 1 | 2 | Both sides of the location were cleared of all tents that were fully obstructing the sidewalk. Assistance was also provided to adjacent property owners for removal of debris from vacant lots due to illegal dumping. |
| 5/13/2021 | Julia Tuttle Causeway (NW 36th St) | Special Clean Up with FDOT | D2 | N/A | 0 | DBi/FDOT | N/A | 4 | 2 | 5 | 1 | N/A | 4 Dbi/FDOT workers; collected 3 trucks of debris |
| 5/14/2021 | 570 NW 67th Street | Special Clean Up | D5 | 4 | 1 | N/A | Sanitation | 3 | 3 | 4 | 1 | N/A |  |

6

DEF000112

Homeless Matters Clean-up Log

| Date | Location | Clean Up | District | Clients Engaged | Placement | Partner Agencies Present | City of Miami Solid Waste | City of Miami Waste Collectors | City of Miami Green Shirts | City of Miami Police | City of Miami NSC | Garbage Tons | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/18/2021 | Peacock Park & Alice Wainwright Park | Maintenance | D2 | 5 | 0 | N/A | N/A | 4 | 2 | 4 | N/A | N/A | Individuals refused shelter, and were given trespass warnings. All individuals encountered were in the Peacock Park area. |
| 5/18/2021 | NW 12th St between NW 1st CT and NW 1st Ave | NRO Homeless Outreach | D5 | N/A | 0 | N/A | N/A | N/A | N/A | 2 | 1 | N/A | |
| 5/19/2021 | NW 4th Street to W. Flagler Street from NW 47 Avenue to NW 53 Avenue | N/A | D4 | N/A | N/A | N/A | Hawk | 8 | N/A | N/A | N/A | 4 | |
| 5/19/2021 | NW 20 ST & NW 1 AVE | Major | D2/D5 | N/A | N/A | Camillus House Wynwood BID | Hawk | 7 | 4 | 3 | 2 | 1 | Tents were removed from full obstruction on N.W. 1st Avenue between 19-20th Street except for 2 tents that are erected on private property where there the fence has been pushed back onto the property. Overtown Administrator will try to contact property owner to request the fence line be pushed back if possible, or erect trespass signage on the unfenced parcel so that police are able to enforce. 4-5 Tents still remain on N.W. 20th Street in the swale area, but the sidewalk has been cleared for pedestrians. Overtown Administrator proposes trespass signs along 20th Street be erected on the swale to prevent future encampments. |
| 5/26/2021 | NW 12th and 13th ST on NW 1st Ct. to NW 1st Ave and NW 19th and 20th St. NW 17th Street between NW 7th and 6th Ave. | Major | D5 | N/A | N/A | N/A | Hawk Rear Loader Sweeper Water Truck | 6 | N/A | 2 | N/A | 4 | |
| 5/27/2021 | Peacock Park & Alice Wainwright Park | Maintenance | D2 | 5 | 0 | N/A | N/A | 2 | 2 | 4 | 2 | N/A | |
| 6/2/2021 | SW 8th Street from 23rd-12th Avenue, West Flagler Street from 13th-8th Avenue as well as along River Drive | Maintenance | D3 | 25 | 5 | N/A | N/A | N/A | 2 | 5 | N/A | N/A | Three of the individuals encountered (adult male) were arrested, and one individual was Baker Acted (transported to Jackson Crisis Center for 72 hour mental health evaluation). |
| 6/2/2021 | NW 11th Street under the overpass | Major | D5 | | 9 | Camillus House | Hawk Rear Loader Water Truck | 8 | 8 | 4 | | | |
| 6/4/2021 | NW 10th Street under the overpass | Major | D5 | | 7 | N/A | N/A | 6 | 4 | 4 | | | |
| 6/10/2021 | Peacock Park & Alice Wainwright Park | Maintenance | D2 | 9 | 0 | N/A | N/A | 2 | 2 | 4 | N/A | N/A | |

DEF000113

Homeless Marlins Clean-up Log

| Date | Location | Clean Up | District | Clients Engaged | Placement | Partner Agencies Present | City of Miami Solid Waste | City of Miami Waste Collectors | City of Miami Green Shirts | City of Miami Police | City of Miami NSC | Garbage Tons | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/10/2021 | Julia Tuttle Causeway (NW 36th St) | Maintenance | D2 | N/A | 1 | FDOT/Dbi | N/A | 4 | 1 | 5 | 1 | N/A | |
| 6/22/2021 | Peacock Park & Alice Wainwright Park | Maintenance | D2 | 4 | 0 | N/A | N/A | 2 | N/A | 3 | N/A | N/A | |
| 6/28/2021 | SW 2nd Street and SW 1st Avenue | Major | D5 | 24 | 0 | N/A | N/A | 5 | 2 | 1 | N/A | N/A | |
| 7/2/2021 | Under I-95 connects Flagler St. to Bridge | Major | | | | | | | | | | | |
| 7/7/2021 | SW 2nd St at 1st Ave. to Wharf and around MRC | Major | | | | | | | | | | | |
| 7/9/2021 | NW 7th Ave. 14th – 17th Streets    17th St. 7th – 8th Avenues | Major | | | | | | | | | | | |
| 7/12/2021 | NW 18th St 7th – 8th Avenues. | Major | | | | | | | | | | | |
| 7/14/2021 | NW 10th Street (under the I-95 overpass) | Major | | | | | | | | | | | |
| 7/16/2021 | NW 11th Street (under the I-95 overpass) | Major | | | | | | | | | | | |
| 7/19/2021 | SW 2nd St at 1st Ave to Warf and around MRC | Major | | | | | | | | | | | |
| 7/21/2021 | North Miami Ct. & N. Miami Avenue 20th to 22nd Streets | Major | | | | | | | | | | | |
| 7/21/2021 | Peacock Park & Alice Wainwright Park | Maintenance | 2 | 10 | 1 | N/A | N/A | 1 | 1 | 4 | | | Placement to Mercy Hospital |
| 7/23/2021 | Flagler Street 14th Ave. to Jose Marti Park | Major | | | | | | | | | | | |
| 7/26/2021 | NW 6th Street between N. Miami & NW 2nd Avenues | Major | | | | | | | | | | | |
| 7/28/2021 | NW 1st Court 14th to 13th streets | Major | | | | | | | | | | | |
| 7/30/2021 | NW 10th & 11th streets | Major | | | | | | | | | | | |

Each major scheduled cleanup is dependent on available shelter beds, quarantine and isolation space (QI), weather, and coordinated resources from other City departments. This pertains to major cleanups where we have to give notice, NOT

DEF000114

| Date | Location | Before | After |
|------|----------|--------|-------|
| 9/23/2021 | NW 1st Court and NW 12th street |  |  |
| 9/30/2020 | 12th Street-14th Street on 1st Place |  |  |
| 10/7/2020 | 11th Street between 4th and 6th Avenue |  |  |

DEF000115

| 10/21/2020 | 12-13th Streets between 1 Avenue and 2nd Avenue |  |  |
|---|---|---|---|
| 10/24/2020 | Jose Marti Park, SW 5th and 6th ST between 3rd Ave and 4th Ave |  |  |
| 10/27/2020 | 17th Streets between 4th Avenue to 8th Avenue Avenue |  |  |

DEF000116

| | | | |
|---|---|---|---|
| 10/28/2020 | 10/11th Streets between N.W. 4th and N.W. 6th Avenue/ N.W. 7th Avenue Underpass and 14th Street |  |  |
| 11/4/2020 | Jose Marti Park, SW 6th St and 5st between 3rd and 4th Avenue |  |  |
| 12/9/2020 | N.W. 10th Street-11th Street between 4-6th Avenue |  |  |

DEF000117

| | | | |
|---|---|---|---|
| 1/19/2021 | NW 70 Street and I95 |  |  |
| 2/10/2021 | NW 17th Street from 5th to 9th Ave., NW 18th Ave. from 7th to 8th Ave. NW 7th Ave under expressway, 8th Ave 17th St. to 18th St.(across Highland Park Pavilion), NW 17th Ave from 5th to 7th Ave. |  |  |
| 2/10/2021 | NW 17th Street from 5th to 9th Ave., NW 18th Ave. from 7th to 8th Ave. NW 7th Ave under expressway, 8th Ave 17th St. to 18th St.(across Highland Park Pavilion), NW 17th Ave from 5th to 7th Ave. |  |  |

DEF000118

| 2/24/2021 | Area around Miami Rescue Mission Building |  |  |
|---|---|---|---|
| 3/9/2021 | Flagler Street & 12th Ave |  |  |
| 3/9/2021 | Flagler Street & 7th Ave |  |  |

DEF000119

| 3/9/2021 | Flagler Street & NW S. River Drive (Under the Bridge) |  |  |
|---|---|---|---|
| 3/9/2021 | SW 8th street & 12th Ave (CVS) |  |  |
| 3/10/2021 | NW 18th Street and NW 7th Avenue |  |  |

DEF000120

| | | | |
|---|---|---|---|
| 3/10/2021 | NW 18th Street and NW 7th Avenue |  |  |
| 3/16/2021 | Miami River west of the 27th Ave bridge |  |  |
| 3/17/2021 | I95 and NW 38th Street between 3rd & 2nd Ave |  |  |

DEF000121



| 3/19/2021 | Peacock Park & Alice Wainwright Park | | |
| 3/24/2021 | NW 18 Street and NW 18th Court | | |
| 3/28/2021 | Peacock and Wainwright Park | | |

DEF000122

| 4/7/2021 | Overtown NW 10th & NW 11th Street |  |  |
| --- | --- | --- | --- |
| 4/14/2021 | NW 7th Avenue and NW 14th & 15th Streets/I95<br><br>NW 12th Avenue and NW 11th Avenue/ I95 |  |  |
| 4/15/2021 | Peacock Park & Alice Wainwright Park |  |  |

DEF000123

| | | | |
|---|---|---|---|
| 4/21/2021 | NW 10th and NW 11th Streets<br><br>NW 14th Street between NW 3rd and NW 4th Avenues (underpass) |  |  |
| 5/6/2021 | Peacock and Wainwright Parks |  | |
| 5/11/2021 | Underpass at NW 62 & 79 Street |  |  |

DEF000124

| 5/12/2021 | NW 12th to 14th streets and 1st |  |  |
| --- | --- | --- | --- |
| 5/13/2021 | Julia Tutle Causeway/NW 36 S |  |  |
| 5/14/2021 | 570 NW 67th Street |  |  |

DEF000125

| 5/18/2021 | Peacock Park & Alice Wainwright Park |  | |
| 5/18/2021 | NW 12th St between NW 1st CT and NW 1st Ave |  |  |
| 5/19/2021 | NW 20 ST & NW 1 AVE |  |  |

DEF000126

| 5/26/2021 | NW 12th and 13th ST on NW 1st Ct.<br>to NW 1st Ave and  NW 19th and 20th St.<br>NW 17th Street between NW 7th and 6th Ave. |   | |
| 5/27/2021 | Peacock Park & Alice Wainwright Park |   |   |
| 6/4/2021 | NW 10th Street under the overpass |   | |

DEF000127

| 6/10/2021 | Peacock Park & Alice Wainwright Park |  | |
| 6/10/2021 | Julia Tuttle Causeway (NW 36th St) |  | |
| 6/22/2021 | Peacock Park & Alice Wainwright Park |  |  |

DEF000128

| | | | |
|---|---|---|---|
| 6/28/2021 | SW 2nd Street and SW 1st Avenue |  | |
| 7/22/2021 | Peacock Park & Alice Wainwright Park |  | |

DEF000129

| Census Homeless Count | 2020 | 2021 | Diff | % |
|---|---|---|---|---|
| Unsheltered-City of Miami, City Limits | 654 | 555 | -99 | -15% |
| Total Homeless in Emergency Shelter | 1,762 | 1,836 | 74 | 4% |
| Emergency Weather Placements | 0 | 0 | 0 | 0% |
| Hotel/Motel | 236 | 112 | -124 | -53% |
| Total Homeless in Transitional Housing | 515 | 393 | -122 | -24% |
| Safe Haven | 27 | 12 | -15 | -56% |
| Subtotal-SHELTERED Homeless: | 2540 | 2353 | -187 | -7% |
| Total - Sheltered and unlsheltered homeless: | 3194 | 2908 | -286 | -9% |

| City of Miami - Homeless Outreach (Green Shirts) Data | Total | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Placed | **3613** | 622 | 564 | 600 | 592 | 598 | 637 | | | | | | |
| Number of Adults | **2418** | 493 | 465 | 514 | 467 | 485 | 487 | | | | | | |
| Children (under 18) | **562** | 127 | 97 | 84 | 125 | 113 | 143 | | | | | | |
| Veterans | **92** | 11 | 12 | 22 | 14 | 17 | 16 | | | | | | |
| Chronically Homeless (homeless for at least a year or repeatedly) | **893** | 182 | 172 | 195 | 157 | 191 | 178 | | | | | | |
| Youth (under 25) | **108** | 20 | 21 | 24 | 15 | 28 | 20 | | | | | | |
| Parents (with children Under 25) | **24** | 8 | 5 | 6 | 5 | 3 | 5 | | | | | | |
| IDs provided (birth certificates, social security cards and other forms of ID) | **37** | 0 | 0 | 0 | 0 | 1 | 36 | | | | | | |
| Lazarus Project Miami | **892** | 327 | 312 | 318 | 287 | 287 | | | | | | | |
| Food Vouchers | **22** | 7 | 7 | 0 | 0 | 0 | 8 | | | | | | |
| Emergency Weather | **676** | 0 | 175 | 245 | 144 | 97 | 15 | | | | | | |
| Total Services Provided | **4742** | 935 | 872 | 905 | 1018 | 936 | 1011 | | | | | | |
| Number of Contacts (may be duplicated) | **14396** | 2172 | 1667 | 2559 | 2406 | 2603 | 2989 | | | | | | |
| Clean Ups | **35** | 12 | 5 | 7 | 11 | 3 | 9 | | | | | | |
| Complaints Total | **4** | | | | | 2 | 2 | | | | | | |
| Complaints Solid Waste | **1** | | | | | | 1 | | | | | | |

DEF000130

| | Total | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Complaints DHS | 2 | | | | | 1 | 1 | | | | | | |
| Complaints Other | 1 | | | | | 1 | | | | | | | |

| **Camillus House Shelter Program**<br>Provision of seventy-five (75) beds in Camillus House where ten (10) beds will be set aside as overnight (24 hour stay) beds, for nightly use of homeless individuals that are Pottinger candidates, along with other associated and accompanying homeless services and case management, for a period of one (1) year, subject to said bed being exclusively designated for the City's homeless, and at a total cost of $460,000 | Total | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Extended Stay Beds (Total # Served)<br>*(beds longer than one night stay)* | | 93 | 93 | 85 | 82 | 90 | 91 | | | | | | |
| Overnight Beds (Total # Served)<br>*(beds set for overnight stay)* | | 3 | 0 | 0 | 0 | 0 | 0 | | | | | | |
| **Total** | | 96 | 93 | 85 | 82 | 90 | 91 | | | | | | |
| Vacancy Rates - Extended Stay Beds | | 6 | 6 | 8 | 17 | 12 | 2 | | | | | | |
| **Extended Beds Placements**<br>*(accommodations for more than one night)* | | | | | | | | | | | | | |
| City of Miami (referred from Overnight)<br>*(placements from overnight to extended)* | | 3 | 0 | 0 | 0 | 0 | 0 | | | | | | |
| City of Miami Agency Discharge Release Outreach  - MOA<br>*(placements by City after homeless discharged from jail or programs)* | | 0 | 0 | N/A | N/A | N/A | N/A | | | | | | |
| Citrus Health Network<br>*(placements by Mental Health Center)* | | 0 | 0 | N/A | N/A | N/A | N/A | | | | | | |
| Camillus HT Expanded Services Bed<br>*(placements by Camillus House)* | | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | |
| City of Miami Agency Outreach - MHAP<br>*(placements by Green Shirts)* | | 22 | 23 | 9 | 18 | 20 | 30 | | | | | | |
| **Overnight Beds Placements**<br>*(accommodations for one night)* | | | | | | | | | | | | | |
| City of Miami Police<br>*(placements by Miami Police)* | | 3 | 0 | 0 | 0 | 0 | 0 | | | | | | |
| City of Miami Agency Outreach - MHAP<br>*(placements by Green Shirts)* | | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | |

DEF000131

| **Camillus House Day Center**<br>An agreement between Camillus House, Inc. and the City of Miami  for the Day Services Program, which is designed to provide meaningful, engaging activities for a period of one (1) year at a total cost of $100,000. Services provided include showers, clothing, mail, group activities, meals, ID Services to assist with re-establishing personal identification and referrals and to care for mental health, medical treatment and housing | Oct | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Day Center Clients Served**<br>*(# of clients served through Day Center)* | | | | | | | | | | | | | |
| **Total Individuals Served**<br>*(# of clients serviced per month, clients may be duplicated)* | | 1,367 | 1,253 | 1,367 | 1,147 | 1,177 | 1,265 | | | | | | |
| **Unique Clients Served**<br>*(# of new, non-duplicated clients served)* | | 666 | 601 | 635 | 628 | 601 | 600 | | | | | | |
| **Day Center Client Services**<br>*(# of clients served through Day Center by service type)* | | | | | | | | | | | | | |
| **Meals**<br>*(includes breakfast, lunch, dinner)* | | 1,761 | 1,561 | 1,654 | 1,457 | 1,480 | 1,686 | | | | | | |
| **Showers**<br>*(hot showers offered three days per week)* | | 1,569 | 1,401 | 1,449 | 1,313 | 1,392 | 1,593 | | | | | | |
| **Mail Services**<br>*(can use Camillus mailing address sand receive mail on a daily basis)* | | 568 | 336 | 538 | 610 | 576 | 646 | | | | | | |
| **Social Activities (suspended due to COVID)**<br>*(activities accessible to  all clients to assist for social interaction)* | | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | |
| **Clothing**<br>*(clients may obtain a free exchange of clean clothing, in conjunction with the shower program, or via special referral)* | | 1,568 | 1,402 | 1,471 | 1,379 | 1,392 | 1,594 | | | | | | |
| **ID Card Services**<br>*(help obtaining Camillus House" picture ID and assists with re-establishing  identity by obtaining birth certificates, social security cards and other forms of ID)* | | 418 | 313 | 319 | 283 | 285 | 249 | | | | | | |
| **Career Source Service (suspended due to COVID)**<br>*(assistance with locating employment opportunities)* | | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | |
| **Referrals**<br>*(referrals to outside organizations for additional needs)* | | 2,351 | 1,847 | 1,790 | 1,539 | 2,048 | 1,917 | | | | | | |

DEF000132

| Date Address | NET Area | Location | Comments |
|---|---|---|---|
| Monday 2/28/2022 | Wynwood | NW 2nd Ave. to N. Miami Ave. from 20 to 22 Street. | 1 Homeless Encampment/Several Homelss loitering. |
| Monday 2/28/2022 | Edgewater | Biscayne Blvd. NW 37 to 36 Street. | Several homeless lotering on both sides of Biscayne under 195 bridge. |
| Tuesday 3/1/2022 | Overtown | NW 1 Ave to 1 Ct. 11 to 14 Street. | Several Homeless encampments. |
| Tuesday 3/1/2022 | Overtown | NW 5 Ave from 10 to 14 Street. | Several Homeless encampments. |
| Wednesday 3/2/2022 | Downtown | N. Miami Ave from NW 9 to SE 1 Street. | Several Homeless Encampments. |
| Wednesday 3/2/2022 | Downtown | SW 1 Ave West towards S. River Dr. from SW 3 St. towards Flagler St. | Several Homeless Encampments. |
| Thursday 3/3/2022 | Overtown | NW 5 Ave. from 10 to 11 Street. | Several Homeless encampments. |
| Thursday 3/3/2022 | Overtown | NW 6 Ave NW 17 Street. | Several Homeless encampments. |
| Friday 3/4/2022 | Allappattah | NW 7 ave west to NW 9 Ct. NW 14 North towards NW 18 Street | Several Homeless encampments. |
| Friday 3/4/2022 | Allappattah | NW 17 Ave NW 11 Street | 1 Encampment Under the |

PLAINTIFF'S EXHIBIT

16

DEF000074

| Date Posted | Date Adress | NET | Location | Comments |
|---|---|---|---|---|
| 3/4/2022 | Monday 3/7/2022 | Wynwood | NW 1 Ave to NW 2nd Ave From 20 to 22 Street | Several Homeless Encampments. |
| 3/4/2022 | Monday 3/7/2022 | Model City | NW 6 Ave NW 79 Street/NW 15 Ave 67 Street | Several Homeless Encampments. |
| 3/4/2022 | Monday 3/7/2022 | Wyn/Upper Eastside | Biscayne Blvd NW 38 to 36 Street/ On both sides of Biscayne Blvd. | Several Homeless loitering. Specially by the bus bench. |
| 3/4/2022 | Tuesday 3/8/2022 | Overtown | NW 5 ave from 10 to 11 Street. | Several Homeless Encampments. |
| 3/4/2022 | Tuesday 3/8/2022 | Allappattah | NW 7 to 9 AVE from 14 to 18 Street. | Several Homeless Encampments. |
| 3/4/2022 | Tuesday 3/8/2022 | Overtown | NW 6 Ave NW 17 Street. | Several Homeless Encampments. |
| 3/4/2022 | Wednesday 3/9/2022 | Downtown | N. Miami Ave from NW 9 to SE 2nd Street. | Several Homeless Encampments. |
| 3/4/2022 | Wednesday 3/9/2022 | Downtown | SW 1 to S. River Dr. from Flagler to SW 3rd Street. | Several Homeless Encampments. |
| 3/4/2022 | Wednesday 3/9/2022 | Downtown | S. River Driver From SW 2 to SW 3 Street Beind the MRC by the WARF | 2 Homeless encampments. Several Homeless loitering. |
| 3/4/2022 | Thursday 3/10/2022 | Overtown | NW 5 Ave 10 to 11 Street | Several Homeles Encampments. |
| 3/4/2022 | Thursday 3/10/2022 | Overtown | NW 1 Ave to NW 1 Ct from 11 to 14 Street | Several Homeles Encampments. |
| 3/4/2022 | Friday 3/11/2022 | Little Havana/Brickell | SW 4 to SW 2nd Ave from SW 6 to SW 8 Street. | Several Homeless Encampments. |
| 3/4/2022 | Friday 3/11/2022 | Downtown | Ferrer & Bayfront Park | Several Homeless Loitering/ Outreach |

DEF000075

The following is a weekly schedule for the HEAT task force for the Month of March 7 through the 11 2022.

DEF000076

| DATE POSTED | DATE ADDRESS | NET | LOCATION | COMMENTS |
|---|---|---|---|---|
| 3/11/2022 | Monday 3/14/2022 | Wyn/Uppereastside | NW 2nd to NW 1 Ct. From 19 to 21 Street | Several Homeless Encampments/Homeless Loitering. |
| 3/11/2022 | Monday 3/14/2022 | Upp. East/Edgewater | Biscayne Blvd 38 to 36 Street. Under the I95 on both sides of the street. | 1 Homeless Encanpment. Several homeless Loitering. |
| 3/11/2022 | Monday 3/14/2022 | Wynwood | NW 2nd Ave to N. Miami Ave. from 36 to 37 Street. | 1 Homeless Encncampment. Several Homeless Loitering. |
| | | | | |
| 3/11/2022 | Tuesday 3/15/2022 | Overtown | NW 5 Ave From 10 to 11 Street. | Several Homeless Encampments. |
| 3/11/2022 | Tuesday 3/15/2022 | Overtown | NW 6 Ave 17 Street. | Several Homeless Encampments. |
| 3/11/2022 | Tuesday 3/15/2022 | Allappattah | NW 14 to 18 Street. West of NW 7 Ave. | Several Homeless Encampments. Homeless Loitering. |
| | | | | |
| 3/11/2022 | Wednesday 3/16/2022 | Downtown | N. Miami Ave From NW 9 to SE 2nd Street. | Several Homeless Encampments. Several Homeless Loitering. |
| 3/11/2022 | Wednesday 3/16/2022 | Downtown | SW 1 Ave to S. River Dr. SW 3rd St. North to Flagler Street. | Several Homeless Encampments. |
| | | | | |
| 3/11/2022 | Thursday 3/17/2022 | Overtown | NW 5 Ave 10 to 11 Street. | Several Homeless Encampments. |
| 3/11/2022 | Thursday 3/17/2022 | Overtown | NW 1 Ave to 1 Ct from 11 to 14 Street. | Several Homeless Encampments. |
| | | | | |
| 3/11/2022 | Friday 3/18/2022 | Brickell/Coral Way | I95 South off Ramp SW 26 RD. underpass. | Homeless Encampment. |
| 3/11/2022 | Friday 3/18/2022 | Coral Way | 2969-2999 S. Dixie Highway North side under Metro Rail | Homeless Encampment. |
| 3/11/2022 | Friday 3/18/2022 | Coral Way | 3001-3009 S. Dixie Highway North side under the Metro Rail. | Homeless Encampment. |

DEF000077

| DATE POSTED | DATE ADDRESS | NET | LOCATION | COMMENTS |
|---|---|---|---|---|
| 3/18/2022 | Monday 3/21/2022 | Wynwood/EdgeW | NW 1 to NW 2nd Ave from 19 to 21 Street. | Several Homeless Encampments. |
| 3/18/2022 | Monday 3/21/2022 | Wynwood | NW 2nd Ave N. Miami Ave on NW 37 Street. | 1 Homeless Encampment. |
| 3/18/2022 | Monday 3/21/2022 | Edgewater | Biscayne Blvd. from 38 to 36 Street. | Homeless loitering on both sides of Biscayne under the overpass. |
| 3/18/2022 | Monday 3/21/2022 | Allappattah | NW 7 Ave from 14 to 18 Street. | Several Homeless Encampments. |
| 3/18/2022 | Tuesday 3/22/2022 | Overtown | NW 5 Ave from 10 to 11 Street. | Several homeless Encampments. |
| 3/18/2022 | Tuesday 3/22/2022 | Overtown | NW 6 ave 17 Street. | Several Homeless Encampments. |
| 3/18/2022 | Wednesday 3/23/2022 | Downtown | N. Miami Ave. from NW 9 to SE 2nd Street. | Several Homeless Encampments. |
| 3/18/2022 | Wednesday 3/23/2022 | Downtown | N. Miami Ave East towards S. River Drive from SW 3rd to Flagler Street. | Several Homeless Encampments. |
| 3/18/2022 | Wednesday 3/23/2022 | Downtown | Ferrer & Bayfront Park. | Several Homeless Loitering. |
| 3/18/2022 | Thursday 3/24/2022 | Overtown | NW 5 Ave from 10 to 11 Street | Several homeless Encampments. |
| 3/18/2022 | Thursday 3/24/2022 | Overtown | NW 1 Ave to NW 1 Ct from NW 11 to 14 Street. | Several Homeless Encampments. |
| 3/18/2022 | Friday 3/25/2022 | Little Havana | SW 3 to 5 Ave from SW 6 to SW 8 Street. Afternoon session tentative Depending on Citywide needs. | Several Homeless Encampments. |

DEF000078

| Date Posted | Date Address | NET | Location | Comments |
|---|---|---|---|---|
| 3/25/2022 | Monday 3/28/2022 | Wynwood | NW 2nd Ave to NW 1 Ct. from 20 to 21 Street. | 1 Homeless Encampment. Several Homeless loitering. |
| 3/25/2022 | Monday 3/28/2022 | Wynwood | NW 6 Ave NW 20 Street. Southside under the I95 bridge. | 2 Homeless Encampments. |
| 3/25/2022 | Monday 3/28/2022 | Edgewater | Biscayne Blvd NW 38 to 36 Street. | Several Homeless Loitering. |
| 3/25/2022 | Monday 3/28/2022 | Wynwood | NW 2nd Ave to N. Miami Ave NW 37 Street. | 1 Homeless Encampment. |
| 3/25/2022 | Tuesday 3/29/2022 | Overtown | NW 3 to 7 Ave from 10 to 11 Street. | Several Homeless Encampments. |
| 3/25/2022 | Tuesday 3/29/2022 | Overtown | NW 6 Ave 17 Street | Several Homeless Encampments. |
| 3/25/2022 | Tuesday 3/29/2022 | Allappattah | NW 7 to 9 Ave from NW 14 to 18 Street. | Several Homeless Encampments. |
| 3/25/2022 | Wednesday 3/30/2022 | Downtown | N. Miami Ave. from NW 9 to SE 2 Street. | Several Homeless Encampments on both sides of N. Miami Ave. |
| 3/25/2022 | Wednesday 3/30/2022 | Downtown | SW 2nd Ave West towards S. River dr. | Several Homeless Encampments. |
| 3/25/2022 | Wednesday 3/30/2022 | Downtown | SW 2nd Ave from SW 2 Street North to Flagler Street. | Several homeless Encampments. |
| 3/25/2022 | Thursday 3/31/2022 | Overtown | NW 1 Ct to NW 2nd Ave from NW 11 to 14 Street. | Several Homeless Encampments. |
| 3/25/2022 | Thursday 3/31/2022 | Little Havana | NW 11 Street From NW 22 Ave West to NW 23 Ave. | Several Homeless Encampments. Under the I95 bridge. |
| 3/25/2022 | Thursday 3/31/2022 | Little Hav. Brickell | SW 3 Ave West to SW 5 Ave SW 6 to 8 Street | Several Homeless Encampments. |
| 3/25/2022 | Friday 4/1/2022 | Little Haiti | NET wide | Homeless Outreach. |

| 4/1/2022 | Monday 4/4/2022 | Wynwood | NW 2nd to NW 1st Ave from 19 to 21 Street. | 1 Homeless Encampment/ Several Homeless Loitering. |
| 4/1/2022 | Monday 4/4/2022 | Edgewater | 50 NE 22 Street | 1 Homeless Encampment. |
| 4/1/2022 | Monday 4/4/2022 | Edgewater | Biscayne Blvd. 38 to 36 Street/under the 195 overpass | Several Homeless Loitering. |
| 4/1/2022 | Tuesday 4/5/2022 | Little Havana | NW 22 to 23 Ave NW 11 Street/Locations will be provided on Monday. | Command Post/Homeless outreach/Enviromental Crimes. |
| 4/1/2022 | Tuesday 4/5/2022 | Overtown | NW 3 to 5 Ave from 10 to 11 | Several Homeless Encampments. |
| 4/1/2022 | Wednesday 4/6/2022 | Downtown | N. Miami Ave. from NW 8 Street to SE 2nd Street. | Several Homeless Encampments. |
|  | Wednesday 4/6/2022 | Downtown | S. Miami Ave West towards S. River Drive/Both sides of Street. | Several Homeless Encampments. |
|  | Wednesday 4/6/2022 | Downtown | SW 2nd Ave North towards Flagler Street/Both sides of SW | Several Homeless Encampments. |
|  | Wednesday 4/6/2022 | Downtown | West Flagler Street/ West towards Little Havana/on the | Several Homeless Encampments. |
| 4/1/2022 | Thursday 4/7/2022 | Overtown | NW 6 Ave 17 Street | Several Homeless Encampments. |
| 4/1/2022 | Thursday 4/7/2022 | Overtown | NW 1 Ct. NW 11 to 14 Street, | Several Homeless Encampments. |
| 4/1/2022 | Friday 4/8/2022 | Overtown | NW 7 to 9 Ave NW 14 to 18 | Several Homeless Encampments. |
|  |  |  | Second Half Tentative. |  |

DEF000080

| Date Posted | Date Address | NET | Location | Comments |
|---|---|---|---|---|
| 4/8/2022 | Monday 4/11/2022 | Wynwood | NW 2nd Ave to 1 Ct. from 20 to 21 Street. | 1 Homeless Encampment/Several Homeless Loitering. |
| 4/8/2022 | Monday 4/11/2022 | Edgewater | Biscayne BLVD. from 38 to 36 Street. | Several Homeless Loitering. |
| 4/8/2022 | Monday 4/11/2022 | Allappattah | NW 7 Ave to NW 9 Ct. from 14 to 18 Street. | Several Homeless Loitering. Homeless Encampments, |
| | | | | |
| 4/8/2022 | Tuesday 4/12/2022 | Overtown | NW 1 Ave to 1 Ct from NW 11 to 14 Street. | Several Homeless Encampments. |
| 4/8/2022 | Tuesday 4/12/2022 | Overtown | NW 3 Ave from NW 11 to 17 Street. | Several Homeless Loitering. |
| 4/8/2022 | Tuesday 4/12/2022 | Overtown | NW 5 Ave from 10 to 11 Street. | Several Homeless Encampments. |
| | | | | |
| 4/8/2022 | Wednesday 4/13/2022 | Downtown | SW 2nd Ave Flagler Street | Several Homeless Encampments. |
| 4/8/2022 | Wednesday 4/13/2022 | Downtown | Flagler Street bridge leads into Little Havana under the I95 Bridge | Several Homeless Encampments. On both sides of the road |
| 4/8/2022 | Thursday 4/14/2022 | Downtown | N. Miami Ave from NW 8 to SE 3rd Street. | Several Homeless Encampments. |
| 4/8/2022 | Thursday 4/14/2022 | Downtown | N. Miami Ave West towards S. River Drive./ Behind MRC | Several Homeless Encampments. |
| 4/8/2022 | Thursday 4/14/2022 | Overtown | NW 6 Ave NW 17 Streets | Several Homeless Encampments. |
| | | | | |
| 4/8/2022 | Friday 4/15/2022 | Brickell | SW 3 to 5 Ave from SW 6 to 8 Street | Several Homeless Encampments. |
| | | | Afternoon Session Tentative. | |

DEF000081

| Date Posted | Date Address | NET | Location | Comments |
|---|---|---|---|---|
| Friday | Monday 4/18/2022 | Wynwood | NW 2nd Ave to NW 1 Ct. from NW 19 to 21 Street. | Several Homeless Encampments. |
| Friday | Monday 4/18/2022 | Edgewater | Biscayne Blvd NW 38 to 36 Street Under I95 East/West side. | Several Homeless Loitering. |
| Friday | Monday 4/18/2022 | Little Haiti | NW 5th Ct 71-72 Street under the I95 | Several Homeless Encampments./Construction Debris |
| Friday | Tuesday 4/19/2022 | Overtown | NW 3 to 7 Ave NW 10 to 11 Street | Several Homeless Encampments. |
| Friday | Tuesday 4/19/2022 | Overtown | Nw 1 Ct to NW 1 Ave from 11 to 14 Street | Several Homeless Encampments. |
| Friday | Wednesday 4/20/2022 | Downtown | N. Miami Ave from NW 8 South to SE 3rd Street. | Several Homeless Encampments. |
| Friday | Wednesday 4/20/2022 | Downtown | N. Miami Ave SE 3rd Street West to S. River Drive. | Several Homeless Encampments. |
| Friday | Wednesday 4/20/2022 | Downtown | SW 2nd Ave North towards Flagler Street. | Several Homeless Encampments. |
| Friday | Thursday 4/21/2022 | Overtown/All app | NW 6 Ave NW 17 Street. | Several Homeless Encampments. |
| Friday | Thursday 4/21/2022 | Allappattah | NW 7 Ave from 14 to 18 Street. | Several Homeless Encampments. |
| Friday | Friday 4/22/2022 | Coralway | US DixieHighway From 16 to 37 Ave. | Several homeless Encampments. |

DEF000082

| Date posted | Date Address | NET | Location | Comments |
|---|---|---|---|---|
| Friday 5/6/2022 | Monday 5/9/2022 | Overtown | NW 1 Ave NW 16 Street. East of NW 1 Ave. | Several Homeless Encampments. |
| Friday 5/6/2022 | Monday 5/9/2022 | Overtown | NW 2nd to NW 1 Ct. from NW 20 to 21 Street | Several Homeless Encampments/Homeless Loitering. |
| Friday 5/6/2022 | Tuesday 5/10/2022 | Overtown | NW 1 Ct. to NW 2nd Ave from NW 11 to 14 Street. | Several Homeless Encampments. |
| Friday 5/6/2022 | Tuesday 5/10/2022 | Overtown | NW 5 Ave NW 10 & 11 Street. | Several Homeless Encampments. |
| Friday 5/6/2022 | Tuesday 5/10/2022 | Overtown | NW 3 Ave from NW 14 to 20 Street. | Several Homeless Loitering. |
| Friday 5/6/2022 | Wednesday 5/11/2022 | Coconut Grove | 2820 McFarlane Rd, (Peacock Park) | Several Homeless Loitering. |
| Friday 5/6/2022 | Wednesday 5/11/2022 | Brickell | SW 3 to 4 Ave SW 6 to 8 Street. | Several Homeless Encampments. |
| Friday 5/6/2022 | Thursday 5/12/2022 | Downtown | SW 3 Ave Flagler St. West of SW 3rd Ave towards little Havana | Several Homeless Encampments. |
| Friday 5/6/2022 | Thursday 5/12/2022 | Downtown | NW 2nd to NW 3rd Ave. NW 1 Street. South of Skate Park | Homeless Loitering. |
| Friday 5/6/2022 | Thursday 5/12/2022 | Downtown | Ferrer & Bayfront Park. | Homeless Loitering. |
| Friday 5/6/2022 | Friday 5/13/2022 | Downtown | West of SW 2nd Ave. North of SW 1 Street. under the overpass | Several Homeless Encampments. |

DEF000083

| Date Posted | Date Address | NET | Location | Comments |
|---|---|---|---|---|
| Sunday 6/5/2022 | Monday 6/6/2022 | Wynwood | 45 NW 21 Street. | Homeless Encampments. |
| Sunday 6/5/2022 | Monday 6/6/2022 | Wynwood | NW 1 Ave to NW 1 ct. from NW 20 to 21 Street. | Homeless Encampments./Homeless Loitering. |
| Sunday 6/5/2022 | Monday 6/6/2022 | Overtown | NW 1 Ave NW 14 Street. | Homeless Encampments/By the Train tracks |
| Sunday 6/5/2022 | Tuesday 6/7/2022 | Overtown | NW 1 Ct to NW 1 Ave. NW 11 to 12 Street. | Homeless Encampments. |
| Sunday 6/5/2022 | Tuesday 6/7/2022 | Overtown/Allapp | NW 6 Ave NW 17 Street | Homeless Encampments. |
| Sunday 6/5/2022 | Wednesday 6/8/2022 | Allappatah | NW 7 Ave towards NW 8 Ave from NW 15 to 18 Street | Homeless Encampments./Homeless Loitering. |
| Sunday 6/5/2022 | Wednesday 6/8/2022 | Downtown | N. Miami Ave from NW 8 Street towards SE 3rd Street | Homeless Encampments./Homeless Loitering. |
| Sunday 6/5/2022 | Thursaday 6/9/2022 | Flagami | Flagami Operation/ 0800x1200 | Homeless Encampments/Homeless Loitering. |
| Sunday 6/5/2022 | Thursaday 6/9/2022 | Brickell/Little Hav | SW 3 to 5 Ave from SW 6 to 8 Street. | Homeless Encampments/Homeless Loitering. |
| Sunday 6/5/2022 | Friday 6/10/2022 | Downtown | SW 1 Ave towards S. River Drive SW 2nd to Flagler Street. | Homeless Encampments. |
| Sunday 6/5/2022 | Friday 6/10/2022 | Downtown | SW 1 Ave towards S. River Drive/ Flagler Bridge towards Little Hav, | Homeless Encampments. |

DEF000084

| Date Posted | Date Address | NET | Location | Comments |
|---|---|---|---|---|
| Friday 6/10/2022 | Monday 6/13/2022 | Wynwood | NW 1 to 2 Ave. From NW 19 to 21 Street. | Homeless Encampments/Homeless Loitering. |
| Friday 6/10/2022 | Monday 6/13/2022 | Overtown | NW 1 Ct. NW 14 Street. | Homeless Loitering. |
| Friday 6/10/2022 | Monday 6/13/2022 | Overtown | NW 1 Ct. to NW 1 Ave. From NW 11 to 12 Street. | Homeless Encampments. |
| Friday 6/10/2022 | Tuesday 6/14/2022 | Overtown/Allap | NW 6 Ave. NW 17 Street. | Homeless Encampments. |
| Friday 6/10/2022 | Tuesday 6/14/2022 | Allappattah | NW 7 Ave Weat towards NW 8 Ave From NW 15 to 18 Street. | Homeless Encampments/Homeless Loitering. |
| Friday 6/10/2022 | Wednesday 6/15/2022 | Downtown | N. Miami Ave. from NW 8 to SE 3rd Street. | Homeless Encampments/Homeless Loitering. |
| Friday 6/10/2022 | Wednesday 6/15/2022 | Downtown | SE 2nd Street West towards S. River Drive. | Homeless Encampments/Homeless Loitering. |
| Friday 6/10/2022 | Wednesday 6/15/2022 | Downtown | Behind the MRC adjacent to the Warf | Homeless Loitering. |
| Friday 6/10/2022 | Thursday 6/16/2022 | Downtown | SW 2nd Street & SW 2 Ave North towards Flagler Street. | Homeless Encampments/Homeless Loitering. |
| Friday 6/10/2022 | Thursday 6/16/2022 | Downtown | SW 3 Ave SW 1 Street South & North Pedestrian Sidewalk towards the river. | Homeless Encampments/Homeless Loitering. |
| Friday 6/10/2022 | Thursday 6/16/2022 | Downtown | Flagler Street Bridge towards Little Havana. Both sides of Flagler Bridge. | Homeless Encampments/Homeless Loitering. |
| Friday 6/10/2022 | Friday 6/17/2022 | Little Havana | Under NW 12 Ave bridge (South Side) | Homeless Encampments. |

DEF000085

| Friday 6/10/2022 | Friday 6/17/2022 | Brickell/Little Hav | SW 3 Ave SW 7 to 8 Street | Homeless Encampments. |
|---|---|---|---|---|

DEF000086

| Date Posted | Date Address | NET | Location | Comments |
|---|---|---|---|---|
| Thursday 6/16/2022 | Tuesday 6/21/2022 | Wynwood | 440 NW 29 ST. | Homeless Encampment. |
| Thursday 6/16/2022 | Tuesday 6/21/2022 | Wynwood | NW 1 Ct. to NW 1 Ave NW 19 to NW 21 Street. | Homeless Encampment/Homeless Loitering. |
| Thursday 6/16/2022 | Tuesday 6/21/2022 | Overtown | NW 1 Ct. NW 14 Street. | Homeless Loitering. |
| Thursday 6/16/2022 | Tuesday 6/21/2022 | Overtown | NW 1 Ct NW 11 to 12 Street/1212 NW 1 Ave(Vacant Bldg) | Homeless Encampments/Homeless Loitering |
| Thursday 6/16/2022 | Wednesday 6/22/2022 | Downtown | N. Miami Ave from NW 8 to SE 3rd Street. | Homeless Encampments/Homeless Loitering. |
| Thursday 6/16/2022 | Wednesday 6/22/2022 | Downtown | SW 1 Ave SW 2nd Street West towards S. River Drive. | Homeless Encampments/Homeless Loitering. |
| Thursday 6/16/2022 | Wednesday 6/22/2022 | Downtown | SW 2nd Ave SW 2nd Street North towards Flagler Street. | Homeless Encampments/Homeless Loitering. |
| Thursday 6/16/2022 | Thursday 6/23/2022 | Overtown/Allap | NW 6 Ave NW 17 Street. | Homeless Encampments. |
| Thursday 6/16/2022 | Thursday 6/23/2022 | Allappattah | NW 7 Ave West towards NW 8 Ave from NW 15 to 18 Street. | Homeless Encampments/Homeless Loitering. |
| Friday 6/16/2022 | Friday 6/24/2022 | Downtown | West Flagler Bridge towards Little Havana | Homeless Encampments. |
| Friday 6/16/2022 | Friday 6/24/2022 | Brickell/Little Hav | SW 4 Ave from SW 6 to SW 8 Street. | Homeless Encampments. |

DEF000087

| Date | Commission District | Location | Arrival | Departure | Comments/ Results | Date Posted |
|------|------|------|------|------|------|------|
| Monday 07/18/22 | 1 | NW 6 Ave & NW 17 Street | | | | Thursday 07/14/2022 |
| Tuesday 07/19/22 | 1 | NW 7 Ave to NW 8 Ave & NW 17 Street | | | | Thursday 07/14/2022 |
| Wednesday 07/20/22 | 1 | NW 8 Ave & NW 14 Street to NW 17 Street | | | | Thursday 07/14/2022 |
| | | | | | | |
| Monday 07/18/22 | 2 | SW 2 Ave to SW 3 Ave & SW 2 Street to Flagler Street | | | | Thursday 07/14/2022 |
| Wednesday 7/20/2022 | 2 | SW 1 Ave to S. River to SW 2 Street | | | | Thursday 07/14/2022 |
| Thursday 07/21/22 | 2 | N Miami Ave & 8 Street to SE 3 Street | | | | Thursday 07/14/2022 |
| | | | | | | |
| Tuesday 07/19/22 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | | | | Thursday 07/14/2022 |
| Thursday 7/21/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | | | | Thursday 07/14/2022 |
| Friday 07/22/22 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | | | | Thursday 07/14/2022 |
| | | | | | | |
| Tuesday 07/19/22 | 4 | NW 37 Avenue NW 7 Street (Shopping plaza) | | | | Thursday 07/14/2022 |
| Thursday 07/21/22 | 4 | NW 37 Avenue NW 7 Street (Shopping plaza) | | | | Thursday 07/14/2022 |
| Friday 07/22/22 | 4 | NW 37 Avenue NW 7 Street (Shopping plaza) | | | | Thursday 07/14/2022 |
| | | | | | | |
| Monday 7/18/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | | | | Thursday 07/14/2022 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Wednesday 07/20/22 | **5** | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | | | | Thursday 07/14/2022 |
| Friday 07/22/22 | **5** | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | | | | Thursday 07/14/2022 |

DEF000089

| Date | Commission District | Location | Arrival | Departure | Comments/Results | Date Posted |
|---|---|---|---|---|---|---|
| Monday 07/25/22 | 1 | NW 6 Ave & NW 17 Street | | | | Friday 07/22/2022 |
| Tuesday 07/26/22 | 1 | NW 7 Ave to NW 8 Ave & NW 17 Street | | | | Friday 07/22/2022 |
| Wednesday 07/27/22 | 1 | NW 8 Ave & NW 14 Street to NW 17 Street | | | | Friday 07/22/2022 |
| | | | | | | |
| Monday 07/25/22 | 2 | SW 2 Ave to SW 3 Ave & SW 2 Street to Flagler Street | | | | Friday 07/22/2022 |
| Wednesday 7/27/2022 | 2 | SW 1 Ave to S. River to SW 2 Street | | | | Friday 07/22/2022 |
| Thursday 07/28/22 | 2 | N Miami Ave & 8 Street to SE 3 Street | | | | Friday 07/22/2022 |
| | | | | | | |
| Tuesday 07/26/22 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | | | | Friday 07/22/2022 |
| Thursday 7/28/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | | | | Friday 07/22/2022 |
| Friday 07/29/22 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | | | | Friday 07/22/2022 |
| | | | | | | |
| Tuesday 07/26/22 | 4 | SW 42 AV to SW 49 AV & SW 8 Street | | | | Friday 07/22/2022 |
| Thursday 07/28/22 | 4 | SW 42 AV to SW 49 AV & SW 8 Street | | | | Friday 07/22/2022 |
| Friday 07/29/22 | 4 | SW 42 AV to SW 49 AV & SW 8 Street | | | | Friday 07/22/2022 |
| | | | | | | |
| Monday 7/25/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | | | | Friday 07/22/2022 |
| Wednesday 07/27/22 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | | | | Friday 07/22/2022 |
| Friday 07/29/22 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | | | | Friday 07/22/2022 |

DEF000090

| Date | Commission District | Location | Arrival | Departure | Comments/Results | Date Posted |
|---|---|---|---|---|---|---|
| Monday 08/29/2022 | 1 | NW 6 to 8 Ave & NW 17 Street | | | Unsheltered Encampents | Friday 08/26/2022 |
| Tuesday 08/30/2022 | 1 | NW 6 to 8 Ave & NW 17 Street. | | | Unsheltered Encampents | Friday 08/26/2022 |
| Wednesday 08/31/2022 | 1 | NW 6 to 8 Ave & NW 17 Street. | | | Unsheltered Encampents | Friday 08/26/2022 |
| Tuesday 08/30/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encampents | Friday 08/26/2022 |
| Thursday 09/01/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encampents | Friday 08/26/2022 |
| Friday 09/02/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encampents | Friday 08/26/2022 |
| Monday 08/29/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | | | Unsheltered Loitering | Friday 08/26/2022 |
| Wednesday 08/31/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | | | Unsheltered Loitering | Friday 08/26/2022 |
| Thursday 09/01/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | | | Unsheltered Loitering | Friday 08/26/2022 |
| Tuesday 08/30/2022 | 4 | NW 27 Ave N. River Drive. (Under Bridge) | | | Unsheltered Loitering | Friday 08/26/2022 |
| Thursday 09//01/2022 | 4 | NW 27 Ave N. River Drive (Under Bridge) | | | Unsheltered Loitering | Friday 08/26/2022 |
| Friday 09/02/2022 | 4 | NW 27 Ave N. River Drive (Under Bridge) | | | Unsheltered Loitering | Friday 08/26/2022 |
| Monday 08/29/2022 | 5 | NW 1 Ct to 1 Ave NW 11 to 12 Street | | | Unsheltered Encampents | Friday 08/26/2022 |

DEF000091

| | | | | | |
|---|---|---|---|---|---|
| Wednesday 08/31/2022 | 5 | NW 1 Ct to 1 Ave NW 11 to 12 Street | | | Unsheltered Encamnents | Friday 08/26/2022 |
| Friday 09/02/2022 | 5 | NW 1 Ct to 1 Ave NW 11 to 12 Street | | | Unsheltered Encamnents | Friday 08/26/2022 |

| **Date** | **Location** | **Arrival** | **Departure** | **Comments** | **Posted** |
|---|---|---|---|---|---|
| Monday 08/29/2022 | NW 12 Ave Flagler Street (Walgreens). (D#3) | | | Unsheltered Loitering | Friday 08/26/2022 |
| Monday 08/29/2022 | NW 1 Ct. to NW 1 Ave NW 20 to 21 Street | | | Unshertered Lotering/Unsheltered Encanments | Friday 08/26/2022 |
| Monday 08/29/2022 | NW 7 Ct NW 15 to 17 Street. (D#1) | | | Unsheltered Loitering/ Debris Pick up. | Friday 08/26/2022 |
| Tuesday 08/30/2022 | NW 27 Ave N. River Dr. (Under Bridge) (D#4). | | | Unsheltered Loitering/Debris Pick up. | Friday 08/26/2022 |
| Tuesday 08/30/2022 | W. Flagler Street 12 Ave. (Walgreens) | | | Unsheltered Loitering/Debris Pick up. | Friday 08/26/2022 |
| Tuesday 08/30/2022 | NW 7 Ave NW 18 Street South of Street. (D#1) | | | Two Unsheltered Encampments. | Friday 08/26/2022 |
| Wednesday 08/31/2022 | NW 12 Ave Flagler Street (Walgreens) (D#3) | | | Unsheltered Loitering/Debris pick up. | Friday 08/26/2022 |
| Wednesday 08/31/2022 | N. Miami Ave. NW 6 to SE 3rd Street. (D#2) | | | Unsheltered Loitering/Debris pick up. | Friday 08/26/2022 |
| Wednesday 08/31/2022 | SW 1 Ave to S. River Drive SW 2nd to SW 3rd Street. (D#2) | | | Unsheltered Loitering/Debris pick up. | Friday 08/26/2022 |
| Thursday 09/01/2022 | Ferrer & Maurice Park | | | Unsheltered Loitering/Debris Pick up. | Friday 08/26/2022 |

| | | | | |
|---|---|---|---|---|
| Thursday 09/01/2022 | NW 27 Ave N. River Drive (Under Bridge) (D#4) | | Unsheltered Loitering/Debris Pick up. | Friday 08/26/2022 |
| Thursday 09/01/2022 | NW 1 Ave to NW 1 Ct NW 20 to 21 Street | | One Unsheltered Encampment/Debris Pick up. | Friday 08/26/2022 |
| | | | | |
| Friday 09/02/2022 | SW 2 Ave SW 2 to SW 1 Street. | | Unsheltered Loitering/Debris Pick up | Friday 08/26/2022 |
| Friday 09/02/2022 | NW 27 Ave N. River Dr. (Under Bridge) (D#4) | | Unsheltered Loitering/Debris Pick up | Friday 08/26/2022 |
| Friday 09/02/2022 | SW 1 Ave to S. River Drive SW 2nd Street. | | Unsheltered Loitering/Debris Pick up | Friday 08/26/2022 |

DEF000093

| Date | Commission District | Location | Arrival | Departure | Comments/Results | Date Posted |
|---|---|---|---|---|---|---|
| Tuesday 09/06/2022 | 1 | NW 6 to 8 Ave & NW 17 Street | | | Unsheltered Encampents | Friday 09/02/2022 |
| Wednesday 09/07/2022 | 1 | NW 6 to 8 Ave & NW 17 Street. | | | Unsheltered Encampents | Friday 09/02/2022 |
| Thursday 09/08/2022 | 1 | NW 6 to 8 Ave & NW 17 Street. | | | Unsheltered Encampents | Friday 09/02/2022 |
| Tuesday 09/06/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encampents | Friday 09/02/2022 |
| Thursday 09/08/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encampents | Friday 09/02/2022 |
| Friday 09/09/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encampents | Friday 09/02/2022 |
| Tuesday 09/06/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | | | Unsheltered Loitering | Friday 09/02/2022 |
| Wednesday 09/07/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | | | Unsheltered Loitering | Friday 09/02/2022 |
| Thursday 09/08/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | | | Unsheltered Loitering | Friday 09/02/2022 |
| Wednesday 09/07/2022 | 4 | NW 27 Ave N. River Drive. (Under Bridge) | | | Unsheltered Loitering | Friday 09/02/2022 |
| Thursday 09/08/2022 | 4 | NW 27 Ave N. River Drive (Under Bridge) | | | Unsheltered Loitering | Friday 09/02/2022 |
| Friday 09/09/2022 | 4 | NW 27 Ave N. River Drive (Under Bridge) | | | Unsheltered Loitering | Friday 09/02/2022 |
| Tuesday 09/06/2022 | 5 | NW 1 Ct to 1 Ave NW 11 to 12 Street | | | Unsheltered Encampents | Friday 09/02/2022 |

DEF000094

| | | | | | | |
|---|---|---|---|---|---|---|
| Wednesday 09/07/2022 | 5 | NW 1 Ct to 1 Ave NW 11 to 12 Street | | | Unsheltered Encamments | Friday 09/02/2022 |
| Friday 09/08/2022 | 5 | NW 1 Ct to 1 Ave NW 11 to 12 Street | | | Unsheltered Encamments | Friday 09/02/2022 |
| | | **Monday 09/05/2022 Labor Day (Holiday)** | | | | |
| | | | | | | |
| | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Tuesday 09/06/2022 | NW 27 Ave N. River Dr. (Under Bridge) (D#4). | | | Unsheltered Loitering/Debris Pick up. | Friday 09/02/2022 |
| Tuesday 09/06/2022 | W. Flagler Street 12 Ave. (Walgreens) (D#3) | | | Unsheltered Loitering/Debris Pick up. | Friday 09/02/2022 |
| Tuesday 09/06/2022 | NW 7 Ave NW 18 Street South of Street. (D#1) | | | Two Unsheltered Encampments. | Friday 09/02/2022 |
| Wednesday 09/07/2022 | NW 12 Ave Flagler Street (Walgreens) (D#3) | | | Unsheltered Loitering/Debris pick up. | Friday 09/02/2022 |
| Wednesday 09/07/2022 | N. Miami Ave. NW 6 to SE 3rd Street. (D#2) | | | Unsheltered Loitering/Debris pick up. | Friday 09/02/2022 |
| Wednesday 09/07/2022 | SW 1 Ave to S. River Drive SW 2nd to SW 3rd Street. (D#2) | | | Unsheltered Loitering/Debris pick up. | Friday 09/02/2022 |
| Thursday 09/08/2022 | NW 12 Ave Flagler Street (Walgreens) (D#3) | | | Unsheltered Loitering/Debris Pick up. | Friday 09/02/2022 |

DEF000095

| | | | | | |
|---|---|---|---|---|---|
| Thursday 09/08/2022 | NW 27 Ave N. River Drive (Under Bridge) (D#4) | | | Unsheltered Loitering/Debris Pick up. | Friday 09/02/2022 |
| Thursday 09/08/2022 | NW 1 Ave to NW 1 Ct NW 20 to 21 Street | | | One Unsheltered Encampment/Debris Pick up. | Friday 09/02/2022 |
| | | | | | |
| Friday 09/09/2022 | SW 2 Ave SW 2 to SW 1 Street. | | | Unsheltered Loitering/Debris Pick up | Friday 09/02/2022 |
| Friday 09/09/2022 | NW 27 Ave N. River Dr. (Under Bridge) (D#4) | | | Unsheltered Loitering/Debris Pick up | Friday 09/02/2022 |
| Friday 09/09/2022 | SW 1 Ave to S. River Drive SW 2nd Street. | | | Unsheltered Loitering/Debris Pick up | Friday 09/02/2022 |
| | | | | | |

| District | NET | Location | Comments |
|---|---|---|---|
| | | | |
| 1 | Allapattah | NW 6 Ave to NW 8 Ave & NW 15 Street to NW 18 Street | Unsheltered Encampments/Unsheltered Loitering |
| | | | |
| 2 | Downtown | SW 2 Ave to SW 3 Ave & SW 2 Street to Flagler Street | Unsheltered Encampments/Unsheltered Loitering |
| 3 | Little Havana | NW 12 Ave Flagler Street (Walgreens) | Unsheltered Loitering |
| | | | |

DEF000096

| 4 | Flagami | NW 27 Ave N. River Drive (Under Bridge). | Unsheltered Loitering |
|---|---|---|---|
| 5 | Overtown | NW 1 Ave to NW 1 Ct & NW 11 Street to NW 12 Street | Unsheltered Encampments |

DEF000097

| Date | Commission District | Location | Arrival | Departure | Comments/Results | Date Posted |
|---|---|---|---|---|---|---|
| Monday 09/12/2022 | 1 | NW 6 to 8 Ave & NW 17 Street | | | Unsheltered Encanments | Thursday 09/08/202 2 |
| Tuesday 09/13/2022 | 1 | NW 6 to 8 Ave & NW 17 Street. | | | Unsheltered Encanments | Thursday 09/08/202 2 |
| Wednesday 09/14/2022 | 1 | NW 6 to 8 Ave & NW 17 Street. | | | Unsheltered Encanments | Thursday 09/08/202 2 |
| Monday 09/12/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encanments | Thursday 09/08/202 2 |
| Thursday 09/15/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encanments | Thursday 09/08/202 2 |
| Friday 09/16/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encanments | Thursday 09/08/202 2 |
| Monday 09/12/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | | | Unsheltered Loitering | Thursday 09/08/202 2 |
| Wednesday 09/14/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | | | Unsheltered Loitering | Thursday 09/08/202 2 |
| Thursday 09/15/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | | | Unsheltered Loitering | Thursday 09/08/202 2 |
| Tuesday 09/13/2022 | 4 | NW 27 Ave N. River Drive. (Under Bridge) | | | Unsheltered Loitering | Thursday 09/08/202 2 |
| Thursday 09/15/2022 | 4 | NW 27 Ave N. River Drive (Under Bridge) | | | Unsheltered Loitering | Thursday 09/08/202 2 |
| Friday 09/16/2022 | 4 | NW 27 Ave N. River Drive (Under Bridge) | | | Unsheltered Loitering | Thursday 09/08/202 2 |
| Tuesday 09/13/2022 | 5 | NW 1 Ct to 1 Ave NW 11 to 12 Street | | | Unsheltered Encanments | Thursday 09/08/202 2 |

DEF000098

| Wednesday 09/14/2022 | 5 | NW 1 Ct to 1 Ave NW 11 to 12 Street | | Unsheltered Encampans | Thursday 09/08/2022 |
| Friday 09/16/2022 | 5 | NW 1 Ct to 1 Ave NW 11 to 12 Street | | Unsheltered Encampans | Thursday 09/08/2022 |

| **Date** | **Location** | **Arrival** | **Departure** | **Comments** | **Posted** |
|---|---|---|---|---|---|
| Monday 09/12/2022 | NW 12 Ave Flagler Street (Walgreens) (D#3) | | | Unsheltered Loitering. | Thursday 09/08/2022 |
| Monday 09/12/2022 | NW 1st to 2nd Ave NW 20 to 21 Street. | | | Unsheltered Loitering/Unsheltered Encampments. | Thursday 09/08/2022 |
| Monday 09/12/2022 | N. Miami Ave NW 6 to SE 3rd Street. (D#2) | | | Unsheltered Loitering/Unsheltered Encampments. | Thursday 09/08/2022 |
| Tuesday 09/13/2022 | NW 27 Ave N. River Dr. (Under Bridge) (D#4). | | | Unsheltered Loitering/Debris Pick up. | Thursday 09/08/2022 |
| Tuesday 09/13/2022 | W. Flagler Street 12 Ave. (Walgreens) (D#3) | | | Unsheltered Loitering/Debris Pick up. | Thursday 09/08/2022 |
| Tuesday 09/13/2022 | NW 7 Ave NW 18 Street South of Street. (D#1) | | | Two Unsheltered Encampments. | Thursday 09/08/2022 |
| Wednesday 09/14/2022 | NW 12 Ave Flagler Street (Walgreens) (D#3) | | | Unsheltered Loitering/Debris pick up. | Thursday 09/08/2022 |
| Wednesday 09/14/2022 | Ferrer/Maurice Park Biscayne Blvd 8 to 11 Street. (D#2) | | | Unsheltered Loitering/Debris pick up. | Thursday 09/08/2022 |
| Wednesday 09/14/2022 | SW 1 Ave to S. River Drive SW 2nd to SW 3rd Street. (D#2) | | | Unsheltered Loitering/Debris pick up. | Thursday 09/08/2022 |
| Thursday 09/15/2022 | NW 12 Ave Flagler Street (Walgreens) (D#3) | | | Unsheltered Loitering/Debris Pick up. | Thursday 09/08/2022 |

| | | | | |
|---|---|---|---|---|
| Thursday 09/15/2022 | NW 27 Ave N. River Drive (Under Bridge) (D#4) | | Unsheltered Loitering/Debris Pick up. | Thursday 09/08/2022 |
| Thursday 09/15/2022 | 351 SW 4th Ave (Jose Marti Park) (D#3) | | Unsheltered Loitering/Debris pick up. | Thursday 09/08/2022 |
| | | | | |
| Friday 09/16/2022 | SW 2 Ave SW 2 to SW 1 Street. (D#3) | | Unsheltered Loitering/Debris Pick up | Thursday 09/08/2022 |
| Friday 09/16/2022 | NW 27 Ave N. River Dr. (Under Bridge) (D#4) | | Unsheltered Loitering/Debris Pick up | Thursday 09/08/2022 |
| Friday 09/16/2022 | Tentative. | | | |
| | | | | |

| Date | Commission District | Location | Arrival | Departure | Comments/Results | |
|------|---------------------|----------|---------|-----------|------------------|---|
| Monday 10/10/2022 | 1 | NW 6 to 8 Ave & NW 17 Street | | | Unsheltered Encanments/Unsheltered loitering | Thursday 10/06/2022 |
| Tuesday 10/11/2022 | 1 | NW 6 to 8 Ave & NW 17 Street. | | | Unsheltered Encanments/Unsheltered loitering | Thursday 10/06/2022 |
| Wednesday 10/12/2022 | 1 | NW 6 to 8 Ave & NW 17 Street. | | | Unsheltered Encanments/Unsheltered loitering | Thursday 10/06/2022 |
| Monday 10/10/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encanments | Thursday 10/06/2022 |
| Thursday 10/13/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encanments | Thursday 10/06/2022 |
| Friday 10/14/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street. (Bridge) | | | Unsheltered Encanments | Thursday 10/06/2022 |
| Monday 10/10/2022 | 3 | 1177 SW 8 Street. (CVS rear lot & surrounding area) | | | Unsheltered Loitering | Thursday 10/06/2022 |
| Wednesday 10/12/2022 | 3 | 1177 SW 8 Street. (CVS rear lot & surrounding area) | | | Unsheltered Loitering | Thursday 10/06/2022 |
| Thursday 10/13/2022 | 3 | 1177 SW 8 Street. (CVS rear lot & surrounding area) | | | Unsheltered Loitering | Thursday 10/06/2022 |

DEF000101

| Tuesday 10/11/2022 | 4 | NW 27 Ave N. River Dr. (Under NW 27 Ave Bridge) | | | Unsheltered Loitering | Thursday 10/06/2022 |
|---|---|---|---|---|---|---|
| Thursday 10/13/2022 | 4 | NW 27 Ave N. River Dr. (Under NW 27 Ave Bridge) | | | Unsheltered Loitering | Thursday 10/06/2022 |
| Friday 10/14/2022 | 4 | NW 27 Ave N. River Dr. (Under NW 27 Ave Bridge) | | | Unsheltered Loitering | Thursday 10/06/2022 |
| | | | | | | |
| Tuesday 10/10/2022 | 5 | NW 1 Ct to NW 1 Ave From NW 19 to 20 Street. | | | Unsheltered Encanments/Unsheltered Loitering | Thursday 10/06/2022 |
| Wednesday 10/12/2022 | 5 | NW 1 ct. to NW 1 Ave From NW 19 to 20 Street. | | | Unsheltered Encanments/Unsheltered loitering | Thursday 10/06/2022 |
| Friday 10/14/2022 | 5 | NW 1 ct. to NW 1 Ave From NW 19 to 20 Street. | | | Unsheltered Encanments/Unsheltered loitering | Thursday 10/06/2022 |

| Date | Location | Arrival | Departure | Comments | Posted |
|---|---|---|---|---|---|
| Monday 10/10/2022 | NW 27 Ave. N. River Dr. (Under Bridge) Alongside the River | | | Unsheltered Loitering/Tresspassing. | Thursday 10/06/2022 |
| Monday 10/10/2022 | 1177 SW 8 Street (Rear of CVS) Surrounding areas (D#3) | | | Unsheltered Loitering | Thursday 10/06/2022 |
| Monday 10/10/2022 | S. Miami Ave NW 6 to 5 Ave. (D#2) | | | Unsheltered Loitering/Unsheltered Encampments. | Thursday 10/06/2022 |
| Tuesday 10/11/2022 | Alley adjacent to 1479 NW 69 St. (D#5) | | | Homeless Encanmpment/Debris Pick up. | Thursday 10/06/2022 |

DEF000102

| | | | | | |
|---|---|---|---|---|---|
| Tuesday 10/11/2022 | NW 7 Ave NW 18 Street South of Street. (D#1) | | | Unsheltered Encanmpments/Debris Pick up. | Thursday 10/06/2022 |
| Tuesday 10/11/2022 | 1177 SW 8 Street (Rear of CVS) Surrounding areas (D#3) | | | Unsheltered Loitering/Debris Pick up. | Thursday 10/06/2022 |
| | | | | | |
| Wednesday 10/12/2022 | Little Havana Detail CP on NW 23 Ave NW 11 Street. (D#3) | | | Unsheltered Loitering/Debris pick up. | Thursday 10/06/2022 |
| Wednesday 10/12/2022 | W. Flagler Street SW 2nd Ave by the old Credit Union (D#2) | | | Unsheltered Loitering/Debris pick up. | Thursday 10/06/2022 |
| Wednesday 10/12/2022 | NW 27 Ave N. River Drive (Under Bridge) (D#4) Alongside the River. | | | Unsheltered Loitering/Debris pick up. | Thursday 10/06/2022 |
| Thursday 10/13/2022 | S. Miami Ave SE 3rd Street (Under the Bridge) | | | Unsheltered Loitering/Debris Pick up. | Thursday 10/06/2022 |
| Thursday 10/13/2022 | NW 27 Ave N. River Drive (Under Bridge) (D#4) | | | Unsheltered Loitering/Debris Pick up. | Thursday 10/06/2022 |
| Thursday 10/13/2022 | 351 SW 4th Ave (Jose Marti Park) (D#3) | | | Unsheltered Loitering/Debris pick up. | Thursday 10/06/2022 |
| | | | | | |
| Friday 10/14/2022 | SW 2 Ave SW 2 Street towards the River. | | | Unsheltered Loitering/Debris Pick up | Thursday 10/06/2022 |
| Friday 10/14/2022 | NW 14 Street NW 1 Ct NW 1 Ave | | | Unsheltered Loitering/Debris Pick up | Thursday 10/06/2022 |
| Friday 10/14/2022 | NW 12 Ave NW 16 to 17 Street. In front of the VA. | | | Unsheltered Encanmpments/Debris Pick up | Thursday 10/06/2022 |
| | | | | | |

| District | NET | Location | Comments |
|---|---|---|---|
| 1 | Allapattah | NW 6 Ave to NW 8 Ave & NW 15 Street to NW 18 Street | Unsheltered Encampments/Unsheltered Loitering |
| 2 | Downtown | SW 2 Ave to SW 3 Ave & SW 2 Street to Flagler Street | Unsheltered Encampments/Unsheltered Loitering |
| 3 | Little Havana | 1177 SW 8 Street (Rear of CVS & surrounding area) | Unsheltered Loitering |
| 4 | Flagami | NW 27 Ave N. River Drive (Under Bridge). Along side N. River | One Encanmment/Unsheltered Loitering |
| 5 | Overtown | NW 1 Ct to NW 1 Ave NW 19 to 21 Street. | Unsheltered Encampements |

DEF000104

| District | NET | Location | Comments |
|---|---|---|---|
| | | | |
| 1 | Allapattah | NW 6 Ave to NW 8 Ave & NW 14 Street to NW 18 Street | Unsheltered Encampments/Unsheltered Loitering |
| | | | |
| 2 | Downtown | N. Miami Ave & 8 Street to SE 3rd St. | Unsheltered Encampments/Unsheltered Loitering |
| 2 | Downtown | NW 1 Ave to S.River Dr. & SW 2 Street | Unsheltered Encampments/Unsheltered Loitering |
| 2 | Downtown | SW 2 Ave to SW 3 Ave & SW 2 Street to Flagler Street | Unsheltered Encampments/Unsheltered Loitering |
| | | | |
| 3 | Little Havana | SW 3 Ave to SW 5 Ave from SW 6 Street to SW 8 Street | Unsheltered Loitering |
| | | | |
| 4 | Flagami | NW 37 Ave & NW 7 Street (Plaza) | Unsheltered Loitering |
| | | | |
| 5 | Overtown | NW 1 Ave to NW 1 Ct & NW 11 Street to NW 12 Street | Unsheltered Encampements |

DEF000105

DEF000106

# CITY OF MIAMI, FLORIDA

## INTER-OFFICE MEMORANDUM

TO:   Natasha Colebrook-Williams,     DATE:   Monday, March 23rd, 2022     FILE:
      Assistant City Manager, Operations

FROM:   William Porro,                REFERENCES:   HEAT Team and DHS Collaborative Status
        Director, Dept. of                          Report 3/13/2022 to 3/19/2022
        Human Services

                                      ENCLOSURES:   HEAT Team Clean Up Statistics & Locations

This is in response to the Commission Directive ID 21-97 given on Thursday, December 9th, 2021.

Below are the weekly statistics for the week ending March 19th, 2022. This report and all subsequent weekly reports will now include the entire week from Sunday to Saturday instead of just Monday to Friday. Also included are the weekly, month to date, year to date, and inception to date collaborative reports, which encompasses the City's HEAT Team (Miami PD), the Homeless Outreach (Department of Human Services) and Solid Waste as it pertains to the ongoing homeless cleanup efforts. The "hot spot" locations are included.

**Homeless Empowerment Assistance Team (HEAT)**

| Weekly Report | # of Details | Shelter Placements | Homeless Contacts | # of Arrest |
|---|---|---|---|---|
| March 13 to March 19, 2022* | 5 | 20 | 26 | 0 |
| March 6 to March 12, 2022* | 5 | 16 | 26 | 1 |
| Feb 27 to March 5, 2022* | 4 | 10 | 14 | 0 |
| Feb 21 to Feb 27, 2022 | 4 | 17 | 27 | 1 |
| Feb 13 to Feb 20, 2022 | 5 | 12 | 30 | 2 |
| Feb 6 to Feb 12, 2022 | 5 | 29 | 35 | 0 |
| Jan 30 to Feb 5, 2022 | 5 | 22 | 38 | 1 |
| Jan 23 to Jan 29, 2022 | 5 | 33 | 54 | 1 |
| Jan 16 to Jan 22, 2022 | 4 | 18 | 33 | 1 |
| Jan 9 to Jan 15, 2022 | 5 | 9 | 28 | 1 |
| Jan. 1 to Jan. 7 2022 | 5 | 10 | 20 | 0 |
| Totals | 52 | 196 | 331 | 8 |

*Weekly reports will now include Saturday to Sunday

Locations were selected based on referrals from key City offices, and by our Homeless Outreach Team.

Should you need additional information, please feel free to contact me at (305) 416-2181.

CC.   Arthur Noriega V, City Manager
      Manuel Morales, Interim Police Chief
      Wade Sanders, Solid Waste Director
      Sergio Torres, Homeless Outreach Administrator



PLAINTIFF'S EXHIBIT 17

MIAFLA006171

CITY OF MIAMI, FLORIDA

## INTER-OFFICE MEMORANDUM

| | | | |
|---|---|---|---|
| TO: | Cherise G. Gause<br>Assistant Chief of Police<br>Field Operations Division<br>(Through Channels) | DATE: | 03/21/2022   FILE: |
| FROM: | *FTC LT Conrad Chin-Quee # 1049*<br>Lieutenant Conrad Chin-Quee # 1049<br>FTO/CIT/HEAT Program Commander<br>Field Operations Division | REFERENCES<br><br>ENCLOSURES: | Homeless Empowerment Assistance Team<br>Weekly Review 03-13-22 Thru 03-19-2022 |

### Overview:

The Homeless Empowerment Assistance Team (HEAT) was designed as a task force in order to work together to mitigate homelessness through outreach services that enable the homeless community to overcome their barriers and empower them to take advantage of varying services. Together with the collaborative effort of the City of Miami Solid Waste Team and Homeless Outreach Team, police personnel respond to "hot spot" locations to provide assistance to the homeless population within those areas.

### Weekly:

During the assessment period for the week of **March 13, 2022 through March 19, 2022** the HEAT task force outreach resulted in the following:

- 5 Details
- 26 Homeless Contacts (FIVOs)
- 20 Shelter Placements

- 0 Mental Health Referral
- 1 Substance Abuse Referral
- 0 Arrest

**Month-To-Date**, from **March 1, 2022 through March 19, 2022** the HEAT task force outreach resulted in the following:

- 14 Details
- 60 Homeless Contacts (FIVOs)
- 40 Shelter Placements

- 3 Mental Health Referrals
- 1 Substance Abuse Referrals
- 1 Arrests

**Year-To-Date,** for the assessment period from **January 1, 2022 through March 19, 2022** the HEAT task force outreach resulted in the following:

- 52 Details
- 346 Homeless Contacts (FIVOs)
- 204 Shelter Placements

- 3 Mental Health Referrals
- 4 Substance Abuse Referral
- 12 Arrests

MIAFLA006172

**Inception-To-Date** for the assessment period of **August 2, 2021 through March 19, 2022** the HEAT task force outreach resulted in the following:

- 159 Details
- 1,221 Homeless Contacts (FIVOs)
- 612 Shelter Placements

- 11 Mental Health Referrals
- 20 Substance Abuse Referrals
- 51 Arrests (warrants & narcotics)

**For 2021 Only:**
During the assessment period of **August 2, 2021 through December 31, 2021** the HEAT task force outreach resulted in the following:

- 107 Details
- 875 Homeless Contacts (FIVOs)
- 408 Shelter Placements

- 8 Mental Health Referrals
- 16 Substance Abuse Referrals
- 33 Arrests (warrants & narcotics)

**Location Hot Spots:**

| Overtown | Downtown | Wynwood | Allapattah | Brickell | Coconut Grove |
|---|---|---|---|---|---|
| NW 5 Ave / NW 10 St. | SW 1 Ct / SW 2 St. | NW 1 Ave / NW 20 St. | NW 7 Ave / NW 14 St. | SW 4 Ave / SW 6 St. | 2820 McFarlane Rd. |
| NW 5 Ave / NW 11 St. | SW 2 Ave / SW 2 St. | NW Miami Ct / NW 21 St. | NW 7 Ave / NW 17 St. | SW 4 Ave / SW 7 St. | |
| NW 5 Ave / NW 17 St. | SW N. River Drive / SW 2 St. | NW 1 Ave / NW 21 St. | NW 13 Ave / NW N. River Drive. | SW 4 Ave / SW 8 St. | |
| NW 1 Pl / NW 14 St. | SW 1 Ave / SW 2 St. | NW 1 Ave / NW 22 St. | NW 12 Ave / NW 12 St. | | |
| NW 1 Ct / NW 14 St. | N. Miami Ave/NE 1 St. | | | | |
| NW 1 Ave / NW 14 St. | NW 3 Ave / W Flagler St. | | | | |
| NW 1 Ave / NW 12 St. | | | | | |

MIAFLA006173

CITY OF MIAMI, FLORIDA

## INTER-OFFICE MEMORANDUM

**TO :** Cherise G. Gause
Assistant Chief of Police
Field Operations Division
(Through Channels)

*Commander C. Chin-Quee # 1049*

**FROM:** Commander Conrad Chin-Quee # 1049
Edgewater NET, HEAT, FTO, & CIT
Field Operations Division

**DATE :** 08/15/2022     **FILE :**

**REFERENCES:** Homeless Empowerment Assistance Team
Weekly Review 08-07-22 Thru 08-13-2022

**ENCLOSURES :**

**Overview:**

The Homeless Empowerment Assistance Team (HEAT) was designed as a task force in order to work together to mitigate homelessness through outreach services that enable the homeless community to overcome their barriers and empower them to take advantage of varying services. Together with the collaborative effort of the City of Miami Solid Waste Team and Homeless Outreach Team, police personnel respond to "hot spot" locations to provide assistance to the homeless population within those areas.

The attached listed document are the daily results of the actions taken at each scheduled hot spot for outreach/sanitation: (see attached document)

**<u>Weekly:</u>**

During the assessment period for the week of **<u>August 7, 2022, through August 13, 2022,</u>** the HEAT task force outreach resulted in the following:

- 5 Details (30 locations)
- 53 Homeless Contacts (FIVOs)
- 42 Shelter Placements

- 1 Mental Health Referral
- 2 Substance Abuse Referral
- 1 Arrests

**<u>Month-To-Date</u>**, from **<u>August 1, 2022, through August 13, 2022,</u>** the HEAT task force outreach resulted in the following:

- 10 Details (30 locations visited 64 times)
- 111 Homeless Contacts (FIVOs)
- 80 Shelter Placements

- 1 Mental Health Referrals
- 2 Substance Abuse Referrals
- 2 Arrests



PLAINTIFF'S
EXHIBIT

**18**

Homeless Empowerment Assistance Team                                                                2

**Year-To-Date,** for the assessment period from **January 1, 2022, through August 13, 2022,** the HEAT task force outreach resulted in the following:

- 151 Details (198 locations visited 576 times)
- 1,377 Homeless Contacts (FIVOs)
- 1,012 Shelter Placements
- 6 Mental Health Referrals
- 23 Substance Abuse Referral
- 27 Arrests

**Inception-To-Date** for the assessment period of **August 2, 2021, through August 13, 2022,** the HEAT task force outreach resulted in the following:

- 258 Details (449 locations visited)
- 2,252 Homeless Contacts (FIVOs)
- 1,420 Shelter Placements
- 14 Mental Health Referrals
- 33 Substance Abuse Referrals
- 62 Arrests (warrants & narcotics)

**For 2021 Only:**

During the assessment period of **August 2, 2021, through December 31, 2021,** the HEAT task force outreach resulted in the following:

- 107 Details (251 locations)
- 875 Homeless Contacts (FIVOs)
- 408 Shelter Placements
- 8 Mental Health Referrals
- 16 Substance Abuse Referrals
- 33 Arrests (warrants & narcotics)

I do swear and affirm that the information is true and accurate to the best of my knowledge.

_____
Manuel A. Morales
Chief of Police

# City of Miami Police Department
# HEAT Weekly Summary

## August 7, 2022 – August 13, 2022



**Miami Police Department**
**Homeless Empowerment Assistance Team**

MIAFLA001222

## COMMISION DISTRICT 1

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/8/2022 | 1 | NW 6 Ave & NW 17 Street | 09:48 | 11:00 | 10 | 9 | 1 | YES | YES | 9 | 8/5/2022 |
| 8/9/2022 | 1 | NW 7 Ave to NW 8 Ave & NW 17 Street | 08:27 | 10:17 | 13 | 9 | 4 | YES | YES | 9 | 8/5/2022 |
| 8/10/2022 | 1 | NW 8 Ave & NW 17 Street to NW 18 Street | 13:19 | 14:22 | 3 | 0 | 3 | YES | YES | 5 | 8/5/2022 |

| Notes | |
|-------|--|
| | |

8/8/2022 **Before**          **After**                    8/9/2022 **Before**          **After**

   

x

8/10/2022 **Before**          **After**

 

MIAFLA001223

## COMMISION DISTRICT 2

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/8/2022 | 2 | N Miami Ave & 8 Street to SE 3 Street | 08:25 | 08:45 | 0 | 0 | 0 | YES | YES | 9 | 8/5/2022 |
| 8/9/2022 | 2 | SW 1 Ave to S. River to SW 2 Street | 13:11 | 13:55 | 0 | 0 | 0 | YES | YES | 0 | 8/5/2022 |
| 8/11/2022 | 2 | SW 2 Ave- SW 3 Ave & SW 1 St – Flagler Street | 08:38 | 10:46 | 6 | 6 | 0 | YES | YES | 10 | 8/5/2022 |

| Notes | This was a large area encompassing the Commission District.  It covered N Miami Ave- S River Drive and Flagler Street to SE 3 Street.  The distinction was outreach at NMA and 8 Street which also had to be addressed. |
|-------|------|

8/8/2022 **Before**          **After**          8/9/2022 **Before**          **After**

   

8/11/2022 **Before**          **After**

 

MIAFLA001224

## COMMISION DISTRICT 3

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/9/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | 10:16 | 10:59 | 0 | 0 | 0 | YES | YES | 0 | 8/5/2022 |
| 8/10/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | 09:22 | 09:24 | 0 | 0 | 0 | YES | YES | 9 | 8/5/2022 |
| 8/11/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | 09:16 | 09:27 | 0 | 0 | 0 | YES | YES | 10 | 8/5/2022 |

| Notes | |
|-------|--|

8/9/2022 **Before**　　　　　　　　**After**　　　　　　　8/10/2022 **Before**　　　　　　　**After**

   

8/11/2022 **Before**　　　　　　　　**After**

 

MIAFLA001225

## COMMISION DISTRICT 4

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/9/2022 | 4 | SW 43 to 47 Ave SW 8 Street/North side. | 09:03 | 09:28 | 0 | 0 | 0 | YES | YES | 9 | 8/5/2022 |
| 8/10/2022 | 4 | SW 43 to 47 Ave SW 8 Street/North side. | 08:53 | 09:04 | 0 | 0 | 0 | YES | YES | 9 | 8/5/2022 |
| 8/11/2022 | 4 | SW 43 to 47 Ave SW 8 Street/North side. | 08:37 | 08:46 | 0 | 0 | 0 | YES | YES | 10 | 8/5/2022 |

| Notes | |
|-------|--|
|       | |

8/9/2022 **Before**                    **After**                    8/10/2022 **Before**                    **After**

   

8/11/2022 **Before**                    **After**

 

MIAFLA001226

## COMMISSION DISTRICT 5

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/8/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 08:22 | 09:32 | 3 | 1 | 2 | YES | YES | 10 | 8/5/2022 |
| 8/10/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 08:55 | 10:47 | 7 | 4 | 3 | YES | YES | 9 | 8/5/2022 |
| 8/11/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 08:49 | 10:54 | 8 | 8 | 0 | YES | YES | 8 | 8/5/2022 |

| Notes | |
|-------|--|
| | |

8/8/2022 **Before**          **After**                    8/10/2022 **Before**          **After**

   

8/11/2022 **Before**          **After**

 

MIAFLA001227

Weekly Rapid Response Locations

1. Biscayne Blvd & NW 9th Street
2. SW 2nd Ave & SW 2nd Street
3. SW 1st CT & SW 2nd Street
4. NW 7th Ave & NW 15th Street
5. SW 27th Ave & SW 18th Street
6. SW 4th Ave & SW 6th Street
7. SW 4th Ave & SW 5th Street
8. SW 45th Ave & SW 8th Street
9. SW 44TH Ave & SW 8th Street
10. SW 43rd Ave & SW 8th Street
11. NW 8th Ave & W Flagler Street
12. NW 2nd Ave & NW 12th Street
13. NW 1st Ave & NW 20th Street
14. NW 17th Ave & NW 14th Ter
15. NW 17th Ave & NW N River Drive

MIAFLA001228

CITY OF MIAMI, FLORIDA

## INTER-OFFICE MEMORANDUM

| | | |
|---|---|---|
| TO : | Cherise G. Gause<br>Assistant Chief of Police<br>Field Operations Division<br>(Through Channels) | DATE : 08/19/2022   FILE : |
| FROM: | *Commander C. Chin-Quee # 1049*<br>Commander Conrad Chin-Quee # 1049<br>Edgewater NET, HEAT, FTO, & CIT<br>Field Operations Division | REFERENCES: Homeless Empowerment Assistance Team<br>Weekly Review 08-14-22 Thru 08-20-2022<br><br>ENCLOSURES : |

**Overview:**

The Homeless Empowerment Assistance Team (HEAT) was designed as a task force in order to work together to mitigate homelessness through outreach services that enable the homeless community to overcome their barriers and empower them to take advantage of varying services. Together with the collaborative effort of the City of Miami Solid Waste Team and Homeless Outreach Team, police personnel respond to "hot spot" locations to provide assistance to the homeless population within those areas.

On the attached listed document are the daily results of the actions taken at each scheduled hot spot for outreach/sanitation: (see attached document)

**Weekly:**

During the assessment period for the week of **August 14, 2022, through August 20, 2022,** the HEAT task force outreach resulted in the following:

- 5 Details (24 locations)
- 48 Homeless Contacts (FIVOs)
- 42 Shelter Placements
- 0 Mental Health Referral
- 2 Substance Abuse Referral
- 3 Arrests

**Month-To-Date**, from **August 1, 2022, through August 20, 2022,** the HEAT task force outreach resulted in the following:

- 15 Details (30 locations visited 93 times)
- 159 Homeless Contacts (FIVOs)
- 122 Shelter Placements
- 1 Mental Health Referrals
- 4 Substance Abuse Referrals
- 5 Arrests

Homeless Empowerment Assistance Team                                                2

**Year-To-Date,** for the assessment period from **January 1, 2022, through August 20, 2022,** the HEAT task force outreach resulted in the following:

- 156 Details (200 locations visited 605 times)
- 1,411 Homeless Contacts (FIVOs)
- 1,042 Shelter Placements
- 7 Mental Health Referrals
- 25 Substance Abuse Referral
- 30 Arrests

**Inception-To-Date** for the assessment period of **August 2, 2021, through August 20, 2022,** the HEAT task force outreach resulted in the following:

- 263 Details (451 locations visited)
- 2,286 Homeless Contacts (FIVOs)
- 1,450 Shelter Placements
- 15 Mental Health Referrals
- 35 Substance Abuse Referrals
- 65 Arrests (warrants & narcotics)

**For 2021 Only:**

During the assessment period of **August 2, 2021, through December 31, 2021,** the HEAT task force outreach resulted in the following:

- 107 Details (251 locations)
- 875 Homeless Contacts (FIVOs)
- 408 Shelter Placements
- 8 Mental Health Referrals
- 16 Substance Abuse Referrals
- 33 Arrests (warrants & narcotics)

_____

I do swear and affirm that the information is true and accurate to the best of my knowledge.

_____

Manuel A. Morales
Chief of Police

MIAFLA001230

# City of Miami Police Department
# HEAT Weekly Summary

## August 14, 2022 – August 20, 2022



**Miami Police Department**
**Homeless Empowerment Assistance Team**

MIAFLA001231

## COMMISION DISTRICT 1

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/15/2022 | 1 | NW 6 Ave & NW 17 Street | 08:40 | 11:50 | 11 | 9 | 0 | YES | YES | 10 | 8/12/2022 |
| 8/16/2022 | 1 | NW 7 Ave to NW 8 Ave & NW 17 Street | 08:44 | 11:00 | 12 | 10 | 0 | YES | YES | 10 | 8/12/2022 |
| 8/17/2022 | 1 | NW 5 Ave &NW 17 Street | 08: 50 | 11:00 | 12 | 10 | 0 | YES | YES | 10 | 8/12/2022 |

| Notes | |
|-------|--|

8/15/2022 **Before**          **After**                    8/16/2022 **Before**          **After**

   

8/17/2022 **Before**          **After**

 

MIAFLA001232

## COMMISION DISTRICT 2

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/16/2022 | 2 | SW 1 CT & SW 2 Street | 10:06 | 10:39 | 0 | 0 | 0 | YES | YES | 0 | 8/12/2022 |
| 8/17/2022 | 2 | SW 1 CT & SW 2 Street | 10:17 | 10:40 | 0 | 0 | 0 | YES | NO | 0 | 8/12/2022 |
| 8/18/2022 | 2 | SW 1 CT & SW 2 Street | 09:00 | 10:20 | 7 | 7 | 0 | YES | YES | 10 | 8/12/2022 |

| Notes | |
|-------|--|
| | |

8/16/2022 **Before**        **After**        8/17/2022 **Before**        **After**

   

8/18/2022 **Before**        **After**

 

MIAFLA001233

**COMMISION DISTRICT 3**

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/15/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | 09:26 | 09:35 | 0 | 0 | 0 | YES | YES | 1 | 8/12/2022 |
| 8/16/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | 09:36 | 09:40 | 0 | 0 | 0 | YES | NO | 0 | 8/12/2022 |
| 8/17/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | 09:51 | 09:53 | 0 | 0 | 0 | YES | NO | 0 | 8/12/2022 |

| Notes | |
|-------|--|
| | |

8/15/2022 **Before**          **After**                    8/16/2022 **Before**          **After**

   

8/17/2022 **Before**          **After**

 

MIAFLA001234

## COMMISION DISTRICT 4

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|--------------------|----------|---------|-----------|-------|-----------|----------|------------|-----------|-------|-------------|
| 8/15/2022 | 4 | SW 43 to 47 Ave SW 8 Street/North side. | 08:59 | 09:07 | 0 | 0 | 0 | YES | YES | 1 | 8/12/2022 |
| 8/16/2022 | 4 | SW 43 to 47 Ave SW 8 Street/North side. | 09:05 | 09:13 | 0 | 0 | 0 | YES | NO | 0 | 8/12/2022 |
| 8/17/2022 | 4 | SW 43 to 47 Ave SW 8 Street/North side. | 09:15 | 09:30 | 0 | 0 | 0 | YES | NO | 0 | 8/12/2022 |

| Notes | |
|-------|--|

8/15/2022 **Before**          **After**          8/16/2022 **Before**          **After**

   

8/17/2022 **Before**          **After**



MIAFLA001235

## COMMISSION DISTRICT 5

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|--------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/15/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 13:21 | 14:29 | 0 | 0 | 0 | YES | YES | 1 | 8/12/2022 |
| 8/16/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 13:50 | 14:20 | 0 | 0 | 0 | YES | NO | 0 | 8/12/2022 |
| 8/17/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 13:45 | 14:30 | 0 | 0 | 0 | YES | NO | 0 | 8/12/2022 |

| Notes | |
|-------|--|
| | |

8/15/2022 **Before**          **After**          8/16/2022 **Before**          **After**

   

8/17/2022 **Before**          **After**

 

MIAFLA001236

Weekly Rapid Response Locations

1. SW 43rd Ave & SW 7th Street
2. SW 44th Ave & SW 8th Street
3. SW 45th Ave & SW 8th Street
4. SW 3rd Ave & SW 5th Street
5. SW 4th Ave & SW 5th Street
6. SW 4th Ave & SW 6th Street
7. SW 1st CT & SW 2ND Street
8. SW 1st Ave & SW 2nd Street
9. SW 13th Ave & SW 10th Street

MIAFLA001237

CITY OF MIAMI, FLORIDA

## INTER-OFFICE MEMORANDUM

| | | | |
|---|---|---|---|
| TO : | Cherise G. Gause<br>Assistant Chief of Police<br>Field Operations Division<br>(Through Channels) | DATE : | 08/28/2022 | FILE : |

*Commander C. Chin-Quee # 1049*

FROM:  Commander Conrad Chin-Quee # 1049
Edgewater NET, HEAT, FTO, & CIT
Field Operations Division

REFERENCES:  Homeless Empowerment Assistance Team
Weekly Review 08-21-22 Thru 08-27-2022

ENCLOSURES :

**Overview:**

The Homeless Empowerment Assistance Team (HEAT) was designed as a task force in order to work together to mitigate homelessness through outreach services that enable the homeless community to overcome their barriers and empower them to take advantage of varying services. Together with the collaborative effort of the City of Miami Solid Waste Team and Homeless Outreach Team, police personnel respond to "hot spot" locations to provide assistance to the homeless population within those areas.

On the attached listed document are the daily results of the actions taken at each scheduled hot spot for outreach/sanitation: (see attached document)

**Weekly:**

During the assessment period for the week of **August 21, 2022, through August 27, 2022,** the HEAT task force outreach resulted in the following:

- 5 Details (21 locations)
- 55 Homeless Contacts (FIVOs)
- 42 Shelter Placements

- 0 Mental Health Referral
- 0 Substance Abuse Referral
- 0 Arrests

**Month-To-Date**, from **August 1, 2022, through August 27, 2022,** the HEAT task force outreach resulted in the following:

- 20 Details (33 locations visited 117 times)
- 220 Homeless Contacts (FIVOs)
- 170 Shelter Placements

- 1 Mental Health Referrals
- 4 Substance Abuse Referrals
- 5 Arrests

Homeless Empowerment Assistance Team                                                                          2

**Year-To-Date,** for the assessment period from **January 1, 2022, through August 27, 2022,** the HEAT task force outreach resulted in the following:

- 161 Details (200 locations visited 624 times)
- 1,486 Homeless Contacts (FIVOs)
- 1,104 Shelter Placements

- 7 Mental Health Referrals
- 25 Substance Abuse Referral
- 30 Arrests

**Inception-To-Date** for the assessment period of **August 2, 2021, through August 27, 2022,** the HEAT task force outreach resulted in the following:

- 268 Details (451 locations visited)
- 2,361 Homeless Contacts (FIVOs)
- 1,512 Shelter Placements

- 15 Mental Health Referrals
- 35 Substance Abuse Referrals
- 65 Arrests (warrants & narcotics)

**For 2021 Only:**

During the assessment period of **August 2, 2021, through December 31, 2021,** the HEAT task force outreach resulted in the following:

- 107 Details (251 locations)
- 875 Homeless Contacts (FIVOs)
- 408 Shelter Placements

- 8 Mental Health Referrals
- 16 Substance Abuse Referrals
- 33 Arrests (warrants & narcotics)

_____

I do swear and affirm that the information is true and accurate to the best of my knowledge.

_____

Manuel A. Morales
Chief of Police

# City of Miami Police Department
# HEAT Weekly Summary

## August 21, 2022 – August 27, 2022



**Miami Police Department**
**Homeless Empowerment Assistance Team**

MIAFLA001240

## COMMISION DISTRICT 1

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/22/2022 | 1 | NW 6 to 8 Ave & NW 17 Street | 08:37 | 11:00 | 13 | 9 | 4 | NO | YES | 10 | 8/18/2022 |
| 8/23/2022 | 1 | NW 6 to 8 Ave & NW 17 Street | 13:39 | 14:04 | 5 | 5 | 0 | YES | YES | 9 | 8/18/2022 |
| 8/24/2022 | 1 | NW 6 to 8 Ave & NW 17 Street | 08:55 | 11:03 | 10 | 9 | 1 | YES | YES | 10 | 8/18/2022 |

| Notes | |
|---|---|

8/22/2022 **Before**          **After**          8/23/2022 **Before**          **After**

   

8/24/2022 **Before**          **After**

 

## COMMISION DISTRICT 2

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/23/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street | 08:59 | 10:30 | 3 | 1 | 2 | YES | YES | 10 | 8/18/2022 |
| 8/25/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street | 09:26 | 10:38 | 4 | 1 | 3 | YES | YES | 10 | 8/18/2022 |
| 8/26/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street | 08:46 | 09:36 | 9 | 8 | 1 | YES | YES | 10 | 8/18/2022 |

| Notes | |
|-------|--|

8/23/2022 **Before**        **After**                    8/25/2022 **Before**        **After**

   

8/26/2022 **Before**        **After**

 

MIAFLA001242

**COMMISION DISTRICT 3**

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 8/22/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | 14:40 | 14:47 | 0 | 0 | 0 | NO | NO | 0 | 8/18/2022 |
| 8/23/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | 10:05 | 10:34 | 0 | 0 | 0 | YES | YES | 9 | 8/18/2022 |
| 8/24/2022 | 3 | SW 3 to SW 5 Ave. From SW 6 to SW 8 Street. | 09:56 | 10:37 | 1 | 1 | 0 | YES | YES | 1 | 8/18/2022 |

| Notes | |
|------|------|

8/22/2022 **Before**          **After**          8/23/2022 **Before**          **After**

   

8/24/2022 **Before**          **After**

 

MIAFLA001243

**COMMISION DISTRICT 4**

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|--------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/23/2022 | 4 | NW 38th Ave & NW 7th Street | 12:59 | 13:19 | 1 | 1 | 0 | NO | YES | 4 | 8/18/2022 |
| 8/25/2022 | 4 | NW 38th Ave & NW 7th Street | 13:41 | 13:48 | 0 | 0 | 0 | YES | YES | 1 | 8/18/2022 |
| 8/26/2022 | 4 | NW 38th Ave & NW 7th Street | 10:58 | 11:27 | 0 | 0 | 0 | YES | YES | 1 | 8/18/2022 |

| Notes | |
|-------|--|

8/23/2022 **Before**          **After**                    8/25/2022 **Before**          **After**

   

8/26/2022 **Before**          **After**

 

MIAFLA001244

## COMMISSION DISTRICT 5

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/22/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 14:01 | 14:26 | 0 | 0 | 0 | NO | NO | 0 | 8/18/2022 |
| 8/24/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 13:13 | 13:39 | 0 | 0 | 0 | YES | NO | 0 | 8/18/2022 |
| 8/25/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 13:40 | 14:10 | 4 | 4 | 0 | YES | YES | 5 | 8/18/2022 |

| Notes | |
|-------|--|
| | |

8/22/2022 **Before**          **After**          8/24/2022 **Before**          **After**

   

8/25/2022 **Before**          **After**

 

MIAFLA001245

Weekly Rapid Response Locations

1. SW 3rd Ave & SW 5th Street
2. SW 4th Ave & SW 5th Street
3. SW 4th Ave & SW 6th Street
4. NW 37th Ave & NW 7th Street
5. SW 1st CT & SW 2ND Street
6. SW 37th Ave & SW 7th Street

MIAFLA001246

CITY OF MIAMI, FLORIDA

## INTER-OFFICE MEMORANDUM

| | | | |
|---|---|---|---|
| TO : | Cherise G. Gause<br>Assistant Chief of Police<br>Field Operations Division<br>(Through Channels) | DATE : | 09/05/2022 |  FILE : |
| FROM: | *Commander C. Chin-Quee # 1049*<br>Commander Conrad Chin-Quee # 1049<br>Edgewater NET, HEAT, FTO, & CIT<br>Field Operations Division | REFERENCES: | Homeless Empowerment Assistance Team<br>Weekly Review 08-28-22 Thru 09-03-2022 |
| | | ENCLOSURES : | |

**Overview:**

The Homeless Empowerment Assistance Team (HEAT) was designed as a task force in order to work together to mitigate homelessness through outreach services that enable the homeless community to overcome their barriers and empower them to take advantage of varying services. Together with the collaborative effort of the City of Miami Solid Waste Team and Homeless Outreach Team, police personnel respond to "hot spot" locations to provide assistance to the homeless population within those areas.

On the attached listed document are the daily results of the actions taken at each scheduled hot spot for outreach/sanitation: (see attached document)

**Weekly:**

During the assessment period for the week of **August 28, 2022, through September 03, 2022,** the HEAT task force outreach resulted in the following:

- 5 Details (22 locations)
- 55 Homeless Contacts (FIVOs)
- 42 Shelter Placements

- 0 Mental Health Referral
- 0 Substance Abuse Referral
- 0 Arrests

**Month-To-Date**, from **August 1, 2022, through September 03, 2022,** the HEAT task force outreach resulted in the following:

- 20 Details (37 locations visited 139 times)
- 277 Homeless Contacts (FIVOs)
- 214 Shelter Placements

- 1 Mental Health Referrals
- 4 Substance Abuse Referrals
- 5 Arrests

Homeless Empowerment Assistance Team                                                                      2

**Year-To-Date,** for the assessment period from **January 1, 2022, through September 03, 2022,** the HEAT task force outreach resulted in the following:

- 166 Details (201 locations visited 643 times)
- 1,543 Homeless Contacts (FIVOs)
- 1,148 Shelter Placements
- 7 Mental Health Referrals
- 25 Substance Abuse Referral
- 30 Arrests

**Inception-To-Date** for the assessment period of **August 2, 2021, through September 03, 2022,** the HEAT task force outreach resulted in the following:

- 273 Details (452 locations visited)
- 2,418 Homeless Contacts (FIVOs)
- 1,556 Shelter Placements
- 15 Mental Health Referrals
- 35 Substance Abuse Referrals
- 65 Arrests (warrants & narcotics)

**For 2021 Only:**

During the assessment period of **August 2, 2021, through December 31, 2021,** the HEAT task force outreach resulted in the following:

- 107 Details (251 locations)
- 875 Homeless Contacts (FIVOs)
- 408 Shelter Placements
- 8 Mental Health Referrals
- 16 Substance Abuse Referrals
- 33 Arrests (warrants & narcotics)

_____

I do swear and affirm that the information is true and accurate to the best of my knowledge.

_____

Manuel A. Morales
Chief of Police

# City of Miami Police Department
# HEAT Weekly Summary

# August 28, 2022 – September 3, 2022



**Miami Police Department**
**Homeless Empowerment Assistance Team**

MIAFLA001249

## COMMISION DISTRICT 1

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|--------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/29/2022 | 1 | NW 6 to 8 Ave & NW 17 Street | 09:57 | 11:30 | 8 | 7 | 0 | YES | YES | 7 | 8/26/2022 |
| 8/30/2022 | 1 | NW 6 to 8 Ave & NW 17 Street | 08:45 | 09:53 | 1 | 1 | 0 | YES | YES | 10 | 8/26/2022 |
| 8/31/2022 | 1 | NW 6 to 8 Ave & NW 17 Street | 10:19 | 11:14 | 4 | 3 | 1 | YES | YES | 6 | 8/26/2022 |

| Notes | |
|-------|--|
| | |

8/29/2022 **Before**          **After**          8/30/2022 **Before**          **After**

   

8/31/2022 **Before**          **After**



MIAFLA001250

## COMMISION DISTRICT 2

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|--------------------|----------|---------|-----------|-------|-----------|----------|-----------|-----------|-------|-------------|
| 8/31/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street (Bridge) | 08:36 | 09:37 | 3 | 3 | 0 | YES | YES | 9 | 8/26/2022 |
| 9/1/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street (Bridge) | 09:55 | 11:09 | 4 | 4 | 0 | YES | YES | 10 | 8/26/2022 |
| 9/2/2022 | 2 | SW 2 to 3 Ave SW 1 St to Flagler Street (Bridge) | 09:11 | 10:00 | 6 | 6 | 0 | YES | YES | 10 | 8/26/2022 |

| Notes | |
|-------|--|
|       | |

8/31/2022 **Before**          **After**              9/1/2022 **Before**          **After**

   

9/2/2022 **Before**          **After**

 

MIAFLA001251

**COMMISION DISTRICT 3**

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/29/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | 13:28 | 13:51 | 0 | 0 | 0 | YES | NO | 0 | 8/26/2022 |
| 8/31/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | 13:21 | 13:34 | 0 | 0 | 0 | YES | YES | 0 | 8/26/2022 |
| 9/2/2022 | 3 | NW 12 Ave Flagler Street (Walgreens Sidewalk) | 08:58 | 09:15 | 0 | 0 | 0 | YES | YES | 4 | 8/26/2022 |

| Notes | |
|-------|--|
| | |

8/29/2022 **Before**          **After**          8/31/2022 **Before**          **After**

   

9/2/2022 **Before**          **After**

 

MIAFLA001252

## COMMISION DISTRICT 4

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|--------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/30/2022 | 4 | NW 27 Ave N. River Drive. (Under Bridge) | 10:53 | 10:47 | 0 | 0 | 0 | YES | YES | 7 | 8/26/2022 |
| 8/31/2022 | 4 | NW 27 Ave N. River Drive. (Under Bridge) | 09:58 | 10:29 | 0 | 0 | 0 | YES | YES | 3 | 8/26/2022 |
| 9/1/2022 | 4 | NW 27 Ave N. River Drive. (Under Bridge) | 09:43 | 10:11 | 2 | 2 | 0 | YES | YES | 6 | 8/26/2022 |

| Notes | |
|-------|--|

8/30/2022 **Before**          **After**              8/31/2022 **Before**          **After**

   

9/1/2022 **Before**          **After**

 

MIAFLA001253

## COMMISSION DISTRICT 5

| Date | Commission District | Location | Arrival | Departure | FIVOs | Placements | Refusals | Sanitation | Bed Space | Bed # | Date Posted |
|------|---------------------|----------|---------|-----------|-------|------------|----------|------------|-----------|-------|-------------|
| 8/29/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 08:57 | 09:40 | 1 | 1 | 0 | YES | YES | 8 | 8/26/2022 |
| 8/30/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 13:39 | 14:20 | 3 | 3 | 0 | YES | YES | 6 | 8/26/2022 |
| 8/31/2022 | 5 | NW 1 Ave to NW 1 Ct. NW 11 to 12 Street | 13:17 | 13:52 | 2 | 2 | 0 | YES | YES | 2 | 8/26/2022 |

| Notes | |
|-------|--|
| | |

8/29/2022 **Before**          **After**                    8/30/2022 **Before**          **After**

   

8/31/2022 **Before**          **After**

 

MIAFLA001254

Weekly Rapid Response Locations

1. NW 3rd Ave & W Flagler Street
2. NW 7th Ave & NW 18th Street
3. SW 12th Ave & W Flagler Street
4. SW 1st Ct & SW 2nd Street
5. N Miami Ave & 6th Street
6. NW 1st Ave & NW 21st Street
7. N Miami Ct & NW 21st Street

MIAFLA001255

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OFFLORIDA
## CASE NO.: 22-cv-21939-BB

COOPER-LEVY ET AL,

          Plaintiffs,

   vs.

CITY OF MIAMI,

          Defendant.

_____/

## CITY OF MIAMI'S
## RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

Defendant, THE CITY OF MIAMI, pursuant to Rule 36 of the Federal Rules of Civil Procedure, hereby serves its responses and objections ("Responses") to Plaintiff's, First Request for Admissions, and states as follows:

1.    Admit that City Personnel who engage in Clean Up Operations are acting under color of state law.

**RESPONSE:  Objection. This request for admission improperly calls for a legal conclusion. *Plain Bay Sales, LLC v. Gallaher*, 2020 WL 3791608, at \*1 (S.D. Fla. July 7, 2020) ("[A] party may not seek an admission as to a pure conclusion of law."). Thus, denied.**

2.    Admit that City Personnel have disposed of Homeless Person's Property during a Clean Up Operation.

**RESPONSE:  Admit that the City has disposed of abandoned property and Homeless Person's Property that is deemed to be contaminated or poses a risk to public safety. Denied in all other respects.**

PLAINTIFF'S EXHIBIT

**19**

3.      Admit that the City conducts Clean Up Operations pursuant to a City policy.

**RESPONSE**: **Denied.**

4.      Admit that the HEAT Team (Homeless Empowerment Assistance Team) was and is responsible for implementing City Resolution R-21-0237.

**RESPONSE**:  **Objection. This request for admission is vague and ambiguous as written as to "responsible for implementing" and this improperly calls for a legal conclusion. *Cutino v. Untch*, 303 F.R.D. 413, 415 (S.D. Fla. 2014) ("a party is not required to respond to a request that contains vague or ambiguous statements."); *Plain Bay Sales, LLC v. Gallaher*, 2020 WL 3791608, at \*1 (S.D. Fla. 2020) ("[A] party may not seek an admission as to a pure conclusion of law."). Thus, denied.**

5.      Admit that the City does not provide training to City Personnel concerning how to determine if Homeless Person's Property is contaminated.

**RESPONSE**:  **Objection. This request for admission is vague and overbroad as to "training" and the scope of "City Personnel" as defined because not all City employees deal with any issue in this case regarding Homeless Person's Property. *Cutino v. Untch*, 303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

6.      Admit that City Personnel do not regularly photograph Homeless Person's Property prior to disposing of the property.

**RESPONSE**: **Denied.**

7.      Admit that it would be possible for City Personnel to take photographs of Homeless Person's Property during a Clean Up Operation.

**RESPONSE**: **Objection. This request for admission is vague, ambiguous, and overbroad because the request implies that all "City Personnel" are capable of**

**photographing homeless property whether at a Clean Up or not thus requiring the City to speculate to provide an accurate response.** *See Lingelbach v. Smith***, 2020 WL 2084774 (M.D. Fla. 2020);** *Cutino v. Untch***, 303 F.R.D. 413, 415 (S.D. Fla. 2014) ("a party is not required to respond to a request that contains vague or ambiguous statements."). Thus, denied.**

8.      Admit that the City does not issue cameras to non-police City Personnel so they can take photographs of Homeless Person's Property during a Clean Up Operation.

**RESPONSE**: **Denied.**

9.      Admit that the City does not maintain searchable records of photographs taken of Homeless Person's Property disposed of during a Clean Up Operation.

**RESPONSE**: **Denied.**

10.     Admit that City Personnel do not regularly photograph Homeless Person's Property prior to storing the property in the storage container located at 450 SW 5th Street Miami, Florida.

**RESPONSE**: **Objection. This request for admission is vague and ambiguous as to the term "regularly" and overbroad as to scope of time and requires the City to speculate as an accurate response from the beginning of time to present.** *Cutino v. Untch***, 303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

11.     Admit that the City does not have a form Waiver for Voluntary Disposal of Property.

**RESPONSE: Admit.**

12.     Admit that City Personnel never have Homeless Persons sign a Waiver of

Voluntary Disposal of Property form prior to disposing of Homeless Person's Property.

**RESPONSE**: **Admit insofar that a Waiver of Voluntary Disposal of Property form in not given for abandoned property, or property that is contaminated or poses a risk to public safety. Otherwise, denied in all other aspects.**

13.     Admit that the only documentation of Homeless Persons' consent for the City to dispose of their property is when it is recorded on body cameras worn by Miami Police Officers.

**RESPONSE**: **Admit that Body Worn Camera footage documents the disposal of abandoned or contaminated property. Otherwise denied in all other respects.**

14.     Admit that the City does not maintain records which are searchable by a Homeless Person's name to locate the Homeless Person's consent to dispose of their property.

**RESPONSE**: **Objection. This request for admission is vague, ambiguous and overbroad as to the term "records" and "property" and overbroad as to scope of time and requires the City to speculate as to an accurate response from the beginning of time to present.** *Cutino v. Untch*, **303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

15.     Admit that the Inventory Storage Forms provided to Plaintiffs in response to Plaintiffs' Requests for Production represent all Inventory Storage Forms completed by the City since January 1, 2021.

**RESPONSE**: **Admit.**

16.     Admit that the City has a storage unit for Homeless Persons' Property at 450 SW 5th Street, Miami, Florida.

**RESPONSE**: **Denied.**

17.     Admit that the Storage Unit is the only place the City has for storing Homeless Persons' Property collected by City Personnel not pursuant to an arrest.

**RESPONSE**: **Denied.**

18.  Admit that the Storage Unit has no air conditioning.

**RESPONSE**: **Denied.**

19.  Admit that the Storage Unit has no ventilation except when the door is left

open.

**RESPONSE**: **Denied.**

20.  Admit that the City has not disposed of any property placed in the Storage Unit

since before January 1, 2021.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether the City has "disposed of any property placed in the Storage Unit" from the beginning of time to January 1, 2021. *Cutino v. Untch*, 303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

21.  Admit that the City does not have any Identification (driver's licenses, identification cards, passports, birth certificates, public benefits cards, or social security cards) in the Storage Unit.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether "Identification" existed "in the Storage Unit" from the beginning of time to present. *Cutino v. Untch*, 303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

22.  Admit that the City does not have any medicine in the City's Storage

Unit.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether "medicine" existed in the "Storage Unit" from the beginning of time to present.** *Cutino v. Untch*, **303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

23.     Admit that the City does not have any eyeglasses in the Storage Unit.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether "eyeglasses" existed in the "Storage Unit" from the beginning of time to present** *Cutino v. Untch*, **303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

24.     Admit that the City does not have an urn with ashes in the Storage

Unit.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether "an urn with ashes" existed in the "Storage Unit" from the beginning of time to present.** *Cutino v. Untch*, **303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

25.     Admit that the City does not have any photographs in the Storage

Unit.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether "photographs" existed in the "Storage Unit" from the beginning of time to present.** *Cutino v. Untch*, **303 F.R.D.**

413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). **Thus, denied.**

26.     Admit that the City does not have any bikes in the Storage Unit.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether "bikes" existed in the "Storage Unit" from the beginning of time to present.** *Cutino v. Untch*, **303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

27.     Admit that the City does not have $60 in coins in the Storage Unit.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether "$60 in coins" existed in the "Storage Unit" from the beginning of time to present.** *Cutino v. Untch*, **303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

28.     Admit that the City does not have a pair of dentures in the Storage Unit.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether "dentures" existed in the "Storage Unit" from the beginning of time to present.** *Cutino v. Untch*, **303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

29.     Admit that the City does not have a coin and stamp collection in the Storage Unit.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether a "coin and stamp collection" existed in the "Storage Unit" from the beginning of time to present. *Cutino v. Untch*, 303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

30.     Admit that the City does not have jewelry in the Storage Unit.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to scope of time and requires the City to speculate to whether a "jewelry" existed in the "Storage Unit" from the beginning of time to present. *Cutino v. Untch*, 303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

31.     Admit that the City does not have a photograph of any Notice posted by the City prior to the August 2, 2021 Clean Up Operation.

**RESPONSE**: **Denied.**

32.     Admit that the City does not provide training to City Personnel concerning how to comply with APM-1-19.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to "training" and the scope of "City Personnel" as defined because not all City employees deal with APM-1-19 and/or with any issue in this case regarding Homeless Persons. *Cutino v. Untch*, 303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

33.     Admit that City Personnel do not always follow APM-1-19.

**RESPONSE**:   **Objection. This request for admission is vague and overbroad as to the scope of "City Personnel" as defined because not all City employees deal with APM-1-19 and/or with any issue in this case regarding Homeless Persons.** *Cutino v. Untch***, 303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). And, in addition, it is vague and ambiguous as to the usage of the word "follow."** *See id.* **Thus, denied.**

34.     Admit that the City has posted Notices of Clean Up Operations with less than 72 hours' notice.

**RESPONSE: Denied.**

35.      Admit that the City has posted Notices of Clean Up Operations without indicating the time of the Clean Up.

**RESPONSE: Denied.**

36.     Admit that the English versions of the City's Notices of Clean Up Operations do not include any language that property may be picked up and discarded.

**RESPONSE: Admit.**

37.     Admit that the Notices of Clean Up posted by the City do not notify Homeless Persons of the address where Property collected by the City can be retrieved.

**RESPONSE: Admit.**

38.     Admit that a Homeless Person has a property interest in their property under the 4th Amendment.

**RESPONSE: Objection. This request for admission improperly calls for a legal conclusion.** *Plain Bay Sales, LLC v. Gallaher***, 2020 WL 3791608, at \*1 (S.D. Fla. July**

**7, 2020) ("[A] party may not seek an admission as to a pure conclusion of law."). Thus, denied.**

39.     Admit that when the City disposes of Homeless Person's Property, the City has seized property under the 4th Amendment.

**<u>RESPONSE</u>: Objection. This request for admission improperly calls for a legal conclusion. *Plain Bay Sales, LLC v. Gallaher*, 2020 WL 3791608, at \*1 (S.D. Fla. July 7, 2020) ("[A] party may not seek an admission as to a pure conclusion of law."). Thus, denied.**

40.     Admit that when the City disposes of a Homeless Person's Property, it has meaningfully interfered with the Homeless Person's possessory interest in the Property.

**<u>RESPONSE</u>: Objection. This request for admission improperly calls for a legal conclusion. *Plain Bay Sales, LLC v. Gallaher*, 2020 WL 3791608, at \*1 (S.D. Fla. July 7, 2020) ("[A] party may not seek an admission as to a pure conclusion of law."). Thus, denied.**

41.     Admit that the City did not have a warrant to seize Homeless Person's Property during any Clean Up Operation since May 2021.

**<u>RESPONSE</u>: Unable to admit or deny because when a homeless person is arrested due to an arrestable offense or outstanding warrant law enforcement officers may conduct a search incident to arrest.**

42.     Admit that since May 1, 2021, there were no exigent circumstances which would authorize the City to destroy Homeless Person's Property during a Clean Up Operation without a warrant.

**RESPONSE**: **Objection. This request for admission improperly calls for a legal conclusion.** *Plain Bay Sales, LLC v. Gallaher*, **2020 WL 3791608, at \*1 (S.D. Fla. July 7, 2020) ("[A] party may not seek an admission as to a pure conclusion of law."). Thus, denied.**

43.    Admit that a Homeless Person has a property interest in their property under the Due Process Clause of the 14th Amendment.

**RESPONSE**: **Objection. This request for admission improperly calls for a legal conclusion.** *Plain Bay Sales, LLC v. Gallaher*, **2020 WL 3791608, at \*1 (S.D. Fla. July 7, 2020) ("[A] party may not seek an admission as to a pure conclusion of law."). Thus, denied.**

44.    Admit that a Homeless Person has a property interest in their property under the Due Process Clause of the 14th Amendment even if they leave it in a public place, unless it is clear that the Homeless Person abandoned the property.

**RESPONSE**: **Objection. This request for admission improperly calls for a legal conclusion.** *Plain Bay Sales, LLC v. Gallaher*, **2020 WL 3791608, at \*1 (S.D. Fla. July 7, 2020) ("[A] party may not seek an admission as to a pure conclusion of law."). Thus, denied.**

45.    Admit that the City does not provide City Personnel with consistent training in identifying when Homeless Persons' Property is abandoned.

**RESPONSE**: **Objection. This request for admission is vague and overbroad as to "training" and the scope of "City Personnel" as defined because not all City employees deal with any issue in this case regarding Homeless Person's Property.** *Cutino v. Untch*, **303 F.R.D. 413, 415 (S.D. Fla. 2014) (sustaining objections as to vagueness and scope of time). Thus, denied.**

46.      Admit that the City does not provide Homeless Persons with a pre-deprivation opportunity to challenge the City's decision to dispose of Homeless Person's Property.

**RESPONSE: Objection. This request for admission improperly calls for a legal conclusion.** *Plain Bay Sales, LLC v. Gallaher*, **2020 WL 3791608, at \*1 (S.D. Fla. July 7, 2020) ("[A] party may not seek an admission as to a pure conclusion of law."). Thus, denied.**

47.      Admit that the City does not provide Homeless Persons with a post-deprivation opportunity to challenge the City's decision to dispose of Homeless Person's Property.

**RESPONSE: Objection. This request for admission improperly calls for a legal conclusion.** *Plain Bay Sales, LLC v. Gallaher*, **2020 WL 3791608, at \*1 (S.D. Fla. July 7, 2020) ("[A] party may not seek an admission as to a pure conclusion of law."). Thus, denied.**

48.      Admit that the City did not store any property belonging to Plaintiff Cooper-Levy.

**RESPONSE: Unable to admit or deny because not all property in the City's possession has an identified owner and there is no evidence Cooper-Levy came to claim property in the City's possession.**

49.      Admit that the City did not store any property belonging to Plaintiff Sylverin.

**RESPONSE: Unable to admit or deny because not all property in the City's possession has an identified owner and there is no evidence Sylverin came to claim property in the City's possession.**

50.      Admit that the City did not store any property belonging to Plaintiff Rivers.

**RESPONSE: Unable to admit or deny because not all property in the City's**

possession has an identified owner and there is no evidence Rivers came to claim property in the City's possession.

51.     Admit that the City did not store any property belonging to Plaintiff Simmons.

**RESPONSE**: **Unable to admit or deny because not all property in the City's possession has an identified owner and there is no evidence Simmons came to claim property in the City's possession.**

VICTORIA MÉNDEZ, City Attorney
BRYAN E. CAPDEVILA,
Assistant City Attorney
Attorneys for **City of Miami**
444 S.W. 2nd Avenue, Suite 945
Miami, FL  33130-1910
Tel.: (305) 416-1800
Fax: (305) 400-5071
Email:  BCapdevila@miamigov.com
Secondary Email:  SMFernandez@miamigov.com

By: */s/Bryan E. Capdevila*
        Bryan E. Capdevila
        Assistant City Attorney
        Florida Bar No. 119286

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2023, I electronically served the foregoing document to the persons on the attached service list below.

By: */s/Bryan E. Capdevila*
        Bryan E. Capdevila
        Assistant City Attorney
        Florida Bar No. 119286

### SERVICE LIST

Benjamin Samuel Waxman
Benjamin Waxman LLC
77 Harbor Drive, #8
Miami, FL 33149
305-985-5000
Email: benji@benjaminwaxmanlaw.com

Jodi Lynn Siegel
Chelsea Lee Dunn
Southern Legal Counsel
1229 NW 12th Avenue
Gainesville, FL 32601
352-271-8890
Emails: jodi.siegel@southernlegal.org
chelsea.dunn@southernlegal.org

Daniel Boaz Tilley
ACLU Foundation of Florida, Inc.
4343 West Flagler Street, Suite 400
Miami, FL 33134
786-363-2714
Fax: 786-363-1257
Email: dtilley@aclufl.org

Jeffrey Martin Hearne
Jocelyn Lourdes Jauregui
Legal Services of Greater Miami
10720 Caribbean Boulevard, Suite 400
Miami, FL 33189
Emails: jhearne@lsgmi.org
JJauregui@lsgmi.org

Stephen J. Schnably
University of Miami School of Law
Professor of Law
1311 Miller Drive
Coral Gables, FL 33146
305-284-4817
Email: schnably@law.miami.edu

**CITY OF MIAMI - HOMELESS PROGRAM**

| NAME | SIGNATURE |
|------|-----------|
| ACKNOWLEDGMENT OF RECEIPT - APM 1-19 | 01 15 2019. |
| Abello, Mario | Mario Abello |
| Beira, Carmen M | SEE FOLLOWING PAGE |
| Chery, Wilson J. | |
| De la Cruz, Estebania | |
| Martin, Tanya | |
| Escobar, Maria | |
| Espinosa, Maxie | |
| Figueroa, Natalia | |
| Gonzalez, Alain | |
| Rowe, Bradley James | |
| Cabral, Anaelys | |
| Jackson, Jamille | |
| Harris, Willie | |
| Gonzalez, Alberto | |
| Jordan, Cosmo | |
| Leath, Ricky | |
| Llerandi, Arturo | |
| Venturini, Giancarlos | |
| Mohip, Felix | |
| Morrison, Darren J | |
| Palmer, Joel | |
| Rachel, Willie, Jr. | |
| Ramos, Carlos | |
| Morales, Karla | |
| Rodriguez, Pedro | |
| Romero, Ivan | |
| Torres, Sergio | |
| Trueba, Lazaro | |
| Paucar, Beatriz | |
| Williams, Thomas | |
| Wilson, Clifford | |
| Witherspoon, Tonny | |
| Yemat, Annette M. | |
| Hernandez, Francis | |
| Carrasco, Johanna | |

DUENAS, JUAN

PLAINTIFF'S EXHIBIT

**20**

**CITY OF MIAMI - HOMELESS PROGRAM**
**ACKNOWLEDGMENT OF RECEIPT - APM 1-19**

| NAME | SIGNATURE |
|------|-----------|
| Abello, Mario | |
| Beira, Carmen M | |
| Chery, Wilson J. | |
| De la Cruz, Estebania | |
| Martin, Tanya | |
| Escobar, Maria | |
| Espinosa, Maxie | |
| Figueroa, Natalia | |
| Gonzalez, Alain | |
| Rowe, Bradley James | |
| Cabral, Anaelys | |
| Jackson, Jamille | |
| Harris, Willie | |
| Gonzalez, Alberto | |
| Jordan, Cosmo | |
| Leath, Ricky | |
| Llerandi, Arturo | |
| Venturini, Giancarlos | |
| Mohip, Felix | |
| Morrison, Darren J | |
| Palmer, Joel | |
| Rachel, Willie, Jr. | |
| Ramos, Carlos | |
| Morales, Karla | |
| Rodriguez, Pedro | |
| Romero, Ivan | |
| Torres, Sergio | |
| Trueba, Lazaro | |
| Paucar, Beatriz | |
| Williams, Thomas | |
| Wilson, Clifford | |
| Witherspoon, Tonny | |
| Yemat, Annette M. | |
| Hernandez, Francis | |
| Carrasco, Johanna | |
| DUENAS, JUAN | |

| POLICY NUMBER: | **CITY OF MIAMI** | REVISIONS | |
|---|---|---|---|
| **APM- 1- 19** | | **REVISED SECTION** | **DATE OF REVISION** |
| | | Created | 01/14/2019 |



DATE:

*1/14/2019*

ISSUED BY:

*Emilio T. Gonzalez*
<u>City Manager/Designee</u>

**SIGNATURE**

**ADMINISTRATIVE POLICY**

---

**SUBJECT:**      **TREATMENT OF HOMELESS PERSONS' PROPERTY**

---

**Purpose**      The purpose of this policy is to establish a standard practice for the handling, temporary storage, and disposition of property belonging to homeless persons.

**Scope**      This Administrative Policy shall apply to all City employees, whether probationary, classified, unclassified, executive, temporary, or part-time, except employees of the Miami Police Department shall be bound by and follow the procedures set forth in Departmental Order 11 Chapter 10, or any existing Departmental Order addressing the treatment of homeless persons' property, to the extent there is any conflict between this Administrative Policy and any Departmental Order.

**Definitions**

A. "Contaminated or Dangerous Items" are those items that present a hazard to the health and safety of City Personnel or the public. These items include, but are not limited to, hazardous materials, flammable materials (e.g., propane tanks), fabric contaminated with human or animal waste, fabric contaminated with flammable substances (e.g., oil or petroleum products), wet fabric (mold hazard), etc.

B. "Homeless Person" shall mean a person who lacks a fixed, regular, and adequate night-time residence and has a primary night-time residency that is: (a) supervised publicly or privately operated shelter designed to provide temporary living accommodations; (b) an institution that provides a temporary residence for individuals intended to be institutionalized; or (c) a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings. The term "homeless person" does not include any person imprisoned or otherwise detained pursuant to an Act of

MIAFLA000531

Congress or a state law. 42 U.S.C. §11301, et seq. (1994).

C. "Homeless Person's Property" or "Homeless Property" shall mean personal property known to belong to a homeless person, or readily recognizable as property of a homeless person (i.e., bedding or clothing and other belongings organized or packaged together in a way indicating it has not been abandoned).

**Procedures**

**I.    General procedures:**

1. City Personnel will attempt to secure personal items such as identification, medicines and eyeglasses and other small items of importance identified by the Homeless Person or readily identifiable as intimate personal property.

2. Notwithstanding anything herein:

   a. Homeless Property that is contaminated or otherwise poses a health or safety concern to City Personnel or to members of the public may be disposed of.

   b. The City is not responsible for taking custody of mattresses, upholstered furniture, or other bulky items on public property, and may dispose of those items.

   c. Nothing herein prevents the disposal of items reasonably belied to be refuse.

   d. The City may prohibit the presence of unattended property in specified areas where the presence of such unattended property poses a threat or risk to the public health of safety.

**II.    Tagged/Labeled Homeless Persons' Property:**

1. In order to aid the City in its ability to readily identify and handle the property of homeless persons, the City requires that all homeless individuals who wish to identify their personal property place a tag or label with their name and contact information (telephone and/or email) on the outside of any such property, such that City employees can easily identify the property as belonging to a specific individual and will have a means of contacting that individual with regard to any actions taken as to that property.

2. Whenever a City employee encounters unattended but tagged/labeled homeless persons' property, the following procedure shall be employed:

   a. Any personal items such as identification, medicines and eyeglasses and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel, and a copy of that

MIAFLA000532

form will be provided to the Homeless Person by e-mail (if provided/available).

b. Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

c. Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding, photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel, and a copy of that form will be provided to the Homeless Person by e-mail (if provided/available).

d. Whenever possible, City personnel will photograph the homeless property prior to taking action.

e. Following any such action described above, the City will attempt to contact the homeless individual identified on that tag/label to inform them of the disposition of their unattended property, and to notify them of any stored property and the method through which the homeless person can claim that property. Three (3) attempts at contact will be made. The City shall document any such attempts.

III. **When a Homeless Person accepts voluntary placement in shelter:**

1. When a Homeless Person accepts placement in a shelter, City personnel will request the Homeless Person to secure the personal items that they wish to take to shelter with them. These items should include, at a minimum, any identification, medication, eyeglasses, and electronics in the homeless person's possession.

2. City personnel will request that the Homeless Person identify any of their remaining Homeless Property that they are willing to voluntarily discard. When a homeless person voluntarily agrees to discard property, they will be asked to sign a Waiver for Voluntary Disposal of Property Form.

3. Any remaining Homeless Property that cannot be taken to the shelter, which is not contaminated or does not otherwise pose a health hazard or obvious safety issue, will be documented, secured, and stored by City personnel. The Homeless Person will be required to sign an Inventory Storage Form, and a copy of that form will be provided to the Homeless Person. Any such stored property will be held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed.

4. Whenever possible, City personnel will photograph the homeless property prior to taking action.

MIAFLA000533

City of Miami

APM 1-19: Treatment of Homeless Persons' Property

IV.    **During a Cleanup operation:**

1.    All Cleanup operations will be coordinated by the Department of Human Services.

2.    City personnel will place notices of Cleanup operation, at least seven (7) days prior to the cleaning date. The notice will inform individuals of the date of cleaning and will provide the phone number and address of the Veterans Affairs/Homeless Assistance Program Division in the Department of Human Services, where any collected Homeless Property can be retrieved.

3.    Whenever possible, City personnel will photograph the Homeless Property prior to the Cleanup operation.

4.    Cleanup operation when the Homeless Person is present:

   a.   City Personnel will inform the Homeless Person that the Cleanup is about to commence and request that they relocate themselves with their Homeless Property. These items should include, at a minimum, any identification, medication, eyeglasses, and electronics in the homeless person's possession.

   b.   City personnel will request that the Homeless Person identify any of their remaining Homeless Property that they are willing to voluntarily discard. When a homeless person voluntarily agrees to discard property, they will be asked to sign a Waiver for Voluntary Disposal of Property Form.

   c.   Any remaining Homeless Property that cannot be left on the site, which is not contaminated or does not otherwise pose a health hazard or obvious safety issue, shall be documented, secured, and stored by City personnel. The Homeless Person will be required to sign an Inventory Storage Form, and a copy of that form will be provided to the Homeless Person. Any such property will be held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed.

5.    Cleanup operation when the Homeless Person is not present:

   a.   Any personal items such as identification, medicines and eyeglasses and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.

   b.   Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

   c.   Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding,

MIAFLA000534

photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.

d. If the property was tagged/labeled, the City will attempt to contact the individual identified as the property owner in the manner set forth in section II, above. If the property was not tagged/ labeled, the City will post a notice at the location of the property disposition, notifying the potential owner of the property that their property was either discarded or stored, and informing the reader of how to contact the City to discuss that property.

## V. Procedures for unattended and unidentified (untagged/unlabeled) Homeless Property:

1. The Department of Human Service shall be contacted prior to City personnel taking action with respect to Homeless Property.

2. Any personal items such as identification, medicines and eyeglasses and other small items of importance readily identifiable as intimate personal property will be collected and held for a period of ninety (90) days, after which the City will dispose of the property if unclaimed. An Inventory Storage Form will be completed by City personnel.

3. Any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy.

4. Any Homeless Property that does not appear to be contaminated or otherwise pose a health hazard or obvious safety issue, such as identification, clothing, bedding, photographs, personal papers, and keepsakes, will be collected and held for a period of ninety (90) days. An Inventory Storage Form will be completed by City personnel.

## VI. Storage Procedures

1. The City homeless property storage site will be accessible by public transit or other means accessible to persons with low income.

2. When Homeless Property is collected by City personnel it should be labeled with the date of its removal and location from which it was removed to assist with its being reclaimed by its owners. Bags may be used to keep items collected from the same sites together.

MIAFLA000535