UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 22-cv-21939-BLOOM/Torres**

LATOYLA YASHEEN COOPER-LEVY,
*et al.,*

      Plaintiffs,

v.

CITY OF MIAMI,

      Defendant.

_____/

## OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant City of Miami, Florida's ("City" or "Defendant") Motion for Summary Judgment, ECF No. [82], and Plaintiffs Latoyla Cooper-Levy ("Cooper-Levy"), Phillip Sylverin ("Sylverin"), Sherman Rivers ("Rivers"), and Joseph Simmons ("Simmons") Motion for Partial Summary Judgment, ECF No. [79]. Plaintiffs filed a Response in Opposition to the City's Motion, ECF No. [106], to which the City filed a reply, ECF No. [110]. The City filed a Response in opposition to Plaintiffs' Motion, ECF No. [104], to which Plaintiffs filed a Reply, ECF No. [112].[1] The Court has considered the Motions, all supporting and opposing submissions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, the Motions are denied.

---

[1] In addition, Plaintiffs submitted a Statement of Material Facts in Support of their Motion, ECF No. [78] ("Pls.' SMF"), a Counterstatement of Material Facts in their Response to Defendant's Motion, ECF No. [105] ("Pls.' CSMF"), and a Reply Statement of Material Facts in Support of their Motion, ECF No. [111] ("Pls.' RSMF"). The City submitted a Statement of Material Facts in Support of their Motion, ECF No. [82] ("Def.'s SMF"), a Counterstatement of Material Facts in their Response to Defendant's Motion, ECF No. [103] ("Def.'s CSMF"), and a Reply Statement of Material Facts in Support of their Motion, ECF No. [109] ("Def.'s RSMF").

I.      BACKGROUND

The Court assumes the parties' familiarity with the facts of this case but provides a summary of the material and background facts.[2] This case arises from the City's alleged violations of homeless individuals' constitutional rights. Plaintiffs, all of whom are or have been homeless individuals, commenced this case by filing their Complaint pursuant to 42 U.SC. § 1983, asserting two claims for violations of their Fourth and Fourteenth Amendment rights. *See generally* ECF No. [1].

A.  Material Facts

The following facts are undisputed unless otherwise noted.

i.      APM

The City has an administrative policy, APM 1-19 ("the APM"), that governs the treatment by City personnel of homeless persons' property. Pls.' SMF ¶ 4 (citing ECF No. [74-1] Ex. 3); Def's CSMF ¶ 4. All City personnel, including police officers, are required to follow the APM. Pls.' SMF ¶ 10; Def.'s CSMF ¶ 10. The purpose of the APM is to establish a standard practice for the handling, temporary storage, and disposition of property belonging to homeless persons. Pls.' SMF ¶ 5; Def's CSMF ¶ 5.

a.  *Definitions*

The APM defines "Homeless Person's Property", or "Homeless Property" as personal property known to belong to a homeless person, or readily recognizable as property of a "Homeless Person",[3] such as bedding, clothing or other belongings organized or packaged

---

[2] The Court previously set forth the history of this action, which stems from the litigation in *Pottinger v. City of Miami*, 359 F. Supp. 3d 1177, 1179 (S.D. Fla. 2019), and the factual allegations in the Complaint, in its Order on the City's Motion to Dismiss. *See generally* ECF No. [23].

[3] The Court adopts the parties' appellation for individuals who are "homeless." According to the APM, a homeless person is a person who lacks a fixed, regular, and adequate night-time residence and has a primary night-time residency that is: (a) supervised publicly or privately operated shelter designed to

together in a way indicating it has not been abandoned. Pls.' SMF ¶ 6; Def.'s CSMF ¶ 6. The APM does not define abandoned property, specify how abandoned property is identified, or set forth procedures concerning such property. Homeless Property includes "personal items", which include items such as "identification, medicines and eyeglasses and other small items of importance identified by the Homeless Person or readily identifiable as intimate personal property." ECF No. [74-1] at 197. The APM requires that all homeless persons who wish to identify their personal property place a tag or label with their name and contact information on the outside of any such property. *Id.* The APM further defines "Contaminated or Dangerous Items" as those items that present a hazard to the health and safety of City Personnel or the public. APM-1-19 at 1, ECF No. [80-1]. Contaminated or Dangerous Items include "hazardous materials, flammable materials . . . , fabric contaminated with human or animal waste, fabric contaminated with flammable substances . . . [and] wet fabric (mold hazard)[.]" *Id.* The APM sets forth procedures for "City personnel" during "Cleanup operations". *Id.* § IV.[4]

### b. *APM Procedures*

The APM requires City personnel to place notices of Cleanup operations prior to the Cleanup date. Pls.' SMF ¶ 86; Def.'s CSMF ¶ 86. An August 2021 amendment reduced the APM's requirement that there be seven (7) days' notice given before a Cleanup operation to seventy-two (72) hours. Pls.' SMF ¶ 9 (ECF No. [74-1] Ex. 3); Def.'s CSMF ¶ 9. The APM

---

provide temporary living accommodations; (b) an institution that provides a temporary residence for individuals intended to be institutionalized; or (c) a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.
APM-1-19 at 1. The APM excludes from its definition of homeless persons those who are imprisoned or otherwise detained pursuant to an Act of Congress or a state law. *Id.*

[4] In addition, the Miami Police Department (MPD) has a Departmental Order ("PDO") which states that it is the MPD's policy to "ensure that personnel are sensitive to the needs and rights of our Homeless population, as well as knowledgeable of the department's arrest policies concerning such persons." ECF No. [74-1] at 261-65. The APM provides that in case of any conflict between the provisions of the APM and the PDO, police officers are to follow the latter. Pls.' SMF ¶ 12; Def.'s CSMF ¶ 12.

requires that the notices provide the date of the Cleanup operation and the phone number and address of the Veterans Affairs/Homeless Assistance Program Division in the Department of Human Services (DHS) where any collected Homeless Property can be retrieved. Pls.' SMF ¶ 87; Def.'s CSMF ¶ 87.

During a Cleanup operation, the APM provides procedures for when a homeless individual is present and when Homeless Property appears to be unattended. In the former case, City personnel will inform the Homeless Person that the Cleanup operation is about to commence and request they relocate themselves with their Homeless Property. ECF No. [74-1] at 199. City personnel will ask if the Homeless Person would agree to voluntarily discard property, requesting that they sign a Waiver for Voluntary Disposal of Property Form. *Id.* For any Homeless Property that the Homeless Person does not move, "cannot be left on the site," and is not a Contaminated or Dangerous item, such property shall be "documented, secured, and stored by City personnel" for a period of ninety (90) days, after which unclaimed property will be disposed. *Id.* When Homeless Property is secured and stored, the Homeless Person is asked to sign an Inventory Storage Form. *Id.*

In the latter case, City personnel are to collect Homeless Property that is not contaminated or dangerous for a period of 90 days, after which the property is discarded if unclaimed. *Id.* Prior to storing Homeless Property, City personnel must complete an Inventory Storage Form. *Id.* If the unattended Homeless Property does not have a tag or label indicating its owner, the City will post a notice at the location where the property was discarded or stored. *Id.*

The APM states that any items that are contaminated or otherwise pose a health hazard or obvious safety issue will be disposed of according to this policy. *Id.*

David Rosemond fulfills a role at the City which provides "strategic coordination" to the Homeless Empowerment Assistance Team (HEAT), testified that City personnel "leave property at [a] location" in a manner that is consistent with "the spirit of the APM". Tr. of Jan. 11, 2023 Dep. of David Rosemond ("Rosemond Dep.") at 10:22-11:2, 67:13-21. None of the City's personnel has been warned, disciplined, or fired for violating the APM. Pls.' SMF ¶ 130; Def.'s CSMF ¶ 130.

### ii.    The HEAT

To implement the APM's procedures, the City created the Homeless Empowerment Assistance Team (HEAT), which conducts Cleanup operations at homeless encampments, defined as "ten . . . or more unsheltered homeless individuals living in relatively close proximity to one another." Pls.' SMF ¶¶ 18, 20; Def.'s CSMF ¶¶ 18, 20; Tr. of Nov. 14, 2022 Dep. of Conrad Chin-Quee at 360, ECF No. [74-3].

The HEAT is comprised of the members of the MPD, DHS, and the Solid Waste department. Pls.' SMF ¶ 19; Def.'s CSMF ¶ 19. The HEAT was staffed with four MPD officers and one MPD sergeant at its inception, but the number of police officers in the HEAT increased to eight (8) MPD officers and two (2) sergeants. Pls.' SMF ¶¶ 28, 29; Def.'s SMF ¶ 28, 29. During Cleanup operations, MPD officers provide security, traffic control, enforcement, and conduct background checks to determine eligibility for shelter. Pls.' SMF ¶ 21; Def.'s CSMF ¶ 21. The City does not obtain warrants prior to conducting Cleanup operations. Pls.' SMF ¶ 22; Def.'s CSMF ¶ 22. MPD officers in the HEAT may arrest homeless persons during Cleanup operations if that person has an outstanding arrest warrant. Pls.' SMF ¶¶ 24-25; Def.'s CSMF ¶¶ 24-25. The parties dispute whether the MPD is responsible for organizing and determining the location of Cleanup operations and for documenting activity at Cleanup operations, including by taking "before" and "after" photographs and preparing reports. Pls.' SMF ¶¶ 26-27; Def.'s

CSMF ¶¶ 26-27. The parties agree that DHS coordinates the dissemination of notices of Cleanup operations, provides outreach, "wrap around" services, and shelter placement to homeless persons. Pls.' SMF ¶ 30; Def.'s CSMF ¶ 30.

In addition, the HEAT includes personnel identified as Green Shirts, whose main role is to engage Homeless Persons that are at an encampment during a Cleanup operation, "offer assistance," and go through ostensibly abandoned property to look for personal belongings that should be stored. Tr. of Nov. 9, 2022 Dep. of Lazaro Trueba ("Trueba Dep.") at 124:24-125:6, ECF No. [74-16].

As part of Cleanup operations, the members of the HEAT from Solid Waste operate a street sweeper, combination cranes, front loaders, water trucks and garbage trucks. Pls.' SMF ¶¶ 35, 123; Def.'s CSMF ¶¶ 35, 123. The activities that occur during Cleanup operations include picking up debris, garbage, sweeping the streets, and spraying Homeless encampments with water and disinfectant. *See* Pls.' SMF ¶¶ 35-37; Def.'s CSMF ¶¶ 35-37.

### iii.    Evidence of the City's Policy, Custom or Practice

#### a.  *Notices Prior to Cleanup Operations*

The City has used various forms of notices of Cleanup operations over time. Pls.' SMF ¶ 88; Def.'s CSMF ¶ 88. The first version of the notice was a yellow vinyl with adhesive; the parties dispute whether the ink on the notices, and the notices themselves, can withstand the elements. *See* Pls.' SMF ¶ 89; CSMF ¶ 89. The first version of the notice in the English language states in part as follows:

NOTICE
BE ADVISED THAT THIS AREA WILL BE CLEANED ON
. . .
**PLEASE REMOVE ANY PERSONAL BELONGINGS FROM THE SITE.**

IF YOU WOULD LIKE TO RELOCATE TO EMERGENCY HOUSING,
PLEASE CALL 305.960.4980 (HELP) OR CONTACT THE OUTREACH
WORKERS WHOM [*sic*] WILL BE VISITING THE AREA FREQUENTLY

**THANK YOU**

ECF No. [74-11] at 267. The record supports that the City has posted those yellow vinyl notices on signs, concrete walls, and chain-link fences in the vicinity of homeless encampments, in some cases multiple times. *See* ECF No. [74-11] at 266-278. There are occasions when the City posts a notice of a Cleanup operation for a certain day but does not conduct a Cleanup operation that day. Pls.' SMF ¶ 95; Def.'s CSMF ¶ 95. The City started using a new version of the notice in November 2021. Pls.' SMF ¶ 90; Def.'s CSMF ¶ 90. The City's notices of upcoming Cleanup operations do not provide the address where the City stores property. Pls.' SMF ¶ 92; Def.'s CSMF ¶ 92.

### b. *Contaminated Property*

City personnel use the definition of "Contaminated or Dangerous Items" in the APM when determining whether property is contaminated. Pls.' SMF ¶ 100; Def.'s CSMF ¶ 100. In practice, members of the HEAT may determine if property is contaminated. Pls.' SMF ¶ 102; Def.'s CSMF ¶ 102. The parties dispute whether contaminated property is discarded once it is identified. Pls.' SMF ¶ 105 (citing ECF No. [74-1] at 66:15-18; ECF No. [74-15] at 67:24-5, 69:12-16; ECF No. [74-2], ECF No. [74-2] at 51:22-52:25; Trueba Dep. at 50:5-7, 91:5-7; Rosemond Dep. at 57:23-6; ECF No. [74-6] at 122:4-11; ECF No. [74-17] at 83:23-84:1, 85:21-23, 95:4-13; ECF No. [74-8] at 62:12-16; ECF No. [74-18] at 90:1-15; McLean Dep. at 82:3-12); Def.'s CSMF ¶ 105 (citing ECF No. [74-4] at 115:15-116:1-17; Trueba Dep. at 53:1-5, 62:24-63:2; ECF No. [74-2] at 51:11-54:15; McLean Dep. at 87:6-16; ECF No. [74-8] at 70:17-72:12, 73:11-74:15; Rosemond Dep. at 216:21-217:3, 218:17–219:5; ECF No. [74-17] at 174:1-176:5). However, the testimony by Christian Candalier, a Homeless Outreach Specialist, indicates that

property that contains mold, "has an unknown liquid, human or animal waste", "flammable stuff, detergent, [and] whatever . . . could be . . . considered contaminated", and therefore may be discarded. Tr. of Mar. 24, 2023 Dep. of Christian Candales ("Candales Dep.") at 52:12-19, ECF No. [74-2].

### c.  *Abandoned Property*

Sergio Torres, a Homeless Program Administrator, testified that the determination of whether Homeless Property is abandoned is one based on "common sense." Tr. of Dec. 13, 2022 Dep. of Sergio Torres ("Torres Dep.") at 44:5-19, 45:9-46:20, ECF No. [74-15]. Christian Candalier, a Homeless Outreach Specialist, testified that City personnel look for "clear signs" that property is abandoned. For example, City personnel will ask Homeless Persons in the vicinity of unattended property to whom the property belongs; if Homeless Persons in the vicinity indicate, in sum and substance, that the property has "been [at the location] for days[,] [a]nd nobody has touched it[,]" that is a "clear sign" of abandonment. Candales Dep. at 52:9-25. In addition, if the HEAT observe that unattended property has been at a location for two days, the HEAT will not disturb the property; but if the property is unattended on the third day, that is also "a clear indication that it's abandoned." *Id.* On the other hand, Rosemond testified that even if property "appears to be abandoned," or is unattended "for days," the City's default is not to seize the property. Rosemond Dep. at 218:25-219:2.

In practice, property that is determined to be abandoned may be disposed of. Pls.' SMF ¶ 117; Def.'s CSMF ¶ 117.

### d.  *Storage of Homeless Property*

Green Shirts store property and fill out Inventory Storage Forms. Pls.' SMF ¶ 138; Def.'s CSMF ¶ 138. There are sixty-five (65) Storage Inventory Forms in the record. Pls.' SMF ¶ 145; Def.'s CSMF ¶ 145. Twelve (12) of the completed Storage Inventory Forms are illegible. Pls.'

SMF ¶ 146; Def.'s CSMF ¶ 146. Thirty-six (36) of the Storage Inventory Forms list the location where the property listed on the Forms was found. Pls.' SMF ¶ 147; Def.'s CSMF ¶ 147. The date on which property that is listed on the Forms was stored is missing on twenty (20) of those Forms. Pls.' SMF ¶ 148; Def.'s CSMF ¶ 148. Of the Inventory Storage Forms for which the dates are legible, one Form is from 2018, ten are from 2019, three are from 2021, three are from 2022, and thirteen are from 2023. Pls.' SMF ¶ 149; Def.'s CSMF ¶ 149. The record also contains thirty-seven (37) handwritten notes that list property. Pls.' SMF ¶ 150; Def.'s CSMF ¶ 150. Of those notes, eighteen (18) only list property without identifying information, such as the owner's name, a location in which the property was secured, or a date. Pls.' SMF ¶ 153; Def.'s CSMF ¶ 153. Eight other lists identify only the property and a date. Pls.' SMF ¶ 154; Def.'s CSMF ¶ 154. One of the handwritten notes has only a first name listed on it and no location or date. Pls. SMF ¶ 155; Def.'s CSMF ¶ 155. None of the handwritten notes identifies the City employee who secured the property. Pls.' SMF ¶ 156; Def.'s CSMF ¶ 156.

Items that are wet are not stored. Pls.' SMF ¶ 140; Def.'s CSMF ¶ 140. Officer Leighton McLean testified that there's a limit to the amount of Homeless Persons' property that the City can store. *See* Tr. of June 21, 2023 Dep. of Officer Leighton McLean ("McLean Dep.") at 116:3-9, ECF No. [74-7].

   e. *Disposal of Homeless Property*

Solid Waste collects property to be disposed of at Cleanup operations and afterward takes the property to a county facility. Pls.' SMF ¶ 124; Def.'s CSMF ¶ 124. The parties dispute whether the City notifies Homeless Persons of the property it stores or discards after Cleanup operations. Pls.' SMF ¶ 126; Def.'s CSMF ¶ 126. Rosemond testified that he did not know what steps the City takes to provide notice to an owner of property that his or her property was disposed of. Rosemond Dep. at 68:1-69:3. But Rosemond's testimony also indicates that

property that is unattended, versus abandoned, is not treated as abandoned property. *See id.* at 69:4-70:2. Moreover, the record indicates that the City has stored—as opposed to discarded—unattended Homeless Property; in at least one instance involving a shopping cart that contained several items, the City has posted a notice that states in part: "[t]his shopping cart has been removed from the premises. To claim it[,] please go to 450 SW 5 Street or call at 1 877 994 4357." ECF No. [74-11] at 293.

### f. *Voluntary Disposal of Homeless Property*

The City does not use the Waiver for Voluntary Disposal of Property Form. Pls.' SMF ¶ 159; Def.'s CSMF ¶ 159. The City does not maintain a filing system of a homeless person's written consent to voluntarily dispose of their property that is searchable by that person's name Pls.' SMF ¶ 160; Def.'s CSMF ¶ 160. The Waiver for Voluntary Disposal of Property Forms are not used because "to spend time documenting something to say that we are throwing away garbage seems to be contrary to the objective of this mission, which is to try to get people off the street." Rosemond Dep. at 80:2-25.

### iv. **Evidence of Plaintiffs' Property Loss During Cleanup Operations**

### a. *Cooper-Levy*

Cooper-Levy is a thirty-five (35) year old woman who was homeless until at least July 27, 2023. Pls.' SMF ¶ 40; Def.'s CSMF ¶ 40. The parties dispute whether the City discarded Cooper-Levy's property while she was at work in May 2021. Pls.' SMF ¶ 42; Def.'s CSMF ¶ 42. In May 2021, Cooper-Levy was homeless, residing in an encampment outside a shelter in the vicinity of "Sister Teresa" "off 27 and something" in the Overtown neighborhood. Tr. of July 27, 2023 Dep. of Latoya Yasheen Cooper-Levy ("Cooper-Levy Dep.") at 40:10-41:4, ECF No. [74-5]. Cooper-Levy testified that a homeless man called her on the phone while she was at her place of employment, explaining that the City was "throwing [out] people['s] property [and that [she]

should hurry up and come off where [she's] at and come and get [her] stuff before [the City] . . . disposed [of] it." *Id.* at 54:21-55:12. Cooper-Levy requested of her manager to leave her work to get her property; however, by the time she returned to the vicinity of Sister Teresa, her property "was all gone." *Id.* at 55:12-18. Prior to her property disappearing, Cooper-Levy did not see a notice of the Cleanup operation, but afterward she saw a notice on the ground in the vicinity of the encampment. *Id.* at 81:8-22. Cooper-Levy testified that she had never experienced a Cleanup operation like the one that occurred in May 2021 before. *See* Cooper-Levy Dep. at 63:22-64:17.

Cooper-Levy further testified her missing property included an urn with her mother's ashes, U.S. passport, birth certificate, Social Security card, identification, work uniform, non-slippery shoes, and a tent. Cooper-Levy Dep. at 65:25-70:20. The City did not store an urn with ashes in its storage unit. Pls.' SMF ¶ 49, Def.'s CSMF ¶ 49.

### b. *Simmons*

Simmons is sixty-three (63) years old and has been homeless in Miami for unspecified periods of time for twenty-one (21) years. Pls.' SMF ¶ 50; Def.'s CSMF ¶ 50. Simmons testified that the MPD threw away his property in 2021 that was in the vicinity of "11th Street" when he was living "near 7 and 10" "under the bridge." Tr. of Dep. of Joseph Simmons ("Simmons Dep.") at 17:24-25, 18:15-16. ECF No. [74-13]. The parties dispute whether the City seized Simmons's property on the August 2, 2021 Cleanup operation. Pls.' SMF ¶¶ 51-53; Def.'s CSMF ¶¶ 51-53. Simmons believes that MPD disposed of his property because the individuals who threw away his property had City of Miami badges. *Id.* at 18:22-25. However, Simmons later admitted that he had not seen the MPD throwing away his property. *Id.* at 42:3-7. Rather, a third person told Simmons his property had been discarded. *Id.* at 42:19-23.

Simmons testified his property was not "contaminated" or wet. Pls.' SMF ¶ 56; Def.'s CSMF ¶ 56. He also testified that he kept all his property "together." Simmons Dep. at 51:10-18.

Simmons testified that he is familiar with the City's notices, which are pieces of paper notifying that the City would conduct a Cleanup operation on a particular day. Simmons Dep. at 45:21-25. Simmons recalls seeing twenty (20) notices on the day that his property disappeared but did not see any notices in the week prior to his property's disappearance. *Id.* at 46:23-47:11. Simmons claims the following property was destroyed: one tent, clothes, furniture, medication, glasses, dentures, identification documents, a coin and stamp collection, and jewelry. ECF No. [74-13] at 74. The City did not store Simmons's dentures or his coin and stamp collection in a storage unit. Pls.' SMF ¶¶ 60-61; Def.'s CSMF ¶¶ 60-61. The parties dispute whether the City had discarded Simmons' property "on other occasions." Pls.' SMF ¶ 62; Def.'s CSMF ¶ 62. Simmons' testimony indicates that the August 2, 2021 Cleanup was the first time his property had been discarded. *See* Simmons Dep. at 39:11-43:8.

> ### c. *Rivers*

Rivers is sixty-two (62) years old and homeless. Pls.' SMF ¶ 63; Def.'s CSMF ¶ 64. At the relevant time, Rivers resided in a homeless encampment on "10th Street and 3rd Avenue." Tr. of Dep. of July 11, 2023 Sherman Rivers ("Rivers Dep.") at 7:24-8:7, ECF No. [74-10]. Rivers testified that, on August 2, 2021 at lunchtime, he observed a crane picking up his belongings, including his tent and the contents therein, and putting those belongings in a truck and/or "in the garbage." *Id.* at 40:1-41:3, 48:12-21. However, Rivers testified that his tent was "[m]issing" when he returned to his encampment. *Id.* at 77:12-14. The parties dispute whether Rivers' property was within the area designated by the City for a Cleanup operation on August 2, 2021. Pls.' SMF ¶¶ 65-66; Def.'s CSMF ¶¶ 65-66. Rivers' testimony also indicates that City officials said his belongings were contaminated. Rivers Dep. at 41:4-10. However, Rivers asserted that his property did not stink or have mildew. *Id.* at 117:20-118:3. Rivers testified that he kept his property neat and clean, and cleaned the area around his tent. *Id.* at 105:21-106:7.

The City did not store $60.00 in coins belonging to Rivers in its storage unit. Pls.' SMF ¶ 71; Def.'s CSMF ¶ 71.

### d. *Sylverin*

Sylverin is forty-four (44) years old and was homeless as late as 2021. Pls.' SMF ¶ 74; Def.'s CSMF ¶ 74. Sylverin testified that in 2021 he lived somewhere "between 11th or 10th" by the "Brightline area" near Overtown. Tr. of July 13, 2023 Dep. of Philip Sylverin ("Sylverin Dep.") at 24:22-25:25, ECF No. [74-14]. On August 2, 2021 at 9:00 a.m., an MPD officer woke Sylverin to effectuate a Cleanup operation and instructed him to grab what he could carry. Tr. of July 13, 2023 Dep. of Philip Sylverin ("Sylverin Dep.") at 82:11-14, ECF No. [74-14]. At the time, Sylverin used a wheelchair for mobility. Pls.' SMF ¶ 77; Def.'s CSMF ¶ 77. Sylverin testified that the August 2, 2021 Cleanup was unlike any prior Cleanup operation that he had experienced. Sylverin Dep. at 90:17-91:9; 93:4-25, 98:20-99:1.

Sylverin testified he did not know the City was coming to his encampment to conduct a Cleanup on August 2, 2021. Pls.' SMF ¶ 78; Def.'s CSMF ¶ 78. Sylverin did not see Cleanup notices the week of August 2, 2021. Pls.' SMF ¶ 79; Def.'s CSMF ¶ 79. Sylverin testified that his property was discarded during the August 2, 2021 Cleanup. Sylverin testified that he owned four cats; and that a cat died during a Cleanup operation, though the parties dispute whether the cat belonged to Sylverin. Pls.' SMF ¶ 83; Def.'s CSMF ¶ 83. Sylverin testified that he kept the area around his property clean. Pls.' SMF ¶ 81; Def.'s CSMF ¶ 81. The parties dispute whether the City disposed of Sylverin's mattress, couch, table, and chairs. Pls.' SMF ¶ 121; Def.'s CSMF ¶ 121. Sylverin testified that property was taken from him within the six months prior to July 13, 2023. Pls.' SMF ¶ 84; Def.'s CSMF ¶ 84.

## II.    LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations[.]'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019); *see also Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant." (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990) (citation omitted).

### III.   DISCUSSION

#### A.   Defendant's Motion

The City contends "[t]here are serious doubts regarding the Plaintiffs' averments that a widespread and pervasive custom exists, on whether the incidents were isolated occurrences, and whether a constitutional violation actually transpired." ECF No. [82] at 2 n.2. Nevertheless, the City maintains that summary judgment on all Counts is warranted because the record is devoid of evidence that the City had either a custom or policy of seizing and destroying the property of homeless people. Specifically, the City submits there is no factual dispute that the City Manager was involved with or had knowledge of the Cleanup operation's practices, except to issue the APM. ECF No. [82] at 7. To sustain a finding of the City's liability under Section 1983, the City submits that Plaintiffs must prove that the City was the "moving force" behind the deprivation of Plaintiffs' rights that caused their injuries. *Id.* at 4. The City argues that Plaintiffs cannot do so because they cannot show that a final decisionmaker caused their injuries through repeated acts perpetrated with deliberate indifference to the acts' known and obvious consequences. *Id.* at 3-7.

Plaintiffs respond that there are several other ways for Plaintiffs to establish a municipal government's liability under Section 1983: a municipality may be the "moving force" behind a deprivation of constitutional rights based on (1) an official policy—such as a rule or regulation— that is enacted by its legislative body, (2) the municipality's informal practices (or course of conduct) that are so widespread and pervasive as to carry the force of law, or (3) ratification by a final policymaker of a subordinate's decision or policy statement. *See* ECF No. [106] at 3-4.

More specifically, Plaintiffs first assert that the City's promulgation, via the City Manager, of APM-1-19, and the City's legislative body's enactment of three resolutions in April 2021 and September 2021, are official policies that expose the City to liability for Fourth

Amendment violations. *Id.* at 4-7. Second, Plaintiffs maintain that evidence supports the City has a policy—the APM—and customs that violate the Due Process Clause of the Fourteenth Amendment. *Id.* at 7-11. Plaintiffs further respond that they are not required to show that a final decisionmaker acted with deliberate indifference because that requirement applies only where a plaintiff claims a municipality's failure to train staff or negligently hire them. *Id.* at 11-12. Finally, Plaintiffs state that there are factual disputes that undermine the City's arguments: (1) whether the City has a widespread custom of failing to store property, (2) whether the City posts notices in a manner reasonably calculated to notify homeless individuals that the City will store or dispose of property after a sweep, (3) whether the City provides notice that it has seized property, and (4) whether the City unreasonably discards property it deems to be contaminated or abandoned. *Id.* at 13-14.[5]

The City first replies that Plaintiffs are improperly attempting to amend their Complaint because the Complaint only alleges that the City engaged in practices that violate Section 1983, not that the City's written policies give rise to Section 1983 liability. ECF No. [110] at 4. Second, the City contends that summary judgment should be awarded to the extent Plaintiffs' arguments in its Response are not supported within its Counterstatement of Material Facts because it is procedurally improper for Plaintiffs to rely on their other submissions. *Id.* at 5.

---

[5] Plaintiffs contend that the City has "an officially-adopted policy of permitting a particular constitutional violation" that is "inherent" in the APM and "amplified" by City resolutions, citing *Grech v. Clayton County, Georgia*, 335 F.3d 1326, 1330 (11th Cir. 2003) (*en banc*). ECF No. [106] at 4-5, 8. But *Grech* does not support this contention. *Grech* concerned whether a particular municipal official was a policymaker. *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1330 (11th Cir. 2003). The court found the official was not a policymaker. *Id.* at 1344-48. Plaintiffs identify no legal authority that a municipal policy concerning homeless encampments is *per se* violative of the constitutional rights of the homeless, or that the language of the APM is unlawful. To the contrary, the case law cited in the briefing supports that a City may implement health and safety measures concerning homeless property like those set forth in the APM, including measures to destroy personal property that is contaminated or otherwise poses a health hazard or obvious safety issue to City workers or members of the public. *Peery v. City of Miami*, 977 F.3d 1061, 1070 (11th Cir. 2020). As such, Plaintiffs' argument on this point is conclusory, not meritorious, and unpersuasive.

Third, the City replies to the arguments in Plaintiffs' response *seriatim*. *See generally id.* at 5-16. Relevant to Plaintiffs' argument that the City has a widespread custom that violates Section 1983, the City points out that Plaintiffs' Counterstatement of Material Facts contains no facts, undisputed or otherwise, that describe the City's sweep protocols, the dates of the City's practices, or whether those protocols adhere to or are contrary to the APM. *Id.* at 9. Moreover, the evidence undermines the existence of an unofficial widespread custom because the evidence suggests the City's approach in its sweeps were inconsistent. *Id.* at 10.

Further, the City maintains the deliberate indifference standard applies even in cases where a plaintiff alleges a deliberate action in violation of section 1983. ECF No. [110] at 11-12. The City argues that liability for an official written policy requires a showing that a municipality's legislative body or authorized decisionmaker intentionally deprived a plaintiff of a federal protective right but submits that Plaintiffs have adduced no evidence of such intent. *Id.* at 12. The City adds that Plaintiffs have offered no evidence that the City's written policies have caused their injuries either. *Id.*

### i.     The City's Procedural Arguments

As a preliminary matter, the Court disagrees with the City that Plaintiffs are improperly attempting to amend their Complaint through their Response. In the City's view, Plaintiffs' contention that the City's written policies are the root problem in this action was not "a theory they advanced in their Complaint" and may not be advanced at this stage. ECF No. [110] at 2. However, "under the Federal Rules of Civil Procedure, a complaint need not pin a plaintiff's claim for relief to a precise legal theory." *Gregory v. Quality Removal, Inc.*, No. 14-21480-CIV, 2014 WL 5494448, at *4 (S.D. Fla. Oct. 30, 2014) (quoting *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citing Fed. R. Civ. P. 8(a)(2))). Rather, the issue is whether Plaintiffs' Complaint sufficiently notified the City of a plausible section 1983 claim. The Complaint does so. As the

Court stated in its Order on the City's Motion to Dismiss, the instant action asserts claims under Section 1983 for violations of Plaintiffs' rights under the Fourth Amendment and the Due Process Clause that are predicated, in part, on four separate incidents during which the City discarded their property. *See generally* ECF No. [23]. As such, to the extent Plaintiffs have developed theories of liability based on the discovery in this case, that development is proper. *Gilmour v. Gates, McDonald and Co.*, 382 F.3d at 1312 (11th Cir. 2004), a case on which the City relies, is not to the contrary. There, the court held that a new claim could not be raised in response to a summary judgment motion. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Such is not the case here.

The Court also rejects the City's argument that summary judgment is warranted because Plaintiffs failed to point to record evidence in its Counterstatement of Material facts. On a summary judgment motion, a non-movant must support his or her assertions by citing to particular parts of materials in the record. Fed. R. Civ. P. 56(c)(1). Although Plaintiffs incorporate by reference their own motion, that is not a violation of the SDFL Local Rules, *see generally* S.D. Fla. L.R. 56.1, and this is not a case where the Court had to "scour" the record since the Court was able to review Plaintiffs' Statement of Material Facts for material facts. *Cf. Joseph v. Napolitano*, 839 F. Supp. 2d 1324, 1329 (S.D. Fla. 2012) (explaining that Local Rule 56.1 reflects "a clear policy that it is **not** the court's obligation to scour the record for a factual dispute that precludes summary judgment") (emphasis in original).

Thus, the Court will first address whether action by a final policymaker is necessary to a finding of liability under Section 1983. The Court will then determine whether record evidence supports the existence of a municipal policy or custom. The Court then considers whether the deliberate indifference requirement applies in this case.

ii.      **Municipal Custom or Policy**

To prove a claim under 42 U.S.C. § 1983, a plaintiff must show that he was (1) deprived of a right (2) secured by the Constitution or laws of the United States and (3) that the alleged deprivation was committed under color of state law. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("*Brown*"); *Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001). A plaintiff must also show that (4) the deprivation of his federal right was attributable to the enforcement of a municipal custom or policy. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997).

Importantly, a municipality is not liable under § 1983 based on *respondeat superior*. *See Monell*, 436 U.S. at 691; *Brown*, 520 U.S. 397, 403 (1997) ("a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."). Instead, a municipality is only liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. This requires that "a plaintiff seeking to impose liability on a municipality under § 1983 . . . identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Brown*, 520 U.S. at 403.

Indeed, "the requirement of a municipal policy or custom constitutes an essential element of a § 1983 claim that a plaintiff must prove in order to establish municipal liability." *Buckner*, 116 F.3d at 453; *see Flowers v. Patrick*, 869 F. Supp. 2d 1331, 1334-35 (M.D. Ala. 2012) ("a plaintiff's complaint against a municipality [must] 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" (quoting *Randall v. Scott*, 610 F.3d 701, 707 n.2 (11th Cir. 2010))). A policy or custom "can be either a written custom or policy, such as an ordinance, or an unwritten practice that is so

widespread and 'so permanent and well settled as to constitute a custom or use with the force of law.'" *Flowers*, 869 F. Supp. 2d at 1334-35 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

### a. Final Policymaker

The City's opening memorandum misconstrues the governing law; as Plaintiffs correctly observe and the City concedes in its Reply, the Eleventh Circuit has stated that "not all theories of municipal liability under § 1983 require (or depend on) a single final policymaker." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). For instance, a municipality may be held liable if a plaintiff can show that the municipality's officials acted pursuant to a widespread municipal practice, regardless of a final policymaker's decision. *See Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999) ("an entity can be held monetarily liable only through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers, ***or*** for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking body.") (emphasis added; cleaned up). As such, if the record supports that the City is liable based on one or more of the City's customs, summary judgment is not warranted. *See, e.g.*, *Godby v. Montgomery Cnty. Bd. of Educ.*, 996 F. Supp. 1390, 1407 (M.D. Ala. 1998) (denying summary judgment where evidence supported school board had long-standing and widespread practice violative of § 1983).[6]

---

[6] Plaintiffs contend that the City violated § 1983 for many reasons, including on account of the acts of a decisionmaker. *See generally* ECF No. [106] at 6. As noted, however, Plaintiffs elected to incorporate their arguments and citations to the record from their submissions in support of their Motion. However, unless the Court grants summary judgment on Defendant's Motion, the better approach would be for the Court to consider Plaintiffs' arguments to the extent it is necessary to do so when addressing their Motion, rather than considering those arguments in deciding the Defendant's Motion.

In its Order on Defendant's Motion to Dismiss, the Court found the Complaint adequately alleged that Plaintiffs' rights in their property were deprived due to the City's widespread practice of seizing and destroying personal property without providing adequate notice—whether before or after a seizure—or an opportunity for the owners to recover their property. ECF No. [23] at 10. Those allegations include that the City has a practice that stems from, but is inconsistent with, the APM in several ways. *See* Compl. ¶ 32 ("The City's practice and custom of how it treats the personal property of homeless individuals differs from the written policy outlined in APM-1-19 and PDO 11, Ch. 10."). In making that determination, the Court relied on *Hoefling*, a case where the Eleventh Circuit held a plaintiff, who alleged that his sailboat was unlawfully seized and destroyed, adequately alleged the City had a policy, custom and/or practice of failing to abide by the state laws, regulations, and procedures governing the investigation and removal of derelict vessels located in state waters. *Hoefling*, 811 F.3d at 1280. In support, the plaintiff's complaint alleged a "systematic roundup and destruction of ugly boats in [the City's] waters" as part of a "Cleanup" operation. *Id.* The plaintiff alleged that the "Cleanup" program was inconsistent with "established law and procedures intended to safeguard against the unlawful destruction of private property[.]" *Id. Hoefling* thus held that the plaintiff sufficiently pled municipal liability under a § 1983 claim for procedural due process and Fourth Amendment violations.

In reliance on *Hoefling*, the Court concluded the Complaint adequately stated a claim for relief. As the Court explained,

> Plaintiffs here allege four instances on two separate occasions during which the City seized and destroyed their personal property without providing adequate notice or an opportunity for the owners to recover their property . . . . [t]he specific sweeps alleged are separated in time by several months . . . and occurred at different geographical locations.

ECF No. [23] at 10. In the City's Motion, the City does not genuinely dispute that Plaintiffs have a property interest in their discarded property—at least not with argument supported by legal authorities. *See* ECF No. [82] at 2 n.2. In line with *Hoefling*, to the extent there are factual disputes concerning the four instances alleged in the Complaint, and the existence of a custom relating to those instances, summary judgment is not warranted in this case. For that reason, the Court turns to the record to determine whether there are genuine and material factual disputes.

### b. *The City's Custom*

As the following demonstrates, the record evidence indeed raises a factual dispute as to whether the City has a practice for handling Homeless Property, particularly a practice of discarding property that Homeless Persons do not voluntarily part with, either by unreasonably categorizing the property either as contaminated or abandoned, or by failing to take steps to ensure that Homeless Property that the City stores can be returned to Homeless Persons. In Plaintiffs' framing, the record shows that the City "unreasonably disposes of property it deems to be 'contaminated' or abandoned." ECF No. [106] at 14.

As described in the material facts, the APM requires City personnel to place notices of Cleanup operations prior to the date on which the Cleanup operation will occur, with at least 72 hours of notice. Pls.' SMF ¶¶ 9, 86; Def.'s CSMF ¶¶ 9, 86. According to the APM, the HEAT arrives at a homeless encampment that is designated for a Cleanup operation, requests that Homeless Persons there relocate their property, offers to voluntarily discard their unwanted property, and—for those individuals who elected to part with property—requires them to sign a Voluntary Disposal of Property Form prior to disposing the property. ECF No. [74-2] at 199. For any Homeless Property that the owner cannot move and that cannot be left on the site, City personnel must document, secure, and store the property for a period of ninety days, after which

unclaimed property will be disposed of. *Id.* City personnel must request that the Homeless Person sign an Inventory Storage Form. *Id.*

Where Homeless Property is unattended, the APM provides that City personnel must collect that property, including personal items, inventory the property on an Inventory Storage Form, and store the property for a ninety-day period, after which the City may discard the Homeless Property. *Id.* When the City stores unattended property, the APM requires that the City complete an Inventory Storage Form and hold the property for ninety days. ECF No. [74-1] at 199.

Turning specifically to the evidence of the City's Cleanup operations, the record shows the HEAT has posted yellow vinyl notices near homeless encampment sites, though the record is not clear as to when those notices were posted. *See* ECF No. [74-11] at 266-278. Moreover, the parties dispute the effectiveness of those notices. The Court's review indicates that, at least in some instances, multiple vinyl yellow notices were posted over each other, which indicates that Cleanup operations occur in some areas with such frequency that it may not be evident when the next Cleanup operation will occur. In any event, Cooper-Levy testified she did not see a notice of a Cleanup operation on the day she claims she lost her personal items—including an urn with her mother's ashes—in the vicinity of Sister Theresa in Overtown; however, she noticed notices of a Cleanup operation on the ground after she lost her property. Cooper-Levy Dep. at 81:8-22. Similarly, Simmons testified that he saw twenty (20) notices on the day his property disappeared but not in the week prior to his property's disappearance. Simmons Dep. at 46:23-47:11. Likewise, Sylverin testified that he did not see Cleanup notices the week of August 2, 2021. Pls.' SMF ¶ 79; Def.'s CSMF ¶ 79.

When the City stores Homeless Property, the evidence indicates that the City completes Inventory Storage Forms and there exist sixty-five (65) Storage Inventory Forms, and thirty-seven (37) handwritten notes with lists of property. Pls.' 145; Def.'s ¶ 145. However, many of those Forms and notes are illegible, incomplete, and do not provide sufficient information to connect inventoried property to their owner. Pls.' SMF ¶¶ 146-56; Def.'s CSMF ¶¶ 146-56.

The parties dispute whether the HEAT discards Homeless Property that the HEAT identifies as Contaminated or Dangerous items during Cleanup operations, but the record indicates that such items are discarded, at least in certain instances. Pls.' SMF ¶ 105; Def.'s CSMF ¶ 105; Candales Dep. at 52:12-19. For example, River's testimony indicates that the City has at least in one instance discarded property which belonged to Rivers, on the grounds the property was contaminated. Rivers Dep. at 41:4-10. However, Rivers testified his property did not stink, did not have mildew, he kept his property neat and clean, and he cleaned the area around his tent. *Id.* at 105:21-106:7. Similarly, the record does not support that the property belonging to any other Plaintiff was contaminated. *E.g.*, Simmons Dep. at 50:8-19 (testifying that his property was not contaminated or wet).

The parties also dispute the circumstances under which the City would identify Homeless Property as abandoned property. According to Candales, the City looks for "clear signs of abandonment" before considering Homeless Property abandoned. Candales Dep. at 52:9-25. However, Candales's testimony indicates that the City considers abandoned any Homeless Property (1) that is unattended, (2) for which no homeless persons in its vicinity can identify the location of the owner, and (3) where the property has been observably unattended for three days. *Id.* at 52:9-25. Moreover, Rosemond's testimony indicates that the City's default is not to disturb ostensibly abandoned property. Rosemond Dep. at 218:25-219:2. However, when considering

Case No. 22-cv-21939-BLOOM/Torres

the provisions of the APM, such unattended property cannot be undisturbed without impeding the cleaning of a homeless encampment during a Cleanup operation. That means either the City does not follow the APM in this respect or Rosemond's testimony is incorrect.

Moreover, Plaintiffs' testimony indicates that the City has discarded Homeless Property that its owners had not abandoned. For instance, a homeless man called Cooper-Levy on May 2021 while she was at work to let her know the City was discarding homeless persons' property and advised her to "come and get [her] stuff" at the encampment because the City was "throwing [out] people['s] property[.]" Cooper-Levy Dep. at 54:21-55:12. That testimony supports that Cooper-Levy had not intended to abandon her property, and her property did not exhibit "clear signs" of abandonment. Likewise, although the parties dispute whether Rivers' property was located at the Cleanup location, Rivers testified he observed a crane picking up and throwing his tent, with the property that was contained therein, into a garbage truck during his lunch break from work on August 2, 2021. Rivers Dep. at 40:1-41:3, 48:12-21. Moreover, Simmons testified he observed City personnel throwing away his property in 2021 in the vicinity of "11th Street", though his testimony appears to be inconsistent on this point and indicates that he heard from a third party that MPD officers threw away his property. *See* Simmons Dep. 18:22-25, 42:3-7, 42:19-23. The HEAT discarded his property even though he kept all his property "together", indicating that it was not abandoned. *Id.* at 45:21-25. Moreover, Sylverin testified that his property was discarded *while he was present* at a Cleanup on August 2, 2021 while living somewhere "between 11th and 10th", and that he kept the area around his property clean. *See* Sylverin Dep. at 24:22-25, 63:22-25, 63:1-3, 80:11-25, 81:1-6, 97:12-18; Pls.' SMF ¶ 121; Def.'s CSMF ¶ 121.

Further, the parties dispute whether the City provides notice to Homeless Persons when it stores or discards Homeless Property. Pls.' SMF ¶ 126; Def.'s CSMF ¶ 126.

In the light most favorable to Plaintiffs, those facts support that the City has a practice of discarding Homeless Property that is not contaminated, dangerous to public health and safety, or abandoned. Those facts also support that the City stores Homeless Property that eventually becomes discarded because the City's Inventory Storage Forms fail to provide sufficient information to allow the City or Homeless Persons to retrieve stored property. The objective of that practice is to "try to get people off the street." Rosemond Dep. at 80:2-25.

The above-described practice is inconsistent with or extrinsic to the APM in that the practice entails discarding items that are not contaminated, dangerous to public health or safety, or abandoned; and inadequately notifying Homeless Persons of the City's storage of Homeless Property and inventorying that property for the purposes of retrieval. As the Court pointed out in its Order on the City's Motion to Dismiss, this practice is sufficiently pervasive and widespread as the City discarded Homeless Property not abandoned or contaminated during different periods and occurring at different geographical locations. ECF No. [23] at 10. Although those circumstances may indicate the incidents are isolated, those circumstances also point to a widespread practice under the summary judgment standard. The Court's conclusion is bolstered by the fact that none of the City's personnel have been warned or disciplined for violating the APM, even though the incidents involving Plaintiffs support that Cleanup operations have been conducted at variance with the APM's provisions, suggesting that the practice is entrenched and tolerated. Pls.' SMF ¶ 130; Def.'s CSMF ¶ 130.

### c. *Plaintiffs' Injuries*

The facts further support that the City discarded Plaintiffs' property pursuant to the City's property discarding practice causing injury. The record does not indicate that Plaintiffs' property

was stolen by others or lost on their own account. Rather, as described above, each Plaintiff has testified that the City disposed of his or her property. Moreover, each Plaintiff has testified that he or she no longer has possession of certain property. Cooper-Levy lost her tent, various forms of identification, clothes, and an urn with her mother's ashes. Cooper-Levy Dep. at 65:25-70:20. Simmons lost a tent, clothes, furniture, personal items, including jewelry and a coin stamp collection. ECF No. [74-13] at 74. Rivers lost his tent and a $60.00 coin collection. Rivers Dep. at 40:1-41:3, 48:12-21; Pls.' SMF ¶ 71; Def.'s CSMF ¶ 71. Finally, the evidence supports that Sylverin lost furniture and his pet cats. Pls.' SMF ¶¶ 83, 121; Def.'s CSMF ¶¶ 83, 121.

The foregoing disputes are relevant to the proof of each element of a Section 1983 claim. Thus, summary judgment is not warranted unless Plaintiffs are required to make a showing that the City acted with deliberate indifference. The Court next turns to that issue.

### iii.    Deliberate Indifference

As another threshold matter, the Court disagrees with Plaintiffs that the deliberate indifference standard is only applicable to negligent hiring or failure to train employees claims. The Supreme Court has spoken on this issue: "a plaintiff seeking to establish municipal liability on the theory that a facially *lawful* municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407 (emphasis added). Where a plaintiff alleges that the deprivation of his or her federal right is attributable to a facially lawful municipal action, that plaintiff must meet the stringent "deliberate indifference" standard. Otherwise, a section 1983 action would impermissibly subject a municipal government to liability on showing of mere negligence. For that reason, Plaintiffs' reliance on *Brown* and *Connick v. Thompson*, 563 U.S. 51 (2011) is misplaced. Those cases, although concerning the

hiring and training of municipal employees, respectively, are not by their own terms limited to those situations.

However, the Court also disagrees with the City that a showing of deliberate indifference is required in every circumstance. Where the municipal action *itself* violates federal law, questions of fault and causation are straightforward. *Brown*, 520 U.S. at 404. As *Brown* states, "the conclusion that *the action taken or directed by the municipality* or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.* at 405 (emphasis added). Because the action taken by the municipality here is the practice of taking and destroying property that is not abandoned, contaminated, or dangerous, without notice or an opportunity to be heard, the City has not met its burden on summary judgment.

Accordingly, the City's Motion is due to be denied.

**B.  Plaintiffs' Motion**

In their Motion, Plaintiffs raise three interrelated arguments to support partial summary judgment. First, Plaintiffs contend that the City violated Plaintiffs' constitutional rights through the APM and through the City personnel's implementation of the policy in practice during Cleanup operations. ECF No. [79] at 4. Specifically, Plaintiffs maintain there is no genuine dispute as to whether the City deprived Plaintiffs of their property during a Cleanup operation, or that the City was following a custom or practice in depriving Plaintiffs of their property rights. *Id.* at 6. Second, Plaintiffs argue that the deprivation of their property was a violation of the Fourth Amendment. *Id.* at 9-10. Third, Plaintiffs contend that the deprivation was also violative of procedural due process. *Id.* at 10-23. On those grounds, Plaintiffs assert they are entitled to declaratory and injunctive relief. *Id.* at 23-26.

i.       The Existence of a Municipal Policy or Custom, and Causation

As another preliminary matter, the Court notes that Plaintiffs argue in their Response to the City's Motion that "there are additional facts which are in dispute which could allow a reasonable juror to determine that the City's unconstitutional custom and practice caused Plaintiffs to lose their property." ECF No. [106] at 13. In particular, Plaintiffs contend there is a dispute as to whether the City has a widespread custom of failing to store property. *Id.* at 13. Plaintiffs also contend it is disputed whether the City provides reasonable notice of when it intends to conduct a Cleanup operation and when it disposes of property. *Id.* Plaintiffs also state that "[i]t remains disputed whether the City unreasonably disposes of property it deems to be 'contaminated' or abandoned." *Id.* at 14.

Plaintiffs argue at cross purposes in their Motion and their Response. Recognizing that tension, Plaintiffs submit that "[t]he Court does not need to resolve [the disputes identified in their Response] if the Court agrees with the arguments put forth in" Plaintiffs' Motion. *Id.* However, those factual disputes are central to a determination of whether Plaintiffs can meet their burden to demonstrate the City's liability. As Plaintiffs recognize, a plaintiff must establish that he or she suffered a constitutional violation caused by an official municipal policy or custom. *See Monell*, 436 U.S. at 690; *see also McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) ("It is only when the 'execution of the government's policy or custom . . . inflects the injury' that the municipality may be held liable." (citing *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989))).

Accordingly, for Plaintiffs to be entitled to summary judgment on the City's liability, the undisputed factual record must demonstrate that Plaintiffs suffered a constitutional violation that is attributable to a municipal policy or custom. However, as the Court set forth in reciting the

material facts in this case and in its discussion regarding the City's Motion, the record demonstrates the presence of genuine and material factual disputes.

First, there is a dispute as to whether Plaintiffs received adequate notice regarding the Cleanup operations. For example, the parties dispute whether the City notifies Homeless Persons of the property it stores or discards after Cleanup operations. Pls.' SMF ¶ 124; Def.'s CSMF ¶ 124. That dispute is material because it applies to whether Plaintiffs were deprived of procedural due process. Although the record indicates that, in at least one instance, the City provided notice that it stored a Homeless Person's shopping cart, that scintilla of evidence does not establish that the City has a practice of doing so in every instance. *See* ECF No. [74-11] at 293. There is also a question about whether the notice the City provides to Homeless Persons is adequate. *See, e.g.*, Cooper-Levy Dep. at 81:8-22 (describing how notices of Cleanup operation were on the ground after the May 2021 Cleanup operation).

Second, there are factual disputes concerning whether the deprivation of Plaintiffs' property was pursuant to a municipal policy or custom. As to Simmons's property, there is a dispute as to whether his property was taken by City officials during Cleanup operations. Pls.' SMF ¶¶ 51-53; Def.'s CSMF ¶¶ 51-53. That dispute is material because the taking of his property during that Cleanup operation is necessary to establish that it was pursuant to an alleged City custom. If City officials took Simmons's property outside of a Cleanup operation, then Simmons cannot argue the City's taking was pursuant to one of the City's customs. Stated another way, the dispute as to whether Simmon's property was taken during a Cleanup operation substantiates a reasonable inference that the loss of his property may have been attributable to an isolated occurrence. Similarly, as to Rivers's property, there is a dispute as to whether that

property was taken during the August 2, 2021 Cleanup operation. Pls.' SMF ¶¶ 65-66; Def.'s CSMF ¶¶ 65-66.

Third, there are factual disputes concerning the existence of a municipal custom or policy. There is a dispute whether the City disposes of abandoned property and a dispute on whether the City discards contaminated property. Rosemond Dep. at 218:25-219:2. Pls.' SMF ¶ 105; Def.'s CSMF ¶ 105. It is also disputed whether the City disposes of Homeless Property once stored. *See* McLean Dep. at 116:3-9 (testifying that there is a limit to the amount of Homeless Persons' property that the City can store).

Importantly, there is evidence that calls into question whether the May 2021 and August 2, 2021 Cleanups were implemented pursuant to a municipal policy or custom. For example, Cooper-Levy and Rivers testified that they had never experienced a Cleanup like the ones at issue, indicating that those Cleanups were unusual or outside the norm for the City's Cleanup operations; i.e., the incidents that gave rise to this action are isolated occurrences. *See* Cooper-Levy Dep. at 63:22-64:17; Sylverin Dep. at 90:17-91:9; 93:4-25, 98:20-99:1.

The Court's review of the record does not support that Plaintiffs' property was abandoned or contaminated, and the City does not contend that property was abandoned or contaminated. Nevertheless, given the other factual disputes that exist, summary judgment is improper as to the City's Section 1983 liability.

### ii.      Declaratory and Injunctive Relief

Because there are factual disputes concerning the City's Section 1983 liability, it is premature for the Court to consider Plaintiffs' arguments concerning equitable relief.

### iii.      Request for a Hearing

Because the Court has been able to adjudicate Plaintiffs' Motion without the benefit of a hearing, Plaintiffs' request for a hearing is not necessary.

IV.      **CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   The City's Motion for Summary Judgment, **ECF No. [82]**, is **DENIED**.

2.   Plaintiffs' Motion for Partial Summary Judgment, **ECF No. [79]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on December 11, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record